# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

KALEY CHILES,

*Plaintiff-Appellant/Cross-Appellee,*

v.

PATTY SALAZAR, in her official capacity as Executive Director of the Department of Regulatory Agencies, et al.,

*Defendants-Appellees/Cross-Appellants.*

On Appeal from the United States District Court
for the District of Colorado
Case No. 1:22-CV-02287
Honorable Charlotte N. Sweeney

## APPENDIX OF APPELLANT/CROSS-APPELLEE

BARRY K. ARRINGTON
ARRINGTON LAW FIRM
4195 Wadsworth Blvd.
Wheat Ridge, CO 80033
(303) 205-7870
barry@arringtonpc.com

SHAUN PEARMAN
PEARMAN LAW FIRM
4195 Wadsworth Blvd.
Wheat Ridge, CO 80033
(720) 343-8534
shaun@pearmanlawfirm.com

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

CODY S. BARNETT
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
cbarnett@ADFlegal.org

*Attorneys for Plaintiffs-Appellants*

## APPENDIX TABLE OF CONTENTS

| ECF No. | Document Description | Page No. |
|---|---|---|
|  | District Court docket entries | App.1 |
| 1 | Verified Complaint | App.13 |
| 55 | Order denying Plaintiff's motion for preliminary injunction | App.59 |
| 56 | Plaintiff's Notice of Appeal | App.91 |
| 65 | Defendants' Notice of Cross-Appeal | App.93 |

**Query     Reports     Utilities     Help     Log Out**

APPEAL,JD4,NDISPO

# U.S. District Court - District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:22-cv-02287-CNS-STV

Chiles v. Salazar et al
Assigned to: Judge Charlotte N. Sweeney
Referred to: Magistrate Judge Scott T. Varholak
Case in other court: U.S. Court of Appeals, 10th
                           Cir., 22-01445
                           U.S. Court of Appeals, 10th
                           Cir., 23-01002
Cause: 42:1983 Civil Rights Act

Date Filed: 09/05/2022
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 09/05/2022 | 1 | COMPLAINT against All Defendants (Filing fee $ 402,Receipt Number ACODC-8640599)Attorney Barry Kevin Arrington added to party Kaley Chiles(pty:pla), filed by Kaley Chiles. (Arrington, Barry) (Entered: 09/05/2022) |
| 09/05/2022 | 2 | SUMMONS REQUEST as to Patty Salazar by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 09/05/2022) |
| 09/05/2022 | 3 | SUMMONS REQUEST as to Reina Sbarbaro-Gordon by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 09/05/2022) |
| 09/05/2022 | 4 | SUMMONS REQUEST as to Jennifer Luttman by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 09/05/2022) |
| 09/05/2022 | 5 | SUMMONS REQUEST as to Amy Skinner by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 09/05/2022) |
| 09/05/2022 | 6 | SUMMONS REQUEST as to Karen Van Zuiden by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 09/05/2022) |

| 09/05/2022 | 7 | SUMMONS REQUEST as to Karykay Jimenez by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 09/05/2022) |
|---|---|---|
| 09/05/2022 | 8 | SUMMONS REQUEST as to Kalli Likness by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 09/05/2022) |
| 09/05/2022 | 9 | SUMMONS REQUEST as to Sue Noffsinger by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 09/05/2022) |
| 09/05/2022 | 10 | SUMMONS REQUEST as to Richard Glover by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 09/05/2022) |
| 09/05/2022 | 11 | SUMMONS REQUEST as to Erika Hoy by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 09/05/2022) |
| 09/05/2022 | 12 | SUMMONS REQUEST as to Kristina Daniel by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 09/05/2022) |
| 09/05/2022 | 13 | SUMMONS REQUEST as to Halcyon Driskell by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 09/05/2022) |
| 09/05/2022 | 14 | SUMMONS REQUEST as to Crystal Kisselburgh by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 09/05/2022) |
| 09/05/2022 | 15 | SUMMONS REQUEST as to Anjali Jones by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 09/05/2022) |
| 09/05/2022 | 16 | SUMMONS REQUEST as to Theresa Lopez by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 09/05/2022) |
| 09/05/2022 | 17 | SUMMONS REQUEST as to Jonathan Culwell by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 09/05/2022) |
| 09/06/2022 | 18 | Case assigned to Magistrate Judge Maritza Dominguez Braswell Text Only Entry (norlin, ) (Entered: 09/06/2022) |
| 09/06/2022 | 19 | SUMMONS issued by Clerk. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons, # 11 Summons, # 12 Summons, # 13 Summons, # 14 Summons, # 15 Summons, # 16 Magistrate Judge Consent Form) (norlin, ) (Entered: 09/06/2022) |

| 09/07/2022 | [20](#) | SUMMONS REQUEST as to Anjali Jones by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 09/07/2022) |
|---|---|---|
| 09/08/2022 | [21](#) | SUMMONS issued by Clerk. (csarr, ) (Entered: 09/08/2022) |
| 09/13/2022 | [22](#) | NOTICE of Entry of Appearance by Janna K. Fischer on behalf of Jonathan Culwell, Kristina Daniel, Halcyon Driskell, Richard Glover, Erika Hoy, Marykay Jimenez, Anjali Jones, Crystal Kisselburgh, Kalli Likness, Theresa Lopez, Jennifer Luttman, Sue Noffsinger, Patty Salazar, Reina Sbarbaro-Gordon, Amy Skinner, Karen Van ZuidenAttorney Janna K. Fischer added to party Jonathan Culwell(pty:dft), Attorney Janna K. Fischer added to party Kristina Daniel(pty:dft), Attorney Janna K. Fischer added to party Halcyon Driskell(pty:dft), Attorney Janna K. Fischer added to party Richard Glover(pty:dft), Attorney Janna K. Fischer added to party Erika Hoy(pty:dft), Attorney Janna K. Fischer added to party Marykay Jimenez(pty:dft), Attorney Janna K. Fischer added to party Anjali Jones(pty:dft), Attorney Janna K. Fischer added to party Crystal Kisselburgh(pty:dft), Attorney Janna K. Fischer added to party Kalli Likness(pty:dft), Attorney Janna K. Fischer added to party Theresa Lopez(pty:dft), Attorney Janna K. Fischer added to party Jennifer Luttman(pty:dft), Attorney Janna K. Fischer added to party Sue Noffsinger(pty:dft), Attorney Janna K. Fischer added to party Patty Salazar(pty:dft), Attorney Janna K. Fischer added to party Reina Sbarbaro-Gordon(pty:dft), Attorney Janna K. Fischer added to party Amy Skinner(pty:dft), Attorney Janna K. Fischer added to party Karen Van Zuiden(pty:dft) (Fischer, Janna) (Entered: 09/13/2022) |
| 09/14/2022 | [23](#) | ORDER OF RECUSAL by Magistrate Judge Maritza Dominguez Braswell on September 14, 2022. Accordingly, it is ORDERED that I RECUSE myself from this case, pursuant to 28 U.S.C. § 455(a). It is further ORDERED that the Clerk of Court shall cause this case to be reassigned to another Magistrate Judge. (csarr, ) (Entered: 09/14/2022) |
| 09/14/2022 | 24 | REASSIGNING MAGISTRATE JUDGE pursuant to [23](#) Order of Recusal. Case randomly drawn to Magistrate Judge Scott T. |

| | | |
|---|---|---|
| | | Varholak. All future pleadings should be designated as 22-cv-02287-STV.(Text Only Entry) (csarr, ) (Entered: 09/14/2022) |
| 09/15/2022 | 25 | ORDER SETTING DEADLINE FOR FILING ELECTION CONCERNING CONSENT/NON-CONSENT TO MAGISTRATE JURISDICTION FORM AND SETTING SCHEDULING CONFERENCE by Magistrate Judge Scott T. Varholak on 15 September 2022. Consent Form due by 11/3/2022. Proposed Scheduling Order due 11/10/2022. Scheduling Conference set for 11/17/2022 09:00 AM in Courtroom A 402 before Magistrate Judge Scott T. Varholak. (cmadr, ) (Entered: 09/15/2022) |
| 09/15/2022 | 26 | NOTICE of Entry of Appearance *for Plaintiff Kaley Chiles* by Shaun Pearman on behalf of All Plaintiffs Attorney Shaun Pearman added to party Kaley Chiles(pty:pla) (Pearman, Shaun) (Entered: 09/15/2022) |
| 09/16/2022 | 27 | NOTICE of Entry of Appearance by Abby Lynn Chestnut on behalf of All Defendants Attorney Abby Lynn Chestnut added to party Jonathan Culwell(pty:dft), Attorney Abby Lynn Chestnut added to party Kristina Daniel(pty:dft), Attorney Abby Lynn Chestnut added to party Halcyon Driskell(pty:dft), Attorney Abby Lynn Chestnut added to party Richard Glover(pty:dft), Attorney Abby Lynn Chestnut added to party Erika Hoy(pty:dft), Attorney Abby Lynn Chestnut added to party Marykay Jimenez(pty:dft), Attorney Abby Lynn Chestnut added to party Anjali Jones(pty:dft), Attorney Abby Lynn Chestnut added to party Crystal Kisselburgh(pty:dft), Attorney Abby Lynn Chestnut added to party Kalli Likness(pty:dft), Attorney Abby Lynn Chestnut added to party Theresa Lopez(pty:dft), Attorney Abby Lynn Chestnut added to party Jennifer Luttman(pty:dft), Attorney Abby Lynn Chestnut added to party Sue Noffsinger(pty:dft), Attorney Abby Lynn Chestnut added to party Patty Salazar(pty:dft), Attorney Abby Lynn Chestnut added to party Reina Sbarbaro-Gordon(pty:dft), Attorney Abby Lynn Chestnut added to party Amy Skinner(pty:dft), Attorney Abby Lynn Chestnut added to party Karen Van Zuiden(pty:dft) (Chestnut, Abby) (Entered: 09/16/2022) |

| 09/21/2022 | [28](#) | ENTRY OF APPEARANCE by Defendants Jonathan Culwell, Kristina Daniel, Halcyon Driskell, Richard Glover, Erika Hoy, Marykay Jimenez, Anjali Jones, Crystal Kisselburgh, Kalli Likness, Theresa Lopez, Jennifer Luttman, Sue Noffsinger, Patty Salazar, Reina Sbarbaro-Gordon, Amy Skinner, Karen Van Zuiden. (Finke, Robert) Modified to correct document title and to reflect this is NOT a motion, pursuant to STV Chambers on 9/22/2022 (cmadr, ). (Entered: 09/21/2022) |
|---|---|---|
| 09/22/2022 | [29](#) | MOTION for Preliminary Injunction by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 09/22/2022) |
| 09/23/2022 | 30 | MINUTE ORDER In light of the filing of [29](#) Plaintiffs Motion for Preliminary Injunction, the Clerk of Court is directed to reassign this matter to a District Judge. See D.C.COLO.LCivR 40.1(c)(2)(a). SO ORDERED, by Magistrate Judge Scott T. Varholak on 9/23/2022. Text Only Entry (stvlc4, ) (Entered: 09/23/2022) |
| 09/23/2022 | 31 | CASE REASSIGNED pursuant to 30 Minute Order. Pursuant to Order or Memorandum. This case is randomly reassigned to Judge Robert E. Blackburn and drawn to Magistrate Judge Scott T. Varholak. All future pleadings should be designated as 22-cv-02287-REB. (Text Only Entry) (cmadr, ) (Entered: 09/23/2022) |
| 09/23/2022 | [32](#) | MEMORANDUM RETURNING CASE by Senior Judge Blackburn. This case is randomly reassigned to Judge Charlotte N. Sweeney and drawn to Magistrate Judge Scott T. Varholak. All future pleadings should be designated as 22-cv-02287-CNS. (athom, ) (Entered: 09/23/2022) |
| 09/26/2022 | 33 | ORDER REFERRING CASE to Magistrate Judge Scott T. Varholak for **non-dispositive matters**. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of Local Civ. R. 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order |

App.005

|  |  | upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non-dispositive motions, (4) pursuant to Local Civ. R. 16.6 and at the discretion of the Magistrate Judge, convene such early neutral evaluation and/or settlement conferences and direct related procedures as may facilitate resolution of this case without the necessity of a motion or prior authorization of the undersigned. By Judge Charlotte N. Sweeney on 9/26/2022. Text Only Entry (cnssec. ) (Entered: 09/26/2022) |
|---|---|---|
| 09/29/2022 | 34 | MOTION to Intervene by Intervenor Defendant One Colorado, Ltd.. (Attachments: # 1 Bridges Declaration)(Finger, Craig) (Entered: 09/29/2022) |
| 09/30/2022 | 35 | NOTICE of Entry of Appearance by Asaf Orr on behalf of One Colorado, Ltd.Attorney Asaf Orr added to party One Colorado, Ltd.(pty:intvd) (Orr, Asaf) (Entered: 09/30/2022) |
| 09/30/2022 | 36 | NOTICE of Entry of Appearance by Christopher F. Stoll on behalf of One Colorado, Ltd.Attorney Christopher F. Stoll added to party One Colorado, Ltd.(pty:intvd) (Stoll, Christopher) (Entered: 09/30/2022) |
| 10/10/2022 | 37 | Unopposed MOTION for Extension of Time to by Defendants Jonathan Culwell, Kristina Daniel, Halcyon Driskell, Richard Glover, Erika Hoy, Marykay Jimenez, Anjali Jones, Crystal Kisselburgh, Kalli Likness, Theresa Lopez, Jennifer Luttman, Sue Noffsinger, Patty Salazar, Reina Sbarbaro-Gordon, Amy Skinner, Karen Van Zuiden. (Attachments: # 1 Proposed Order (PDF Only) [Proposed] Order Granting Unopposed Motion for Extension of Time)(Fischer, Janna) (Entered: 10/10/2022) |
| 10/13/2022 | 38 | ORDER granting 37 Unopposed MOTION for Extension of Time. The Defendants' response to the Plaintiff's Motion for Preliminary Injunction 29 is now due on or before 11/3/2022. By Judge Charlotte N. Sweeney on 10/13/2022. Text Only Entry(cnssec. ) (Entered: 10/13/2022) |
| 10/14/2022 | 39 | NOTICE of Entry of Appearance by Brianna Susan Tancher on behalf of All Defendants Attorney Brianna Susan Tancher added to party Jonathan Culwell(pty:dft), Attorney Brianna Susan |

| | | |
|---|---|---|
| | | Tancher added to party Kristina Daniel(pty:dft), Attorney Brianna Susan Tancher added to party Halcyon Driskell(pty:dft), Attorney Brianna Susan Tancher added to party Richard Glover(pty:dft), Attorney Brianna Susan Tancher added to party Erika Hoy(pty:dft), Attorney Brianna Susan Tancher added to party Marykay Jimenez(pty:dft), Attorney Brianna Susan Tancher added to party Anjali Jones(pty:dft), Attorney Brianna Susan Tancher added to party Crystal Kisselburgh(pty:dft), Attorney Brianna Susan Tancher added to party Kalli Likness(pty:dft), Attorney Brianna Susan Tancher added to party Theresa Lopez(pty:dft), Attorney Brianna Susan Tancher added to party Jennifer Luttman(pty:dft), Attorney Brianna Susan Tancher added to party Sue Noffsinger(pty:dft), Attorney Brianna Susan Tancher added to party Patty Salazar(pty:dft), Attorney Brianna Susan Tancher added to party Reina Sbarbaro-Gordon(pty:dft), Attorney Brianna Susan Tancher added to party Amy Skinner(pty:dft), Attorney Brianna Susan Tancher added to party Karen Van Zuiden(pty:dft) (Tancher, Brianna) (Entered: 10/14/2022) |
| 10/19/2022 | 40 | RESPONSE to 34 MOTION to Intervene filed by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 10/19/2022) |
| 10/28/2022 | 41 | REPLY to Response to 34 MOTION to Intervene filed by Intervenor Defendant One Colorado, Ltd.. (Finger, Craig) (Entered: 10/28/2022) |
| 11/02/2022 | 42 | CONSENT to Jurisdiction of Magistrate Judge by Plaintiff Kaley Chiles All parties do not consent.. (Arrington, Barry) (Entered: 11/02/2022) |
| 11/02/2022 | 43 | Proposed Scheduling Order by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 11/02/2022) |
| 11/03/2022 | 44 | RESPONSE to 29 MOTION for Preliminary Injunction filed by Intervenor Defendant One Colorado, Ltd.. (Attachments: # 1 Appendix A-Official Policy Position Statement)(Finger, Craig) (Entered: 11/03/2022) |
| 11/03/2022 | 45 | RESPONSE to 29 MOTION for Preliminary Injunction filed by Defendants Jonathan Culwell, Kristina Daniel, Halcyon |

| | | |
|---|---|---|
| | | Driskell, Richard Glover, Erika Hoy, Marykay Jimenez, Anjali Jones, Crystal Kisselburgh, Kalli Likness, Theresa Lopez, Jennifer Luttman, Sue Noffsinger, Patty Salazar, Reina Sbarbaro-Gordon, Amy Skinner, Karen Van Zuiden. (Attachments: # 1 Declaration of Judith M. Glassgold, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Tancher, Brianna) (Entered: 11/03/2022) |
| 11/07/2022 | 46 | Unopposed MOTION for Extension of Time to *File Reply in Support of Motion for Preliminary Injunction* by Plaintiff Kaley Chiles. (Attachments: # 1 Proposed Order (PDF Only)) (Arrington, Barry) (Entered: 11/07/2022) |
| 11/07/2022 | 47 | ORDER granting 46 Unopposed MOTION for Extension of Time to File Reply in Support of Motion for Preliminary Injunction. The reply is now due by 12/1/2022. By Judge Charlotte N. Sweeney on 11/7/2022. Text Only Entry(cnssec. ) (Entered: 11/07/2022) |
| 11/10/2022 | 48 | MINUTE ORDER This Matter is before the Court sua sponte. The Scheduling Conference set in this matter for 11/17/2022 is VACATED. The parties shall contact Magistrate Judge Varholak's chambers within ten (10) days of a ruling on 29 Motion for Preliminary Injunction to discuss dates to reset the scheduling conference. SO ORDERED, by Magistrate Judge Scott T. Varholak on 11/10/2022. Text Only Entry (stvlc4, ) (Entered: 11/10/2022) |
| 11/30/2022 | 49 | REPLY to Response to 29 MOTION for Preliminary Injunction filed by Plaintiff Kaley Chiles. (Arrington, Barry) (Entered: 11/30/2022) |
| 12/02/2022 | 50 | First MOTION for Leave to File Excess Pages by Defendants Jonathan Culwell, Kristina Daniel, Halcyon Driskell, Richard Glover, Erika Hoy, Marykay Jimenez, Anjali Jones, Crystal Kisselburgh, Kalli Likness, Theresa Lopez, Jennifer Luttman, Sue Noffsinger, Patty Salazar, Reina Sbarbaro-Gordon, Amy Skinner, Karen Van Zuiden. (Attachments: # 1 Proposed Order (PDF Only) Proposed Order for Request for Additional Pages) (Fischer, Janna) (Entered: 12/02/2022) |

App.008

| | | |
|---|---|---|
| 12/02/2022 | 51 | ORDER granting 50 First MOTION for Leave to File Excess Pages. By Judge Charlotte N. Sweeney on 12/2/2022. Text Only Entry.(cnssec.) (Entered: 12/02/2022) |
| 12/06/2022 | 52 | First MOTION to Dismiss *Plaintiff's Complaint* by Defendants Jonathan Culwell, Kristina Daniel, Halcyon Driskell, Richard Glover, Erika Hoy, Marykay Jimenez, Anjali Jones, Crystal Kisselburgh, Kalli Likness, Theresa Lopez, Jennifer Luttman, Sue Noffsinger, Patty Salazar, Reina Sbarbaro-Gordon, Amy Skinner, Karen Van Zuiden. (Attachments: # 1 Exhibit Declaration Reina Sbarbaro-Gordon)(Chestnut, Abby) (Entered: 12/06/2022) |
| 12/06/2022 | 53 | MOTION to Dismiss by Intervenor Defendant One Colorado, Ltd.. (Finger, Craig) (Entered: 12/06/2022) |
| 12/19/2022 | 54 | ORDER denying 34 MOTION to Intervene by Intervenor Defendant One Colorado, Ltd and striking 53 MOTION to Dismiss by Intervenor Defendant One Colorado, Ltd. Before the Court is One Colorado, Ltd.'s ("One Colorado's") Motion for Permission to Intervene as a Defendant Pursuant to Federal Rule of Civil Procedure 24(b) (See ECF No. 34 ). After reviewing the Motion, related briefing, and relevant legal authority, the Court DENIES the Motion for Permission to Intervene. Exercising its discretion, the Court concludes that One Colorado's input does not add value to the existing litigation, and that One Colorado's interests are adequately represented by Defendants. See, e.g., Lower Arkansas Valley Water Conservancy Dist. v. United States, 252 F.R.D. 687, 69092 (D. Colo. 2008). Accordingly, the Court STRIKES One Colorado's Motion to Dismiss (ECF No. 53 ). By Judge Charlotte N. Sweeney on 12/19/2022. Text Only Entry.(cnssec.) (Entered: 12/19/2022) |
| 12/19/2022 | 55 | ORDER denying 29 Motion for Preliminary Injunction by Judge Charlotte N. Sweeney on 12/19/22.(jdyne) (Entered: 12/19/2022) |
| 12/20/2022 | 56 | NOTICE OF APPEAL as to 55 Order on Motion for Preliminary Injunction by Plaintiff Kaley Chiles (Filing fee $ 505, Receipt |

| | | |
|---|---|---|
| | | Number ACODC-8840394) (Arrington, Barry) (Entered: 12/20/2022) |
| 12/21/2022 | 57 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 56 Notice of Appeal filed by Kaley Chiles to the U.S. Court of Appeals. ( Retained Counsel, Fee paid,) (Attachments: # 1 Preliminary Record, # 2 Docket Sheet) (sphil, ) (Entered: 12/21/2022) |
| 12/21/2022 | 60 | USCA Case Number 22-1445 for 56 Notice of Appeal filed by Kaley Chiles. (sphil, ) (Entered: 12/22/2022) |
| 12/22/2022 | 58 | MOTION for Extension of Time to File Response/Reply as to 52 First MOTION to Dismiss *Plaintiff's Complaint* by Plaintiff Kaley Chiles. (Attachments: # 1 Proposed Order (PDF Only)) (Arrington, Barry) (Entered: 12/22/2022) |
| 12/22/2022 | 59 | ORDER granting 58 Unopposed Motion for Extension of Time to File Response as to 52 First MOTION to Dismiss Plaintiff's Complaint. The response is now due on or before 1/3/2023. By Judge Charlotte N. Sweeney on 12/22/2022.Text Only Entry(cnssec.) (Entered: 12/22/2022) |
| 12/23/2022 | 61 | MINUTE ORDER: Pursuant to Judge Sweeney's 59 December 22, 2022 Order and communication from the parties, this Court's 48 November 10, 2022 Order is AMENDED as follows: The parties shall contact Magistrate Judge Varholak's chambers within ten (10) days of a ruling on 52 Motion to Dismiss to discuss dates to reset the scheduling conference, if claims remain. SO ORDERED, by Magistrate Judge Scott T. Varholak on 12/23/22. Text Only Entry (stvlc3, Andrew) (Entered: 12/23/2022) |
| 12/30/2022 | 62 | TRANSCRIPT ORDER FORM re 56 Notice of Appeal by Plaintiff Kaley Chiles (Arrington, Barry) (Entered: 12/30/2022) |
| 01/02/2023 | 63 | LETTER TO USCA and all counsel certifying the record is complete as to 56 Notice of Appeal filed by Kaley Chiles. A transcript order form was filed stating that a transcript is not necessary. ( Appeal No. 22-1445) Text Only Entry (sphil, ) (Entered: 01/02/2023) |

| 01/03/2023 | [64](#) | RESPONSE to [52](#) First MOTION to Dismiss *Plaintiff's Complaint* filed by Plaintiff Kaley Chiles. (Attachments: # [1](#) Exhibit A)(Arrington, Barry) (Entered: 01/03/2023) |
|---|---|---|
| 01/03/2023 | [65](#) | NOTICE OF APPEAL as to [55](#) Order on Motion for Preliminary Injunction by Defendants Jonathan Culwell, Kristina Daniel, Halcyon Driskell, Richard Glover, Erika Hoy, Marykay Jimenez, Anjali Jones, Crystal Kisselburgh, Kalli Likness, Theresa Lopez, Jennifer Luttman, Sue Noffsinger, Patty Salazar, Reina Sbarbaro-Gordon, Amy Skinner, Karen Van Zuiden (Filing fee $ 505, Receipt Number ACODC-8862852) (Fischer, Janna) (Entered: 01/03/2023) |
| 01/03/2023 | [66](#) | NOTICE of Entry of Appearance by Janna K. Fischer on behalf of Jonathan Culwell, Kristina Daniel, Halcyon Driskell, Richard Glover, Erika Hoy, Marykay Jimenez, Anjali Jones, Crystal Kisselburgh, Kalli Likness, Theresa Lopez, Jennifer Luttman, Sue Noffsinger, Patty Salazar, Reina Sbarbaro-Gordon, Amy Skinner, Karen Van Zuiden (Fischer, Janna) (Entered: 01/03/2023) |
| 01/04/2023 | [67](#) | LETTER Transmitting Notice of Cross-Appeal to all counsel advising of the transmittal of the [65](#) Notice of Appeal, filed by Reina Sbarbaro-Gordon, Theresa Lopez, Anjali Jones, Sue Noffsinger, Jennifer Luttman, Kristina Daniel, Halcyon Driskell, Karen Van Zuiden, Jonathan Culwell, Patty Salazar, Amy Skinner, Crystal Kisselburgh, Marykay Jimenez, Erika Hoy, Richard Glover, Kalli Likness to the U.S. Court of Appeals. ( Retained Counsel, Fee paid,) (Attachments: # [1](#) Preliminary Record, # [2](#) Docket Sheet)(sphil, ) (Entered: 01/04/2023) |
| 01/04/2023 | [68](#) | USCA Case Number 23-1002 for [65](#) Notice of Appeal, filed by Reina Sbarbaro-Gordon, Theresa Lopez, Anjali Jones, Sue Noffsinger, Jennifer Luttman, Kristina Daniel, Halcyon Driskell, Karen Van Zuiden, Jonathan Culwell, Patty Salazar, Amy Skinner, Crystal Kisselburgh, Marykay Jimenez, Erika Hoy, Richard Glover, Kalli Likness. (sphil, ) (Entered: 01/05/2023) |
| 01/09/2023 | [69](#) | NOTICE of Entry of Appearance by John J. Bursch on behalf of Kaley ChilesAttorney John J. Bursch added to party Kaley |

App.011

| | | |
|---|---|---|
| | | Chiles(pty:pla) (Bursch, John) (Entered: 01/09/2023) |
| 01/17/2023 | 70 | REPLY to Response to 52 First MOTION to Dismiss *Plaintiff's Complaint* filed by Defendants Jonathan Culwell, Kristina Daniel, Halcyon Driskell, Richard Glover, Erika Hoy, Marykay Jimenez, Anjali Jones, Crystal Kisselburgh, Kalli Likness, Theresa Lopez, Jennifer Luttman, Sue Noffsinger, Patty Salazar, Reina Sbarbaro-Gordon, Amy Skinner, Karen Van Zuiden. (Fischer, Janna) (Entered: 01/17/2023) |
| 01/26/2023 | 71 | TRANSCRIPT ORDER FORM re 65 Notice of Appeal, by Defendants Jonathan Culwell, Kristina Daniel, Halcyon Driskell, Richard Glover, Erika Hoy, Marykay Jimenez, Anjali Jones, Crystal Kisselburgh, Kalli Likness, Theresa Lopez, Jennifer Luttman, Sue Noffsinger, Patty Salazar, Reina Sbarbaro-Gordon, Amy Skinner, Karen Van Zuiden (Miyata, Bianca) (Entered: 01/26/2023) |
| 01/27/2023 | 72 | LETTER TO USCA and all counsel certifying the record is complete as to 65 Notice of Appeal, filed by Reina Sbarbaro-Gordon, Theresa Lopez, Anjali Jones, Sue Noffsinger, Jennifer Luttman, Kristina Daniel, Halcyon Driskell, Karen Van Zuiden, Jonathan Culwell, Patty Salazar, Amy Skinner, Crystal Kisselburgh, Marykay Jimenez, Erika Hoy, Richard Glover, Kalli Likness. A transcript order form was filed stating that a transcript is not necessary. ( Appeal No. 23-1002) Text Only Entry. (sphil, ) (Entered: 01/27/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/06/2023 07:45:12 | | |
| **PACER Login:** | cindyeville | **Client Code:** |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-02287-CNS-STV |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Civil Action No. 22-cv-2287**

KALEY CHILES,

      Plaintiff,

v.

PATTY SALAZAR, in her official capacity as Executive Director of the Department of
Regulatory Agencies; and
REINA SBARBARO-GORDON in her official capacity as Program Director of the State Board
of Licensed Professional Counselor Examiners and the State Board of Addiction Counselor
Examiners;
JENNIFER LUTTMAN, in her official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
AMY SKINNER, in her official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
KAREN VAN ZUIDEN, in her official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
MARYKAY JIMENEZ, in her official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
KALLI LIKNESS, in her official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
SUE NOFFSINGER, in her official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
RICHARD GLOVER, in his official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
ERIKA HOY, in her official capacity as a member of the State Board of Licensed Professional
Counselor Examiners;
KRISTINA DANIEL, in her official capacity as a member of the State Board of Addiction
Counselor Examiners;
HALCYON DRISKELL, in her official capacity as a member of the State Board of Addiction
Counselor Examiners;
CRYSTAL KISSELBURGH, in her official capacity as a member of the State Board of
Addiction Counselor Examiners;
ANJALI JONES, in her official capacity as a member of the State Board of Addiction
Counselor Examiners;
THERESA LOPEZ, in her official capacity as a member of the State Board of Addiction
Counselor Examiners; and
JONATHAN CULWELL, in his official capacity as a member of the State Board of Addiction
Counselor Examiners;

      Defendants.

App.013

_____

## VERIFIED COMPLAINT
_____

Plaintiff Kaley Chiles submits the following Verified Complaint against Defendants:

### I.  INTRODUCTION

1.      The relationship between a mental health professional and her client has always been based on a deeply held trust from which a critical therapeutic alliance forms allowing the professional to provide vital mental health care to the client. The client communicates their goals, desires and objectives to the mental health professional, and the mental health professional provides counseling that aligns with the client's self-determined choices. This relationship has always been viewed as sacrosanct and inviolable. Until now.

2.      With the passage of the Counseling Censorship Law (defined below), the government has interjected itself between mental health professionals and their clients as effectively as if Defendants were standing in the counselor's office with their hand over her mouth lest she dare say something contrary to the state-approved orthodoxy mandated by the law.  This is repugnant to the First Amendment liberties of both counselors and their clients.  Defendants' actions have caused, are causing, and will continue to cause irreparable injury to Plaintiff's fundamental liberties.  Therefore, Plaintiff brings this action to challenge the constitutionality of the Counseling Censorship Law.

3.      Plaintiff engages in licensed, ethical, and professional counseling that honors her clients' autonomy and right to self-determination, that permits clients to prioritize their religious and moral values above unwanted same-sex sexual attractions, behaviors, or identities, and that enables clients to choose a licensed counselor who can address their self-determined values, not values imposed by the government. Plaintiff has First Amendment rights as a

2

licensed counselor to engage in and provide counseling consistent with her and her clients' sincerely held religious beliefs, and her clients have First Amendment rights to receive such counseling free from Defendants' blatant and egregious viewpoint discrimination.

4.      The Counseling Censorship Law prevents a minor from seeking counseling to address a conflict about, or questions concerning, her unwanted same-sex sexual attractions, behaviors, and identities and from seeking to reduce or eliminate her unwanted same-sex sexual attractions, behaviors, or identities through counseling, such as sexual orientation change efforts ("SOCE"). Thus, the law denies Plaintiff's minor clients their right to self-determination, their right to prioritize their religious and moral values, and their right to receive effective counseling consistent with their freely chosen values.

5.      By prohibiting Plaintiff from counseling with clients in an effort fully to explore their sexuality (including seeking to eliminate or reduce unwanted same-sex attractions, behaviors, or identity), even when the client desires and freely consents to such counseling, the Counseling Censorship Law also violates the Plaintiff's constitutional rights.

6.      The Counseling Censorship Law is also unfairly discriminatory. Plaintiff helps heterosexual clients by exploring with them their sexual attractions, behaviors and identity. But in many situations the law makes it illegal for her to provide the same help to minors with same sex attractions and/or gender identity conflicts. This is causing immediate and irreparable harm to Plaintiff and her clients.

7.      By denying minors the opportunity to pursue a particular course of action that could most effectively help them address the conflict between their sincerely held religious beliefs and their unwanted same-sex attractions, behaviors, or identity, the Counseling Censorship Law

App.015

is causing those minors confusion and anxiety and infringing on their free speech and religious liberty rights.

8.      Plaintiff seeks to enjoin enforcement of the Counseling Censorship Law because it violates her and her clients' rights to freedom of speech and free exercise of religion guaranteed by the First and Fourteenth Amendments to the United States Constitution.

9.      Plaintiff also seeks a judgment declaring that the Counseling Censorship Law, both on its face and as applied, is an unconstitutional violation of the First and Fourteenth Amendments to the United States Constitution.

## II.  PARTIES

10.     Plaintiff is a resident of the State of Colorado.

11.     Patty Salazar ("Salazar") is the Executive Director of the Colorado Department of Regulatory Agencies.

12.     The Colorado State Board of Licensed Professional Counselor Examiners shall be referred to herein as the Counselor Board.  The Colorado State Board of Addiction Counselor Examiners shall be referred to herein as the Addiction Board.  The Counselor Board and the Addiction Board shall be referred to jointly as the "Boards."

13.     Reina Sbarbaro-Gordon ("Sbarbaro-Gordon") is the Program Director of both the Counselor Board and the Addiction Board.

14.     Jennifer Luttman, Amy Skinner, Karen Van Zuiden, MaryKay Jimenez, Kalli Likness, Sue Noffsinger, and Richard Glover are the members of the Counselor Board.

15.     Erika Hoy, Kristina Daniel, Halcyon Driskell, Crystal Kisselburgh, Anjali Jones, Theresa Lopez, and Jonathan Culwell are the members of the Addiction Board.

16.     All Defendants are sued in their official capacities.

17.     All Defendants are for all purposes relevant to this Complaint acting under color of state law.

## III.  JURISDICTION AND VENUE

18.     This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought pursuant to 42 U.S.C. §1983.

19.     This Court has jurisdiction under 28 U.S.C. §§1331 and 1343.

20.     Venue is proper in this Court under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

21.     This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §2201-02, implemented through Rule 57 of the Federal Rules of Civil Procedure, and is authorized to grant injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

22.     This Court is authorized to grant Plaintiff's prayer for relief regarding costs, including a reasonable attorney's fee, pursuant to 42 U.S.C. § 1988.

## IV.  GENERAL ALLEGATIONS

**A.     THE COUNSELING CENSORSHIP LAW**

23.     C.R.S. § 12-245-202(3.5) states:

(a) 'Conversion therapy' means any practice or treatment by a licensee, registrant, or certificate holder that attempts or purports to change an individual's sexual orientation or gender identity, including efforts to change behaviors or gender expressions or to eliminate or reduce sexual or romantic attraction or feelings toward individuals of the same sex.

(b) 'Conversion therapy' does not include practice or treatments that provide:

(I) Acceptance, support, and understanding for the facilitation of an individual's coping, social support, and identity exploration and development, including sexual-orientation-neutral interventions to prevent or address unlawful conduct or unsafe

5

sexual practice, as long as the counseling does not seek to change sexual orientation or gender identity; or

(II) Assistance to a person undergoing gender transition.

24.     C.R.S. § 12-245-224(1) states in pertinent part:

"A person licensed, registered, or certified under this article 245 violates this article 245 if the person: . . .

(t) Has engaged in any of the following activities and practice: . . .

(V) Conversion therapy with a client who is under eighteen years of age.

25.     C.R.S. § 12-245-224(1)(t)(V) shall be referred to herein as the "Counseling Censorship Law" or the "Law."

**B.      THE COLORADO LICENSING LAWS**

26.     Pursuant to C.R.S. § 12-245-604(1), the Counseling Board issues licenses to qualified professional counselors.

27.     Pursuant to C.R.S. § 12-245-804(1), the Addiction Board issues licenses to qualified addiction counselors.

28.     Plaintiff holds a license as a licensed professional counselor issued by the Counseling Board.

29.     Plaintiff holds a license as an addiction counselor issued by the Addiction Board.

30.     Each of the Boards is a "regulator" as that term is used in Title 12 of the Colorado Revised Statutes.  See C.R.S. § 12-20-102(14).

31.     Pursuant to C.R.S. § 12-20-403, regulators, including the Boards, are authorized to initiate and carry out disciplinary procedures on account of any alleged violations of the provisions of the Counseling Censorship Law by a licensee.

App.018

32.     Pursuant to C.R.S. § 12-245-225, the Boards may revoke or suspend the license of any licensee that a violates and provision of C.R.S. § 12-245-224, including violating the Counseling Censorship Law.

33.     Pursuant to Administrative Procedure 10-1, the Boards delegate their authority to initiate and/or review complaints against licensees under their jurisdiction to Sbarbaro-Gordon.

34.     Pursuant to C.R.S. § 12-20-403, Salazar has authority to assign a complaint against a licensee to the appropriate regulator, assign a complaint specially for investigation, or take such other action on the complaint as appears to her to be warranted in the circumstances.

35.     In summary, the Boards have issued licenses to Plaintiff.  If Plaintiff were accused of violating the Counseling Censorship Law, each of the Defendants would play a role in the process of investigating the complaint against Plaintiff and taking action in response to the complaint, up to and including revoking Plaintiff's licenses.

36.     The purpose of this action is to seek a declaration that the Counseling Censorship Law is unconstitutional and to enjoin the Defendants from enforcing this unconstitutional law against Plaintiff.

## C.     RESEARCH ON SOCE COUNSELING

37.     It is well known to practitioners in the mental health field that most of those who seek counseling to change sexual orientation are motivated by religious convictions.  Thus, in 2013 the American Counseling Association issued a statement declaring that "Conversion therapy as a practice is a religious, not psychologically-based, practice. . . . The treatment may include techniques based in Christian faith- based methods . . ."[1] In other words, according to the ACA, the practice the Counseling Censorship Law seeks to prohibit is a religious practice.

---

[1] Joy S. Whitman, *et al*, *Ethical issues related to conversion or reparative therapy*, AMERICAN COUNSELING ASSOCIATION, https://bit.ly/3RoGkUA (last visited Sept. 1, 2022).

38.      The Human Rights Campaign organization, which is active nationally in promoting

counseling censorship laws and ordinances, in its website accuses "right-wing religious groups"

of "promot[ing] the concept that an individual can change their sexual orientation or gender

identity."[2]

39.      In a report published in 2009, a task force of the American Psychological Association

reported that "most SOCE ["sexual orientation change efforts"] currently seem directed to those

holding conservative religious and political beliefs, and recent research on SOCE includes

almost exclusively individuals who have strong religious beliefs." [3] The Task Force further

reported that those who seek counseling with a goal of moving away from same-sex attractions

are "predominately . . . men who are strongly religious and participate in conservative

faiths."  *Id.*

40.      Leading authors in the field have made the same observation repeatedly over the last

two decades. In 1999, psychology professor and prominent advocate of counseling censorship

laws Douglas Haldeman wrote that "Historically, most conversion therapy occurred in religious

settings." In 2004, Prof. Haldeman again wrote that "the vast majority of those seeking sexual

orientation change because of internal conflict have strong religious affiliations." Douglas C.

Haldeman, *When Sexual & Religious Orientation Collide: Considerations in Working with*

*Conflicted Same-Sex Attracted Male Clients*, 32 THE COUNSELING PSYCHOLOGIST 691, 693

(2004).  In an important 2016 paper, internationally prominent authors Prof. Lisa Diamond and

Prof. Clifford Rosky cited multiple peer-reviewed papers to conclude that "[T]he majority of

individuals seeking to change their sexual orientation report doing so for religious reasons

---

[2] Human Rights Campaign, *The Lies and Dangers of "Conversion Therapy,"* https://bit.ly/3AH427V (last visited
Sept. 1, 2022).
[3] American Psychological Association, *Task Force on Appropriate Therapeutic Responses to Sexual
Orientation* (2009), https://bit.ly/3wMq7kq (last visited Sept. 1, 2022).

rather than to escape discrimination." Lisa M. Diamond & Clifford J. Rosky, *Scrutinizing Immutability: Research on Sexual Orientation & U.S. Legal Advocacy for Sexual Minorities*, 52 JOURNAL OF SEX RESEARCH 1, 6 (2016).

41.     In sum, through the Counseling Censorship Law, the State is not only seeking to censor and suppress ideas and personal goals with which it disagrees; it is targeting ideas and motivations well known to be primarily associated with and advocated by people of faith for reasons of faith.

42.     Gender dysphoria is defined in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"), in adolescents and adults, as "A marked incongruence between one's experienced/expressed gender and assigned gender [i.e., biological sex], of at least 6 months duration," along with certain other indicators, and resulting in "clinically significant distress or impairment in social, occupational, or other important areas of

42.     The widely urged path of "affirming" a transgender identity for girls, for example, includes the use of puberty blockers beginning as young as eight; cross-sex hormones a few years later which build muscle mass and causes growth of facial hair and a deepened voice; "social transition," including adoption of a male name and male pronouns and dress; breast-binding to conceal their developing female biology; and ultimately double mastectomy and hysterectomy, followed by life-long administration of cross-sex hormones.

43.     It is commonly presumed that the gender affirming care model is evidence based. However, studies evaluating this are scarce and questionable. One study compared a group of waitlisted adolescents to those receiving puberty blockers and failed to show a statistically significant difference between the treated and waitlisted groups at the study end-period at 18 months. Although the authors highlighted in the abstract the small improvements in the

App.021

puberty-blocked group at 12 months. Costa, R., Dunsford, M., Skagerberg, E., Holt, V., Carmichael, P., & Colizzi, M., *Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria*, THE JOURNAL OF SEXUAL MEDICINE, *12*(11) (2015), 2206.  The actual conclusion demonstrated by the study was that by 18 months there were no significant differences between treated and waitlisted adolescents. Biggs, M, letter to the editor regarding the original article by Costa et al: *Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria*, THE JOURNAL OF SEXUAL MEDICINE, *16*(12) (2019), 2043.  More on this topic is below regarding various countries that are pulling away from gender affirming care and recognizing their haste in previously accepting it.

44.    Public opinion, media attention, and legislative advocacy appear to have swayed researchers seeking to paint gender affirming care as successful despite a lack of evidence or evidence contrary to their conclusions. Tordoff, D. M., Wanta, J. W., Collin, A., Stepney, C., Inwards-Breland, D. J., & Ahrens, K., *Mental health outcomes in transgender and nonbinary youths receiving gender-affirming care*, JAMA NETWORK OPEN, *5*(2), 10/13 (2022). For example, Dr. Paul Sullins points out that in the above-mentioned study, the authors "list their study's "Question" as "Is gender- affirming care for transgender and nonbinary (TNB) youths associated with changes in depression, anxiety, and suicidality?" But they don't claim this anywhere — not specifically. They reference "improvements" twice… but offer no statistical demonstration anywhere in the paper or the supplemental material."[4]

---

[4] *See* Jesse Sengal, *Researchers Found Puberty Blockers and Hormones Didn t Improve Trans Kids'Mental Health at Their Clinic. Then They Published a Study Claiming the Opposite*. (Updated) April 2022, https://bit.ly/3AIhaJQ (last visited Sept. 1, 2022).

45.     Dr. Sullins writes about his attempts to gain better access to the data and conclusions drawn by the study authors and explains, "In a March 6 email, [an author] wrote, "Although we provided the raw data in the supplement for transparency, I advise caution in interpreting these data as is." Great, I thought; I could hand off the data to someone who is better at this stuff than I am and ask what they think. Except the data wasn't actually included in the supplementary material. I asked Tordoff where it was. Radio silence. I sent a polite follow-up email. Again, nothing." *Id*.

46.     Academics and practitioners in the field have described evidence that many of these girls appear to have been strongly influenced by internet contacts, or by local friend groups. Littman, L., *Individuals treated for gender dysphoria with medical and/or surgical transition who subsequently detransitioned: A survey of 100 detransitioners*, ARCHIVES OF SEXUAL BEHAVIOR, *50*(8), 3354) (2021) and are potentially harmed by "Access to Internet sites that uncritically support their wishes." William Byne, M. D., & Bradley, S., *Report of the APA Task Force on Treatment of Gender Identity Disorder*, 15.

47.     Obviously "sex reassignment surgery," which removes testicles or ovaries, permanently sterilizes the affected individual. However, it is generally recognized by practitioners that cross-sex hormones, which are increasingly prescribed even for minors, may also irreversibly sterilize a child for life. A Harvard Medical School professor and her co-authors, who are active in medically transitioning minors, admit that "cross-sex hormones . . . may have irreversible effects," and describes infertility as "a side effect" of these drugs. Guss, C., Shumer, D., & Katz-Wise, S. L., *Transgender and gender nonconforming adolescent care: psychosocial and medical considerations*, CURRENT OPINION IN PEDIATRICS, *26*(4) (2015), 424-5. Another team of prominent practitioners in the field caution that there is evidence that cross-sex hormones

App.023

administered to minors will permanently and irreversibly sterilize at least some of these youths, both male and female. Yet these practitioners also recognize that "research suggest[s] some of these individuals may desire genetic children as adults." Amy Tishelman *et al*., *Health Care Provider Perceptions of Fertility Preservation Barriers and Challenges with Transgender Patients*, 36 JOURNAL OF ASSISTED REPRODUCTION AND GENETICS 579, 580 (2019).

48.    In addition to permanent sterilization, accepting and living in a transgender identity carries a number of known likely lifetime costs and risks for a young person.

49.    Any individual whose testicles or ovaries are surgically removed through so-called "sex reassignment surgery" requires life-long medical hormonal therapy. In general, the use of cross-sex hormones, once begun, will be continued for life.

50.    As a result of chemical or surgical impacts on their sexual development and organs, some transgender adults experience diminished sexual response and are unable ever to experience orgasm.

51.    Multiple authors have cautioned that administration of cross-sex hormones to biological males increases the individual's risk of blood clots and resulting strokes, heart attack, and lung and liver failure.

52.    It is often asserted that transgender youth attempt suicide at much higher rates than the general adolescent population. This is true. But it is not true that there is any statistically significant evidence that "affirmation" in a transgender identity substantially reduces actual suicide attempts. Instead, multiple studies report that adolescents and adults who adopt and live in a transgender identity continue to suffer severely negative mental health outcomes— including suicide and attempted suicide—throughout their lives, and this remains true even if

12

App.024

they undergo the ultimate "gender-affirming" step of extensive surgery to reconfigure their body to conform in appearance to their desired gender identity.

53.     Even advocates of medical transition recommend "delaying affirmation" because "At this time, the scientific and medical communities have not yet reached consensus regarding the appropriate treatment of prepubescent children with gender dysphoria" and note that failure to be completely affirmative to a child or adolescent's desire for transition "should not be construed as conversion therapy or an attempt to change gender identity" Byne W., *Regulations restrict practice of conversion therapy*, LGBT HEALTH, 3(2) (2016) 2.

54.     A long-term study in Sweden found that even *after* sex-reassignment surgery transgender individuals exhibited a rate of completed suicide 19 times higher than the control group, suicide attempts at a 7.6 times higher rate, and hospitalization for any psychiatric condition at a 4.2 times higher rate. These researchers concluded that "[t]he most striking result was the high mortality rate in both male-to-females and female-to-males, compared to the general population." C. Dhejne *et al*., *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden*, 6 PLoS ONE, e16885, 5-6 (2011).

55.     Similarly, a study in the United States found that the death rates of transgender-identifying veterans are comparable to those who suffer from schizophrenia and bipolar diagnoses, with these individuals dying on average 20 years earlier than a comparable population.[5]

56.     Many academics and practitioners and even transgender activists have observed that gender identity is not necessarily either binary or fixed for life. Indeed, in formally

---

[5] U.S. Dept. of Vet. Affairs, *Rates of Suicide Higher among Transgender Veterans*, https://bit.ly/3KGHh8z (last visited Sept. 1, 2022).

App.025

promulgating a rule in 2016, the United States Department of Health and Human Services defined "gender identity" as "an individual's internal sense of gender, which may be male, female, neither, or a combination of male and female, and which may be different from an individual's sex assigned at birth," and disparaged "the expectation that individuals will consistently identify with only one gender" as an inaccurate "sex stereotype." *Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31, 376 (May 18, 2016) at 31, 384 and 31,468.

57.     In addition, at least for pre-adolescents who experience gender dysphoria and receive therapeutic support but do not socially transition, "every follow-up study of GD children, without exception, found the same thing: Over puberty, the majority of GD children cease to want to transition." J. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, 46 JOURNAL OF SEX & MARITAL THERAPY 1, 1 (2019). In fact, multiple studies have documented that for pre-pubertal children who suffer from gender dysphoria, the very large majority—estimates range between 61%-98% percent—will grow into comfort with a gender identity congruent with their biological sex by young adulthood, so long as they are not affirmed as children in a transgender identity.  Ristori, J., & Steensma, T. D., *Gender dysphoria in childhood*, INTERNATIONAL REVIEW OF PSYCHIATRY, *28*(1), (2016) 15.

58.     Pablo Expósito-Campos explains that some people who detransition conclude that "being transgender is not the reason underlying his/her distress and body discomfort" and that for some

> the decision to detransition is primarily motivated by the cessation of a
> transgender identity. This category potentially includes anyone who identified as
> trans-gender, socially or medically transitioned, and later returned to identifying
> with his/her birth sex. The reasons behind core or primary detransitions are
> multifarious, and may comprise: realizing that transitioning does not alleviate GD
> (Dodsworth, 2020; Herzog, 2017; Lev, 2019; Marchiano, 2020), finding

alternative ways to cope with GD (Herzog, 2017; Stella, 2016), mental health concerns (Post-Trans, n.d.; Stella, 2016), solving previous psychological/emotional problems that contributed to GD (Butler & Hutchinson, 2020; Stella, 2016), the remission of GD itself over time (Stella, 2016), understanding how past trauma, internalized sexism, and other psychological difficulties influenced the experience of GD (Dodsworth, 2020; Gonzalez, 2019; Herzog, 2017; McFadden, 2017; Post-Trans, n.d.; Stella, 2016; Yoo, 2018); the reconciliation with one's sexuality (Marchiano, 2020; GNC Centric, 2019; Pazos-Guerra et al., 2020; Post-Trans, n.d.); and a change in individual, political, social, or religious views that leads the person to question his/her trans- gender status (Dodsworth, 2020; Exposito-Campos, 2020; Herzog, 2017; Kermode, 2019; Stella, 2016; Turban & Keuroghlian, 2018).

Pablo Expósito-Campos, *A typology of gender detransition and its implications for healthcare providers,* JOURNAL OF SEX & MARITAL THERAPY, *47*(3) (2021), 270-280.

59.     Another study found that reasons for detransition included (70%) realizing that one's gender dysphoria was related to other issues; (62%) health concerns; (50%) observing that transition did not help gender dysphoria; and (45%) finding alternatives to deal with gender dysphoria, with external factors such as (13%) lack of support, (12%) financial concerns, and (10%) discrimination being less common. Elie Vandenbussche, *Detransition-related needs and support: A cross-sectional online survey,* JOURNAL OF HOMOSEXUALITY, *69*(9) (2021), 1607.

60.     It is not surprising, therefore, that increasing numbers of young women who for a time transitioned to live in a male gender identity and underwent varying degrees of hormonal and surgical "transition" but who later regretted those decisions and reclaimed a female gender identity are speaking up. These women are publicly expressing regret about the harm done to their bodies and minds, and anger against the too-hasty counsel and medical advice they received as minors which steered them into that transgender identity and those medical choices.

61.     While many of these women had previously detailed their experiences on internet blog websites pseudonymously, in recent years they have become more visible, writing under their

App.027

real names, posting videos online, and forming support groups for those in similar situations.[6] In 2018, *The Atlantic* profiled several high- profile "detransitioners" who have been raising awareness of their own stories as a warning to those who are promoting or hearing only positive narratives about the impact of gender transition on affected individuals.[7]

62.      For example, Max Robinson, who has been featured at length in both *The Atlantic* and *The Economist*,[8] became convinced that her internal discomfort needed to be resolved by a sex "transition" after discovering the "world of online gender-identity exploration" at age 15. A doctor prescribed cross-sex hormones for her beginning at age 16, and at age she underwent a double mastectomy. While Max was initially pleased with the results, it wasn't long before she realized that she had made a mistake and began the process of "detransitioning" at age 19. She lives with permanent physical changes—a deep voice, a beard, and a flat chest—that cannot be reversed.

63.      Similarly, Cari Stella was prescribed cross-sex hormones by a doctor at age 17 and underwent a double mastectomy at age 20. According to Cari, from the time she first saw a therapist, no professional ever suggested or helped her explore alternatives to a "transition."[9] Already by age 22, Cari realized that she had been led into a mistake, and "detransitioned." Cari maintained a blog[10] and YouTube channel[11] reflecting on her experiences, and in a video posted

---

[6] See Pique Resilience Project, www.piqueresproject.com (last visited Sept. 1, 2022) and Detrans Canada, detranscanada.com (last visited Sept. 1, 2022).

[7] *See* Jesse Singal, *When Children Say They're Trans*, *The Atlantic*, July/Sept. 2018, https://bit.ly/2MoIOkg (last visited Sept. 1, 2022).

[8] See Charlie McCann, *When girls won't be girls*, The Economist, Sept. 28, 2017, https://econ.st/3cAUKSO (last visited Sept. 1, 2022).

[9] *See In praise of gatekeepers: An interview with a former teen client of TransActive Gender Center*, 4th Wave Now, April 21, 2016, https://bit.ly/3Q20Zgh (last visited Sept. 1, 2022).

[10] See Cari Stella, Guide on Raging Stars Blog, https://bit.ly/3q01SLB (last visited Sept. 1, 2022).

[11] See Cari Stella, YouTube, https://bit.ly/3RtH5fe (last visited Sept. 1, 2022).

in 2016 said: "I'm a real-live 22-year-old woman with a scarred chest and a broken voice and a 5 o'clock shadow because I couldn't face the idea of growing up to be a woman."

64.     In the United Kingdom, 23-year-old Keira Bell successfully sued the Tavistock and Portman NHS Trust—the leading British clinic responsible for administering puberty blocking drugs—after her own experience culminated in the realization that she had been rushed "down the wrong path."[12]  As a teenager, Keira went through a regimen of puberty blockers and cross-sex hormones, before undergoing a double mastectomy at age 20. She initially believed that the measures would help her achieve happiness, but "detransitioned" shortly after having the double mastectomy. Keira has become an outspoken campaigner for reform, stating that her doctors had failed her as a confused and distressed adolescent by failing to "challenge" her oversimplified desires to be male. "I think it's up to these [medical] institutions," Keira has said, "to step in and make children reconsider what they are saying, because it is a life-altering path."

65.     Given Ms. Bell's experience and the experiences of many others, in July 2022 the U.K.'s National Health Service's order the Tavistock to be closed after a report found it was not safe for children.[13]

66.     Similarly, authorities in Finland issued guidelines drastically reducing puberty blockers as a treatment for gender dysphoria because, as the new guidelines note, "[c]ross-sex identification in childhood, even in extreme cases, generally disappears during puberty."[14]

67.     In a widely quoted press release, the National Academy of Medicine of France stated:

---

[12] *See Puberty blockers: Under-16s "unlikely to be able to give informed consent*," BBC News, Dec. 1, 2020, https://bbc.in/3ee30c2 (last visited Sept. 1, 2022).
[13] Daily Mail, 7/28/22, https://bit.ly/3egeHPl (last visited Sept. 1, 2022).
[14] Wesley Smith, Finns Turn against Puberty Blockers for Gender Dysphoria, National Review, 7/21/21 https://bit.ly/3B4o5OO (last visited Sept. 1, 2022).

When [transgender medical care is provided], it is essential to ensure medical and psychological support . . . **especially since there is no test to distinguish between persisting gender dysphoria and transient adolescent dysphoria. Moreover, the risk of over-diagnosis is real, as evidenced by the growing number of young adults wishing to detransition**.  It is, therefore, appropriate to extend the phase of psychological care as much as possible.[15]

Emphasis added.

68.     Sweden has issued a report noting,

The risks of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits, and that the treatments should be offered only in exceptional cases. This judgement is based mainly on three factors: **the continued lack of reliable scientific evidence concerning the efficacy and the safety of both treatments, the new knowledge that detransition occurs among young adults, and the uncertainty that follows from the yet unexplained increase in the number of care seekers, an increase particularly large among adolescents registered as females at birth.**"[16]

Emphasis added.

69.     Many stories similar to Ms. Bell's are coming to light as more individuals realize that they are not alone in enduring these experiences.[17] Researchers have emphasized the need for research into the specific needs of this group.  *See e.g.*, Butler, C., & Hutchinson, A., *Debate: The pressing need for research and services for gender desisters/detransitioners*, CHILD AND ADOLESCENT MENTAL HEALTH, *25*(1) (2020), 45-47; Entwistle, K., Debate: *Reality check– Detransitioner's testimonies require us to rethink gender dysphoria*, CHILD AND ADOLESCENT MENTAL HEALTH, *26*(1) (2021), 15-16; Hildebrand-Chupp, R., *More than 'canaries in the gender coal mine': A transfeminist approach to research on detransition*, THE SOCIOLOGICAL

---

[15] National Academy of Medicine, France, 2/28/22 Press Release, https://bit.ly/3CL86Xm (last visited Sept. 1, 2022).

[16] The National Board of Health and Welfare of Sweden, *Care of children and adolescents with gender dysphoria Summary*, English translation, https://bit.ly/3B509uL (last visited Sept. 1, 2022).

[17] See Post Trans, https://post-trans.com/ (last visited Sept. 1, 2022), Voices, Sex Change Regret, https://sexchangeregret.com/voices/ (last visited Sept. 1, 2022), among others. *See also* Abigail Shrier, *Irreversible Damage: The Transgender Craze Seducing Our Daughters*, Regnery Publishing (2020).

18

App.030

REVIEW, *68*(4) (2020), 800-816.  It is not surprising, therefore, that increasing numbers of young people who struggle with questions of gender identity, and the parents of such young people, are aware that there are often grave and lasting costs resulting from adopting a transgender identity and that adoption of or attraction to a transgender identity is not necessarily fixed, unchangeable, or desirable.

70.     One study claims that less than 1% of those who transition experience regret. Wiepjes, C. M., *et al.*, *The Amsterdam cohort of gender dysphoria study (1972–2015): trends in prevalence, treatment, and regrets*, THE JOURNAL OF SEXUAL MEDICINE, 15(4) (2018), 582.

> However, this study suffers from significant limitations that lessen the certainty of the claim of 'low regret' in youth:
> - The currently-treated populations of adolescents are very different from the population studied. All study subjects had severe gender dysphoria that began in early childhood and had no significant mental health comorbidities, which is not true of today's adolescent patients. Further, the study only evaluated those who underwent gonadectomy (surgical removal of testes/ovaries), which is not as commonly performed today, especially among gender-dysphoric natal females.
> - The study excluded 22% of those who started on the hormonal treatment pathway but did not proceed further with surgical removal of ovaries or testes. These individuals may have higher levels of regret than the group that proceeded to complete their medical transition as outlined in the Dutch protocol.
> - The follow-up time was less than 10 years, which is when regret typically emerges in adult studies.
> - 20% of study subjects dropped out of care / were lost to follow-up, which can mask regret.
> - Importantly, the definition of 'regret' was exceedingly narrow. For example, neither Keira Bell [mentioned above], nor many of the regretful detransitioners from the recent research on detransition would be considered to be 'regretters' by the study.
> To qualify as a 'regretter,' one had to revert to living in their natal sex role by starting natal-sex hormone supplementation, and do so under medical supervision of the same clinic that facilitated the original transition.'[18]

71.     Unfortunately, the question about whether to transition, the risk of regret, and what kind of counseling should accompany such decisions, remains unanswered. Studies on the subject

---

[18] Society for Evidence-based Gender Medicine, *Gender-Dysphoric Adolescents and Gender Transition Regret: What We Don't Know, Society for Evidence-based Gender Medicine*, November 2, 2021 https://bit.ly/3CPeDjY (last visited Sept. 1, 2022).

have a long-term reputation of being "very low quality" due to "serious methodological

limitation.  The "[s]tudies lacked bias protection measures such as randomization and control

groups, and generally depended on self-report[ing that] may also indicate a higher risk of

reporting bias within the studies."  Murad, M. H., *et al*., *Hormonal therapy and sex*

*reassignment: A systematic review and meta-analysis of quality of life and psychosocial*

*outcomes*, CLINICAL ENDOCRINOLOGY, *72*(2) (2010), 229. A more recent study echoes these

concerns, stating that studies attempting to evaluate the success of gender affirming care model

included "psychosocial aspects" were very limited in number and had "rather short follow-up

periods" or "comprised a very small sample." Ruppin, U., & Pfäfflin, F., *Long-term follow-up*

*of adults with gender identity disorder*, ARCHIVES OF SEXUAL BEHAVIOR, *44*(5) (2015), 1321.

Dr. Roberto D'Angelo expounds on research being hindered by significant numbers of subjects

lost to follow up:

- Smith *et al*. report that sex reassignment is effective, based on a study of 162 adults who had undergone SRS. They were able to obtain follow-up data from only 126 (78%) of subjects because a significant number were "untraceable" or had moved abroad.
- De Cuypere *et al*. report that sex reassignment surgery is an effective treatment for transsexuals. Of 107 patients who had undergone SRS between 1986 and 2001, 30 (28%) could not be contacted and 15 (14%) refused to participate.
- Johannson *et al*. reported good outcomes for SRS. Of 60 patients who had undergone SRS, 42 (70%) agreed to participate in the follow up research. Of the non-participants, 1 had died of complications of SRS, 8 could not be contacted and 9 refused to participate.
- Salvador *et al*. reported that SRS has a positive effect on psychosocial functioning. Only 55 of the 69 patients (80%) could be contacted as 17 were lost to follow-up
- Van de Grift *et al*. reported 94–96% of patients are satisfied with SRS and have good quality of life. A total of 546 patients with Gender Dysphoria who had applied for SRS at clinics in Amsterdam, Hamburg and Ghent were contacted to complete an online survey. Only 201 (37%) responded and completed the survey.

Roberto D'Angelo, *Psychiatry's ethical involvement in gender-affirming care,* AUSTRALASIAN

PSYCHIATRY, *26*(5) (2018), 462.

72.     It is also not surprising, and is entirely reasonable and legitimate, that some young

people (and/or their parents) wish to explore whether it is possible for them to escape from

gender dysphoria and achieve comfort with their own biological sex, so as to avoid all of these

potentially severe lifetime costs of living in a transgender identity.

73.     Dr. D'Angelo adds,

> We generally understand adolescence to be a time of identity exploration in which
> young people may try on various ways or being in the world. While such
> exploration is healthy, making permanent medical decisions on the basis of this
> exploration is not usually considered to be a good idea… It is the responsibility of
> the medical and therapeutic establishment to guard against both under-diagnosis
> and treatment, as well as over-diagnosis and treatment, either of which can be
> harmful. Gender dysphoria ought not to be any different simply because it is more
> politicized… **we believe there is an important human rights issue at stake
> here in relation to young people receiving appropriate mental health care**.
> This includes developing our understanding of which young people will benefit
> from transitioning and which young people require other forms of intervention
> other than gender-affirming care to address their difficulties.[19]

Emphasis added.

74.     Meanwhile, there are no statistically significant studies that demonstrate that voluntary

conversational counseling which aims to help the client towards a personally chosen goal of

achieving or returning to comfort with his or her own biological sex is in any way harmful to

the client. In 2012 the APA reported that SOCE counseling was not shown to be effective but

then explained that the very evidence they examined to draw this conclusion is comprised of "a

host of methodological problems with research in this area, including biased sampling

techniques, inaccurate classification of subjects, assessments based solely upon self-reports, and

poor or nonexistent outcome measures." American Psychological Association, *Guidelines for

psychological practice with lesbian, gay, and bisexual clients*, THE AMERICAN PSYCHOLOGIST,

---

19 Roberto D'Angelo, *Response to Julia Serano s critique of Lisa Littman s paper: Rapid Onset Gender Dysphoria
in Adolescents and Young Adults: A Study of Parental Reports*, Sept. 27, 2018, https://bit.ly/3e8lp9X (last visited
Sept. 1, 2022).

App.033

*67*(1) (2012), 14. To the contrary, a 2022 review concluded, "79 studies on SOCE do not provide scientific proof that they are more harmful than other forms of therapy, more harmful than other courses of action for those with SSA, or more likely to be harmful than helpful for the average client."[20]

75.    Dr. Nicolas Cummings, former president of the American Psychological Association, has noted that SOCE counseling can provide enormous benefits. Nicholas A. Cummings, *Sexual reorientation therapy not unethical*, USA Today, July 30, 2013, https://bit.ly/3AEGyjM (last visited Sept. 1, 2022).  Dr. Cummings noted that the State's premise for adopting the Counseling Censorship Law (i.e., the sweeping contention that must be a fraud because homosexual orientation can't be changed) is damaging and incorrect.  *Id*.  Dr. Cummings personally counseled countless individuals in his years of mental health practice, and he reported that hundreds of those individuals seeking to reduce or eliminate their unwanted same-sex attractions, behaviors, or identity were successful.  *Id*. ("Of the patients I oversaw who sought to change their orientation, **hundreds were successful**." (emphasis added)).  Dr. Cummings said that the assertion that same-sex sexual attractions, behaviors, or identity is one identical inherited characteristic is unsupported by scientific evidence and that "**contending that all same-sex attraction is immutable is a distortion of reality**."  *Id*. (emphasis added).

76.    Dr. Cummings went on to criticize efforts to prohibit SOCE counseling as violating the client's right to self-determination and therapeutic choice.  *Id*. ("Attempting to characterize all sexual reorientation therapy as unethical violates patient choice and gives an outside party a veto over patients' goals for their own treatment.").

---

20 Peter Sprigg, (November 2020) *No Proof of Harm: 79 Key Studies Provide No Scientific Proof That Sexual Orientation Change Efforts (SOCE) Are Usually Harmful*, Family Research Council, https://bit.ly/3Q9e07u (last visited Sept. 1, 2022).

77.     Dr. Cummings concluded that "[a] political agenda shouldn't prevent gays and lesbians who desire to change from making her own decisions." *Id*.

78.     Dr. Cummings concluded by condemning political efforts to prohibit SOCE counseling as harmful to clients and counselors. *Id*. ("Whatever the situation at an individual clinic, accusing professionals from across the country who provide treatment for fully informed persons seeking to change their sexual orientation of perpetrating a fraud **serves only to stigmatize the professional and shame the patient**." (emphasis added)).

79.     The American College of Pediatricians has noted that the political position statements of numerous mental health organizations discouraging SOCE have "no firm basis" in evidentiary support.  American College of Pediatricians, *Legislators are Not Psychotherapists*! Jan. 27, 2014, https://bit.ly/3AFkXaP (last visited Sept. 1, 2022).  The ACP noted that, "[t]he scientific literature, however, is clear: **Same-sex attractions are more fluid than fixed, especially for adolescents— many of whom can and do change**." *Id*. (emphasis added).  The ACP also noted that "there is a body of literature demonstrating a variety of positive outcomes from SOCE." *Id*.  Like Dr. Cummings, the ACP concluded that SOCE counseling is beneficial and that laws, such as the Counseling Censorship Law here, serve only to impose harm on minors who seek couneling. *Id*. ("Barring change therapy or SOCE will threaten the health and well-being of children wanting therapy.").

80.     Whether one decides to believe conclusions drawn by certain studies, there is almost uniform consensus that the studies conducted thus far in this area of clinical practice are insufficient to draw firm conclusions (such as restricting access to care, as the Counseling Censorship Law does), thus nullifying any arguments that one stance or the other is firmly evidence based. Almost every study and paper cited above includes notes by the authors that

App.035

more exploration on this topic is needed and there is a significant lack of clarity on these matters thus far. For legislative entities to claim that restrictions on free speech are evidenced based is simply false.

**D.      VOLUNTARY COUNSELING PROVIDED BY PLAINTIFF**

81.      The above discussion uses the term sexual orientation change efforts (SOCE) and conversation therapy, because these are the labels chosen in the Counseling Censorship Law and in recent research.  Thus, these terms have been the most functional search term when discussing forms of counseling alternative to the affirmative only approach. However, "[d]uring its May 27th, 2016, meeting, the board of the Alliance for Therapeutic Choice and Scientific Integrity (ATCSI) voted unanimously to endorse new terminology that more accurately and effectively represents the work of Alliance therapists who see clients with unwanted same-sex attractions. The board has come to believe that terms such as reorientation therapy, conversion therapy, and even sexual orientation change efforts (SOCE) are no longer scientifically or politically tenable."[21]   The board then set forth a list of reasons this language change was chosen. *Id.*

82.      Plaintiff does not engage in aversive techniques; nor is she aware of any practitioner who engages in such practice with clients seeking to reduce or eliminate their unwanted same-sex attractions, behaviors, or identity. Plaintiff does not imply that categorical change in attractions is a therapeutic goal or create unrealistic expectations for clients. However, much of what the Counseling Censorship Law prohibits counseling is outside of this intention.

83.      Plaintiff began her career focusing on trauma. This focus led her to focuses on adjacent and co-occurring clinical issues such as addictions, attachment, and then personality disorders.

---

21 *See Why the Alliance Supports SAFE- Therapy* https://bit.ly/3efpp8A (last visited Sept. 1, 2022).

App.036

Subsequently, plaintiff has desired to focus on other adjacent and potentially co-occurring clinical issues like eating disorders and sexuality. Prior to the Counseling Censorship Law, Plaintiff helped clients freely discuss sexual attractions, behaviors, and identity by talking with them about gender roles, identity, sexual attractions, root causes of desires, behavior and values. Since the Counseling Censorship Law, she has continued to have these discussions freely with some clients but has intentionally avoided conversations with clients that may be perceived as violating the Law. The limitations imposed by the Law have prevented Plaintiff from being able to fully explore the topic of sexuality with minors.  Thus, the minors in her care are prevented from being able to fully explore the topic with her, and potential minors seeking counseling that fully explores their sexuality are prevented from becoming clients.

84.     Speech is the only tool that Plaintiff uses in her counseling with minors seeking to discuss their sexuality. (Plaintiff is not currently engaging in discussions with minor clients if they have concerns about their sexual attractions or sexual orientation due to the Law). She sits down with her clients and talks to them about their goals, objectives, religious or spiritual beliefs, values, desires, and identity to help them (1) explore and understand their feelings and (2) formulate methods of counseling that will most benefit them.

85.     Plaintiff does not begin counseling with any predetermined goals other than those that the clients themselves identify and set. This is consistent with the clients' fundamental right of self-determination.

86.     Often a client does wish to address unwanted sexual attraction, behaviors, or identity or they are content with a sexual identity other than that of their biological sex. When that is the case, Plaintiff focuses on helping the client and parents to heal any wounds or frustrations and

App.037

to begin to work on loving and accepting the minor client despite any challenges that arise from sexual attractions, behaviors, or identity.

87.     Plaintiff does not seek to "cure" clients of same-sex attractions or to "change" clients' sexual orientation; she seeks only to assist clients with their stated desires and objectives in counseling, which sometime includes clients seeking to reduce or eliminate unwanted sexual attractions, change sexual behaviors, or grow in the experience of harmony with one's physical body.

88.     The only relevant considerations in Plaintiff's counseling are that same-sex attractions, behaviors, identity, or a sense that one must change one's physical body as a solution to gender dysphoria are (a) sometimes an experience over which the client has anxiety or distress, and (b) the client seeks to eliminate that anxiety or distress.

89.     These are the same relevant considerations in all forms of mental health counseling. These considerations hold regarding many things for which clients seek counseling, including many that are not mental illnesses but that nevertheless impose great stress, anxiety, confusion, or grief on the client. In fact, it is commonly understood that quality counseling that is conducted with unconditional positive regard WILL include clinician stances such as challenge and confrontation in order to assist the client in building their own sense of self that is not dependent upon the counselor's (or anyone else's) approval or affirmation.

**E.     VAGUENESS PROBLEMS WITH THE COUNSELING CENSORSHIP LAW**

90.     Because of the difficulty in measuring sexual orientation and gender identity, the prohibitions in the Counseling Censorship Law are hopelessly vague and leave Plaintiff guessing at which practices are permitted and which are prohibited.

App.038

91.     The Counseling Censorship Law prohibits Plaintiff under any circumstances from engaging in any practice that seeks to reduce or eliminate same-sex sexual attractions, behaviors, or identity. This prohibition is virtually impossible for Plaintiff to comply with because it is well understood in the mental health profession that sexual orientation and gender identity are difficult to define and encompass a number of factors, including behavior, practice, identity, attractions, sexual fantasy, romantic attractions, and erotic desires.

92.     The Counseling Censorship Law does not specify which clients would be classified as seeking to "change" and those that would merely be deemed to be conforming their behavior with their original "sexual orientation." As Plaintiff's clients do not always immediately present wanting to "change," she is left to guess at which point any of her counseling practices would be deemed to constitute efforts to reduce or eliminate unwanted same-sex attractions.

93.     Sexual orientation is also nearly impossible to measure, and there is no agreement on whether sexual orientation is a categorical construct or exists on a continuum. A client's motives, attractions, identification, and behaviors may vary over time and circumstances with respect to one another, which makes them dynastically changing features of an individual's concept of self.

94.     Despite the difficulty in measuring and defining sexual orientation and in predicting normative perceptual changes in one's sexuality over time, Plaintiff must now put her professional licenses in jeopardy when even discussing something that could be **perceived** as "changing" sexual orientation or identity.

95.     The Counseling Censorship Law permits licensed counselors to provide counseling that provides "acceptance, support, and understanding" of a client's same-sex attractions, behaviors, or identity. This presents another major source of confusion, uncertainty, and vagueness for

App.039

Plaintiff.  It is impossible for Plaintiff to provide acceptance and support to a client who comes in for counseling and yet at the same time requests assistance in seeking to eliminate unwanted same-sex attractions, behaviors, or identity.

96.      Most of Plaintiff's clients do not initially request counseling specifically to reduce or eliminate unwanted same-sex attractions, behaviors, or identity.  Instead, they want help and counseling to understand the sources, causes, and origins of their feelings. Moreover, these feelings may not be known or discussed during the intake process and may arise during the course of therapy for other issues.  During the course of such counseling, without ever specifically setting out to reduce or eliminate unwanted same-sex attractions, behaviors, or identity, some clients will experience a change in their sexual attractions, behaviors, or identity. This is true even if they never specifically sought to experience such a change or to eliminate their unwanted feelings.  Plaintiff is left to guess at whether counseling simply discussing the confusion, anxiety, conflict, or stress a client feels about their unwanted same-sex attractions, behaviors, or identity – without specifically seeking to reduce or eliminate such feelings – runs afoul of the Counseling Censorship Law' prohibitions.

97.      If Plaintiff is merely counseling an individual to understand the origins of their attractions or helping them to understand and resolve the conflict with their religious beliefs, she is unable to know whether such counseling may result in a spontaneous change for the minor client, even though it was not the topic or goal of her counseling.

98.      Thus, Plaintiff is left to guess at what topics are permissible when a minor client presents with anxiety, confusion, distress, or conflict over unwanted same-sex attractions, behaviors, or identity, and the Counseling Censorship Law provides no clear guideposts on such issues.

App.040

**F.      INDIVIDUALIZED EXEMPTIONS IN THE COUNSELING CENSORSHIP LAW**

99.      The Counseling Censorship Law also establishes a system of individualized exemptions. The law permits counseling on the broad topic of sexual orientation, gender identity, and attractions, behaviors, and identities of minors seeking counseling, but it prohibits such counseling when the client desires to receive counseling to change, reduce, or eliminate same-sex attractions, behaviors, or identity.

100.      However, the law permits counseling relating to change of gender identity when such a client is "undergoing gender transition."

101.      Thus, the law prohibits counseling that which affirms an individual's desire to conform their gender identity with their biological identity, but it provides an individual exemption for identical counseling when a client seeks to change their gender identity and expression.

102.      The law permits counseling providing acceptance and support for a client with same-sex attractions, behaviors, or identity, and it permits counseling providing acceptance and support for a client's gender identity and expression.  But the law prohibits counseling providing acceptance and support for a client whose attractions, behaviors, expressions, or identity do not match her concept of self.

103.      Thus, the law exempts counseling affirming a minor transitioning from one gender to another but prohibits such counseling for a client seeking to eliminate the confusion or identity that does not match his or her biological makeup.

**G.      PLAINTIFF'S WORK**

104.      Plaintiff graduated with a Master of Arts in clinical mental health in 2014.  She is a licensed professional counselor and licensed addiction counselor in the state of Colorado. She is

a practicing Christian.  She adamantly disagrees with the proposition that a person can practice counseling while denying or omitting their philosophical and existential framework. While she does not believe it is possible to practice counseling in a philosophical vacuum, she highly respects client autonomy and therefore does not seek to impose her values or beliefs on her clients.

105.    Plaintiff has engaged in providing counseling and coaching to clients, court ordered coparenting classes, parent coordinator/decision making, and court ordered substance-abuse evaluations.

106.    Plaintiff currently works at Deeper Stories Counseling in Colorado Springs. Her duties include counseling assigned clients as well as supervising post-graduate clinicians. The owner of Deeper Stories allows clinicians to limit or expand caseloads depending on interest and specialties. Currently Plaintiff works with adults who are seeking Christian counseling and minors who are internally motivated to seek counseling (as opposed to being required to come to counseling by someone else.)

107.    Plaintiff has worked part time at the Cascade, Colorado location of Sandstone Care since December 2018.  Initially, Plaintiff worked in a program that offered 30 days of residential treatment for adolescents ranging from 13-18 years old.  Plaintiff created and facilitated the "family immersion program" which included parents (and sometimes siblings) coming to the facility for a "weekend" (Thursday, Friday and Saturday) during their adolescent's stay. During these weekends, Plaintiff would see up to three families, facilitating parent groups, family groups and overseein the families' stay at the facility. On weeks the family was not present, Plaintiff would facilitate online sessions. Since 2020, all sessions have been conducted online in a different format called the "family intensive program."

App.042

108.     Plaintiff is a client-directed counselor in that it is the client who sets the goals for counseling. Plaintiff does not impose an agenda on her clients; nor does she determine clients' goals for counseling. Clients set their own goals for counseling.  Plaintiff only works with voluntary clients who determine the goals that they have for themselves. Plaintiff does not coerce her clients into engaging in counseling but respects her clients' right of self-determination.  She treats each client with unconditional positive regard regardless of the client's personal beliefs, concept of self or feelings of wanted or unwanted same-sex attractions, behaviors, or identity.

109.     Plaintiff has had minor clients with homosexual attractions or behaviors who have expressed that they are happy identifying as gay, lesbian, bi-sexual, or gender non-conforming in various ways and do not want help for changing identity, attractions, or behavior. In such cases, Plaintiff asks if there are any other goals that the minor is interested in pursuing. In many cases, minors ask for help with social issues, family relationships, parent-child communication, or helping to facilitate the parents' coping with the sexual identity of the child. Plaintiff has helped a number of minors and parents with those goals.  She does not try to help minors change their attractions, behavior, or identity, when her minor clients tell her they are not seeking such change. In her residential work as a family counselor, adolescents may still be required to attend family sessions to develop a goal despite the absence of initial therapeutic goals since this is a required part of the residential program. However, in her outpatient settings, when a minor states they do not have a therapeutic goal or wish to explore one, counseling is terminated.

110.     Many of Plaintiff's clients are referred through churches or word of mouth. Many of her clients uphold a biblical worldview which includes the concepts that attractions do not dictate

31

behavior, nor do feelings and perceptions determine identity. Clients who identify as Christians holding to a biblical worldview believe their faith and their relationships with God supersede romantic attractions and that God determines their identity according to what He has revealed in the Bible rather than their attractions or perceptions determining their identity.

111.    Clients who have same-sex attractions or gender identity confusion and who also prioritize their faith above their feelings are seeking to live a life consistent with their faith. Clients who have been living a life inconsistent with their faith or values often present with internal conflicts, depression, anxiety, addiction, eating disorders and so forth and are seeking resolution of such turmoil.

112.    Plaintiff has never received any complaint or report of harm from any of her clients seeking and receiving counseling for any issue, including the many minors she has counseled.

113.    Plaintiff began her career with an interest in serving underserved populations whom she perceived as having issues that are resistant to typical counseling or that prevented them from benefitting from typical talk therapy. This led her to specialize in trauma. This focus then led her to specialize also in addictions and then personality disorders. Recently she has taken more interest in specializations such as eating disorders, gender dysphoria and sexuality. However, after the mandates of the Counseling Censorship Law were imposed on her, Plaintiff has been unable to fully explore certain clients' bodily experiences around sexuality and gender and how their sensations, thoughts, beliefs, interpretations, and behaviors intersect. In other areas such as trauma, addictions, personality disorders, and eating disorders, ethical and evidenced-based practice includes the clinician sometimes expressing doubts, confronting, challenging, questioning, etc. Yet for this specific issue and clientele, it appears the clinician is limited to an

App.044

"acceptance" only stance.  Limiting one's counseling approach in such a one-sided way would generally be considered unethical for any of the other above-mentioned counseling challenges.

114.    In addition to Plaintiff's current clients, there are potentially many future clients who will be adversely affected by the Counseling Censorship Law. Plaintiff has periodically received requests for counseling for both matters related to sexual attractions and gender identity. The Counseling Censorship Law will prevent future clients from getting help.

## H.    IRREPARABLE HARM TO PLAINTIFF AND HER CLIENTS

115.    Consistent with her First Amendment rights, Plaintiff wants to offer a counseling approach to clients and potential clients including minors that includes a full exploration of clients' reported orientation, identity, behaviors and feelings without the imposition of the Counseling Censorship Law's "acceptance-only" government mandate.  She asks for the same freedom in discussing these topics that she would have with minor clients surrounding other controversial topics such as eating disorders, addiction, and criminal behavior.

116.    Consistent with her First Amendment rights, Plaintiff wants to provide counseling, including certain types of voluntary counseling related to sexuality and gender, to minor clients and potential clients.

117.    Because of the Counseling Censorship Law, Plaintiff is prohibited from offering certain types of voluntary counseling related to sexuality and gender to minor clients and potential clients.

118.    Because of the Counseling Censorship Law, Plaintiff is prohibited from engaging in constitutionally protected speech, including offering certain types of counseling to clients and potential clients.  The law literally prohibits her from uttering certain words to her clients if such words are counter to the state's mandated orthodoxy.

App.045

119.     Because of the Counseling Censorship Law, Plaintiff has been chilled in her constitutionally protected expression.

120.     Because of the Counseling Censorship Law, Plaintiff has been and will be forced to deny voluntary counseling that fully explores sexuality and gender to her clients and potential clients in violation of her and her clients' sincerely held religious beliefs.

121.     Because of the Counseling Censorship Law, Plaintiff has suffered, is suffering, and will continue to suffer ongoing, immediate, and irreparable injury to her First Amendment rights to freedom of speech.

122.     Because of the Counseling Censorship Law, Plaintiff has suffered, is suffering, and will continue to suffer ongoing, immediate, and irreparable injury to her First Amendment rights to free exercise of religion.

123.     Because of the Counseling Censorship Law, Plaintiff's minor clients are prohibited from receiving voluntary counseling that fully explores sexuality and gender that the clients desire to obtain from a licensed professional with expertise in this area.  Plaintiff's minor clients have thus suffered, are suffering, and will continue to suffer ongoing, immediate, and irreparable injury to their First Amendment rights to receive information.

124.     Because of the Counseling Censorship Law, Plaintiff's clients have suffered, are suffering, and will continue to suffer ongoing, immediate, and irreparable injury to their First Amendment rights to free exercise of religion.

125.     Plaintiff and her clients and potential clients have no adequate remedy at law to protect the ongoing, immediate, and irreparable injury to their First Amendment liberties.

### V.  FIRST CLAIM FOR RELIEF
### (First Amendment:  Free Speech)

126.     Plaintiff reiterates the above allegations.

App.046

127.    The Free Speech Clause of the First Amendment, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiff's freedom of speech.

128.    The Counseling Censorship Law, on its face and as applied, are unconstitutional prior restraints on Plaintiff's speech.

129.    The Counseling Censorship Law, on its face and as applied, unconstitutionally discriminate on the basis of viewpoint.  The Counseling Censorship Law authorizes only one viewpoint on SOCE counseling and unwanted same-sex sexual attractions, behaviors, and identity by forcing Plaintiff to present only one viewpoint on the otherwise permissible subject matter of same-sex attractions, behaviors, or identity.

130.    The Counseling Censorship Law, on its face and as applied, discriminates against Plaintiff's speech on the basis of the content of the message she offers.

131.    Defendants lack compelling, legitimate, significant, or even rational governmental interests to justify the Counseling Censorship Law' infringement of the right to free speech.

132.    The Counseling Censorship Law, on its face and as applied, is not the least restrictive means to accomplish any permissible government purpose sought to be served by the law. Informed consent provisions outlining the required disclosure prior to engaging in SOCE counseling with a minor would have been far less restrictive of Plaintiff's speech, and mental health counseling organizations have urged legislatures to adopt informed consent provisions.

133.    The Counseling Censorship Law does not leave open ample alternative channels of communication for Plaintiff.

134.    The Counseling Censorship Law, on its face and as applied, unconstitutionally chills and abridges the right of Plaintiff to freely communicate information pertaining to unwanted same-sex sexual attractions, behaviors, or identity.

App.047

135.    The Counseling Censorship Law's prohibitions on licensed counselors' offering voluntary SOCE counseling that could change, reduce, or otherwise address a minor client's unwanted same-sex attractions, behaviors, or identity, which would include a referral to someone who offers SOCE counseling, on its face and as applied, abridge Plaintiff's right to offer information about such matters.

136.    The Counseling Censorship Law' violations of Plaintiff's rights of free speech have caused, are causing, and will continue to cause Plaintiff and her clients to suffer undue and actual hardship and irreparable injury.

137.    Plaintiff has no adequate remedy at law to correct the continuing deprivation of her most cherished constitutional liberties.

## VI.  SECOND CLAIM FOR RELIEF
### (First Amendment:  Clients' Right to Receive Information)

138.    Plaintiff reiterates the above allegations.

139.    The First Amendment, as applied to the states by the Fourteenth Amendment, protects an individual's freedom of speech, and the corollary to that right, the right to receive information.

140.    Plaintiff's clients have sincerely held religious beliefs that shape their desire to receive SOCE counseling and the information that Plaintiff can provide on reducing or eliminating unwanted same-sex attractions, behaviors, and identity.

141.    The Counseling Censorship Law prevents Plaintiff's clients from receiving SOCE counseling and deprives them of the opportunity to even obtain information about SOCE counseling from licensed counselors.

142.    The Counseling Censorship Law is not supported by compelling government interests.

App.048

143.     Even if the Counseling Censorship Law were supported by compelling government interest, it is not narrowly tailored to achieve that purpose and therefore violates the fundamental rights of Plaintiff's clients to receive information.

144.     The Counseling Censorship Law, on its face and as applied, is not the least restrictive means to accomplish any permissible government purpose sought to be served by the law.

145.     The Counseling Censorship Law' violations of the fundamental rights of Plaintiff's clients have caused, are causing, and will continue to cause undue and actual hardship and irreparable injury.

146.     Plaintiff's clients have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

## VII.  THIRD CLAIM FOR RELIEF
### (First Amendment:  Free Exercise of Religion)

147.     Plaintiff reiterates the above allegations.

148.     The Free Exercise Clause of the First Amendment, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiff's right to free exercise of religion.

149.     Many of Plaintiff's clients have sincerely held religious beliefs that same-sex sexual attractions, behaviors, or identity are wrong, and they seek to resolve these conflicts between their religious beliefs and their attractions in favor of their religious beliefs.

150.     Plaintiff also has sincerely held religious beliefs to provide spiritual counsel and assistance to her clients who seek such counsel. Plaintiff holds sincerely held religious beliefs that she should counsel clients on the subject matter of same-sex attractions, behaviors, or identity from a religious viewpoint that aligns with her religious beliefs and those of her clients.

App.049

151.     The Counseling Censorship Law, on its face and as applied, targets Plaintiff's and her clients' sincerely held religious beliefs regarding human nature, gender, ethics, morality, and SOCE counseling, which are informed by the Bible and constitute central components of their faith.  The Counseling Censorship Law causes a direct and immediate conflict with their religious beliefs by prohibiting them from offering, referring, and receiving counseling that is consistent with their religious beliefs.

152.     The Counseling Censorship Law, on its face and as applied, has impermissibly burdened Plaintiff's and her clients' sincerely held religious beliefs.  Indeed, the law affirmatively compels them act in contradiction to those beliefs. The Counseling Censorship Law has also forced Plaintiff and her clients to choose between the teachings and requirements of their sincerely held religious beliefs and the value system imposed by the State.

153.     The Counseling Censorship Law places Plaintiff and her clients in an irresolvable conflict between compliance with their sincerely held religious beliefs and compliance with the law.

154.     The Counseling Censorship Law also put substantial pressure on Plaintiff and her clients to violate their sincerely held religious beliefs by ignoring the fundamental tenets of their faith concerning same-sex attractions, behaviors, or identity.

155.     The Counseling Censorship Law, on its face and as applied, is neither neutral nor generally applicable, but rather specifically and discriminatorily targets the religious speech, beliefs, and viewpoint of those individuals who believe change is possible.  The law thus expressly constitutes a substantial burden on sincerely held religious beliefs that are contrary to the State's approved viewpoints on same-sex attractions, behavior, or identity.

App.050

156.    No compelling government interest justifies the burdens Defendants impose upon Plaintiff and her clients' rights to the free exercise of religion.

157.    Even if the Counseling Censorship Law were supported by compelling government interests, it is not the least restrictive means to accomplish any permissible government purpose which the Counseling Censorship Law seeks to serve.

158.    The Counseling Censorship Law, both on its face and as-applied, does not accommodate Plaintiff's sincerely held religious beliefs.

159.    The Counseling Censorship Law, both on its face and as-applied, specifically targets religion for disparate treatment and has set up a system of individualized exemptions that permits certain counseling on same-sex attractions, behaviors, or identity while denying religious counseling on the same subjects.

160.    The Counseling Censorship Law, both on its face and as applied, constitutes a religious gerrymander.

161.    The Counseling Censorship Law' violations of Plaintiff's and her clients' rights to free exercise of religion and has caused, is causing, and will continue to cause Plaintiff and her clients to suffer undue and actual hardship and irreparable injury.

162.    Plaintiff has no adequate remedy at law to correct the continuing deprivation of her most cherished constitutional liberties.

## VIII.  FOURTH CLAIM FOR RELIEF
### (Fourteenth Amendment:  Due Process)

163.    The Fourteenth Amendment's guarantee of Due Process prohibits the government from imposing or threatening punishment based on laws that are so vague that they do not provide fixed legal standards as to what is prohibited and what is not, and so leave room for standardless or discriminatory enforcement.

App.051

164.    In fact, as detailed below, essentially all of the key terms in the Counseling Censorship Law are undefined in the law itself, and also undefined in science, and indeed have more in common with slogans than with a fixed standard identifying what counseling speech is prohibited and subject to punishment under such statute.

165.    As a result, the Counseling Censorship Law is unconstitutional on its face because it does not provide adequate standards or guidelines to govern the actions of Defendants who are the persons empowered by Colorado to enforce the law.  Instead, the law enables and authorizes those who are empowered to pursue enforcement actions in this highly controversial and politicized area to do so based on their personal predilections, rather than on any fixed legal standard, and likewise to pursue discriminatory enforcement.

166.    The vagueness and lack of fixed legal standards in the Counseling Censorship Law is all the more impermissible because it impacts a fundamental right.  Because of this vagueness and the unbounded discretion that it affords to those authorized to bring enforcement actions, counselors engaging with a client who raises concerns relating to gender identity, same-sex attractions, or sexual behaviors must be all the more fearful that they will be accused of violating the law. As a result, consciously or unconsciously, counselors including Plaintiff inevitably engage in a degree of self-censorship that infringes the freedom of speech of both counselor and client.

167.    The Counseling Censorship Law is unconstitutionally vague because it provides no standards or guidelines defining the line between speech that permissibly provides "[a]cceptance, support, and understanding for the facilitation of an individual's coping, social support, and identity exploration and development" and speech that unlawfully seeks to "change" that person's gender identity or sexual orientation.

168.     Given that "development" necessarily involves "change," the purported distinction is incoherent, and thus leaves those authorized to bring enforcement actions free to do so based on their personal predilections, or for discriminatory purposes including disapproval of the beliefs, viewpoint, or messages of a particular counselor.

169.     The prohibition on seeking to "change an individual's . . . gender identity" also fails to provide adequate standards or guidelines to govern the actions of those authorized to bring enforcement actions because the term "gender identity" is undefined in the law and is vague.

170.     "Gender identity" has no clear definition. In a 2016 rule interpreting Section 1556 of the Patient Protection and Affordable Care Act, the Department of Health and Human Services defined "gender identity" as "an individual's internal sense of gender, which may be male, female, neither, or a combination of male and female, and which may be different from an individual's sex assigned at birth." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376 (May 18, 2016) at 31,384.

171.     A publication sponsored by the ACLU, Human Rights Campaign, and National Education Association asserts that gender identity encompasses any "deeply-felt sense of being male, female, both or neither," and can include a "gender spectrum" "encompassing a wide range of identities and expressions." *Schools in Transition: A Guide for Supporting Transgender Students in K-12 Schools*, at 6-7.

172.     The National Center for Lesbian Rights contends that "Gender is comprised of a person's physical and genetic traits, their own sense of gender identity and their gender expression" and similarly asserts that gender identity "is better understood as a spectrum." That source goes on to say that an individual may have an "internal sense of self as male, female, both or neither," and that "each person is in the best position to define their own place on the

41

gender spectrum."[22] Indeed, the medical text *Principles of Transgender Medicine and Surgery*, declares that "Gender identity can be conceptualized as a continuum, a Mobius, or patchwork."[23]

173. An individual who is unhappy with or uncertain about his or her "sense of being male, female, both or neither," or who wishes to evaluate and "define their own place on the gender spectrum," or who does not wish to live life with an identity as amorphous as a Mobius strip or a "patchwork," may well wish the aid of a professional counselor. But what conversation will comprise permissible "development" of that individual's place on that disorienting Mobius strip, and what will be condemned as an unlawful effort to "change" the individual's "gender identity," is unknowable.

174. Because the Counseling Censorship Law fails to define "gender identity," and that term has no consistent definition in the wider law or medical science, the Counseling Censorship Law leaves those authorized to bring enforcement actions free to do so based on their personal predilections, or for discriminatory purposes including disapproval of the beliefs, viewpoint, or messages of a particular counselor.

175. The prohibition on seeking to "change an individual's sexual orientation" also fails to provide adequate standards or guidelines to govern the actions of those authorized to bring enforcement actions, because the term "sexual orientation" is undefined in the law and is vague in practice. There is no agreement in the scientific literature as to the definition of "sexual orientation," or to what extent "orientations" may overlap or blend from one to another. The APA Handbook of Sexuality and Psychology cautions that "Sexual orientation is usually

---

[22] Asaf Orr et al., National Center for Lesbian Rights, *Schools in Transition: A Guide for Supporting Transgender Students in K-12 Schools* 5, (2015), https://bit.ly/3KFFpwI (last visited Sept. 1, 2022).
[23] *Principles of Transgender Medicine and Surgery* 43 (Randi Ettner, Stan Monstrey & Eli Coleman 2eds., 2nd ed. 2016).

App.054

considered a multi-dimensional construct" in which "aspects of sexual orientation . . . are not necessarily concordant." (556).  Professors Diamond and Rosky warn that "it is important to note that sexual orientation is not easy to define or measure," and "is a multifaceted phenomenon" which cannot be simplified to mere "sexual attractions," but instead incorporates (among other components) "sexual attractions, . . . sexual behavior, and sexual identity," while "identity and behavior are structured by social context, social constraints, and social opportunities." Lisa M. Diamond & Clifford J. Rosky, *supra*, 3.  This, say Diamond and Rosky, "obviously poses a problem for research on the causes of sexual orientation." *Id*. It also poses a severe problem for a counselor, therapist, or client who wishes to know what type of counseling or therapeutic goals might be condemned as seeking to change "sexual orientation."

176.    Because the Counseling Censorship Law fails to define "sexual orientation," and that term has no consistent definition in the wider law or medical science, the Counseling Censorship Law leaves those authorized to bring enforcement actions free to do so based on their personal predilections, or for discriminatory purposes including disapproval of the beliefs, viewpoint, or messages of a particular counselor.

177.    The Counseling Censorship Law is further impermissibly vague because it prohibits any practice that "*attempts* . . . to change an individual's sexual orientation or gender identity."  The law fails to provide any standards or guidelines as to whether this refers to the subjective intent of the client, or that of the counselor, again leaving unfettered discretion on this critical question to any person authorized to bring an enforcement action and inviting discriminatory enforcement.

178.    Indeed, a client's personal intention in raising a subject relating to sexuality may or may not be known to the counselor and may change from one meeting to the next. Consequently, a

counselor might face sanctions on the basis of the shifting subjective thoughts and goals of his client that are beyond the counselor's knowledge.

179.    The Counseling Censorship Law further fails to provide adequate standards or guidelines to govern the actions of those authorized to bring enforcement actions because it provides no definitions of terms "gender expressions" and "identity exploration and development" and provides no information at all as to what "behaviors" a counselor may or may not help a client attempt to change.

180.    In the absence of any clarity on these terms, almost any counseling conversation that relates to gender, intimate relationships, or sexuality could be accused of seeking to "change . . . sexual orientation or gender identity." Thus, the failure of the Counseling Censorship Law to define these terms additionally leaves those authorized to bring enforcement actions free to do so based on their personal predilections, or for discriminatory purposes including disapproval of the beliefs, viewpoint, or messages of a particular counselor.

181.    Meanwhile, the sanctions faced by counselors for violating the Counseling Censorship Law are severe, ranging up to the revocation of her licenses, fines and the loss of her livelihood.

182.    For these reasons, the Counseling Censorship Law is so vague on its face that it deprives licensees of Due Process rights protected by the Fourteenth Amendment.

183.    The deprivation of these rights constitutes irreparable injury.

## IX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.    That this Court issue preliminary and permanent injunctions enjoining Defendants, Defendants' officers, agents, employees, attorneys, and all other persons acting in active concert or participation with them, from enforcing the Counseling Censorship Law

App.056

B.      That this Court render a Declaratory Judgment declaring the Counseling

Censorship Law and Defendants' actions in applying the Counseling Censorship Law

unconstitutional under the United States Constitution.

C.      That this Court award Plaintiff the reasonable costs and expenses of this action,

including attorney's fees, in accordance with 42 U.S.C. § 1988.

D.      That this Court grant such other and further relief as this Court deems equitable

and just under the circumstances.

Respectfully submitted this 5th day of September 2022.

*/s/ Barry K. Arrington*

_____
Barry K. Arrington
Arrington Law Firm
3801 East Florida Avenue, Suite 830
Denver, Colorado 80210
Voice:  (303) 205-7870
Email:  barry@arringtonpc.com

Shaun Pearman
The Pearman Law Firm, P.C.
4195 Wadsworth Boulevard
Wheat Ridge Colorado  80033
Phone Number:  (303) 991-7600
Fax Number:  (303) 991-7601
E-mail:  shaun@pearmanlawfirm.com

*Attorneys for Plaintiff*


**VERIFICATION**

I, Kaley Chiles, am over the age of 18 and the Plaintiff in this action.  The statements

and allegations about me or which I make in this VERIFIED COMPLAINT are true and

correct, based upon my personal knowledge (unless otherwise indicated), and if called upon to

testify as to their truthfulness, I would and could do so competently.  I declare under penalties

App.057

of perjury, under the laws of the United States, that the foregoing statements are true and

correct.

Executed this 1st day of September 2022.

Kaley Chiles

App.058

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:22-cv-02287-CNS-STV

KALEY CHILES,

      Plaintiff,

v.

PATTY SALAZAR, in her official capacity as Executive Director of the Department of
Regulatory Agencies; *et al.*,

      Defendants.

---

## ORDER

---

Before the Court is Plaintiff Kaley Chiles' Motion for Preliminary Injunction (ECF No. 29). Ms. Chiles is a licensed professional counselor (ECF No. 1 at 29-30 ¶ 104). Her clients include minors who identify as gay, lesbian, bisexual, transgender, or gender non-conforming (*Id.* at 31 ¶ 109). Ms. Chiles argues that Colorado's regulation of specific therapeutic practices unlawfully abridges what she can say to her minor clients (*See* ECF No. 29 at 2). It does not. As such, and for the reasons set forth below, Ms. Chiles' Motion for Preliminary Injunction (ECF No. 29) is DENIED.

App.059

# I. BACKGROUND[1]

Plaintiff Kaley Chiles is a licensed professional counselor in the state of Colorado, as well as a practicing Christian (ECF No. 1 at 6, 29-30 ¶¶ 28-29, 104). Ms. Chiles' client base includes minors seeking counseling related to same-sex attraction and gender identity (*Id.* at 31 ¶ 109). As a counselor, she does not engage in "aversive techniques," and she alleges that she previously "helped clients freely discuss" sexual attractions, gender identity, gender roles, and "root causes of [their] desires [and] behavior" (*Id.* at 24-25 ¶¶ 82-83).[2] Ms. Chiles only pursues the "goals" that her clients "themselves identify and set," rather than "any predetermined goals" for clients' counseling (*Id.* at 25, 31 ¶¶ 85, 108). According to Ms. Chiles, Colorado law prohibits her from "fully explor[ing]" certain clients' "bodily experiences around sexuality and gender," including any client's discussion of their own "unwanted sexual attraction, behaviors, or identity" (*Id.* at 25-26, 32 ¶¶ 86, 88, 113). Many of Ms. Chiles' clients do not initially request counseling to eliminate their attractions or identities (*Id.* at 28 ¶ 96). Instead, discussion of clients' unwanted attractions or identities "may arise" during their counseling with Ms. Chiles (*Id.*)

Colorado enacted its Minor Therapy Conversion Law in 2019. *See, e.g.,* C.R.S. §§ 12–245–202, 12–245–101. Under the Minor Therapy Conversion Law, mental health professionals may not engage in what is commonly known as "conversion therapy" for minors who identify as gay, lesbian, bisexual, transgender, or gender non-conforming (*See* ECF Nos. 1 at 5, 45 at 15). *See*

---

[1] The background facts are taken predominantly from Ms. Chiles' Verified Complaint, the parties' briefs, and the briefs' supporting exhibits. *See Denver Homeless Out Loud v. Denver, Colorado*, 514 F. Supp. 3d 1278, 1285 (D. Colo. 2021), *vacated and remanded on other grounds*, 32 F.4th 1259 (10th Cir. 2022).

[2] "Aversion techniques" include treatments that "induc[e] nausea, vomiting, or paralysis; providing electric shocks; or having the individual snap an elastic band around the wrist when the individual bec[omes] aroused to same-sex erotic images or thoughts" (ECF No. 45-3 at 31).

App.060

*also, e.g.,* C.R.S. § 12–245–202(3.5)(a). Ms. Chiles alleges that the Minor Therapy Conversion Law prohibits her ability to assist minor clients "seeking to reduce or eliminate unwanted sexual attractions, change sexual behaviors, or grow in the experience of harmony with [their] physical bod[ies]" (ECF No. 1 at 26-27 ¶¶ 87, 91-92). Consequently, she has "intentionally avoided" certain conversations with her clients that she fears may violate the Minor Therapy Conversion Law (*Id.* at 25 ¶ 83).

Ms. Chiles sued Defendants, alleging the Minor Therapy Conversion Law violates her constitutional rights and bringing claims under the First and Fourteenth Amendments (*See generally* ECF No. 1). She filed her Motion for Preliminary Injunction in September 2022 (ECF No. 29). The Motion is fully briefed (*See* ECF Nos. 45, 49).

## II. LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy." *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 797 (10th Cir. 2019) (quotation omitted). To prevail on a preliminary injunction motion, the movant bears the burden of showing that four factors weigh in their favor: (1) they are likely to succeed on the merits; (2) they will suffer irreparable injury if the injunction is denied; (3) the threatened injury outweighs the injury the injunction would cause the opposing party; and (4) the injunction would not adversely affect the public interest. *See Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (citation omitted). "An injunction can issue only if each factor is established." *Denver Homeless Out Loud v. Denver, Colorado*, 32 F.4th 1259, 1277 (10th Cir. 2022) (citation omitted). Where the government is the non-moving party, the last two preliminary injunction factors merge. *See Denver Homeless*, 32 F.4th at 1278 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Preliminary

injunctions changing the status quo are "disfavored," and in these instances, the moving party's burden of establishing that they are likely to succeed on the merits is heightened. *See Free the Nipple*, 916 F.3d at 797 (quotation omitted).

### III. ANALYSIS

Having considered Ms. Chiles' Motion for Preliminary Injunction, the related briefing, and relevant legal authority, the Court denies Ms. Chiles' Motion.

#### A. Standing

Ms. Chiles argues that she has standing to pursue her claims, even though Defendants have "not yet threatened" to revoke her professional licenses (ECF No. 29 at 10). She also argues that she has third-party standing to sue on behalf of her clients (*See id.* at 20). The Defendants contend that Ms. Chiles lacks standing to bring this pre-enforcement action, and that she lacks third-party standing (*See* ECF No. 45 at 33, 48). The Court considers Ms. Chiles' standing to bring this suit herself and whether she has third-party standing to sue on behalf of her clients in turn.

##### 1. *Ms. Chiles' Standing*

Ms. Chiles argues that she has standing to sue, given the gravamen of her First Amendment claims, even though Defendants have not yet enforced the Minor Therapy Conversion Law against her (ECF No. 29 at 10-11). Defendants contend that Ms. Chiles has failed to demonstrate that she intends to engage in conduct that violates the Minor Therapy Conversion Law (ECF No. 45 at 48). The Court agrees with Ms. Chiles that she has standing to sue.

For a federal court to exercise jurisdiction over a suit, the plaintiff must have standing to sue. *See, e.g., Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Standing consists of three elements, and a plaintiff—as the party invoking federal jurisdiction—bears the burden of satisfying

them. *See, e.g. Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A plaintiff must have suffered an "injury in fact" that is "fairly traceable" to the defendant's challenged conduct and that is "likely to be redressed by a favorable judicial decision." *Id.* (citation omitted). If the plaintiff fails to meet this burden, "there is no case or controversy for the federal court to resolve," and the federal court cannot exercise jurisdiction over the plaintiff's claims. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (quotation omitted); *see also* U.S. Const. art. III, § 2.

The analysis changes, however, in the First Amendment context. The First Amendment "creates unique interests that lead [courts] to apply the [constitutional] standing requirements somewhat more leniently, facilitating pre-enforcement suits." *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (citation omitted). One way a plaintiff may establish standing for their First Amendment claim is by "alleging a credible threat of future prosecution plus an ongoing injury resulting" from the statute's "chilling effect" on the plaintiff's desire to exercise their First Amendment rights. *Id.* (quotations omitted). To determine whether a plaintiff's pre-enforcement First Amendment claim has alleged a "chilling effect" that sufficiently demonstrates the plaintiff has suffered an injury in fact, courts consider the following:

> (1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so because of a credible threat that the statute will be enforced.

*Id.* at 1129–30.

Ms. Chiles alleges that the threat of the Minor Therapy Conversion Law's enforcement has created an ongoing injury resulting from the Law's "chilling effect" (*See, e.g.*, ECF No. 1 at 35 ¶ 134). In her preliminary injunction motion, Ms. Chiles argues that—given the nature of her First

5

Amendment claim—she has satisfied *Peck*'s factors to show that she has suffered an injury in fact (ECF No. 29 at 10). Therefore, the Court considers whether Ms. Chiles has satisfied these three *Peck* factors. For the reasons set forth below, she has.

### a.   Past Engagement

Ms. Chiles has engaged in the type of speech affected by the Minor Therapy Conversion Law.[3] The Minor Therapy Conversion Law implicates speech that purports to "eliminate or reduce sexual or romantic attraction or feelings toward individuals of the same sex." § 12–245–202(3.5)(a). Further, the Minor Therapy Conversion law contemplates practices that provide "understanding for the facilitation of an individual's coping." *Id.* at § 12–245–202(3)(b)(I). Ms. Chiles alleges her therapeutic practices have concerned these forms of speech. For instance, she alleges that she seeks to help clients "explore certain . . . bodily experiences," including any "unwanted sexual attraction[s]" that "may arise" during her counseling sessions (ECF No. 1 at 25-26, 28, 32 ¶¶ 86, 96, 112). Therefore, she has met her burden of showing that she has in the past engaged in the type of speech "affected" by the Minor Therapy Conversion Law. *Peck*, 43 F.4th at 1129–30.

### b.   Present Desire

Ms. Chiles has shown that she has a present desire to engage in speech affected by the Minor Therapy Conversion Law.[4] For instance, she states in the Verified Complaint that she has

---

[3] As discussed later, the Minor Therapy Conversion Law is a professional conduct regulation that imposes an incidental burden on speech. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018).

[4] Ms. Chiles did not submit an affidavit in support of her preliminary injunction motion. However, the Court construes Ms. Chiles Verified Complaint, submitted under "penalties of perjury," as an affidavit for purposes of its analysis of *Peck*'s second factor (ECF No. 1 at 45-46). *See also, e.g.*, *Controltec, LLC v. Anthony Doors, Inc.*, No. 06-CV-00295-MSK, 2006 WL 8460951, at *1 (D. Colo. Feb. 22, 2006) (concluding that the moving party for a preliminary injunction "must show by Verified Complaint or Affidavit" facts to establish four preliminary injunction factors).

"intentionally avoided conversations with clients" that may be perceived as violating the Minor

Therapy Conversion Law, including conversations related to her practice—counseling clients on

their "sexual attractions, behaviors, and [gender] identity" (ECF No. 1 at 24-25 ¶ 83). Ms. Chiles

wishes to "assist clients with their stated desires," including discussions with certain clients

"seeking to reduce or eliminate unwanted sexual attractions" (*Id.* at 26 ¶ 87). Accordingly, she has

established the specific content of her desired speech for future client interactions, and satisfied

*Peck*'s second factor. *Cf. Peck*, 43 F.4th at 1131 (holding that "First Amendment plaintiffs

generally need not state that they 'have specific plans to engage in XYZ speech next Tuesday' in

order to show standing" (citation omitted)).

### c.  Credible Threat

In determining whether a First Amendment plaintiff has satisfied *Peck*'s third "credible

threat" factor, courts consider the following:

> (1) whether the plaintiff showed past enforcement against the
> same conduct; (2) whether authority to initiate charges was not
> limited to a prosecutor or an agency and, instead, any person
> could file a complaint against the plaintiffs; and (3) whether the
> state disavowed future enforcement.

*Peck*, 43 F.4th at 1132 (quotations omitted). No one "credible threat" factor is dispositive. *See id.*

*See also Scott v. Hiller*, No. 21-CV-02011-NYW-KLM, 2022 WL 4726038, at *6 (D. Colo. Oct.

3, 2022) ("The fact that a prosecutor had never enforced the statute at issue is not dispositive."

(citing *Peck*, 43 F.4th at 1133)). In short, the plaintiff must demonstrate "an objectively justified

fear of real consequences." *Peck*, 43 F.4th at 1132 (quotations omitted).

Regarding the "past enforcement" factor, Ms. Chiles has failed to identify any past

enforcement against the same conduct presented in her Verified Complaint. She argues only that

App.065

the Minor Therapy Conversion Law may impose "severe" sanctions if counselors violate it in the future (ECF No. 29 at 11). The "past enforcement" factor weighs against her for this reason.

Under the "prosecution" factor, Ms. Chiles admits that Defendants "are the persons empowered by Colorado to enforce" the Minor Therapy Conversion Law against her as a licensed professional counselor (ECF No. 1 at 40 ¶ 165; *see also id.* at 6-7 ¶¶ 31, 35). Therefore, the second element weighs against her. *See Peck*, 43 F.4th at 1132 (concluding second factor weighed against plaintiff where only "prosecutors c[ould] bring charges" under a statute).

Turning to whether the state has "disavowed" enforcement of the Minor Therapy Conversion Law, there is nothing in the preliminary injunction record to demonstrate that the Defendants "do not disavow an intent to prosecute" Ms. Chiles. *Peck*, 41 F.4th at 1132. Defendants' refusal to explicitly disavow enforcement of the Minor Therapy Conversion Law has "heavy weight" in the Court's assessment of Ms. Chiles' First Amendment claims. *Id.* at 1133. There is "nothing . . . to prevent [Defendants] or another [state entity] from" bringing charges in the future against Ms. Chiles under the Minor Therapy Conversion Law for statements that mirror those she has previously made to clients. *Id.*; *see also id.* at 1133 (concluding that a state's "refusal to provide such an assurance [that it will not enforce] undercu[t]" an argument that the plaintiff's "perception of a threat of prosecution is not objectively justifiable"). Therefore, the "disavowal" factor weighs in Ms. Chiles' favor.

Weighing the "credible threat" factors, Ms. Chiles has met her burden of showing that there is a credible threat that Defendants will enforce the Minor Therapy Conversion Law against her. *Peck*, 43 F.4th at 1129–30. Although only the third factor weighs in favor of Ms. Chiles, demonstrating that she suffers a credible threat of enforcement "is not supposed to be a difficult

App.066

bar to clear in the First Amendment pre-enforcement context." *Id.* at 1133. *See also Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003) ("As to whether a First Amendment plaintiff faces a credible threat of prosecution, the evidentiary bar that must be met is extremely low."); *Tingley v. Ferguson*, 47 F.4th 1055, 1066–67 (9th Cir. 2022) ("The unique standing considerations in the First Amendment context tilt dramatically toward a finding of standing when a plaintiff brings a pre-enforcement challenge" (quotations omitted)). Therefore, given the absence of Defendants' explicit disavowal to enforce the Minor Therapy Conversion Law and the "heavy weight" it places on the Court's assessment of whether Ms. Chiles' fears are credible, her fear of enforcement is "objectively justifiable" and therefore satisfies *Peck*'s "credible fear" factor. *See Peck*, 43 F.4th at 1133.

\* \* \*

For the reasons set forth above, Ms. Chiles has satisfied *Peck*'s three factors. She has in the past engaged in the type of speech affected by the Minor Therapy Conversion Law, demonstrated that she has a present desire to engage in speech the Minor Therapy Conversion Law affects, and that she has no intention to engage in this speech based on a "credible fear" that the Minor Therapy Conversion Law will be enforced against her. *See Peck*, 43 F.4th at 1129–30. Accordingly, she has established the injury in fact requirement, and has standing to bring this pre-enforcement First Amendment action. *See id.* at 1133; *see also Spokeo*, 578 U.S. at 338.[5]

---

[5] Ms. Chiles contends that she has standing because she has satisfied *Peck*'s requirements (*See* ECF No. 29 at 10). However, *Peck* only concerned standing's injury in fact requirement—not Ms. Chiles' burden to satisfy the two remaining standing elements. *See Peck*, 43 F.4th at 1129 ("[O]nly the injury-in-fact requirement is at issue."). Nonetheless, the Court agrees with Ms. Chiles that she has met her standing burden (ECF No. 29 at 11). *See also Spokeo*, 578 U.S. at 338. As the Tenth Circuit explained in *Peck*, "the statute's alleged violation of [the plaintiff's] First Amendment rights is undisputedly traceable to the statute itself and could be redressed by [a court's] invalidation of the law." *Peck*, 43 F.4th at 1129. So too with the Minor Therapy Conversion Law's alleged chilling of Ms. Chiles'

App.067

2.   *Third-Party Standing*

Ms. Chiles argues that she has standing to "assert the free-speech rights" of her clients (ECF No. 29 at 20). Defendants contend that Ms. Chiles lacks third-party standing because she has not established that she "holds a close relationship" to a specific third-party minor, that there is no "demonstrated hinderance" to a potential client's ability to protect their own interest, and that Ms. Chiles has fundamentally failed to provide any details of how her clients are "impacted" by the Minor Therapy Conversion Law (ECF No. 45 at 33, 35). The Court agrees with Defendants that Ms. Chiles lacks third-party standing to sue on behalf of her clients.

The Ninth Circuit had recent occasion to address this issue in a nearly identical factual context. In *Tingley v. Ferguson*, the Ninth Circuit considered "whether [Washington] may prohibit health care providers operating under a state license from practicing conversion therapy on children." *Tingley*, 47 F.4th at 1063. The Ninth Circuit concluded that a licensed therapist seeking to enjoin Washington's conversion therapy statute lacked standing to "bring claims on behalf of his minor clients." *Id.* at 1066. The plaintiff lacked third-party standing, the Ninth Circuit reasoned, because he made only "generalized statements about the rights of his clients" being purportedly violated by Washington's conversion therapy statute. *Id.* at 1069. Although the plaintiff had a "sufficiently close relationship" with his clients, he failed to allege how Washington's law "specifically deprived" them of counseling information they sought, and as such his allegations that Washington's law affected his clients were "speculative." *Id.*

_____

speech. Therefore, Ms. Chiles has met her burden as to the two remaining standing elements. *See Spokeo*, 578 U.S. at 338.

App.068

The Court finds *Tingley*'s reasoning persuasive. Ms. Chiles makes substantively the same arguments regarding her ability to sue on behalf of her clients as those the Ninth Circuit rejected in *Tingley*. For instance, Ms. Chiles contends that the Minor Therapy Conversion Law deprives her clients' "right to receive" counseling information regarding their sexual orientations or gender identities (ECF No. 29 at 20-21). Assuming Ms. Chiles had a close relationship with her clients, Ms. Chiles identifies nothing in her Verified Complaint or the preliminary injunction record that demonstrates how the Minor Therapy Conversion Law *specifically* deprives her clients of any information they seek. *See Tingley*, 47 F.4th at 1069. Moreover, *Tingley* explained, a therapist's minor clients seeking conversion therapy are free to bring their own lawsuits against conversion therapy laws, and may do so pseudonymously. *See id.*

Accordingly, the Court rejects Ms. Chiles' argument that she has standing to sue on behalf of her clients. "Without more detail about [her] clients, their desired information, or how the [Minor Therapy Conversion Law] has specifically deprived them of access to [conversion therapy] information," the Court refuses to "strain the limitations imposed on [it] by Article III to reach undeveloped claims brought on behalf" of Ms. Chiles' third-party minor clients. *Tingley*, 47 F.4th at 1069–70 (quotations omitted).

**B. Preliminary Injunction & Likelihood of Success on the Merits**

Because Ms. Chiles has standing to challenge the Minor Therapy Conversion Law, the Court turns to her arguments that the Minor Therapy Conversion Law should be enjoined (*See, e.g.,* ECF No. 29 at 3). Regarding the likelihood of success on the merits of her constitutional claims, Ms. Chiles makes two essential arguments. First, that the Minor Therapy Conversion Law unconstitutionally regulates speech rather than conduct, and therefore violates her free speech

App.069

rights (*Id.* at 13). Second, that the Minor Therapy Conversion Law violates her free exercise and due process rights (*Id.* at 22, 25). The Court considers and rejects these arguments in turn.

### 1.   *First Amendment Free Speech Claim*

#### a.   *Professional Conduct Regulation*

Defendants contend that the Minor Therapy Conversion Law—contrary to Ms. Chiles' argument—regulates professional conduct rather than speech. The Court agrees with Defendants that the Minor Therapy Conversion Law regulates professional conduct.

As an initial matter, the Court agrees with Defendants that the Minor Therapy Conversion Law is not so sweeping as Ms. Chiles argues (*See* ECF No. 45 at 18). For instance, she argues that "the [Minor Therapy Conversion Law] *prohibits* [her] from uttering words if those words might assist [her clients] in aligning their desires with their beliefs or their biology" (ECF No. 29 at 14 (emphasis added); *see also* ECF No. 1 at ¶ 4). But, as Defendants contend, the Minor Therapy Conversion Law imposes no prohibition on counselors' ability to assist clients with any concerns they raise regarding their sexuality or gender identity (ECF No. 45 at 19). Under the Minor Therapy Conversion Law, "conversion therapy" does *not* include "practices or treatments" that provide "[a]cceptance, support, and understanding *for the facilitation of an individual's coping.*" § 12–245–202(3.5)(b)(I) (emphasis added). Ms. Chiles is free to facilitate conversations regarding any minor clients' distresses about their sexuality or gender that "may arise" during their counseling sessions (*See* ECF No. 1 at 28 ¶ 96). *See also* § 12–245–202(3.5)(b)(I). Indeed, several of Ms. Chiles' practices are consistent with and do not violate the Minor Therapy Conversion Law (*See* ECF No. 1 at 24-25, 31 ¶¶ 82-83, 85, 108). Ms. Chiles may engage in therapeutic practices related to any minor client's distress, under the limited condition that her therapeutic assistance to a

App.070

client's distress "does not *seek to change* sexual orientation or gender identity." § 12–245–202(3.5)(b)(I) (emphasis added); *see also id.* at § 12–245–202(3.5)(a) (defining "conversion therapy" as a practice that "attempts or purports to change" a client's sexual orientation or gender identity, including "efforts to *change* [a client's] behaviors or gender expressions" (emphasis added)). Simply put, the Court agrees with Defendants that the Minor Therapy Conversion Law narrowly prohibits therapeutic practices that promote particular sexual orientations or gender identities—not practices that support, facilitate, or assist minor clients' exploration of those orientations or identities (*See* ECF No. 45 at 18). *See* § 12–245–202(3.5)(b)(I) (excluding from the definition of "conversion therapy" practices that facilitate minor clients' "identity exploration and development" including "sexual-orientation-neutral interventions" so long as those practices do not "seek to change" a client's sexual orientation or gender identity).

But Ms. Chiles' challenges more than the scope of the Minor Therapy Conversion Law's regulations. Ms. Chiles challenges what the Minor Therapy Conversion Law fundamentally regulates. In her opinion, the Minor Therapy Conversion Law regulates "pure speech," rather than professional conduct, and is therefore subject to strict scrutiny (*See* ECF No. 29 at 13, 15). Defendants argue that the Minor Therapy Conversion Law regulates professional conduct, not speech, and therefore it survives Ms. Chiles' constitutional challenge (*See* ECF No. 45 at 21). The Court agrees with Defendants.

Regulations of professional conduct are constitutionally permissible. *See, e.g.*, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456–57 (1978). And "[s]tates may regulate professional conduct, even though that conduct incidentally involves speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018) (citation omitted). When a state regulates

professional conduct that "incidentally involves speech," the First Amendment "afford[s] less protection" for the incidental professional speech. *Id.* (citations omitted). Although a state cannot "ignore constitutional rights" under the "guise of prohibiting professional misconduct," the First Amendment "does not prohibit restrictions directed [at] conduct from imposing incidental burdens on speech." *Id.* (citations omitted). *See also Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1226 (11th Cir. 2022), *cert. denied sub nom. Del Castillo v. Ladapo,* No. 22-135, 2022 WL 17408180 (U.S. Dec. 5, 2022) ("Because the [statute at issue] is a professional regulation with a merely incidental effect on protected speech, it is constitutional under the First Amendment." (quotations omitted)). "[P]rofessionals are no exception to this rule." *Id.* (citations omitted). *See also Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 884 (1992), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) ("To be sure, [a] physician's First Amendment rights not to speak are implicated by [an informed consent statute] . . . but only as part of the practice of medicine, subject to reasonable licensing and regulation . . . ." (citations omitted)).

The Minor Therapy Conversion Law regulates professional conduct. It contemplates regulating a licensed professional counselor's therapeutic "practice[s] or treatment[s] . . . ." § 12–245–202(3.5)(a); *see also id.* at § 12–245–202(6) (defining "licensed professional counselor"). Under the Minor Therapy Conversion Law, specifically credentialed professionals and their practices are empowered to provide "[a]cceptance, support, and understanding for the facilitation" of clients' therapeutic needs, but prohibited from using their "practices or treatment" in order to "change sexual orientation or gender identity." *Id.* at § 12–245–202(3)(b)(I). A reading of the Minor Therapy Conversion Law's plain text confirms that, as Defendants argue, it is a professional

14

App.072

regulation and "prophylactic measure[] whose objective is the prevention of harm before it occurs." *Ohralik*, 436 U.S. at 464. *See also id.* ("[The] State has a strong interest in adopting and enforcing rules of conduct designed to protect the public from harmful [professional practices] by [professionals] whom it has licensed.").

To support her argument that the Minor Therapy Conversion Law is unconstitutional, Ms. Chiles' characterizes the work she performs as a licensed professional counselor as pure speech protected by the First Amendment—not regulable professional conduct (*See* ECF No. 29 at 13-14). To be sure, "what one thinks or believes, what one utters and says have the full protection of the First Amendment." *Speiser v. Randall*, 357 U.S. 513, 535–36 (1958) (Douglas, J., concurring). And Defendants do not—and cannot—dispute that Ms. Chiles speaks to her clients during counseling sessions (*See* ECF No. 45 at 23-24). But speech made in professional contexts is not always pure speech. *See EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 429 (6th Cir. 2019) ("*Casey* and [*National Institute of Family and Life Advocates*] recognize that First Amendment heightened scrutiny does not apply to incidental regulation of professional speech that is part of the [professional] practice . . . ."). As Defendants argue, speech made in a professional context—particularly in the context of licensed professional counseling—is distinguishable from, for example, political speech (ECF No. 45 at 23). Ms. Chiles admits that she is a licensed professional counselor with a graduate degree in clinical mental health, and that her speech is made in the course of her work as a professional counselor (ECF No. 1 at 29-31 ¶¶ 104, 108). "[I]t has never been deemed an abridgment of freedom of speech . . . to [regulate] a course of [professional] conduct . . . merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Ohralik*, 436 U.S. at 456 (quotations omitted).

App.073

Ms. Chiles cites *Otto v. City of Boca Raton, Florida* for the proposition that a government cannot "relabel" pure speech as conduct to avoid heightened First Amendment scrutiny (*See* ECF No. 29 at 13-14). *See also Otto*, 981 F.3d at 865 ("The government cannot regulate speech by relabeling it as conduct."). Against a similar factual backdrop, *Otto* concluded that ordinances prohibiting "therapists from engaging in counseling . . . with a goal of changing a minor's sexual orientation" ultimately warranted strict scrutiny because the ordinances were "content-based restrictions of speech," not regulations of therapists' professional conduct. *Id.* at 859, 861. The Court finds *Otto*'s reasoning unpersuasive and therefore rejects it. Central to *Otto*'s conclusion that its conversion therapy ordinance was a content-based speech restriction was the Eleventh Circuit's prior admonishment that "the enterprise of labeling certain verbal or written communications 'speech' and others 'conduct' is unprincipled and susceptible to manipulation." *Id.* at 861 (citing *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1308 (11th Cir. 2017) (en banc)). Perhaps. But the Eleventh Circuit's conclusion that strict scrutiny applied to the ordinances in *Otto* simply because "the ordinances depend[ed] on what [was] said" ignores that "what [was] said" depends on its professional context and whether a plaintiff is licensed to say it. *Id.* at 861. *Cf. Del Castillo*, 26 F.4th at 1225–26 ("Assessing a client's . . . needs, conducting . . . research, developing a . . . care system, and integrating information from [an assessment] are not speech. They are 'occupational conduct'. . . as part of . . . professional services." (citation omitted)).

As Defendants observe, other cases run contrary to *Otto* (*See, e.g.,* ECF No. 45 at 25-26). *See, e.g., Del Castillo*, 26 F.4th at 1225 ("A statute that governs the practice of an occupation is not unconstitutional as an abridgment of the right to free speech, so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation." (quotation

App.074

omitted)). *Tingley*, in fact, reached the exact opposite conclusion as *Otto*: "What licensed mental health providers do during their appointments with patients for compensation under the authority of a state license is treatment." *Tingley*, 47 F.4th at 1082. Furthermore, *Tingley* correctly characterized the nature of professional counseling practices related to minors' sexuality and gender identity. *See Tingley*, 47 F.4th at 1083 ("The work that [a therapist] does is different than a conversation about the weather, even if he claims that all he does is 'sit and talk.'"). "That the treatment technique of talk therapy is administered through words does not somehow render it any less of a healthcare treatment technique or any less subject to government regulation in the interest of protecting the public health." *Otto v. City of Boca Raton, Fla*., 41 F.4th 1271, 1294–95 (11th Cir. 2022)[6] (Rosenbaum, J., dissenting from the denial of rehearing en banc). Ms. Chiles errs in arguing otherwise (*See* ECF No. 29 at 15).[7]

> b.   *Rational Basis Review*

The Minor Therapy Conversion Law is viewpoint neutral and does not impose content-based speech restrictions.[8] It is a public health law that regulates professional conduct. Any speech

---

[6] After a three-judge panel of the Eleventh Circuit decided *Otto v. City of Boca Raton, Florida*, 983 F.3d 854 (11th Cir. 2020), the Eleventh Circuit voted against hearing the case en banc. *See Otto v. City of Boca Raton, Florida*, 41 F.4th 1271 (11th Cir. 2022).

[7] Ms. Chiles contends that her speech is not incidental to her professional conduct because Defendants cannot identify any separate conduct—other than her speech—that the Minor Therapy Conversion Law regulates (ECF No. 29 at 15). The Court rejects this argument because it rests on a flawed premise, presupposing "speech" in the context of a licensed professional counselor's work is wholly separate from the work of counseling itself. However, "[t]he practice of psychotherapy is not different from the practice of other forms of medicine simply because it uses words to treat ailments." *Tingley*, 47 F.4th at 1082.

[8] Ms. Chiles argues that the Minor Therapy Conversion Law "discriminates based on viewpoint" because it prohibits "counseling from the viewpoint" that sexuality and gender identity can "change to align with an individual's biology and beliefs" (ECF No. 29 at 20; *see also id.* at 18). Not so. As explained above, the Court agrees with Defendants that the Minor Therapy Conversion Law is a professional conduct regulation that affects all regulated counselors and prohibits therapeutic *practices* attempting to change a minor's sexual orientation or gender identity. *See* C.R.S. § 12–245–202(3.5)(a). To the extent it affects speech incidental to a practitioner's therapeutic practice, it does so in order to regulate outcome-determinative counseling for *all* clients—including heterosexual-identifying clients. Moreover,

App.075

affected by the Minor Therapy Conversion Law is incidental to the professional conduct it regulates. *See National Institute of Family and Life Advocates*, 138 S. Ct. at 2372. Accordingly, the Court declines Ms. Chiles' invitation to apply strict scrutiny in its analysis of her First Amendment challenge (ECF No. 29 at 25).[9]

The Court applies rational basis review to its analysis of the Minor Therapy Conversion Law. *See, e.g., Tingley*, 47 F.4th at 1077–78 (applying rational basis review to conversion therapy law); *Otto*, 41 F.4th at 1276 ("The rational basis 'reasonableness' standard applies only to regulations of conduct that incidentally burden speech." (citing *National Institute of Family and Life Advocates*, 138 S. Ct. at 2373–74)) (Grant, J., concurring in the denial of rehearing en banc); *Ohralik*, 436 U.S. at 462. To survive the "light burden" of rational basis review, the Minor Therapy Conversion Law must be "rationally related to a legitimate state interest." *Tingley*, 47 F.4th at 1078 (quotations omitted); *see also Wilson v. Wichita State Univ*., 662 F. App'x 626, 629 (10th Cir. 2016) ("Under the rational-basis standard, we will uphold an action so long as it is rationally related to a legitimate government purpose." (citation omitted)). Public health laws "must be sustained if there is a rational basis on which the legislature could have thought that it would serve legitimate state interests." *Dobbs*, 142 S. Ct. at 2284 (quotation omitted). "[H]ealth and welfare laws [are] entitled to a strong presumption of validity." *Id.* (citation omitted).

---

this professional regulation applies to all licensed counselors. *See Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 694 (2010) ("It is, after all, hard to imagine a more viewpoint-neutral policy than one requiring *all* student groups to accept *all* comers"); *see also id*. at 699 (distinguishing "singling out" those "who hold religious beliefs" from "those who engage in discriminatory conduct based on . . . religious beliefs" and stating that "all acts of [] discrimination are equally covered [and] [t]he discriminator's beliefs are simply irrelevant") (Stevens, J., concurring).

[9] Because the Minor Therapy Conversion Law is a professional conduct regulation that does not discriminate on the basis of content or viewpoint, Ms. Chiles' argument that Defendants bears the burden to "justify" its content-based restrictions is of no moment, and the Court need not indulge it (ECF No. 25 at 12).

App.076

The Court agrees with Defendants that the Minor Therapy Conversion Law survives rational basis review (*See* ECF No. 45 at 27-29). First, Defendants have a legitimate and important state interest in the prevention of "harmful therapy known to increase suicidality in minors" (*Id.* at 29; ECF No. 45-1 at 5-6). *See also Tingley*, 47 F.4th at 1078 (describing state interest in "protecting . . . minors against exposure to serious harms caused by conversion therapy" as "without a doubt" a "legitimate state interest" (citations and alterations omitted)); *Otto*, 41 F.4th at 1285–86 (describing therapeutic practices that are "sexual-orientation change efforts" as "types of talk therapy that significantly increase the risk of suicide and have never been shown to be efficacious") (Rosenbaum, J., dissenting from the denial of rehearing en banc). The legitimacy and importance of the interest underpinning the Minor Therapy Conversion Law is undisputable. Surely, a state's interest in protecting the psychological and physical health of its minor population cannot be doubted. *Cf. Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 607 (1982) ("[S]afeguarding the physical and psychological well-being of a minor . . . is a *compelling one*." (emphasis added)).

Furthermore, Defendants have a legitimate interest in "regulating and maintaining the integrity of the mental-health profession," which includes regulating the efficacy and safety of its professionals' therapeutic practices—particularly the practices of mental health professionals who counsel minor clients. *Ferguson v. People*, 824 P.2d 803, 810 (Colo. 1992). *See also Tingley*, 47 F.4th at 1078 ("[The state] also has a compelling interest in the practice of professions within [its] boundaries . . . regulating mental health . . . and affirming the equal dignity and worth of LGBT people." (quotations omitted) (first alteration added)).

App.077

Second, the Minor Therapy Conversion Law rationally serves these legitimate and important interests. *See Dobbs*, 142 S. Ct. at 2284. As the Ninth Circuit explained in *Tingley* and its analysis of Washington's conversion therapy law, a state acts "rationally when it decide[s] to protect the physical and psychological well-being of its minors by preventing state-licensed health care providers from practicing conversion therapy on them." *Tingley*, 47 F.4th at 1078 (quotations omitted). The preliminary injunction record demonstrates that conversion therapy is ineffective and harms minors who identify as gay, lesbian, bisexual, transgender, or gender non-conforming (ECF No. 45 at 29-30, 39; *see also, e.g.*, ECF No. 45-1 at 22-24, 29-33). Colorado considered the body of medical evidence regarding conversion therapy and sexual orientation change efforts— and their harms—when passing the Minor Therapy Conversion Law and made the reasonable and rational decision to protect minors from ineffective and harmful therapeutic modalities (*See* ECF No. 45 at 30). *See also Tingley*, 47 F.4th at 1078–79 ("In relying on the body of evidence before it . . . [the state] rationally acted by amending its regulatory scheme for licensed health care providers to add [conversion therapy] to the list of unprofessional conduct for the health professions." (quotations omitted)).[10] Therefore—and for substantially the same reasons set forth in *Tingley*—the Minor Therapy Conversion Law survives rational basis review.

---

[10] Ms. Chiles argues that the medical evidence does not so readily support the Colorado legislature's concerns regarding conversion therapy (*See, e.g.*, ECF Nos. 25 at 5; 1 at 9-10 ¶¶ 43-44). The Court disagrees. The preliminary injunction record amply shows that the Minor Therapy Conversion Law comports with the prevailing medical consensus regarding conversion therapy and sexual orientation change efforts (*See generally* ECF No. 45-1). Moreover, even if Ms. Chiles identifies some medical evidence that runs contrary to the evidence Defendants marshal and consulted in passing the Minor Therapy Conversion Law, "the preponderating opinion in the medical community is against its use." *Tingley*, 47 F.4th at 1081 (quotations omitted). *See also id.* (affirming "the right of the government to regulate what medical treatments its licensed health care providers could practice on their patients according to the applicable standard of care and governing consensus at the time (even if not unanimous)").

Ms. Chiles argues that the Minor Therapy Conversion Law is "presumptively invalid" because—in order for it to survive her challenge—Defendants must identify "historical evidence" that a "long tradition" of similar speech restrictions exists (ECF No. 25 at 12). Again, Ms. Chiles is incorrect. As set forth above, the Minor Therapy Conversion Law is a professional conduct regulation and does not implicate legal frameworks that might otherwise apply to content-based speech restrictions under the First Amendment. *See National Institute of Family and Life Advocates*, 138 S. Ct. at 2373. On this basis, Ms. Chiles' reliance on *New York State Rifle & Pistol Association, Inc. v. Bruen* is misplaced. 142 S. Ct. 2111, 2130 (2022) ("When the government restricts *speech* [it] bears the burden of providing [the restriction's] constitutionality [by] generally point[ing] to historical evidence about the reach of the First Amendment's protections." (quotations omitted) (emphasis added)). Nonetheless, Defendants have identified a history of public health regulations with which the Minor Therapy Conversion Law is entirely consistent (*See* ECF No. 45 at 22-23). "It is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings, *particularly those which closely concern the public health*. There is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine." *Watson v. State of Maryland*, 218 U.S. 173, 176 (1910) (emphasis added); *see also Dent v. State of W.Va.*, 129 U.S. 114, 122 (1889) ("The power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations . . . . [a]s one means to this end it has been the practice of different states, from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely."); *Tingley*, 47 F.4th at 1080 ("There is a long (if

21

App.079

heretofore unrecognized) tradition of regulation governing the practice of those who provide health care within state border.").

Fundamentally, Ms. Chiles fails to overcome the "strong presumption of validity" the Court applies to the Minor Therapy Conversion Law. *Dobbs*, 142 S. Ct. at 2284 (citation omitted). As such, and for the reasons set forth above, she has failed to meet her burden of showing a likelihood of success on the merits of her First Amendment free speech claim. *See Beltronics*, 562 F.3d at 1070 (10th Cir. 2009).

### 2. *First Amendment Free Exercise Claim*

Ms. Chiles argues that the Minor Therapy Conversion Law violates her First Amendment free exercise rights because it is neither neutral nor generally applicable, and therefore cannot survive strict scrutiny (*See* ECF No. 29 at 22, 24). Defendants contend that the Minor Therapy Conversion law is neutral and generally applicable (*See* ECF No. 45 at 38, 40). For these reasons, Defendants argue, rational basis review applies and the Minor Therapy Conversion Law survives rational basis review (*See* ECF No. 45 at 37). For the reasons set forth below, the Court agrees with Defendants.

### a. *Legal Standard Governing First Amendment Free Exercise Claims*

The First Amendment's Free Exercise Clause, "applicable to the States under the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1876 (2021) (quotation omitted); *see also* U.S. Const. amend. I. Laws prohibiting religion's free exercise may be subject to strict scrutiny. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022). "But such strict scrutiny does not always apply to free-exercise claims." *Church v. Polis*, No. 20-

1391, 2022 WL 200661, at *8 (10th Cir. Jan. 24, 2022), *cert. denied sub nom. Cmty. Baptist Church v. Polis*, 142 S. Ct. 2753 (2022). "[N]eutral" and "generally applicable" laws are not subject to strict scrutiny, even if they "incidentally burden[] religion." *Fulton*, 141 S. Ct. at 1876 (citation omitted); *see also Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006) ("Neutral rules of general applicability normally do not raise free exercise concerns even if they incidentally burden a particular religious practice or belief." (citation omitted)); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) ("[O]ur cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."). *Cf. Fulton*, 141 S. Ct. at 1882 ("[A] neutral and generally applicable law typically does not violate the Free Exercise Clause—no matter how severely that law burdens religious exercise." (citation omitted)) (Barrett, J., concurring).

Laws that are "both neutral and generally applicable need only be rationally related to a legitimate governmental interest to survive a constitutional challenge"—i.e., they are only subject to rational basis review. *Grace United Methodist Church*, 451 F.3d at 649 (citation omitted); *see also Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 52 (10th Cir. 2013) ("Government actions that stem from 'neutral' rules of 'general applicability' are subject to rational basis review." (citation omitted)). With this legal standard in mind, the Court proceeds in its analysis of Ms. Chiles' free exercise claim.

### b.  *Minor Therapy Conversion Law & Neutrality*

Ms. Chiles argues that the Minor Therapy Conversion Law is not neutral because it is "based on religious hostility" and "targets a religious practice" (ECF No. 29 at 22). Defendants

contend that Ms. Chiles cannot meet her burden of showing that the Minor Therapy Conversion Law is not neutral because it is "directed at a therapy practice and does not restrict religious exercise" (ECF No. 45 at 38). The Court agrees with Defendants.

A state "fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877 (citation omitted). Factors "relevant to the assessment" of government neutrality include:

- The "historical background" of the challenged decision or policy;

- Specific series of events "leading to the enactment" of the challenged policy; and

- Legislative or administrative histories

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018) (citation omitted).

According to Ms. Chiles, the Minor Therapy Conversion Law is not neutral because it was "well-known" at the time the Colorado General Assembly enacted the Minor Therapy Conversion Law that conversion therapy was primarily sought for religious reasons (ECF No. 29 at 22). Therefore, Ms. Chiles' argument goes, the Minor Therapy Conversion Law impermissibly burdens practitioners who hold particular religious beliefs (*See id.*). The Court disagrees. The Minor Therapy Conversion Law does not "restrict [therapeutic] practices because of their *religious* nature." *Fulton*, 141 S. Ct. at 1877 (citation omitted) (emphasis added). As Defendants argue, the Minor Therapy Conversion Law targets specific "modes of therapy" due to their *harmful* nature— regardless of the practitioner's personal religious beliefs or affiliations (ECF No. 45 at 38). As the preliminary injunction record shows, the Minor Therapy Conversion law targets these therapeutic

24

modalities because conversion therapy is ineffective and has the potential to "increase [minors']

isolation, self-hatred, internalized stigma, depression, anxiety, and suicidality" (ECF No. 45-1 at

36 ¶ 68; *see also id.* at 34-35 ¶ 64). Against the background of a significant body of scientific

research concerning conversion therapy's historical ineffectiveness and harmfulness, the Colorado

General Assembly enacted the Minor Therapy Conversion Law to eliminate the harms minor

clients suffered during conversion therapy (*See, e.g.*, ECF No. 45-1 at 5-6 ¶ 13).

Fundamentally, the Minor Therapy Conversion Law neutrally regulates professional

conduct and professional practices. For this reason, Ms. Chiles' arguments that the Minor Therapy

Conversion Law is not neutral because its regulation of specific therapeutic practices incidentally

burdens her—or any other practitioners'—religious beliefs is unavailing. *See, e.g., Fulton*, 141 S.

Ct. at 1876; *Grace United Methodist*, 451 F.3d at 649. The Minor Therapy Conversion law "is

[not] *specifically directed* at" religious practices, nor are religious exercises its "object." *Kennedy*,

142 S. Ct. at 2442 (quotations omitted) (emphasis added); *see also Grace United Methodist*, 451

F.3d at 649–50 ("A law is neutral so long as its object is something other than the infringement or

restriction of religious practices." (citation omitted)). Simply because some religious bases for

conversion therapy may have been "well-known" at the time the Minor Therapy Conversion Law

was enacted does not erase its facial neutrality or the backdrop of scientific evidence considered

in the Law's passage.[11] There is nothing on the Minor Therapy Conversion Law's face that "refers

to a religious practice without a secular meaning discernable from the language or context."

---

[11] Ms. Chiles identifies herself as a "practicing Christian" (ECF No. 1 at 29-30 ¶ 104). She also notes that conversion therapy may include "techniques based in Christian faith-based methods" and is provided by practitioners who "believe in Christian faith-based methods" of counseling (*Id.* at 7 ¶ 37; *see also* ECF No. 29 at 22). The preliminary injunction does not indicate—and the Court expresses no opinion on—whether any non-Christian practitioners, or Christians with religious beliefs that are dissimilar to Ms. Chiles' beliefs, engage in professional conduct that implicates the Minor Therapy Conversion Law.

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). At bottom, the Minor Therapy Conversion Law is facially neutral, and nothing in the preliminary injunction record demonstrates that "suppression" of any religions or religious beliefs was the Minor Therapy Conversion Law's "central element." *Id.* at 534.

Ms. Chiles makes the additional argument that the Minor Therapy Conversion Law "attempt[s] to impose its views" on practitioners (ECF No. 29 at 23). Nonsense. As Defendants observe, the Minor Therapy Conversion Law exempts from its coverage forms of religious ministry (ECF No. 45 at 40). *See also* C.R.S. § 12-245-217(1) ("A person engaged in the practice of religious ministry is not required to comply with [the Minor Therapy Conversion Law]"); *Tingley*, 47 F.4th at 1085 ("The law's express protection for the practice of conversion therapy in a religious capacity is at odds with [the plaintiff's] assertion that the law inhibits religion."). This exemption underscores that the Minor Therapy Conversion Law intends to regulate therapeutic practices and the harms that flow from these practices, not individual practitioners' religious beliefs. *See id.* For these reasons, Ms. Chiles has not met her burden of showing the Minor Therapy Conversion law is not neutral.

### c.  *Minor Therapy Conversion Law & General Applicability*

Ms. Chiles argues that the Minor Therapy Conversion Law is not generally applicable because it contains "vague terms" that invite "individual exemptions" regarding practitioners' conduct (ECF No. 29 at 24). Defendants contend that the Minor Therapy Conversion Law is generally applicable because it "does not contain a mechanism for individualized exemptions" and prohibits conversion therapy for any reason (ECF No. 45 at 40). The Court agrees with Defendants.

App.084

"The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Lukumi*, 508 U.S. at 543. A law will fail the "general applicability requirement" if the law "prohibits religious conduct while permitting secular conduct . . . ." *Kennedy*, 142 S. Ct. at 2422 (quotations omitted). Further, "[a] law is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877 (quotations omitted). In the case of free exercise challenges based on a law's alleged system of "individualized exceptions," the law is generally applicable "as long as [it] remains exemptionless, and [therefore] religious groups cannot claim a right to exemption; however, when a law has secular exemptions, a challenge by a religious group becomes possible." *Grace United Methodist*, 451 F.3d at 650.

Ms. Chiles argues that the Minor Therapy Conversion Law impermissibly "invites enforcement authorities" to "make individualized exemptions" for secular counselors whose therapeutic practices are approved under the Law (ECF No. 29 at 24). The Court disagrees. The Minor Therapy Conversion Law is enforced against all practitioners who engage in defined forms of conversion therapy. *See* § 12-245-202. It does not invest in any agency the "sole discretion" to decide when enforcement of the Minor Therapy Conversion Law is warranted. *See Fulton*, 141 S. Ct. at 1879. Contrary to Ms. Chiles' contention that the Minor Therapy Conversion Law uses "vague terms," it clearly describes what practices do and do not violate the Law. *See id.; see also* § 12-245-202(3.5)(a), (b). The Minor Conversion Therapy Law's facial language does not provide a "formal and discretionary mechanism" for individual, discretionary exceptions. *See Tingley*, 47 F.4th at 1088. *Cf. Fulton*, 141 S. Ct. at 1878 ("[T]inclusion of a *formal system of entirely*

27

*discretionary exceptions* in [the law] renders [its requirements] not generally applicable." (emphasis added).[12] And to the extent that Ms. Chiles argues that the Minor Therapy Conversion Law favors certain forms of therapeutic counseling over others, it does not. The Minor Therapy Conversion Law simply prohibits specific therapeutic practices (*See* ECF No. 29 at 24).[13] The Minor Therapy Conversion Law's prohibition on specific therapeutic practices constitutes a "limited-yes-or-no inquiry" into whether a counselor's practice violates the Law. *See Axson-Flynn v. Johnson*, 356 F.3d 1277, 1298 (10th Cir. 2004) ("[T]hat kind of limited yes-or-no inquiry is qualitatively different from [a] kind of case-by-case system . . . ."); *see also id.* ("[The] 'individualized exemption' exception is limited . . . to systems that are *designed* to make *case-by-case* determinations . . . ." (emphasis added) (citation omitted). As such, Ms. Chiles has failed to meet her burden regarding the Minor Therapy Conversion Law's general applicability.

### d.  Rational Basis Review

Ms. Chiles has failed to meet her burden of showing the Minor Therapy Conversion Law is not neutral or generally applicable. Therefore, the Court applies rational basis, rather than strict scrutiny, review. *See Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 53 (10th Cir. 2013) ("[The] District's actions were based upon neutral rules of general applicability, [and are] subject to rational basis review." (citation omitted)). As discussed above, the Minor Therapy Conversion

---

[12] The Court agrees with Defendants that the Minor Therapy Conversion Law's exemption of religious ministries from its prohibitions further demonstrates that the Minor Therapy Conversion Law is generally applicable and does not treat secular activity "more favorably" than religious exercise (ECF No. 45 at 41). *See Tandon v. Newsom,* 141 S. Ct. 1294, 1297 (2021). *See also Lukumi*, 508 U.S. at 543 ("[The] government . . . cannot in a selective manner *impose* burdens only on conduct motivated by religious belief . . . ." (emphasis added)); *Kennedy*, 142 S. Ct. at 2422.

[13] At one point in her preliminary injunction motion, Ms. Chiles argues that the Minor Therapy Conversion Law is overinclusive and underinclusive (ECF No. 29 at 30-32). The Court rejects this argument. The Minor Therapy Conversion Law is a neutral and generally applicable law that regulates professional conduct—not pure speech—and clearly delineates what therapeutic practices it does and does not allow. *See* § 12-245-202(3.5)(a), (b).

Law is rationally related to a legitimate governmental interest and survives rational basis review. Ms. Chiles has failed to show a likelihood of success on the merits on her First Amendment free exercise claim.[14]

### 3. Due Process Claim

Ms. Chiles also challenges the Minor Therapy Conversion Law on due process grounds, contending that it is unconstitutionally vague and gives enforcement authorities "unfettered discretion to punish speech with which they disagree" (ECF No. 29 at 32). Defendants argue that Ms. Chiles cannot meet her burden of showing that the Minor Therapy Conversion Law violates the Fourteenth Amendment's Due Process Clause because the Law is clear and does not invite arbitrary enforcement (ECF No. 49 at 45-46). The Court agrees with Defendants.

First, the Minor Therapy Conversion Law is not unconstitutionally vague. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law is unconstitutionally vague if it does not provide "a person of ordinary intelligence [with] fair notice of what is permitted" or is so "standardless" that it permits "seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Ms. Chiles argues that the Minor Therapy Conversion Law is unconstitutionally vague because it is ambiguous and does not precisely define its key terms (*See* ECF No. 29 at 33). The Court disagrees. The Minor Therapy Conversion Law defines what is— and is not—considered "conversion therapy," and what therapeutic practices violate the Law. *See*

---

[14] Because Ms. Chiles has failed to show a likelihood of success on the merits of her free speech and free exercise claims, the Court need not address her argument that she has a "hybrid-rights" claim triggering strict scrutiny. *See Axson-Flynn*, 356 F.3d at 1295 ("[T]he hybrid-rights theory at least requires a colorable showing of infringement of a companion constitutional right." (quotations omitted)).

App.087

§ 12-245-202(3.5)(a), (b). Colorado law elsewhere defines "gender identity" and "sexual orientation." C.R.S. § 24-34-301(3.5), (7). For these reasons, the Minor Therapy Conversion Law provides a person of ordinary intelligence with sufficient information to ably determine what is and is not permitted under the Law. *See* § 12-245-202(3.5)(a), (b). *See also Williams*, 553 U.S. at 304; *Tingley*, 47 F.4th 1055, 1089–90 (rejecting argument that the phrases "sexual orientation" and "gender identity" were unconstitutionally vague); *id.* at 1090 ("[T]he terms of the statute provide a clear, dividing line: whether change [of a minor's gender identity] is the object."); *Reynolds v. Talberg*, No. 1:18-CV-69, 2020 WL 6375396, at *9 (W.D. Mich. Oct. 30, 2020) ("Phrases like 'sexual orientation' and 'gender identity' have also been held sufficiently definite to foreclose vagueness challenges . . . . If the phrase 'gender identity' is not too vague, then surely companion concepts like 'transgender' and 'gender expression' are not overly vague either." (citations omitted)).

Second, the Court rejects Ms. Chiles' argument that the Minor Therapy Conversion Law violates due process on the grounds that its enforcement is "left to the subjective judgments" of enforcement agencies (ECF No. 29 at 34). As discussed above in the Court's analysis of Ms. Chiles' free exercise claim, the Minor Therapy Conversion Law clearly delineates what is and is not permitted under the Law. *See* § 12-245-202(3.5)(a), (b). The Minor Therapy Conversion Law is "sufficiently definite such that it does not encourage arbitrary enforcement" against specified therapeutic practices. *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1180 (10th Cir. 2009). Its enforcement does not require an indeterminate, "wide-ranging inquiry" that "invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 597 (2015). As such, Ms. Chiles has not

App.088

met her burden of showing that the Minor Therapy Conversion Law is unconstitutional under the Fourteenth Amendment's Due Process Clause.

* * *

For the reasons set forth above, Ms. Chiles has failed to meet her burden of showing a likelihood of success on the merits for all of her constitutional challenges to the Minor Therapy Conversion Law. Because a preliminary injunction "can issue only if each [preliminary injunction] factor is established," and Ms. Chiles has not met her burden on the "likelihood of success on the merits" factor, the Court need not determine whether she has met her burden for the remaining preliminary injunction factors. *See Denver Homeless*, 32 F.4th at 1277 (citation omitted).

The Court makes one final observation. Throughout her preliminary injunction motion, Ms. Chiles contends that she "listens and asks questions to help" her clients (ECF No. 29 at 14). According to Ms. Chiles, "[a]ll she does is talk to her clients" (*Id.* at 13). As the preliminary injunction record shows, this is disingenuous. "What licensed mental health providers do during their appointments with patients for compensation under the authority of a state license is treatment." *Tingley*, 47 F.4th at 1082. Ms. Chiles cannot seriously compare her work as a professional counselor to "book club" discussions, given especially that she claims the relationship between "a mental health professional and her client" is based on a "deeply held trust from which a *critical* therapeutic alliance forms allowing the *professional* to provide *vital mental health care* to the client" (*Cf.* ECF No. 29 at 16; ECF No. 1 at 2 ¶ 1 (emphasis added)). The therapeutic work for which she obtained a graduate degree and professional licensure is incomparable to casual conversations about *New York Times* bestsellers. *See also Tingley*, 47 F.4th at 1082–83 ("Comparing the work that licensed mental health providers do to book club discussions or

conversations among friends minimizes the rigorous training, certification, and post-secondary education that licensed mental health providers endure to be able to treat other humans for compensation.").

"Children may identify as gay, straight, cisgender, or transgender." *Id.* at 1084. In the case of children who identify as lesbian, gay, bisexual, cisgender, transgender, or gender non-conforming, they are entitled to treatment—regardless of its outcome—that does not take a cavalier approach to their "dignity and worth." *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018). And at the bare minimum, they are also entitled to a state's protection from therapeutic modalities that have been shown to cause longstanding psychological and physical damage.

## IV. CONCLUSION

Consistent with the above analysis, Ms. Chiles' Motion for Preliminary Injunction (ECF No. 29) is DENIED.

DATED this 19th day of December 2022.

BY THE COURT:

Charlotte N. Sweeney
United States District Judge

App.090

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 22-cv-2287**

KALEY CHILES,

     Plaintiff,

v.

PATTY SALAZAR, in her official capacity as Executive Director of the Department of
Regulatory Agencies; and
REINA SBARBARO-GORDON in her official capacity as Program Director of the State Board
of Licensed Professional Counselor Examiners and the State Board of Addiction Counselor
Examiners;
JENNIFER LUTTMAN, in her official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
AMY SKINNER, in her official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
KAREN VAN ZUIDEN, in her official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
MARYKAY JIMENEZ, in her official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
KALLI LIKNESS, in her official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
SUE NOFFSINGER, in her official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
RICHARD GLOVER, in his official capacity as a member of the State Board of Licensed
Professional Counselor Examiners;
ERIKA HOY, in her official capacity as a member of the State Board of Licensed Professional
Counselor Examiners;
KRISTINA DANIEL, in her official capacity as a member of the State Board of Addiction
Counselor Examiners;
HALCYON DRISKELL, in her official capacity as a member of the State Board of Addiction
Counselor Examiners;
CRYSTAL KISSELBURGH, in her official capacity as a member of the State Board of
Addiction Counselor Examiners;
ANJALI JONES, in her official capacity as a member of the State Board of Addiction
Counselor Examiners;
THERESA LOPEZ, in her official capacity as a member of the State Board of Addiction
Counselor Examiners; and
JONATHAN CULWELL, in his official capacity as a member of the State Board of Addiction
Counselor Examiners;

     Defendants.

1

App.091

---

**NOTICE OF APPEAL**

---

Plaintiff Kaley Chiles, through undersigned counsel, hereby appeals, pursuant to 28 U.S.C. § 1292(a)(1), to the United States Court of Appeals for the Tenth Circuit from the Order of the District Court entered on December 19, 2020 (Doc. 55) denying Plaintiff's motion for preliminary injunction.

Respectfully submitted this 20th day of December 2020.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

Shaun Pearman
The Pearman Law Firm, P.C.
4195 Wadsworth Boulevard
Wheat Ridge Colorado 80033
Phone Number: (303) 991-7600
Fax Number: (303) 991-7601
E-mail: shaun@pearmanlawfirm.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 20, 2022, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email counsel of record:

*/s/ Barry K. Arrington*
_____
Barry K. Arrington

2

App.092

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 22-cv-2287-CNS-STV**
**KALEY CHILES**,

Plaintiff,

v.

**PATTY SALAZAR**, in her official capacity as Executive Director of the Department of Regulatory Agencies; and

**REINA SBARBARO-GORDON**, in her official capacity as Program Director of the State Board of Licensed Professional Counselor Examiners and the State Board of Addiction Counselor Examiners;

**JENNIFER LUTTMAN**, in her official capacity as a member of the State Board of Licensed Professional Counselor Examiners;

**AMY SKINNER**, in her official capacity as a member of the State Board of Licensed Professional Counselor Examiners;

**KAREN VAN ZUIDEN**, in her official capacity as a member of the State Board of Licensed Professional Counselor Examiners;

**MARYKAY JIMENEZ**, in her official capacity as a member of the State Board of Licensed Professional Counselor Examiners;

**KALLI LIKNESS**, in her official capacity as a member of the State Board of Licensed Professional Counselor Examiners;

**SUE NOFFSINGER**, in her official capacity as a member of the State Board of Licensed Professional Counselor Examiners;

**RICHARD GLOVER**, in his official capacity as a member of the State Board of Licensed Professional Counselor Examiners;

**ERIKA HOY**, in her official capacity as a member of the State Board of Licensed Professional Counselor Examiners;

App.093

**KRISTINA DANIEL**, in her official capacity as a member of the State Board of Addiction Counselor Examiners;

**HALCYON DRISKELL**, in her official capacity as a member of the State Board of Addiction Counselor Examiners;

**CRYSTAL KISSELBURGH**, in her official capacity as a member of the State Board of Addiction Counselor Examiners;

**ANJALI JONES**, in her official capacity as a member of the State Board of Addiction Counselor Examiners;

**THERESA LOPEZ**, in her official capacity as a member of the State Board of Addiction Counselor Examiners; and

**JONATHAN CULWELL**, in his official capacity as a member of the State Board of Addiction Counselor Examiners;

Defendants.

---

## NOTICE OF CROSS-APPEAL FROM AN APPEALABLE ORDER

All defendants, through the Colorado Attorney General, hereby give notice of intent to cross-appeal to the United States Court of Appeals for the Tenth Circuit from the Order of the District Court entered on December 19, 2022 (Doc. 55) denying Plaintiff's motion for preliminary injunction.

Respectfully submitted this 3rd day of January, 2023.

PHILIP J. WEISER
Attorney General

s/ *Janna K. Fischer*

***Robert W. Finke***,
First Assistant Attorney General
Telephone: 720-508-6376
Email: robert.finke@coag.gov

2

App.094

***Bianca Miyata***
Senior Assistant Attorney General II
Telephone: 720-508-6651
Email: bianca.miyata@coag.gov

***Janna K. Fischer***
Assistant Attorney General
Telephone: 720-508-6374
Email: janna.fischer@coag.gov

***Abby Chestnut***
Assistant Attorney General
Telephone: 720-508-6353
Email: abby.chestnut@coag.gov

***Brianna S. Tancher***
Assistant Attorney General
Telephone: 720-508-6404
Email: brianna.tancher@coag.gov

*Counsel for Defendants*

App.095

4