Nos. 22-1445; 23-1002

# In the United States Court of Appeals for the Tenth Circuit

KALEY CHILES, Plaintiff-Appellant,

*v.*

PATTY SALAZAR, ET AL., Defendants-Appellees.

On Appeal from the United States District Court
for the District of Colorado, Case No. 1:22-CV-02287-CNS-STV
(Hon. Charlotte N. Sweeney)

## BRIEF OF THE INSTITUTE FOR JUSTICE AS AMICUS CURIAE IN SUPPORT NEITHER PARTY

Paul M. Sherman
Robert J. McNamara
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
psherman@ij.org
rmcnamara@ij.org

*Counsel for Amicus Curiae Institute for Justice*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, amicus curiae the Institute for Justice states that it is a 501(c)(3) nonprofit organization. It has no parent corporation and no publicly traded stock. No publicly held corporation owns any part of it.

s/ Paul M. Sherman
Paul M. Sherman
INSTITUTE FOR JUSTICE
  901 N. Glebe Road, Suite 900
  Arlington, VA 22203
  (703) 682-9320
  psherman@ij.org

# TABLE OF CONTENTS

Page(s)

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES ............................................................ iii

STATEMENT OF AMICUS CURIAE ...................................................... 1

INTRODUCTION ........................................................................ 1

ARGUMENT ........................................................................... 4

    I.    Supreme Court Precedent Confirms That Talk Therapy Is Speech, Not Conduct. ........................................... 6

    II.    The Ruling Below Threatens Countless Speakers and May Harm the Very People Colorado Seeks to Protect. ............... 15

CONCLUSION ........................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps">CASES</span>

*Brandt v. Rutledge,*
   551 F. Supp. 3d 882 (E.D. Ark. 2021) .................................................. 18

*Cohen v. California,*
   403 U.S. 15 (1971) ............................................................................... 8, 9

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010) ........................................................................... *passim*

*Järlström v. Aldridge,*
   No. 3:17-cv-00652-SB, 2017 WL 6388957 (D. Or. Dec. 14, 2017) ........ 16

*King v. Governor of New Jersey,*
   767 F.3d 216 (3d Cir. 2014) ...................................................... 10, 11, 17

*National Institute of Family & Life Advocates v. Becerra,*
   138 S. Ct. 2361 (2018) .................................................................... 11, 14

*Otto v. City of Boca Raton,*
   981 F.3d 854 (11th Cir. 2020) ........................................................ 11, 12

*Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer,*
   961 F.3d 1062 (9th Cir. 2020) ............................................................. 13

*Pickup v. Brown,*
   740 F.3d 1208 (9th Cir. 2014) .................................................. 12, 13, 17

*Rosemond v. Markham,*
   135 F. Supp. 3d 574 (E.D. Ky. 2015) ................................................... 16

*Tingley v. Ferguson,*
   47 F.4th 1055 (9th Cir. 2022) ............................................................. 12

*Tingley v. Ferguson*,
  57 F.4th 1072 (9th Cir. 2023)...................................................... 12, 13

*Wollschlaeger v. Governor of Florida*,
  848 F.3d 1293 (11th Cir. 2017) ............................................... 19

## Constitutional Provisions

U.S. Const. Amend. I........................................................ *passim*

## Statutes, Regluations, and Codes

Ark. Code § 20-9-1504 ............................................................ 18

Colo. Rev. Stat § 12-245-202(3.5)(a) ....................................... 10

Colo. Rev. Stat. § 12-245-202(3.5)(b) ...................................... 10

Colo. HB 19-1129.............................................................. 4, 5

## Other Authorities

*Mississippi Startup Files First Amendment Countersuit Against State
  Licensing Board*, https://ij.org/press-release/mississippi-startup-files-
  first-amendment-countersuit-against-state-licensing-board/ (last
  visited March 14, 2023) ........................................................ 17

*North Carolina Drones*, https://ij.org/case/north-carolina-drones/ (last
  visited March 14, 2023) ........................................................ 17

*Nutt v. Ritter*, No. 7:21-cv-00106-M (E.D.N.C., filed June 9, 2021),
  available at https://perma.cc/VWJ4-F2YZ............................................ 15

## STATEMENT OF AMICUS CURIAE[1]

The Institute for Justice is a nonprofit, public-interest legal center dedicated to defending the essential foundations of a free society: property rights, economic liberty, educational choice, and freedom of speech. As part of its mission to defend freedom of speech, the Institute has challenged laws across the country that regulate a wide array of occupational speech, including teletherapy, parenting advice, dietary advice, and veterinary advice. Amicus believes that the decision below, if allowed to stand, represents a serious threat to the constitutional protection afforded to these and countless other types of occupational speech.

## INTRODUCTION

There are many ways that state-licensed mental-health professionals might try to help clients deal with unwanted thoughts or feelings. Some might simply talk to their clients, offering them guidance and advice. Others might instead prescribe mood-altering drugs or even

---

[1] No party counsel authored any portion of this brief, and no party, party counsel, or person other than Amicus or its counsel paid for this brief's preparation or submission. All parties have consented to the filing of this brief.

perform surgical interventions, such as deep brain stimulation, in which electrodes are implanted into the brain to help control conditions such as obsessive-compulsive disorder. One might fairly say that the former involves mainly speech, while the latter involve mainly medical conduct.

The central question in this appeal is whether—for First Amendment purposes—a prohibition on talk therapy about specific subjects is a restriction on a type of speech, such as conversation, or a restriction on a type of medical conduct, such as prescribing medicine or performing brain surgery. And under the U.S. Supreme Court's established test for distinguishing speech from conduct, this is not a close question. Under that test, even laws that may generally be described as directed at conduct—such as laws prohibiting "unprofessional conduct" within a licensed occupation—must be analyzed under the First Amendment whenever a specific application of that law is triggered by speech of a particular content. Colorado's prohibition on so-called "conversion therapy" for minors singles out speech on a particular subject in precisely this way, and thus is subject

to First Amendment scrutiny. The district court's contrary holding was error.

That error matters because the implications of the district court's ruling extend far beyond the narrow and contentious facts here. A ruling that expels talk therapy from the protection of the First Amendment threatens the rights of virtually anyone who speaks for a living. And there is an entire catalogue of cases from across the country showing that, when occupational licensing boards believe they are above the First Amendment, they silence speakers. Besides that, a ruling that denudes talk therapy of First Amendment protection may harm the very people that Colorado wishes to protect, for it would leave the First Amendment powerless to prevent other states in this Circuit from enacting laws that prohibit licensed mental health providers from offering services such as gender-affirming talk therapy to transgender minors.

Of course, concluding that Colorado's law regulates speech is only the first step in the constitutional analysis—it is not the only step. It may well be that Colorado has amassed sufficient evidence to show Plaintiff-Appellant has no reasonable likelihood of success. Or perhaps

the state has come forward with at least enough evidence to show that other equitable considerations—such as the risk of harm to the public—are enough to defeat the motion. Those are questions that the district court can consider in the first instance on remand—this time applying the level of scrutiny that the First Amendment requires.

## ARGUMENT

Colorado's HB 19-1129, passed into law in 2019, declares it to be unprofessional conduct for various licensed mental-health professionals to provide "conversion therapy" to minors. Conversion therapy is a controversial practice that purports to help gay or transgender minors reduce unwanted feelings regarding their sexual orientation or gender expression. And Plaintiff-Appellant Kaley Chiles offers conversion therapy that, as alleged in her complaint and explained in her motion for preliminary injunction, she carries out entirely through speech—specifically, talk therapy. She contends that Colorado's prohibition on this speech violates the First Amendment.

The district court did not review Colorado's law under the First Amendment because it concluded that talk therapy, despite being conducted exclusively through the spoken word, is not "speech" within

the meaning of the First Amendment. Instead, the court held that talk therapy is a form of "professional conduct" that, for First Amendment purposes, is indistinguishable from brain surgery. Under this view, HB 19-1129 survives constitutional review so long as it merely satisfies the rational basis test. Concluding that the law easily did so, the district court denied the motion for preliminary injunction.

That was error. First, U.S. Supreme Court precedent confirms that talk therapy is speech within the meaning of the First Amendment, and regulations of that speech must satisfy First Amendment scrutiny. Courts that have reached the opposite conclusion—the Ninth Circuit and the court below—have done so only by ignoring that controlling precedent, as other members of the Ninth Circuit have noted. Second, the district court's contrary ruling threatens not only a wide variety of other occupational speech, but also the very minors the state wishes to protect, who may find themselves denied care in other states that take a different view of these issues than Colorado does. The ruling below should be reversed.

I.      **Supreme Court Precedent Confirms That Talk Therapy Is Speech, Not Conduct.**

To determine whether Colorado's prohibition on certain talk therapy regulates speech or conduct, this Court should apply the U.S. Supreme Court's well-established speech/conduct test. That test is set forth most recently and authoritatively in the U.S. Supreme Court's decision in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). Yet neither that test nor the Supreme Court's ruling in *Humanitarian Law Project* appears anywhere in the ruling below.

*Humanitarian Law Project* merits extended discussion because the federal government there made the same argument Colorado makes here: that a prohibition on speech between willing speakers and listeners can escape First Amendment scrutiny if the government frames the prohibition as a restriction on "conduct" rather than speech. There, the Supreme Court considered the constitutionality of a federal law that forbade speech in the form of individualized legal and technical advice to designated foreign terrorists. 561 U.S. at 6–11. The plaintiffs included two U.S. citizens and six domestic organizations that wished, among other things, to "train members of [the Kurdistan Workers' Party (PKK)] on how to use humanitarian and international law to

peacefully resolve disputes" and to "teach PKK members how to petition various representative bodies such as the United Nations for relief." *Id.* at 10, 21–22. They wanted, in other words, to give individualized advice solely through the spoken or written word.

They were prevented from doing so, however, because speech in the form of advice was illegal. Under federal law, the plaintiffs were prohibited from providing terrorist groups with "material support or resources." *Id.* at 12. That term was defined to include both "training," defined as "instruction or teaching designed to impart a specific skill, as opposed to general knowledge," and "expert advice or assistance," defined as "advice or assistance derived from scientific, technical or other specialized knowledge." *Id.* at 12–13. The plaintiffs challenged that prohibition as a violation of the First Amendment. *Id.* at 24–39.

The government defended the law by arguing that the material-support prohibition was aimed at conduct—providing "material support" to terrorist groups—and therefore only incidentally burdened the plaintiffs' expression. *Id.* at 26–27. But the U.S. Supreme Court unanimously rejected that argument, holding that the material-support prohibition was a content-based regulation of speech subject to

heightened scrutiny.[2] *Id.* Further, the Court specifically rejected the notion that the material-support prohibition could escape First Amendment scrutiny because it "*generally* function[ed] as a regulation of conduct." *Id.* at 27. Instead, as the Court observed, even when a law "may be described as directed at conduct," strict scrutiny is still appropriate when, "as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message." *Id.* at 28.

Moreover, and in sharp conflict with the ruling below, the Supreme Court did not base its ruling on some metaphysical distinction between "speech" and "conduct." Rather, the Court turned to its long-established approach for determining whether the First Amendment was implicated, which looks to the activity that triggers the law's application. As an example, the Court pointed to its seminal decision in *Cohen v. California*, 403 U.S. 15 (1971), in which the Court invalidated a conviction for disturbing the peace on First Amendment grounds.

---

[2] Although only six justices joined the majority opinion in *Humanitarian Law Project*, all nine justices agreed that, as applied to the plaintiffs in that case, the material-support prohibition was a restriction on speech, not conduct. *See* 561 U.S. at 26–28; *id.* at 45 (Breyer, J., dissenting).

There, the Court concluded that even though the challenged law was generally directed at the "conduct" of disturbing the peace, as applied to Paul Robert Cohen, that conduct consisted of wearing a jacket bearing a profane message. 403 U.S. at 18. Thus, as applied to Mr. Cohen, the law functioned as a restriction on speech and had to be analyzed as one.

Applying that test to the material-support prohibition, the Court concluded the law was a content-based restriction on speech because the plaintiffs were allowed to communicate some things to designated terrorist groups but not other things:

> [The material-support prohibition] regulates speech on the basis of its content. Plaintiffs want to speak to [designated terrorist organizations], and whether they may do so under [the law] depends on what they say. If plaintiffs' speech to those groups imparts a "specific skill" or communicates advice derived from "specialized knowledge"—for example, training on the use of international law or advice on petitioning the United Nations— then it is barred. On the other hand, plaintiffs' speech is not barred if it imparts only general or unspecialized knowledge.

*Humanitarian Law Project*, 561 U.S. at 27 (citations omitted).

This same analysis applies to the First Amendment claim here. Ms. Chiles wishes to talk with her minor clients, and "whether [she] may do so . . . depends on what [she] say[s]." *Id.* If Ms. Chiles communicates "[a]cceptance, support, and understanding for the

facilitation of an individual's coping, social support, and identity exploration and development" or "[a]ssistance to a person undergoing gender transition," her speech is permitted. Colo. Rev. Stat. § 12-245-202(3.5)(b). If, on the other hand, Ms. Chiles provides talk therapy that seeks to help her clients "change behaviors or gender expressions or . . . eliminate or reduce sexual or romantic attraction or feelings toward individuals of the same sex," her speech is prohibited. *Id.* § 12-245-202(3.5)(a). In other words, just as in *Cohen* and *Humanitarian Law Project*, although Colorado's law may generally function as a ban on "unprofessional conduct," the "conduct" triggering application of the statute to Ms. Chiles consists entirely of speech.

When other courts have applied this test to these same facts, they have reached this same conclusion. For example, in *King v. Governor of New Jersey*, the Third Circuit relied on the Supreme Court's ruling in *Humanitarian Law Project* to conclude that New Jersey's substantively identical ban on conversion therapy for minors regulated speech, not conduct. 767 F.3d 216, 224–25 (3d Cir. 2014). In that court's words, to do otherwise would be to engage in "the enterprise of labeling certain verbal or written communication 'speech' and other 'conduct,'" a practice

it condemned as both "unprincipled and susceptible to manipulation." *Id.* at 228. Instead, that court recognized that the law before it operated as a restriction on speech, and it upheld the law only after concluding that it satisfied First Amendment scrutiny.[2]

The Eleventh Circuit reached the same conclusion in *Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020), which invalidated that city's prohibition on conversion therapy for minors. There, just as the Supreme Court did in *Humanitarian Law Project*, the Eleventh Circuit looked for guidance in the Supreme Court's earlier ruling in *Cohen v. California. Otto*, 981 F.3d. at 866. And just as the Supreme Court had in *Cohen* and *Humanitarian Law Project*, the court easily concluded

---

[2] The Third Circuit held that the speech restricted under New Jersey's law was "professional speech" that, in its view, was entitled to the reduced First Amendment protection currently afforded to commercial speech. *King*, 767 F.3d at 232–37. Thus, the court reviewed that law with only intermediate scrutiny, as opposed to the strict scrutiny that ordinarily applies to content-based restrictions on speech. *Id.* at 237–40.  The U.S. Supreme Court later abrogated that portion of *King* when it confirmed that so-called "professional speech" is entitled to the full protection of the First Amendment, and that content-based restrictions on "professional speech" are subject to "ordinary First Amendment principles." *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2375 (2018) (*NIFLA*); *see also id.* at 2371 (identifying *King* among several other cases that had erroneously "recognized 'professional speech' as a separate category of speech that is subject to different rules").

that the challenged law regulated speech. Indeed, the court held, "[i]f speaking to clients is not speech, the world is truly upside down." *Id.*

But the district court shunned this approach and instead relied heavily on the Ninth Circuit's recent ruling in *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022). In that case, the Ninth Circuit upheld a Washington law substantively identical to the law under review here, concluding that the law regulated professional conduct rather than speech. But the Ninth Circuit in *Tingley* made no effort to square its ruling with the speech/conduct analysis called for in *Humanitarian Law Project*, a point that Senior Judge O'Scannlain specifically criticized in a statement respecting the court's denial of en banc reconsideration in that case. *See Tingley v. Ferguson*, 57 F.4th 1072, 1076 (9th Cir. 2023). Instead, the Ninth Circuit panel based its conclusion on an earlier conversion-therapy case—*Pickup v. Brown*, involving a California law— in which the Ninth Circuit had similarly refused to apply the test set forth in *Humanitarian Law Project,* and was similarly criticized for failing to do so. *See Tingley*, 47 F.4th at 1071 (citing *Pickup v. Brown*, 740 F.3d 1208, 1222 (9th Cir. 2014) (upholding California's ban on conversion therapy for minors)); *see also Pickup*, 740 F.3d at 1215,

1216–18 (O'Scannlain, J., dissenting from denial of rehearing en banc) (criticizing the Ninth Circuit panel's failure to apply *Humanitarian Law Project*).[3]

*Pickup* itself provided no sound basis for distinguishing *Humanitarian Law Project* or avoiding the speech/conduct test it requires. There, the Ninth Circuit purported to distinguish *Humanitarian Law Project* on the grounds that it concerned only "political speech" by "ordinary citizens." 740 F.3d at 1230. But the first of these rationales was wrong from the start; "the Supreme Court in *Humanitarian Law Project* explicitly rejected the plaintiffs' argument that the expression in question consisted of "pure political speech." *Pickup*, 740 F.3d at 1217 (O'Scannlain, J., dissenting from denial of rehearing en banc) (citing *Humanitarian Law Project*, 561 U.S. at 25–

---

[3] Remarkably, the Ninth Circuit in *Tingley* ignored *Humanitarian Law Project* even though, in another recent case involving occupational speech, that court correctly applied *Humanitarian Law Project* to conclude that a restriction on vocational training was a restriction on speech, rather than conduct. *See Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062 (9th Cir. 2020); *see also Tingley*, 57 F.4th at 1078 (O'Scannlain, S.J., statement respecting denial of rehearing en banc) (observing that *Pacific Coast Horseshoeing* "reject[ed]" the version of the speech/conduct distinction applied by the panel majority in *Tingley* and the district court here).

26). And the Supreme Court rejected the second of these rationales—that different First Amendment rules apply to "professionals" rather than "ordinary citizens"—when it rejected the so-called "professional speech doctrine" and abrogated *Pickup* by name in *National Institute of Family & Life Advocates v. Becerra. See* 138 S. Ct. 2361, 2371–75 (2018) (*NIFLA*).

In short, every court that has applied the Supreme Court's established test for distinguishing speech from conduct has reached the natural conclusion that talk therapy is speech. The one circuit court to conclude otherwise—the Ninth Circuit, on which the court below chose to rely—reached that conclusion only by twice ignoring the Supreme Court's test. This Court should not repeat that error and should instead hold that Colorado's prohibition on conversion therapy is a restriction on speech because it is triggered by speech of a particular content.

That conclusion does not necessarily mean that the government will lose; the government may be able to show that conversion therapy is sufficiently harmful—and Colorado's law sufficiently narrow—that the law survives First Amendment scrutiny. But the government must be held to that burden. If it is not, as the following section will show,

countless others who speak for a living will be wrongly deprived of their First Amendment rights.

## II.     The Ruling Below Threatens Countless Speakers and May Harm the Very People Colorado Seeks to Protect.

The subject matter of this case is deeply controversial, but the legal question at the heart of this appeal—how to tell whether a regulation of a licensed occupation regulates "speech" or "conduct"—is a critical one that will recur in many contexts. As America has moved to a more information-based economy, ever-greater numbers of people earn their living by speaking. And, as Amicus's own direct experience illustrates, there will be inevitable conflicts between those speakers' First Amendment rights and the asserted power of state licensing authorities.

Consider the case of retired engineer Wayne Nutt. *Nutt v. Ritter*, No. 7:21-cv-00106-M (E.D.N.C., filed June 9, 2021), available at https://perma.cc/VWJ4-F2YZ. For most of his career, Nutt lawfully practiced engineering in North Carolina, without a license, under the state's "industrial exemption." But when Nutt testified as an expert witness in a lawsuit, the state's engineering board accused him of the unlicensed "practice" of engineering. And North Carolina is not the only

state to apply its engineering statute to public advocacy; the state of Oregon did the same when it accused engineer Mats Järlström of the unlicensed practice of engineering after Järlström emailed the state's board with concerns about the state's timing formula for traffic lights. *See Järlström v. Aldridge*, No. 3:17-cv-00652-SB, 2017 WL 6388957 (D. Or. Dec. 14, 2017).

The Kentucky Board of Examiners of Psychology took a similar tack when it sent a cease-and-desist letter to syndicated newspaper columnist John Rosemond after he published an advice column in a Kentucky newspaper in which he offered advice to parents struggling with their teenage son. *See Rosemond v. Markham*, 135 F. Supp. 3d 574 (E.D. Ky. 2015). As here, the government argued that advice tailored to an individual's personal parenting situation was the unlicensed "practice of psychology," which could be regulated without considering the First Amendment.

State surveying boards in North Carolina and Mississippi have taken similar action against companies that produce maps or take aerial photographs of property. *See Mississippi Startup Files First Amendment Countersuit Against State Licensing Board*,

https://ij.org/press-release/mississippi-startup-files-first-amendment-countersuit-against-state-licensing-board/ (last visited March 14, 2023); *North Carolina Drones*, https://ij.org/case/north-carolina-drones/ (last visited March 14, 2023). In both cases, the state has argued that creating these images is the unlicensed "practice of surveying," even though the maps and photos do not establish official property lines or have any other independent legal effect.

In each of these cases, the government either argued or is still arguing—as Colorado argues here—that the plaintiff's speech is the "conduct" of practicing a profession and thus receives no First Amendment protection. Yet the dangers of that approach are precisely why the Third Circuit has dismissed it as "unprincipled and susceptible to manipulation," *King*, 767 F.3d at 228, and why then-Judge O'Scannlain of the Ninth Circuit similarly derided the practice as a "labeling game." *Pickup*, 740 F.3d at 1218. That is because all speech can be characterized, in some sense, as conduct. University professors engage in the conduct of "instructing." Political consultants engage in the conduct of "strategizing." Stand-up comedians engage in the conduct of "inducing amusement." The ruling below, if affirmed, would permit

this labeling game, leaving no limits to what could be cast out from the scope of the First Amendment.

Even if one ignored the broad repercussions that the district court's ruling may have for other occupations, there is no reason to believe that its ruling would be used only to help vulnerable groups, as Colorado claims to be doing. Indeed, the holding that talk therapy is conduct, rather than speech, is just as likely to be wielded against such groups.

Consider Arkansas's recent enactment of Act 626, which prohibits physicians and other healthcare providers from providing or referring any person under the age of 18 for "gender transition procedures." Ark. Code § 20-9-1504. When advocates for transgender minors challenged that law's referral prohibition as a violation of the First Amendment, the government defended the law on precisely the grounds that the government urges here, arguing "that Act 626 is not a regulation of speech but rather a regulation of professional conduct." *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 893 (E.D. Ark. 2021).

Citing *NIFLA*, the trial court rejected that argument and held that the law was a content-based restriction on speech subject to strict

scrutiny. Finding that the government was unlikely to satisfy that standard, the trial court thus preliminarily enjoined the law, allowing the plaintiffs to receive referrals for medical care during their lawsuit. But had the trial court instead followed the lead of the court below, it would have reviewed Arkansas's law with only rational-basis review, which it may well have survived.

If this Court does not reverse the ruling below, it will be inviting other states within the Tenth Circuit to enact laws like Arkansas's, not just on issues of gender identity, but on any number of other controversial issues. *See, e.g.*, *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293 (11th Cir. 2017) (en banc) (invalidating a Florida law that prohibited doctors from asking their patients about gun ownership). In a Circuit that spans six states and that is home to nearly 20 million people, there is no telling what harm might follow.

## CONCLUSION

This Court should reverse the ruling below and either grant the motion for preliminary injunction or remand for the trial court to apply the appropriate level of First Amendment scrutiny.

Dated: March 15, 2023.          Respectfully submitted,

s/ Paul M. Sherman
Paul M. Sherman
Robert J. McNamara
INSTITUTE FOR JUSTICE
 901 N. Glebe Road, Suite 900
 Arlington, VA 22203
 (703) 682-9320
 psherman@ij.org
 rmcnamara@ij.org

*Counsel for Amicus Curiae*
*Institute for Justice*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with Fed. R. App. P. 29(b)(4) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains <u>3,751</u> words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 29(b)(4) and 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: March 15, 2023.          <u>s/ Paul M. Sherman</u>
                                 Paul M. Sherman
                                 INSTITUTE FOR JUSTICE
                                   901 N. Glebe Road, Suite 900
                                   Arlington, VA 22203
                                   (703) 682-9320
                                   psherman@ij.org

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

1) All required privacy redactions have been made per 10th Cir. R. 25.2;

2) If required to file additional hard copies, that the ECF submission is an exact copy of those documents;

3) The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Bitdefender Endpoint Security Tools, 7.8.3.265, March 14, 2023, and according to the program are free of viruses.

Dated: March 15, 2023.              s/ Paul M. Sherman
                                    Paul M. Sherman
                                    INSTITUTE FOR JUSTICE
                                     901 N. Glebe Road, Suite 900
                                     Arlington, VA 22203
                                     (703) 682-9320
                                     psherman@ij.org