Nos. 22-1445; 23-1002

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

KALEY CHILES,

*Plaintiff-Appellant/Cross-Appellee*,

v.

PATTY SALAZAR, in her official capacity as Executive Director of the
Department of Regulatory Agencies, et al.,

*Defendants-Appellees/Cross-Appellants*.

On Appeal from the United States District Court for the District Of Colorado
Case No. 1:22-cv-02287
The Honorable Charlotte N. Sweeny

## AMICI CURIAE BRIEF OF WASHINGTON, CALIFORNIA, CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA, HAWAI'I, ILLINOIS, MAINE, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW MEXICO, NEW JERSEY, NEW YORK, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, AND WISCONSIN, IN SUPPORT OF DEFENDANTS-APPELLEES

ROBERT W. FERGUSON
*Attorney General of the State of Washington*

CRISTINA SEPE, WSBA 53609
 *Deputy Solicitor General*
ALEXIA DIORIO, WSBA 57280
SARAH E. SMITH, WSBA 55770
 *Assistant Attorneys General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
Cristina.Sepe@atg.wa.gov
Alexia.Diorio@atg.wa.gov
Sarah.E.Smith@atg.wa.gov

SIERRA McWILLIAMS, WSBA 48544
 *Assistant Attorney General*
7141 Cleanwater Drive SW
PO Box 40109
Olympia, WA 98504-0109
(360) 586-5107
Sierra.McWilliams@atg.wa.gov

*Counsel for the State of Washington*

(*Counsel listing continues on
signature page.*)

# TABLE OF CONTENTS

I.    INTERESTS OF AMICI CURIAE .................................................... 1

II.   SUMMARY OF ARGUMENT ......................................................... 2

III.  ARGUMENT .................................................................................. 4

    A.   States Across the Country Have Similarly
        Protected Children and Youth from a Harmful
        and Discredited Practice .............................................................. 4

        1.   States considered ample evidence of the inefficacy
            and harms of conversion therapy in prohibiting it
            for children and youth ............................................................ 5

        2.   The evidence of harm has grown since Colorado
            enacted  HB 19-1129 in 2019 ................................................ 9

    B.   The First Amendment Does Not Exempt Mental Health
        Professionals from Following Standards of Care ...................... 11

        1.   States have broad authority to regulate professional
            conduct consistent with the First Amendment .................... 12

        2.   Courts have upheld state regulations of medical
            practices against First Amendment challenges ................... 13

        3.   Colorado's law is a lawful regulation of
            professional conduct ............................................................ 16

    C.   States Have a Long and Recognized History of
        Regulating Health Care Provider Conduct ................................ 19

    D.   Appellant's Position that Health Care Treatment
        Modalities Using Speech Are Not Conduct-Based
        Would Lead to Dangerous Outcomes ........................................ 22

1. State determinations that conversion therapy
   practiced on minors falls below the standard
   of care for health care providers comport with
   state disciplinary processes ................................................. 22

2. Accepting Appellant's argument would endanger
   the public by immunizing licensed professionals
   from disciplinary action for treatment that falls
   below the standard of care ................................................... 26

3. The Court that has followed Appellant's position
   has not articulated how states may protect public
   health in the absence of professional regulations of
   treatment involving speech ................................................. 28

IV.  CONCLUSION ................................................................................. 32

ADDENDUM ............................................................................................ 1a

# TABLE OF AUTHORITIES

## Cases

*Barsky v. Bd. of Regents of Univ. of State of N.Y.*,
  347 U.S. 442 (1954) ................................................................ 5, 22

*Chiles v. Salazar*,
  No. 1:22-cv-02287-CNS-STV,
  2022 WL 17770837 (D. Colo. Dec. 19, 2022).............................................. 19

*Conant v. Walters*,
  309 F.3d 629 (9th Cir. 2002)......................................................... 14

*Davis v. State Bd. of Psych. Exam'rs*,
  791 P.2d 1198 (Colo. App. 1989) .................................................... 27

*Del Castillo v. Sec'y, Fla. Dep't of Health*,
  26 F.4th 1214 (11th Cir.), *cert. denied sub nom.*
  *Del Castillo v. Ladapo*,
  143 S. Ct. 486 (Mem.) (2022) ..................................................... 15, 30

*Dent v. West Virginia*,
  129 U.S. 114 (1889) ................................................................. 20

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*,
  920 F.3d 421 (6th Cir. 2019)......................................................... 15

*Goldfarb v. Va. State Bar*,
  421 U.S. 773 (1975) ................................................................... 1

*Gonzales v. Oregon*,
  546 U.S. 243 (2006) .................................................................. 20

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ..................................................................... 18

*Huffine v. State Dep't of Health Med. Quality Assurance Comm'n*,
  148 Wash. App. 1015 (2009) (unpublished).............................................. 28

*Kennedy v. Bremerton Sch. Dist.*,
  142 S. Ct. 2407 (2022) ..................................................................... 3

*King v. Governor New Jersey*,
  767 F.3d 216 (3d Cir. 2014), *abrogated in part by*
  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  138 S. Ct. 2361 (2018) ................................................................... 8

*Lowe v. S.E.C.*,
  472 U.S. 181 (1985) ..................................................................... 31

*N.A.A.C.P. v. Button*,
  371 U.S. 415 (1963) ..................................................................... 12

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  138 S. Ct. 2361 (2018) ....................................... 12–13, 19–20, 30

*Nat'l Ass'n for the Advancement of Psychoanalysis v.*
   *Cal. B.d of Psychanalysis*,
  228 F.3d 1043 (9th Cir. 2000) ...................................................... 14

*Ohralik v. Ohio State Bar Ass'n*,
  436 U.S. 447 (1978) ....................................................... 12, 17, 29

*Otto v. City of Boca Raton*,
  981 F.3d 854 (11th Cir. 2020) ........................................... 16, 28–31

*Pickup v. Brown*,
  740 F.3d 1208 (9th Cir. 2014), *abrogated in part by*
  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  138 S. Ct. 2361 (2018) ................................ 6–7, 13, 15, 26–27, 31

*Planned Parenthood of Se. Penn. v. Casey*,
  505 U.S. 833 (1992), *overruled on other grounds by*
  *Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022) ............................................................ 13, 16

*Tingley v. Ferguson*,
  47 F.4th 1055 (9th Cir. 2022)............................ 6, 9, 11–12, 15–17, 19–20, 22

*Townsend v. State Dep't of Health*,
  6 Wash. App. 2d 1035 (2018) (unpublished)................................................ 28

*Watson v. Maryland*,
  218 U.S. 173 (1910) ........................................................................... 1, 20–21

*Williamson v. Lee Optical of Okla., Inc.*,
  348 U.S. 483 (1955) ...................................................................................... 12

## Constitutional Provisions

U.S. Const. amend. I ............................................. 2–4, 11–16, 21–22, 26, 29–30

## Statutes

Colo. Minor Conversion Therapy Law......................... 1–4, 9, 15–18, 22–23, 26
    Colo. Rev. Stat. § 12-245-224(1)(t)(V)
    Colo. Rev. Stat. § 12-245-202(3.5)

Colo. Rev. Stat. § 12-245-202(14)(a) ............................................................... 25

Colo. Rev. Stat. § 12-245-203 ................................................................... 17, 23

Colo. Rev. Stat. § 12-245-217 ..................................................................... 3, 17

Colo. Rev. Stat. § 12-245-224 ................................................................... 17, 23

Colo. Rev. Stat. § 12-245-224(1)(g)(I) ............................................................ 23

Colo. Rev. Stat. § 12-245-303 ........................................................................ 23

Colo. Rev. Stat. § 12-245-603 ........................................................................ 25

Colo. Rev. Stat. § 12-245-604 ........................................................................ 25

Colo. Rev. Stat. § 12-245-605 ........................................................................ 25

Colo. Rev. Stat. § 12-245-606 ........................................................... 25

2012 Cal. Legis. Serv. ch. 835,
    §§ 1(b), (d), (j), (l), (n) ................................................................. 7

2013 N.J. Sess. Law Serv. ch. 150 ...................................................... 8

Assemb. B. 3371, 216th Leg., 1st Ann. Sess. (N.J. 2013) .............................. 4, 8

B20-0501, 20th Council, Reg. Sess. (D.C. 2014) .................................... 4

H.B. 0217, 99th Gen. Assemb., Reg. Sess. (Ill. 2015) ..................................... 4

H.B. 140, 191st Leg., Reg. Sess. (Mass. 2019) ..................................... 4

H.B. 19-1129, 72nd Gen. Assemb., 1st Reg. Sess. (Colo. 2019) ................. 4, 10

H.B. 228, 65th Leg., Reg. Sess. (Utah 2023) ...................................... 5

H.B. 2301, 78th Leg., Reg. Sess. (Or. 2015) ...................................... 5

H.B. 386, 2020 Gen. Assemb., Reg. Sess. (Va. 2020) ...................................... 5

H.B. 587, 165th Gen. Ct., Reg. Sess. (N.H. 2018) ............................... 4

H.B. 664, 13th Leg., Reg. Sess. (Haw. 2019) ...................................... 4

L.D. 1025, 129th Leg., 1st Reg. Sess. (Me. 2019) ............................... 4

S.B. 1028, 438th Gen. Assemb., Reg. Sess. (Md. 2018) ................................... 4

S.B. 1046, 242nd Leg., Reg. Sess. (N.Y. 2019) ..................................... 4

S.B. 1172, 2011-12 Leg., Reg. Sess. (Cal. 2012) .................................. 4, 6

S.B. 121, 53rd Leg., 1st Reg. Sess. (N.M. 2017) ................................... 4

S.B. 132, 2015-16 Leg., Reg. Sess. (Vt. 2016) ................................... 5

S.B. 201, 79th Leg., Reg. Sess. (Nev. 2017) ...................................... 4

S.B. 270, 29th Leg., Reg. Sess. (Haw. 2018) ..................................................... 4

S.B. 5722, 65th Leg., Reg. Sess. (Wash. 2018) ................................................. 5

S.B. 65, 149th Gen. Assemb., Reg. Sess. (Del. 2018) ........................................ 4

Substitute H.B. 5277, 2017 Gen. Assemb., Reg. Sess. (R.I. 2017) .................... 5

Substitute H.B. 6695, 2017 Gen. Assemb., Reg. Sess. (Conn. 2017) ................ 4

Third Engrossed H.F. 16, 93rd Leg., Reg. Sess. (Minn. 2023) .......................... 4

## Executive Materials and Regulations

Exec. Dir. by Gov. Gretchen Whitmer,
No. 2021-3 (Mich. June 14, 2021) .................................................... 4

Exec. Order by Gov. Ricardo A. Rosselló Nevares,
No. OE-2019-016 (P.R. Mar. 27, 2019) ........................................... 5

Exec. Order by Gov. Roy Cooper,
No. 97 (N.C. Aug. 2, 2019) ............................................................. 5

Exec. Order by Gov. Tom Wolf,
No. 2022-02 (Penn. Aug. 16, 2022) ................................................. 5

Exec. Order by Gov. Tony Evers,
No. 122 (Wis. June 1, 2021) ............................................................ 5

N.D. Admin. Code 75.5-02.06.1 (N.D. 2021) ................................................... 5

## Other Authorities

Am. Psychological Ass'n,
*Report of the American Psychological Association Task Force on
Appropriate Therapeutic Responses to Sexual Orientation* (2009),
https://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf ........... 2, 5–6

Anna M. de Haan et al.,
  *A meta-analytic review on treatment dropout in child and*
  *adolescent outpatient mental health care*,
  33 CLINICAL PSYCHOLOGY REV. 698 (2013),
  https://doi.org/10.1016/j.cpr.2013.04.005 .................................................... 24

Caitlin Ryan, et al.,
  *Parent-Initiated Sexual Orientation Change Efforts with*
  *LGBT Adolescents: Implications for Young Adult Mental*
  *Health and Adjustment*, 67 J. OF HOMOSEXUALITY 159 (2020),
  https://doi.org/10.1080/00918369.2018.1538407 ........................................ 10

DAVID A. JOHNSON & HUMAYUN J. CHAUDRY,
  MEDICAL LICENSING AND DISCIPLINE IN AMERICA: A HISTORY
  OF THE FEDERATION OF STATE MEDICAL BOARDS (2012) ............................ 21

David Johnson & Humayun J. Chaudry,
  *The History of the Federal of State Medical Boards*,
  98 J. OF MED. REG. 20 (2012) ........................................................................ 22

*Governor's Statement Upon Signing Assembly Bill No. 3371*
  (Aug. 19, 2013), https://pub.njleg.state.nj.us/Bills/
  2012/A3500/3371_G1.PDF .......................................................................... 8–9

Jack L. Turban, et al.,
  *Association Between Recalled Exposure to Gender Identity*
  *Conversion Efforts and Psychological Distress and Suicide*
  *Attempts Among Transgender Adults*,
  77 JAMA PSYCHIATRY 68 (2020),
  doi:10.1001/jamapsychiatry.2019.2285 ........................................................ 10

Jim Melwert, *New Jersey Gov. Christie Signing Ban on*
  *'Gay Conversion' Therapy*, CBS News,
  Aug. 19, 2013, https://cbsn.ws/3MYUGMv .................................................. 8

S. DAVID YOUNG, THE RULE OF EXPERTS: OCCUPATIONAL
  LICENSING IN AMERICA (1987) ...................................................................... 21

U.S Dep't of Health & Hum. Servs.,
   Substance Abuse & Mental Health Servs. Admin.,
   *Ending Conversion Therapy* (Oct. 2015),
   https://store.samhsa.gov/sites/default/files/d7/priv/sma15-4928.pdf............ 10

U.S Dep't of Health & Hum. Servs.,
   Substance Abuse & Mental Health Servs. Admin.,
   *Moving Beyond Change Efforts: Evidence and*
   *Action to Support and Affirm LGBTQI+ Youth* (2023),
   https://store.samhsa.gov/sites/default/files/pep22-03-12-001.pdf.................11

## I.    INTERESTS OF AMICI CURIAE

Washington, California, Connecticut, Delaware, the District of Columbia, Hawai'i, Illinois, Maine, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Wisconsin (Amici States) submit this brief in support of Defendants-Appellees. Amici States have a strong interest in this case as they are among the twenty-seven states that have exercised their police power to prohibit or restrict the practice of conversion therapy on minors by state-licensed professionals, including counselors and therapists.

States have broad authority to regulate the practice and licensing of professions as part of its "power to protect the public, health, safety, and other valid interests . . . ." *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975); *see Watson v. Maryland*, 218 U.S. 173, 176 (1910) ("[T]he police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health."). Amici States seek to protect their long-standing authority to regulate the practice of health care, including care relating to mental health, within their boundaries. Amici States additionally share compelling interests in protecting the health, safety, and well-being of children and youth, and in affirming the dignity and equal worth and treatment

of LGBTQI+ minors. Amici States seek to safeguard their authority to protect minors from an ineffective and harmful treatment provided under the auspices of a state-issued license. Amici States thus share significant interests in ensuring the appropriate application of the First Amendment to professional conduct regulations, like Colorado's law challenged in this case.

## II.    SUMMARY OF ARGUMENT

Conversion therapy, also referred to as sexual orientation and gender identity change efforts or reparative therapy, encompasses a range of interventions directed at the specific outcomes of changing a person's sexual orientation or gender identity.[1] Like many of the Amici States, Colorado prohibits licensed mental health practitioners from practicing conversion therapy on minors (the Minor Conversion Therapy Law). In so doing, Colorado appropriately relied on the evidence-based professional consensus that conversion therapy is not a safe or effective treatment for any condition; it puts minors at risk of serious harms, including increased risks of suicidality and

---

[1] Interventions include aversive physical therapies, such as electric shock treatment or the use of nausea-inducing drugs, as well as non-aversive therapies, which may incorporate approaches such as psychoanalysis and counseling. *See* Am. Psychological Ass'n, *Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation* 22, 31 (2009), https://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf.

depression; and the practice of conversion therapy on minors falls below the standard of care for mental health practitioners. At issue in this case is whether Colorado validly exercised its police power to regulate professional conduct. Plaintiff-Appellant Kaley Chiles, a licensed professional counselor who would like to conduct conversion therapy on her minor clients, contends that because she uses spoken word to deliver mental health treatment, the Minor Conversion Therapy Law violates her First Amendment right to free speech.[2]

The Court should reject Appellant's position and affirm the district court's order denying her request to preliminarily enjoin Colorado's Minor Conversion Therapy Law for at least three reasons. First, the First Amendment's free speech clause does not provide a blank check for health professionals to operate below the standard of care, nor does it immunize mental health treatments from regulation. Rather, First Amendment jurisprudence has consistently held that states may regulate professional conduct, even if that regulation incidentally impacts speech. Second, states have a long history of establishing and regulating

---

[2] This brief principally discusses the free speech claim, but Amici States agree with Colorado that the district court also correctly rejected Appellant's free exercise claim. Colorado's law makes no reference to religion—except to clarify that the law does not apply to religious ministry. Colo. Rev. Stat. § 12-245-217. Moreover, the law is not "specifically directed at religious practice," nor is religious exercise "otherwise its object." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022) (cleaned up).

professional standards of care. Prohibiting conversion therapy, a health "treatment" resoundingly found to be ineffective and harmful, is part of this tradition and does not run afoul of the First Amendment. Third, a contrary conclusion would likely lead to significant consequences for states' authority to regulate professional practices within their borders. For these reasons and more, the Court should affirm the district court's order.

## III.    ARGUMENT

### A.    States Across the Country Have Similarly Protected Children and Youth from a Harmful and Discredited Practice

Colorado's Minor Conversion Therapy Law is not an outlier. Twenty-seven states have similar legislation or executive orders prohibiting or restricting conversion therapy for minors, many enacted on a bipartisan basis.[3] *See* S.B. 1172 (Cal. 2012); H.B. 19-1129 (Colo. 2019); Substitute H.B. 6695 (Conn. 2017); S.B. 65 (Del. 2018); B20-0501 (D.C. 2014); S.B. 270 (Haw. 2018), H.B. 664 (Haw. 2019); H.B. 0217 (Ill. 2015); L.D. 1025 (Me. 2019); S.B. 1028 (Md. 2018); H.B 140 (Mass. 2019); Exec. Dir. No. 2021-3 (Mich. 2021); Third Engrossed H.F. 16 (Minn. 2023); S.B. 201 (Nev. 2017); H.B. 587 (N.H. 2018); Assemb. B. 3371 (N.J. 2013); S.B. 121 (N.M. 2017); S.B. 1046 (N.Y. 2019);

---

[3] These laws and orders are also provided in the Addendum.

Exec. Order No. 97 (N.C. 2019); N.D. Admin. Code 75.5-02.06.1 (N.D. 2021); H.B. 2307 (Or. 2015); Exec. Order No. 2022-02 (Penn. 2022); Substitute H.B 5277 (R.I. 2017); H.B. 228 (Utah 2023); S.B. 132 (Vt. 2016); H.B. 386 (Va. 2020); S.B. 5722 (Wash. 2018); and Exec. Order No. 122 (Wis. 2021); and Exec. Order No. OE-2019-016 (P.R. 2019).

States took these actions under their authority to regulate health professions to protect children and youth from a "treatment" that is not therapeutic but, rather, poses a significant risk of harm. Such actions fall comfortably within states' authorities to regulate professions, protect children, and protect public health and welfare generally. *See Barsky v. Bd. of Regents of Univ. of State of N.Y.*, 347 U.S. 442, 451 (1954).

**1.     States considered ample evidence of the inefficacy and harms of conversion therapy in prohibiting it for children and youth**

In enacting these laws, states relied on well-documented evidence demonstrating that conversion "therapy" for children and youth causes substantial mental and physical harms. The overwhelming scientific and professional consensus is that conversion therapy is ineffective and harmful. This includes non-aversive, non-physical conversion therapy, which can cause serious harms including emotional trauma, depression, anxiety, suicidality, and self-hatred. *See* Am. Psychological Ass'n, *Report of the American Psychological*

*Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation* (2009). Indeed, all major professional health associations have advocated against and repudiated the use of conversion therapy on minors because it is ineffective and increases the risk of suicidality and lifelong mental illness in its attempt to "cure" a person's sexuality or gender identity. *See Tingley v. Ferguson*, 47 F.4th 1055, 1064 (9th Cir. 2022). Being gay or transgender is not a "disorder" that needs a "cure," and many states have concluded that the significant risks of harms that conversion therapy causes to youth are too great to allow practitioners operating under the imprimatur of a state license to practice conversion therapy.

California was the first state to enact legislation prohibiting licensed professionals from practicing conversion therapy on children and youth. In enacting Senate Bill 1172, the California legislature "relied on the well-documented, prevailing opinion of the medical and psychological community that [conversion therapy] has not been shown to be effective and that it creates a potential risk of serious harm to those who experience it." *Pickup v. Brown*, 740 F.3d 1208, 1223 (9th Cir. 2014), *abrogated in part by Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018) (*NIFLA*) (describing the passage of Senate Bill 1172). The legislature relied on extensive expert opinion

that conversion therapy was neither effective nor safe, including position statements, articles, and reports from the American Psychological Association, the American Psychiatric Association, the American School Counselor Association, the American Academy of Pediatrics, the American Medical Association, the National Association of Social Workers, the American Counseling Association, the American Psychoanalytic Association, the American Academy of Child and Adolescent Psychiatry, and the Pan American Health Organization. *Id.* at 1224. Based on these materials, the legislature declared that conversion therapy "can pose critical health risks to lesbian, gay, and bisexual people"; is "based on developmental theories whose scientific validity is questionable"; is "against fundamental principles of psychoanalytic treatment and often result[s] in substantial psychological pain by reinforcing damaging internalized attitudes"; and "lack[s] medical justification and represent[s] a serious threat to the health and well-being of affected people," among numerous other findings. 2012 Cal. Legis. Serv. ch. 835, §§ 1(b), (d), (j), and (l). California also noted its "compelling interest in protecting the physical and psychological well-being of minors, including lesbian, gay, bisexual, and transgender youth, and in protecting its minors against exposure to serious harms caused by sexual orientation change efforts." *Id.* at § 1(n).

New Jersey relied on a similar body of evidence when it enacted Assembly Bill A3371 just a year later. 2013 N.J. Sess. Law Serv. ch. 150; *King v. Governor New Jersey*, 767 F.3d 216, 221–22 (3d Cir. 2014), *abrogated in part by NIFLA*, 138 S. Ct. at 2371–72. The New Jersey legislature similarly noted "numerous legislative findings" regarding the ineffectiveness and harmful impact of conversion therapy. *Id.* (discussing A3371). In hearings on the bill, legislators heard "horror stories" of conversion therapy, including from a woman who testified that she underwent electric shocks and was given drugs to induce vomiting at age 14 at a conversion therapy camp. Jim Melwert, *New Jersey Gov. Christie Signing Ban on 'Gay Conversion' Therapy*, CBS News, Aug. 19, 2013, https://cbsn.ws/3MYUGMv. In signing the bill into law, then-Governor Chris Christie stated that "on issues of medical treatment for children we must look to experts in the field" and that the "American Psychological Association has found that efforts to change sexual orientation can pose critical health risks including, but not limited to, depression, substance abuse, social withdrawal, decreased self-esteem and suicidal thoughts." *Governor's Statement Upon Signing Assembly Bill No. 3371* (Aug. 19, 2013), https://pub.njleg.state.nj.us/Bills/2012/A3500/3371_G1.PDF. Governor Christie concluded with his belief that "exposing children to these

health risks without clear evidence of benefits that outweigh these serious risks is not appropriate." *Id.*

Washington State's legislature likewise "considered evidence that demonstrated a 'scientifically credible proof of harm' to minors from conversion therapy." *Tingley*, 47 F.4th at 1078 (quoting *Pickup*, 740 F.3d at 1232). Washington legislators were aware of the "fair amount of evidence that conversion therapy is associated with negative health outcomes such as depression, self-stigma, cognitive and emotional dissonance, emotional distress, and negative self-image" and legislators "relied on the fact that every major medical and mental health organization has uniformly rejected aversive and non-aversive conversion therapy as unsafe and inefficacious." *Id.* (cleaned up).

## 2. The evidence of harm has grown since Colorado enacted HB 19-1129 in 2019

At the time Colorado enacted its Minor Conversion Therapy Law, the professional consensus was that "conversion therapy efforts are inappropriate," and that "[i]nterventions aimed at a fixed outcome, such as gender conformity or heterosexual orientation, including those aimed at changing gender identity, gender expression, and sexual orientation are coercive, can be harmful, and should not be part of behavioral health treatments." U.S Dep't of Health & Hum. Servs., Substance Abuse & Mental Health Servs.

Admin. (SAMHSA), *Ending Conversion Therapy* 3, 11 (Oct. 2015), https://store.samhsa.gov/sites/default/files/d7/priv/sma15-4928.pdf.

Evidence showing the harms of conversion therapy on children and teens has grown stronger since Colorado enacted H.B. 19-1129 in 2019. For example, a study found that conversion interventions performed on LGBTQ minors were associated with depression, suicidal thoughts, suicide attempts, less educational achievement, and lower weekly income. Caitlin Ryan, et al., *Parent-Initiated Sexual Orientation Change Efforts with LGBT Adolescents: Implications for Young Adult Mental Health and Adjustment*, 67 J. OF HOMOSEXUALITY 159 (2020), https://doi.org/10.1080/00918369.2018.1538407. That study also found that lesbian, gay, and bisexual minors who had been subjected to external conversion efforts had attempted suicide at a rate nearly three times higher than other lesbian, gay, and bisexual minors. *Id.* at 168. For transgender and gender-nonconforming youth, conversion therapy posed even greater risk of harm; one study found that more than 60% of transgender minors subjected to gender identity change efforts before age 10 attempted suicide. Jack L. Turban, et al., *Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults*, 77 JAMA PSYCHIATRY 68, 74 (2020), doi:10.1001/jamapsychiatry.2019.2285.

And in March 2023, the U.S. Department of Health and Human Services' Substance Abuse and Mental Health Services Administration emphatically stated that sexual orientation and gender identity "change efforts in children and adolescents are harmful and should *never* be provided." SAMHSA, *Moving Beyond Change Efforts: Evidence and Action to Support and Affirm LGBTQI+ Youth* 8 (2023), https://store.samhsa.gov/sites/default/files/pep22-03-12-001.pdf (emphasis added). Instead, effective therapeutic approaches provided by health professionals "support youth in identity exploration and development without seeking predetermined outcomes related to their sexual orientation, gender identity, or gender expression." *Id.* at 51.

**B.    The First Amendment Does Not Exempt Mental Health Professionals from Following Standards of Care**

Appellant maintains that the First Amendment right to free speech allows her to engage in a practice that harms minors simply because that practice is implemented with words. *See* Br. of Appellant at 15–16. Not so. Though the practice of medicine often requires spoken or written word, prohibiting a particular treatment does not violate the right to free speech. A decision to the contrary would allow mental health professionals to operate below the professional standard of care and limit states' powers to regulate licensed professionals. *See Tingley*, 47 F.4th at 1077–78 ("Most medical treatments

require speech . . . but a state may still ban a particular treatment it finds harmful; otherwise any prohibition of a medical treatment would implicate the First Amendment and unduly limit the states' power to regulate licensed professions." (cleaned up)).

### 1.    States have broad authority to regulate professional conduct consistent with the First Amendment

States bear a special responsibility for maintaining standards among licensed professionals in order to protect the public from substandard care. *See Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483 (1955). It is well-settled that "[l]ongstanding torts for professional malpractice . . . 'fall within the traditional purview of state regulation of professional conduct[]'" without running afoul of the First Amendment. *NIFLA*, 138 S. Ct. at 2373 (quoting *N.A.A.C.P. v. Button*, 371 U.S. 415, 438 (1963)). Likewise, "'it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language . . . .'" *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). Thus, the Supreme Court has approved of regulations preventing attorneys from soliciting new clients in-person, *id.* at 457–58, and professional malpractice laws, *N.A.A.C.P.*, 371 U.S. at 438.

These principles extend to the doctor-patient relationship and psychotherapist-client relationship. "Most, if not all, medical and mental health treatments require speech, but that fact does not give rise to a First Amendment claim when the state bans a particular treatment." *Pickup*, 740 F.3d at 1229. Thus, states may lawfully regulate professional conduct by health care providers, even if it incidentally impacts their speech. The Supreme Court has approved, for example, state informed consent laws that required speech specific to abortions. *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 884 (1992), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). The Supreme Court in *NIFLA* re-emphasized that regulations facilitating informed consent to medical treatments are permissible. 138 S. Ct. at 2372; *see also id.* ("States may regulate professional conduct, even though that conduct incidentally involves speech."). It follows that the First Amendment does not deprive the states of authority to regulate the medical treatment itself, so long as states otherwise act within our Constitution's constraints, including due process and equal protection of the laws.

## 2. Courts have upheld state regulations of medical practices against First Amendment challenges

Circuit courts have had several occasions to uphold laws regulating medical practice in the face of First Amendment challenges.

13

For example, in *National Association for the Advancement of Psychoanalysis v. California Board of Psychanalysis* (*NAAP*), the Ninth Circuit concluded that a state law that required health practitioners to have certain training to practice within the state did not run afoul of the First Amendment. 228 F.3d 1043, 1054 (9th Cir. 2000). The court reasoned that because the key component of psychoanalysis is "'the treatment of emotional suffering and depression, *not* speech[,]'" the challenged licensing regulations were related to conduct, not speech. *Id.* (citation omitted). The court further concluded that "[i]t is properly within the state's police power to regulate and license professions, especially when public health concerns are affected." *Id.* The court specifically noted that "the state may have an interest in shielding the public from the untrustworthy, the incompetent, or the irresponsible, or against unauthorized representation of agency." *Id.* (quoting *Thomas v. Collins*, 323 U.S. 516, 544 (1945)); *see also Conant v. Walters*, 309 F.3d 629, 634–37 (9th Cir. 2002) (distinguishing between laws prohibiting doctors from treating patients with marijuana—conduct the government could regulate—from prohibiting doctors from simply speaking about or recommending marijuana outside of the provision of treatment—speech the government could not regulate).

Similarly, in *Pickup* and *Tingley*, the Ninth Circuit upheld California and Washington laws materially similar to the Minor Conversion Therapy Law challenged here. The Ninth Circuit reasoned that laws prohibiting licensed professionals from practicing conversion therapy on minors regulated professional conduct and had only an incidental impact on speech. *Pickup*, 740 F.3d at 1227–29. The court concluded that mental health counselors and therapists are not entitled to special First Amendment protections merely because their practice involves spoken word. *See Tingley*, 47 F.4th at 1077.

The Ninth Circuit is not alone; other courts have similarly concluded that states may lawfully regulate professional conduct without running afoul of the First Amendment, even if that regulation incidentally impacts speech. *See, e.g.*, *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 429–32 (6th Cir. 2019) (upholding a state law requiring abortion providers make certain statements to patients before procedure as a lawful regulation of medical practice with incidental impact on speech); *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1216 (11th Cir.), *cert. denied sub nom. Del Castillo v. Ladapo*, 143 S. Ct. 486 (Mem.) (2022) (state law requiring licensure of dieticians not a speech regulation even if dietician's practice involved communication of

nutrition and diet advice via spoken word). *But see Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020) (further discussed *infra* pp. 28–31).

**3.    Colorado's law is a lawful regulation of professional conduct**

The district court correctly concluded that the Minor Conversion Therapy Law is a lawful regulation of professional conduct that is rationally related to a legitimate government interest.

Colorado's law targets conduct that only incidentally impacts speech. Amici States agree with Appellant that a state cannot relabel disfavored speech as "conduct" in order to make an end-run around the First Amendment. *See* Br. of Appellant at 13. But health care—including mental health treatment like talk therapy—necessarily involves the use of literal speech and the verbal exchange of words as part of treatment. *See Tingley*, 47 F.4th at 1082 ("What licensed mental health providers do during their appointments with patients for compensation under the authority of a state license is treatment."). Contrary to Appellant's position, the use of words as a course of treatment does not automatically trigger heightened First Amendment scrutiny. *See Casey*, 505 U.S. at 884 ("To be sure, the physician's First Amendment rights not to speak are implicated [by an informed consent statute] . . . but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State[.]").

Colorado law generally regulates the practices of mental health practitioners like therapists, counselors, and psychologists to ensure that they abide by professional standards of care. *See, e.g.*, Colo. Rev. Stat. §§ 12-245-203 (stating that no practitioner is authorized to practice outside of their area of training, experience, or competence), 12-245-224 (detailing prohibited activities that fall outside the standards of professional practice). Colorado's Minor Conversion Therapy Law is just one part of this scheme, making it unprofessional conduct for a licensed, certified, or registered mental health care provider to engage in conversion therapy with a minor patient. Colo. Rev. Stat. §§ 12-245-202(3.5) (defining "conversion therapy"); 12-245-224(1)(t)(V) (prohibiting conversion therapy for minor clients). Contrary to Appellant's assertions, the Minor Conversion Therapy Law does not prevent mental health care providers from communicating with the public about conversion therapy, expressing their personal views to minor patients about conversion therapy, sexual orientation, or gender identity, or referring minors seeking conversion therapy to "a person engaged in the practice of religious ministry." *Id.* § 12-245-217(1). Rather, it restricts only professional conduct that consists of practicing conversion therapy and only incidentally impacts the means of that professional practice. *Ohralik*, 436 U.S. at 456; *Tingley*, 47 F.4th at 1077.

Cases outside of the medical practice realm are not to the contrary. *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), examined a federal statute that prohibited providing material support or resources, including "expert advice or assistance," to designated terrorist organizations. The Court held that although a statute "may be described as directed at conduct," strict scrutiny applied as to the plaintiffs because "the conduct triggering coverage under the statute consist[ed] of communicating a message[,]" *id*. at 28, about how to resolve disputes peacefully, *id*. at 36–37. This holding does not invalidate the state regulation of health care treatments. A more comparable analogy would be if a state attempted to prohibit a mental health counselor from "communicating a message" outside of a therapy session, such as expressing the counselor's personal views on conversion therapy. But the Minor Conversion Therapy Law explicitly does *not* do those things. *See* Colo. Rev. Stat. § 12-245-202(3.5) (defining what conversion therapy is and is not).

Applying the long-settled standard for regulating professional conduct, Colorado's Minor Conversion Therapy Law is lawful because it regulates professional conduct that only incidentally impacts speech and is rational. The district court correctly concluded that Colorado's law is rationally related to the legitimate government interest of protecting the mental and physical health of

children and youth and in regulating the mental-health profession. *Chiles v. Salazar*, No. 1:22-cv-02287-CNS-STV, 2022 WL 17770837, at *8–9 (D. Colo. Dec. 19, 2022). The strong medical consensus is that conversion therapy is neither effective nor safe for the treatment of any mental health condition, and should never be used on minors. *Supra* pp. 5–11. The decision to limit treatments that actively cause harm rather than treating a mental health disorder is rationally related to the legitimate interest of protecting the health and safety of patients. *Tingley*, 47 F.4th at 1079.

Under Appellant's view, acts of unprofessional conduct—like the practice of conversion therapy—should be subject to the highest level of constitutional protection. But this would essentially render professionals whose treatments use words immune from any regulation or oversight. This Court should reject such an extreme and harmful conclusion.

**C.    States Have a Long and Recognized History of Regulating Health Care Provider Conduct**

As discussed above, in *NIFLA*, the Supreme Court reaffirmed that laws that regulate speech only "as part of the *practice* of medicine" are lawful. 138 S. Ct. at 2373 (quoting *Casey*, 505 U.S. at 884). The Court specifically noted that "longstanding" historical practices supported this conclusion, including informed consent laws and torts for professional malpractice. *Id.* The Court

explained that while its precedents do not support a free-floating exemption for any and all regulation of professional speech, the Court considers whether a particular law falls within such a "tradition" of regulation. *See id.* at 2372; *Tingley*, 47 F.4th at 1080 ("There is a long (if heretofore unrecognized) tradition of regulation governing the practice of those who provide health care within state borders." (applying standard derived from *NIFLA*, 138 S. Ct. at 2372)).

States who restrict the practice of conversion therapy by licensed professionals on children do so in accordance with their power to regulate medical practice, to enforce professional standards, and protect patients from harm, fraud, discrimination, and abuse. "From time immemorial," states have exercised this power to protect public health and safety and to enact standards for obtaining and maintaining a professional license, without running afoul of the Constitution. *Dent v. West Virginia*, 129 U.S. 114, 122 (1889). Regulation of conduct that affects public health is a core area of traditional state concern. *See Gonzales v. Oregon*, 546 U.S. 243, 270–71 (2006); *Watson*, 218 U.S. at 176 (explaining that "[it] is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health[,]" and

acknowledging that "[t]here is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine").

Regulations on the practice of medicine are long-standing, predating ratification of the First Amendment. The first American laws to control the quality of medical service were enacted in the mid-1600s. For example, in 1649, the Massachusetts Bay Colony restricted physicians, surgeons, or midwives from working "at any time about the bodye of men, women or children, for preservation of life, or health . . . without the advice and consent of such as are skillful in the same Art." DAVID A. JOHNSON & HUMAYUN J. CHAUDRY, MEDICAL LICENSING AND DISCIPLINE IN AMERICA: A HISTORY OF THE FEDERATION OF STATE MEDICAL BOARDS 4 (2012). In the late colonial and early independence periods, states passed a variety of licensing laws for doctors. S. DAVID YOUNG, THE RULE OF EXPERTS: OCCUPATIONAL LICENSING IN AMERICA 12 (1987). Deprofessionalization in the Jacksonian era led many states to repeal penalties for the unlicensed practice of medicine and laws curtailing the operation of proprietary medical schools, but states came out of the regulatory "dark ages," passing a second wave of licensing laws shortly after the Civil War. JOHNSON & CHAUDRY 21. By 1910, nearly all states had instituted or reinstituted licensing laws for medical professionals. David Johnson &

Humayun J. Chaudry, *The History of the Federal of State Medical Boards*, 98 J. OF MED. REG. 20, 22 (2012).

Colorado's Minor Conversion Therapy Law is thus part of a long tradition of states regulating the provision of medical treatment consistent with the First Amendment.

**D.    Appellant's Position that Health Care Treatment Modalities Using Speech Are Not Conduct-Based Would Lead to Dangerous Outcomes**

States do not lose their power to regulate medical treatments "merely because those treatments are implemented through speech rather than through scalpel." *Tingley*, 47 F.4th at 1064. Accepting and upholding Appellant's position that talk therapy cannot be regulated as a health care practice and is instead speech—the regulation of which must survive strict scrutiny—would essentially deregulate this form of health care, leaving children and adults unprotected from treatments that violate generally accepted standards of care.

**1.    State determinations that conversion therapy practiced on minors falls below the standard of care for health care providers comport with state disciplinary processes**

Traditionally, state governments have exercised their power to regulate health care providers by setting minimum educational and professional standards for licensing. *Barsky*, 347 U.S. at 451 ("[P]ractice is a privilege granted by the State under its substantially plenary power to fix the terms of admission.").

States legislate the scope of practice and minimum "standard of care" for the profession, and investigate and discipline providers whose practice falls outside the scope of their profession or below the standard of care. *See, e.g.*, Colo. Rev. Stat. §§ 12-245-203 (defining scope of practice for licensed mental health professionals); 12-245-303 (defining scope of practice for a psychologist). The Colorado Minor Conversion Therapy Law easily fits within this paradigm.

States may discipline licensed professionals operating within their borders for practicing below the standard of care. Many state laws regulating health care practices specify acts that fall below the standard of care, such as sexual misconduct, fraud or misrepresentation, conviction of a crime related to the profession, or betrayal of the practitioner-patient privilege. *See, e.g.*, Colo. Rev. Stat. § 12-245-224. States may also discipline a health care provider for professional conduct that is incompetent, negligent, or rises to a level of malpractice that violates the standards for the profession. *See, e.g.*, *id.* 12-245-224(1)(g)(I) (stating that a professional violates the law if she acts or fails to act in a manner that does not meet the generally accepted standards of the profession).

Over twenty states have determined that the practice of conversion therapy on minors *always* falls below the standard of care for the mental health

professions. This determination is based on voluminous studies demonstrating the practice's harms to children and the consensus of all leading medical and mental health organizations that conversion therapy should not be conducted on children. Accordingly, states may discipline providers for using conversion therapy on minors under states' general laws requiring providers to adhere to the standard of care, even in the absence of a specific law prohibiting this practice. But by specifically identifying conversion therapy for children as a specific form of treatment that falls below the standard of care for mental health professions, states provide notice and clarity to practitioners that this treatment is against the law and increase efficiency for the state licensing disciplinary process.

Clear protections for minors are particularly important in the context of counseling, where children and youth often lack the degree of agency that adults have. The vast majority of children's counseling is initiated by parents or caregivers, with a counselor selected by the parent or caregiver. Anna M. de Haan et al., *A meta-analytic review on treatment dropout in child and adolescent outpatient mental health care*, 33 CLINICAL PSYCHOLOGY REV. 698 (2013), https://doi.org/10.1016/j.cpr.2013.04.005. Children may or may not have the right to consent to this care. Given the significant risk that a child could be placed into conversion therapy without their consent, and the documented risks of harm

such treatment poses, states' decisions to prohibit conversion therapy for state-licensed professionals are of the utmost importance.

Appellant's arguments misunderstand the scope of her role as a counselor and the responsibilities that accompany the privilege of being a state-licensed mental health practitioner. Colorado law defines psychotherapy to include the "treatment, diagnosis, testing, assessment, or counseling in a professional relationship . . . to alleviate behavioral and mental health disorders, understand unconscious or conscious motivation, resolve emotional, relationship, or attitudinal conflicts, or modify behaviors that interfere with effective emotional, social, or intellectual functioning." Colo. Rev. Stat. § 12-245-202(14)(a). Likewise, "professional counseling" is defined to include "activities" and "interventions" such as skill-building in communications, decision-making, and problem-solving; clarifying values; promoting adaptation to life changes; developing social skills, and restructuring cognitive patterns. *Id.* § 12-245-603. In order to lawfully practice, one must have a license from the state and comply with certain training and education requirements. *See, e.g.*, Colo. Rev. Stat. §§ 12-245-604 (minimum qualifications for licensure as licensed professional counselor); 12-245-605 (rights and privileges of licensure for licensed professional counselors); 12-245-606 (duty of continuing professional

competency for licensed professional counselors). Colorado's Minor Conversion Therapy Law—like those upheld in California and Washington—is thus limited only to licensed practitioners' conduct, and even then only to conduct that seeks to change a child's sexual orientation or gender identity. Medical and mental health practices like those engaged in by Appellant are concerned with the treatment of a condition or disorder. Indeed, the regulation of health professions like Appellant's therapy practice takes place in a context where there is a desired outcome in treating the patient for the patient's benefit. Laws prohibiting conversion therapy for minors as practiced by licensed professionals are a lawful extension of a state's duty to regulate professions to protect the public.

> **2.    Accepting Appellant's argument would endanger the public by immunizing licensed professionals from disciplinary action for treatment that falls below the standard of care**

Appellant's position that talk therapy is "pure speech" that should be afforded the highest levels of constitutional protection is legally wrong, for the reasons set forth above. It also carries significant risks. "[P]sychotherapists are not entitled to special First Amendment protection merely because the mechanism used to deliver mental health treatment is the spoken word[.]" *Pickup*, 740 F.3d at 1227. To hold otherwise would "make talk therapy virtually

immune from regulation." *Id*. at 1231 (cleaned up). Further, Appellant's position is even more sweeping than just immunizing talk therapy from regulation; every word a health care provider speaks could be immunized from regulation, no matter how unrelated to the provision of evidence-based health care or how harmful to patients.

Examples of states' lawful regulation of harmful speech-related health care provider conduct abound. For example, in Colorado, the State Board of Psychologist Examiners revoked a psychologist's license for disclosing confidential information about his patients to a third party and soliciting loans from patients. *Davis v. State Bd. of Psych. Exam'rs*, 791 P.2d 1198 (Colo. App. 1989). These acts were undoubtedly carried out through speech, but would be protected from disciplinary action under Appellant's argument. In Washington, the state medical commission disciplined a psychiatrist for violating the standard of care for his profession, where he "deviated from . . . traditional psychotherapy" and failed to maintain an appropriate doctor-client relationship by encouraging his minor patient's "unhelpful dependency" on the psychiatrist and communicating with the patient's parents in a way that alienated family members from each other. *Huffine v. State Dep't of Health Med. Quality Assurance Comm'n*, 148 Wash. App. 1015 (2009)

(unpublished). Under Appellant's framing, the state would have no authority to determine that the provider's conversations with the minor and their parents fell below the standard of care for his profession. Another example: in 2018, Washington found that a licensed marriage and family therapist practiced below the standard of care for her profession by: (1) treating multiple family members individually, causing role confusion and undermining objectivity, (2) suggesting inappropriate medication in inaccurate dosages to a client's physician, and (3) disclosing a minor client's masturbation habits at a school meeting, ignoring the goals of the discussion and distressing all of the participants. *Townsend v. State Dep't of Health*, 6 Wash. App. 2d 1035 (2018) (unpublished). Again, under Appellant's analysis, all of these actions would be protected speech, essentially immune from regulation and disciplinary action, and the provider could continue to provide similar care unchecked, indefinitely. Such an outcome would leave residents at risk of serious harm.

### 3.    The Court that has followed Appellant's position has not articulated how states may protect public health in the absence of professional regulations of treatment involving speech

The Eleventh Circuit stands alone in enjoining two conversion therapy ordinances as content-based regulations that do not survive strict scrutiny. *See Otto*, 981 F.3d 854. The court was analytically wrong and failed to adequately

address how children can be protected from treatments that are deeply harmful, ineffective, and repudiated by all leading medical and mental health organizations. The *Otto* panel proffers that the framing of talk therapy treatment as pure speech, with the associated First Amendment protections, "does not stand in the way of longstanding torts for professional malpractice or other state-law penalties for bad acts that produce actual harm." *Id*. (cleaned up). Rather, the Court noted that "[p]eople who actually hurt children can be held accountable[.]" *Id*. At base, *Otto* stands for the unsupportable position that the government may not *prevent* injury to children from practices that have been widely recognized as harmful, and may only discipline a provider *after* they commit the expected harm. But the law does not require states to wait for harm to occur before they may regulate professional practice and conduct. *See Ohralik*, 436 U.S. at 464 (professional regulation prohibiting client solicitation was a permissible "prophylactic measure[] whose objective is the prevention of harm before it occurs[]"); *id.* ("[T]he State has a strong interest in adopting and enforcing rules of conduct designed to protect the public from harmful [professional practices] by [professionals] whom it has licensed."). Nor does the *Otto* opinion explain how state governments should discipline a mental health provider for malpractice (or what the Eleventh Circuit has defined as speech

protected by the First Amendment). *Otto* contradicts the state's responsibility to protect its people from practice below the standard of care and should not be followed by this Court.

Such a position is also unworkable as a practical matter, and intra-circuit cases have not applied *Otto* to professional regulations that impact speech. For example, in *Del Castillo*, the Eleventh Circuit considered *NIFLA* and held that an unlicensed dietician and nutritionist's practice was subject to state licensing because the effect on her speech was "incidental" even though her work mostly consisted of communicating her opinions and advice on diet and nutrition to clients. 26 F.4th at 1216. The Court considered that a licensed dietician's scope of practice includes "conducting nutrition research, developing a nutrition care system, and integrating information from a nutrition assessment," ultimately concluding that a dietician's practice is not speech and regulation of the profession was "incidental to speech." *Id*. at 1225–26.

Under this framework, there is no sound reason that a mental health counselor should be treated any differently than a nutritionist. Both engage in similar types of activities (like setting treatment goals, researching treatment options, and documenting treatment notes) that may lawfully be regulated as professional conduct even if the regulation incidentally impacts speech. Given

the lack of internal consistency in the *Otto* decision and its incompatibility with historical regulation of professional practice, this Court should decline to follow the Eleventh Circuit.

Finally, Appellant's slippery slope argument—taken from the *Otto* opinion—is a red herring. She maintains that regulating mental health treatment as conduct would lead to the regulation of protected expression, like book clubs and protests. This argument is flawed. These activities can be readily distinguished from the provision of health care. They are intrinsically directed toward the expression of ideas, in contrast with the treatment of a condition or disease. The regulation of health professions takes place in a context where there is a desired health *outcome*—behavioral or physical—in treating the patient, purely for the patient's benefit. In that context, a state-licensed professional acts with the authority of a state license, and acts "to advance the welfare of the clients, rather than to contribute to public debate." *Pickup*, 740 F.3d at 1228; *cf. Lowe v. S.E.C.*, 472 U.S. 181, 232 (1985) (White, J., concurring) ("One who takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances is properly viewed as engaging in the practice of a profession.").

## IV.    CONCLUSION

This Court should affirm the district court's order denying the motion for preliminary injunction.

RESPECTFULLY SUBMITTED this 5th day of May, 2023.

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*

*s/ Cristina Sepe*
CRISTINA SEPE, WSBA 53609
*Deputy Solicitor General*
ALEXIA DIORIO, WSBA 57280
SARAH E. SMITH, WSBA 55770
*Assistant Attorneys General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
Cristina.Sepe@atg.wa.gov
Alexia.Diorio@atg.wa.gov
Sarah.E.Smith@atg.wa.gov

SIERRA McWILLIAMS, WSBA 48544
*Assistant Attorney General*
7141 Cleanwater Drive SW
PO Box 40109
Olympia, WA 98504-0109
(360) 586-5107
Sierra.McWilliams@atg.wa.gov

*Counsel for the State of Washington*

ROB BONTA
  *Attorney General*
  *State of California*
1515 Clay Street
Oakland, CA 94612

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
  *Attorney General*
  *State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333

DANA NESSEL
  *Attorney General*
  *State of Michigan*
P.O. Box 30212
Lansing, MI 48909

AARON D. FORD
  *Attorney General*
  *State of Nevada*
100 North Carson Street
Carson City, NV 89701

WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

BRIAN L. SCHWALB
  *Attorney General*
  *District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
100 West Randolph Street
Chicago, IL 60601

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

RAÚL TORREZ
  *Attorney General*
  *State of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

MATTHEW J. PLATKIN
  *Attorney General*
  *State of New Jersey*
25 Market Street
Trenton, NJ 08625

ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main Street
Providence, RI 02903

JOSHUA L. KAUL
  *Attorney General*
  *State of Wisconsin*
17 West Main Street
Madison, WI 53703

LETITIA JAMES
  *Attorney General*
  *State of New York*
The Capitol
Albany, NY 12224

MICHELLE A. HENRY
  *Attorney General*
  *Commonwealth of Pennsylvania*
Strawberry Square
Harrisburg, PA 17120

CHARITY R. CLARK
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, VT 05609

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,496 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 29(a)(4) and 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Date: May 5, 2023                    *s/ Cristina Sepe*
                                     CRISTINA SEPE, WSBA 53609
                                      *Deputy Solicitor General*
                                     1125 Washington Street SE
                                     PO Box 40100
                                     Olympia, WA 98504-0100
                                     (360) 753-6200
                                     Cristina.Sepe@atg.wa.gov

**ADDENDUM**

**Table A**

**States Prohibiting or Restricting Conversion "Therapy" for Minors**

| Jurisdiction[1] | Law / Regulation | Description |
|---|---|---|
| California | S.B. 1172, 2011-12 Leg., Reg. Sess. (Cal. 2012) | Law prohibiting conversion "therapy" for minors |
| Colorado | H.B. 19-1129, 72nd Gen. Assemb., 1st Reg. Sess. (Colo. 2019) | Law prohibiting conversion "therapy" for minors |
| Connecticut | Sub. H.B. 6695, 2017 Gen. Assemb., Reg. Sess. (Conn. 2017) | Law prohibiting conversion "therapy" for minors |
| Delaware | S.B. 65, 149th Gen. Assemb., Reg. Sess. (Del. 2018) | Law prohibiting conversion "therapy" for minors |
| District of Columbia | B20-0501, 20th Council, Reg. Sess. (D.C. 2014) | Law prohibiting conversion "therapy" for minors |
| Hawai'i | S.B. 270, 29th Leg., Reg. Sess. (Haw. 2018)<br><br>H.B. 664, 30th Leg., Reg. Sess. (Haw. 2019) | Law prohibiting conversion "therapy" for minors |
| Illinois | H.B. 0217, 99th Gen. Assemb., Reg. Sess. (Ill. 2015) | Law prohibiting conversion "therapy" for minors |
| Maine | L.D. 1025, 129th Leg., 1st Reg. Sess. (Me. 2019) | Law prohibiting conversion "therapy" for minors |
| Maryland | S.B. 1028, 438th Gen. Assemb., Reg. Sess. (Md. 2018) | Law prohibiting conversion "therapy" for minors |
| Massachusetts | H.140, 191st Leg., Reg. Sess. (Mass. 2019) | Law prohibiting conversion "therapy" for minors |

---

[1] This table excludes counties and cities that prohibit or restrict conversion therapy for minors.

| Jurisdiction[1] | Law / Regulation | Description |
|---|---|---|
| Michigan | Exec. Dir. By Gov. Gretchen Whitmer, No. 2021-3 (Mich. 2021) | Executive directive prohibiting use of state and federal funds for conversion "therapy" for minors |
| Minnesota | Third Eng. H.F.16 93rd Leg., Reg. Sess. (Minn. 2023) | Law prohibiting conversion "therapy" for minors |
| Nevada | S.B. 201, 79th Leg., Reg. Sess. (Nev. 2017) | Law prohibiting conversion "therapy" for minors |
| New Hampshire | H.B. 587, 165th Gen. Ct., Reg. Sess. (N.H. 2018) | Law prohibiting conversion "therapy" for minors |
| New Jersey | A.B. 3371, 216th Leg., 1st Ann. Sess. (N.J. 2013) | Law prohibiting conversion "therapy" for minors |
| New Mexico | S.B. 121, 53rd Leg., 1st Sess. (N.M. 2017) | Law prohibiting conversion "therapy" for minors |
| New York | S.B. 1046, 242nd Leg., Reg. Sess. (N.Y. 2019) | Law prohibiting conversion "therapy" for minors |
| North Carolina | Exec. Order by Gov Roy Cooper, No. 97, (N.C. 2019) | Executive order prohibiting use of state and federal funds for conversion "therapy" for minors |
| North Dakota | N.D. Admin Code. 75.5-02-06.1 (N.D. 2021) | Ethics regulation prohibiting licensed social workers from practicing conversion "therapy" |
| Oregon | H.B. 2307, 78th Leg., Reg. Sess. (Or. 2015) | Law prohibiting conversion "therapy" for minors |
| Pennsylvania | Exec. Order by Gov. Tim Wolf, No. 2022-02 (Penn. 2022) | Executive order restricting conversion "therapy" for minors |
| Rhode Island | Substitute H.B. 5277A, Gen. Assemb., Reg. Sess. (R.I. 2017) | Law prohibiting conversion "therapy" for minors |

| Jurisdiction[1] | Law / Regulation | Description |
|---|---|---|
| Utah | H.B. 228, 65th Leg., Reg. Sess. (Utah 2023) | Law prohibiting conversion "therapy" for minors |
| Vermont | S. 132, 2015–16 Leg., Reg. Sess. (Vt. 2016) | Law prohibiting conversion "therapy" for minors |
| Virginia | H.B. 386, 2020 Gen. Assemb., Reg. Sess. (Va. 2020) | Law restricting conversion "therapy" for minors |
| Washington | S.B. 5722. 65th Leg., Reg. Sess. (Wash. 2018) | Law restricting conversion "therapy" for minors |
| Wisconsin | Exec. Order by Gov. Tony Evers, No. 122 (Wis. 2021) | Executive order prohibiting use of state and federal funds for conversion "therapy" for minors |
| Puerto Rico | Exec. Order by Gov. Gov. Ricardo A. Rosselló Nevares, No. 2019-016 (P.R. 2019) | Executive order requiring institutions seeking medical licensure to certify they will not offer conversion "therapy" |