CASE NOS. 22-1445, 23-1002
IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

KALEY CHILES,

   Plaintiff – Appellant,

   v.

PATTY SALAZAR, *et al.,*

   Defendant – Appellee.

---

On Appeal from the United States District Court
For the District of Colorado
The Honorable Judge Charlotte N. Sweeney
No. 1:22-CV-02287-CNS-STV

---

**BRIEF OF AMICUS CURIAE CONSTITUTIONAL LAW & FIRST
AMENDMENT SCHOLARS IN SUPPORT OF DEFENDANTS-APPELLEES**

---

Respectfully submitted,

LUKE A. BAREFOOT
THOMAS S. KESSLER
Cleary Gottlieb Steen
& Hamilton LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
lbarefoot@cgsh.com
tkessler@cgsh.com

May 5, 2023               *Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

STATEMENT OF *AMICI CURIAE* ............................................................. 1

SUMMARY OF ARGUMENT ..................................................................... 6

ARGUMENT ............................................................................................... 9

I.  REGULATIONS OF PROFESSIONAL CONDUCT
    THAT INCIDENTALLY BURDEN VERBAL
    COMMUNICATION ARE NOT SUBJECT TO
    HEIGHTENED FIRST AMENDMENT REVIEW. ............................. 9

    A.  First Amendment Heightened Scrutiny Does Not
        Apply To Regulation of Professional Conduct That
        Incidentally Burdens Speech. ...................................................... 10

    B.  *NIFLA* Affirmed The Supreme Court's Jurisprudence
        That Communication As Part of The Practice of
        Medicine Is Not Subject to Heightened First
        Amendment Review. ..................................................................... 15

    C.  This Court Should Follow The Ninth Circuit's
        Analysis In *Tingley* and *Pickup* Upholding
        Conversion Therapy Bans, Which Was Consistent
        With *NIFLA* and Supreme Court Jurisprudence. ...................... 17

    D.  The Text and Statutory Context of Colorado's
        Conversion Therapy Ban Demonstrate That The
        Statute Is A Regulation of Professional Conduct. ...................... 21

II. A RULING THAT ALL PROFESSIONAL CONDUCT
    INVOLVING VERBAL COMMUNICATION IS
    SUBJECT TO HEIGHTENED FIRST AMENDMENT
    REVIEW WOULD DESTROY STATES'
    SANCTIONED POWER TO REGULATE
    PROFESSIONS THROUGH LICENSING, TORT, AND
    MALPRACTICE REGIMES ............................................................. 25

CONCLUSION ............................................................................................ 28

RULE 32(g)(1) CERTIFICATE OF COMPLIANCE ................................... 29

# TABLE OF AUTHORITIES

Page(s)

## Cases

Brokamp v. James,
No. 21-3050-CV, -- F. 4th --, 2023 WL 3102704
(2d Cir. Apr. 27, 2023) (to be published) ............................................17

Capital Associated Industries, Inc. v. Stein,
922 F.3d 198 (4th Cir. 2019) ..........................................................26

Doe v. Rokita,
54 F.4th 518 (7th Cir. 2022) ..........................................................16

Doyle v. Palmer,
365 F.Supp.3d 295 (E.D.N.Y. 2019) ..............................................26

Gentile v. State Bar of Nevada,
501 U.S. 1030 (1991)...................................................................11

Giboney v. Empire Storage & Ice Co.,
336 U.S. 490 (1949)......................................................................9

Gray v. Department of Public Safety,
248 A.3d 212 (Me. 2021)..............................................................26

Greenberg v. Goodrich,
593 F. Supp. 3d 174, 225 (E.D. Pa. 2022) ....................................26

Holder v. Humanitarian Law Project,
561 U.S. 1 (2010)........................................................................20

In re Sawyer,
360 U.S. 622 (1959)......................................................................11

King v. Governor of New Jersey,
767 F.3d 216 (3d Cir. 2014) ....................................................17, 20

National Institute of Family and Life Advocates v. Becerra ("NIFLA"),
138 S. Ct. 2361 (2018)............................................................. passim

New York Times Company v. Sullivan,
376 U.S. 254 (1964)....................................................................14

NLRB v. Cath. Bishop of Chi.,
440 U.S. 490, 500 (1979).............................................................26

Ohralik v. Ohio State Bar Association,

436 U.S. 447 (1978) .................................................................. 10, 25

*Otto v. City of Boca Raton, Florida,*
  981 F.3d 854 (11th Cir. 2022) ....................................... 17, 19, 23, 27

*Pickup v. Brown,*
  740 F.3d 1208 (9th Cir. 2014) ....................................... 13, 14, 17, 18

*Planned Parenthood of Southeastern Pennsylvania v. Casey,*
  505 U.S. 883 (1992) ................................................................ 12, 13

*Semler v. Oregon State Board of Dental Examiners,*
  294 U.S. 608 (1935) .........................................................................12

*Shea v. Board of Medical Examiners,*
  81 Cal. App. 3d 564 (Cal. 1978) .....................................................13

*Sheppard v. Maxwell,*
  384 U.S. 333 (1966) .........................................................................11

*Tarasoff v. Regents of University of California,*
  551 P.2d 334 (Cal. 1976) .................................................................14

*Thornhill v. Alabama,*
  310 U.S. 88 (1940) ...........................................................................15

*Tingley v. Ferguson,*
  47 F.4th 1055 (9th Cir. 2022) ........................................... 8, 17, 18, 19

## Statutes

Colo. Rev. Stat. § 12-245-101 .........................................................22

Colo. Rev. Stat. § 12-245-202 ............................................... 1, 21, 24

Colo. Rev. Stat. § 12-245-224 .......................................................1, 21

## Other Authorities

Am. Acad. of Child & Adolescent Psychiatry, *Conversion Therapy* (Feb. 2018),
  *available at*
  https://www.aacap.org/aacap/Policy_Statements/2018/Conversion_Therapy.aspx
  ................................................................................................7, 23

Am. Med. Ass'n *Sexual orientation and gender identity change efforts (so-called
  "conversion therapy")* (2022), *available at* https://www.ama-
  assn.org/system/files/conversion-therapy-issue-brief.pdf ....................23

iv

Am. Psych. Ass'n *APA Resolution on Gender Identity Change Efforts* (Feb. 2021), *available at* https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf ....................................................................................23

Am. Psych. Ass'n, *APA Resolution of Sexual Orientation Change Efforts* (Feb. 2021), *available at* https://www.apa.org/about/policy/resolution-sexual-orientation-change-efforts.pdf ...............................................................................6

Am. Psychiatric Ass'n, *Position Statement on Conversion Therapy and LGBTQ Patients* (2018), *available at* https://www.psychiatry.org/getattachment/3d23f2f4-1497-4537-b4de-fe32fe8761bf/Position-Conversion-Therapy.pdf..................................................22

ROBERT C. POST, DEMOCRACY, EXPERTISE, AND ACADEMIC FREEDOM: A FIRST AMENDMENT JURISPRUDENCE FOR THE MODERN STATE (2012) .............. 9, 25, 26

Robert C. Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech*, 939 UNIV. ILL. L. REV. (2007)...................... 12, 22

## Rules

Fed. R. App. P. 29 .........................................................................................1

## STATEMENT OF *AMICI CURIAE*[1]

*Amici curiae* are scholars of constitutional law and the First Amendment who share an interest in ensuring that the constitutionality of Colorado's statutory ban on conversion therapy for minors, Colo. Rev. Stat. §§ 12-245-202(3.5)(a), 12-245-224(1)(t)(V), is determined in accordance with settled First Amendment principles.[2]

*Carlos A. Ball* is Distinguished Professor of Law and Judge Frederick Lacey Scholar at Rutgers Law School. He is the author of several books, including *The First Amendment and LGBT Equality* (Harvard, 2017) and *Same-Sex Marriage and Children* (Oxford, 2014). He has written many law review articles on constitutional law and is a co-editor of *Cases and Materials on Sexuality, Gender Identity, and the Law* (West, 2022). Among other constitutional law courses, Professor Ball teaches a class on the First Amendment.

*Ash Bhagwat* is a Distinguished Professor of Law and Boochever and Bird Endowed Chair for the Study and Teaching of Freedom and Equality at UC Davis School of Law. Bhagwat has authored and coauthored works including *The Myth of*

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties, through counsel, have consented to the filing of this brief. Pursuant to Rule 29(a)(4)(E), *Amici* state that no party's counsel authored any portion of this brief and no party, party counsel, or person other than *Amici* or their counsel contributed money to fund the preparation or submission of this brief.

[2] *Amici* join on their own behalf and not as representatives of their universities with which *Amici* are affiliated; university names are provided for purposes of identification only.

*Rights* and *Our Democratic First Amendment.* He previously clerked for Judge Richard A. Posner of the United States Court of Appeals for the Seventh Circuit, and Associate Justice Anthony M. Kennedy of the U.S. Supreme Court.

*Michael Boucai* is a Professor at the University of Buffalo School of Law. Boucai's work has focused on constitutional, criminal, and gender, sexuality & law. He clerked for Judge Rosemary Barkett of the U.S. Court of Appeals for the Eleventh Circuit.

*Alan E. Brownstein* is Professor of Law emeritus at the University of California Davis School of Law. Prior to his retirement, he held the Boochever and Bird Chair for the Study and Teaching of Freedom and Equality. He has written extensively on First Amendment issues in numerous law review articles. His books include (with Leslie Jacobs) *Global Issues in Freedom of Speech and Religion* (2008).

*Erin Carroll* is Professor of Law, Legal Practice at Georgetown Law. Carroll's scholarship focuses on transparency laws and newsgathering, the First Amendment, and methods of protecting watchdog journalism. She previously served as a litigator at Pillsbury Winthrop Shaw Pittman in California.

*Erwin Chemerinsky* is Dean of Berkeley Law, where he serves as Jesse H. Choper Distinguished Professor of Law. He was formerly the Founding Dean and Distinguished Professor of Law at the University of California, Irvine School of

Law.  Previously, he taught at Duke Law School for four years and at the University of Southern California School of Law for twenty-one years.  Professor Chemerinsky has also taught at UCLA School of Law and DePaul University College of Law.  His areas of expertise are constitutional law, federal practice, civil rights and civil liberties, and appellate litigation.  He is the author of seven books and nearly 200 law review articles.

*Michael C. Dorf* is Robert S. Stevens Professor of Law at Cornell Law School, where he serves on the Advisory Board of the First Amendment Clinic and teaches constitutional law, federal courts, and related subjects.  He has authored or co-authored six books and over one hundred scholarly articles and essays for law journals and peer-reviewed science and social science journals.

*Thomas E. Kadri* is Assistant Professor of Law at the University of Georgia School of Law.  Kadri has authored and coauthored works that focus on torts and criminal law, with an emphasis on how technology, law, and social norms enable and affect privacy, speech, and abuse including *Tort Law: Cases & Critique* (1st ed.).  He clerked for Judge M. Margaret McKeown of the U.S. Court of Appeals for the Ninth Circuit and Judge Thomas Griesa of the U.S. District Court for the Southern District of New York.

*Suzette Malveaux* is Moses Lasky Professor of Law and the Director of the Byron R. White Center for the Study of American Constitutional Law at the

University of Colorado Law School. Professor Malveaux teaches and writes in the areas of civil rights, constitutional law and civil procedure. She is a member of the American Law Institute.

*Toni Massaro* is Regents Professor and Dean Emerita at the University of Arizona James E. Rogers School of Law. Massaro also serves as the Executive Director of the University of Arizona Agnese Nelms Haury Program in Environment and Social Justice. She has authored and coauthored several books and law review articles on constitutional law, shame penalties, and law and emotion.

*Neil Richards* holds the Koch Distinguished Chair in Law at Washington University in St. Louis, where he also directs the Cordell Institute for Policy in Medicine and Law. He is one of the world's leading experts in privacy and free expression law and has written extensively about the relationships between privacy and free speech in contemporary society.

*Jocelyn Simonson* is Professor of Law & Associate Dean for Research and Scholarship at Brooklyn Law School. Simonson's work focuses on public participation in the criminal process and local governance and institutions that controls policing and punishment.

*Scott Skinner-Thompson* is Associate Professor at Colorado Law School, where he researches constitutional law, civil rights, and privacy law, with a particular focus on LGBTQ and HIV issues.

*Catherine Smith* is Professor of Children's Constitutional Rights and *Chauncey G. Wilson Memorial Research Chair* at the University of Denver Sturm College of Law. Professor Smith clerked for the late Chief Judge Henry A. Politz of the U.S. Court of Appeals for the Fifth Circuit and for U.S. Magistrate Judge William M. Catoe Jr. In addition to numerous publications and awards, Smith's co-authored amicus brief on children's rights was cited and relied upon in the same-sex marriage decision, *Obergefell v. Hodges*.

*Kyle Courtenay Velte* is Associate Dean for Faculty and Professor of Law at the University of Kansas School of Law. Velte has authored and coauthored several articles that focus on the perceived tensions between religious freedom and LGBT civil rights along law, policy, and theory. She clerked for Justice Alex Martinez of the Colorado Supreme Court and for the Honorable Roxanne Bailin of the 20th Judicial District in Boulder, Colorado.

*Ari E. Waldman* is Professor of Law and Computer Science at Northeastern University. Waldman has authored and coauthored several books and law review articles including *Privacy As Trust: Information Privacy for an Information Age and Industry Unbound: The Inside Story of Privacy, Data, and Corporate Power*. He also directs the School of Law's Center for Law, Information and Creativity (CLIC).

## SUMMARY OF ARGUMENT

States have the well-established authority to regulate the activities of professionals, in particular those who seek to cloak themselves in the imprimatur of a state-issued license. And, although that power extends to a wide variety of professional contexts, it is particularly entrenched with regard to state regulation of health care providers.

Appellant is a mental health care provider licensed by the State of Colorado. Like physicians and nurses, chiropractors, and physical therapists, she provides health care services to her clients. Ignoring that the provision of most health care involves communication from the provider to the patient, Appellant argues that her services cannot be subject to any regulation because, rather than scalpels or stethoscopes, she provides her services via verbal communication. For this remarkable proposition, Appellant relies entirely on the First Amendment. But the precedents of this and other Courts provide that the First Amendment is not alchemical; it does not transform every uttered word into protected speech subject to heightened scrutiny, and it cannot immunize Appellant's services from reasonable regulation.

That is all Colorado has done. In 2019, the Colorado legislature amended an existing statutory regime to prohibit mental health care providers from "engaging in

conversion therapy" with minor patients.[3]   The provision of "conversion therapy" has been banned in some form in at least sixteen states and the District of Columbia and disavowed as ineffective and harmful by every major association of medical and psychological professionals.

Colorado's statutory ban on the provision of "conversion therapy" to minor patients does not implicate First Amendment heightened scrutiny merely because mental health care providers undertake their treatment via verbal communication. Colorado's statute regulates the conduct of mental health care providers that are licensed, registered, or certified in the state of Colorado, and aligns with Supreme Court precedent affirming regulations of professional conduct that implicate verbal communications.   The Supreme Court has consistently held that verbal communication that is part of the provision of professional services is outside the

---

[3] Medical and psychological professionals have used various terms, including but not limited to "conversion therapy," "sexual orientation change efforts" ("SOCE"), and "reparative therapies," to describe the "range of techniques used by a variety of mental health professionals and non-professionals with the goal of changing sexual orientation."   Am. Psych. Ass'n, *APA Resolution of Sexual Orientation Change Efforts* (Feb. 2021), *available at* https://www.apa.org/about/policy/resolution-sexual-orientation-change-efforts.pdf.   For consistency and clarity, *Amici* use the term "conversion therapy" throughout the brief.  Amici's use of the term "conversion therapy" in no way serves as an endorsement of "conversion therapy" as "therapeutic."   *See* Am. Acad. of Child & Adolescent Psychiatry, *Conversion Therapy* (Feb. 2018) (finding "no evidence to support the application of any 'therapeutic intervention' operating under the premise that a specific sexual orientation, gender identity, and/or gender expression is pathological"), *available at* https://www.aacap.org/aacap/Policy_Statements/2018/Conversion_Therapy.aspx.

realm of heightened First Amendment protection when such communication departs from a statutorily delineated professional standard of care. *National Institute of Family and Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361 (2018), did not abrogate this precedent. In *NIFLA*, although the Supreme Court declined to wholesale insulate "professional speech" as a separate category of speech free from heightened scrutiny, the Supreme Court likewise reiterated that verbal communications as part of or incidental to licensed professional practice can be constitutionally regulated as a form of "professional conduct that incidentally burden speech." 138 S. Ct. at 2373. Put differently, although *NIFLA* declined to carve out a broad exception for all "professional speech" from First Amendment coverage, it likewise did not enact a sweeping transformation of all of professionals' verbal communications into protected speech. This Court should follow the Ninth Circuit's approach in *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022), which upheld Washington's conversion therapy ban after *NIFLA*, because the Ninth Circuit's analysis is consistent with the Supreme Court's jurisprudence upholding regulations of professional conduct that involve verbal communications.

Finally, Colorado's statute is consistent with a historically longstanding and widely accepted legal tradition recognizing the constitutional legitimacy of prohibiting conduct by licensed health care providers employing communication in the practice of their profession in a way that falls outside of accepted medical

standards and causes harm to their patients.  It does not prevent the Appellant from

engaging in any speech or otherwise expressing any ideas outside of the treatment

of minor patients under the imprimatur of a state professional license.  To extend

heightened First Amendment protection to all professional services enacted through

verbal communication would strip states of their first-order purpose to serve and

protect their citizens, and would undercut legal regimes long established to enable

this purpose, such as licensing, tort, and malpractice regimes.  For these reasons, the

Court should affirm the ruling of the District Court.

## ARGUMENT

## I.  REGULATIONS OF PROFESSIONAL CONDUCT THAT INCIDENTALLY BURDEN VERBAL COMMUNICATION ARE NOT SUBJECT TO HEIGHTENED FIRST AMENDMENT REVIEW.

The mere fact an individual conveys information through words does not

automatically render that action covered "speech" entitled to heightened scrutiny

under the First Amendment.  *See Giboney v. Empire Storage & Ice Co.*, 336 U.S.

490, 502 (1949) ("[I]t has never been deemed an abridgement of freedom of speech

. . . to make a course of conduct illegal merely because the conduct was in part . . .

carried out by means of language.").  Rather, the First Amendment principally

covers speech implicated in the free formation of public dialogue and opinion.

ROBERT C. POST, DEMOCRACY, EXPERTISE, AND ACADEMIC FREEDOM: A FIRST

AMENDMENT JURISPRUDENCE FOR THE MODERN STATE 15 (2012).  This leaves "vast

stretches of ordinary verbal expression, as for example between dentists and their patients, between corporations and their shareholders, . . . [that] are not considered necessary for the formation of public opinion and are consequently excluded from First Amendment coverage." *Id.* Under the Supreme Court's First Amendment jurisprudence, verbal communications involved in licensed, registered, or certified mental health care providers' practice of "conversion therapy" in the course of treating their minor patients resides within these vast stretches of verbal expression excluded from the Free Speech Clause's heightened protection.

A. **First Amendment Heightened Scrutiny Does Not Apply To Regulation of Professional Conduct That Incidentally Burdens Speech.**

The Supreme Court has repeatedly upheld regulations of health care and legal professionals' verbal utterances on the ground that communication that is part of or incidental to professional conduct is not covered by heightened First Amendment protections. For example, nearly fifty years ago, the Supreme Court held that a state law prohibiting lawyers from soliciting accident victims did not violate the First Amendment. *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 457 (1978). Describing the solicitation of accident victims as "a business transaction in which speech is an essential but subordinate component," the Supreme Court reasoned that "the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Id.* at 456–57. The *Ohralik* Court

noted that there are "[n]umerous examples . . . of communications that are regulated without offending the First Amendment, such as the exchange of information about securities, corporate proxy statements, the exchange of price and production information among competitors, and employers' threats of retaliation for labor activities of employees." *Id.* (citations omitted).

In First Amendment decisions relating to the legal profession, the Supreme Court has consistently cemented the inherent distinction between First Amendment-covered speech outside the scope of a professional's practice and communication that is part of or incidental to licensed professional conduct, which is not subject to heightened protection. In *In re Sawyer*, 360 U.S. 622 (1959), the Supreme Court reinstated the license of an attorney who had been suspended for attacking a judge's fairness, on the basis that the comments were not in fact offending. 360 U.S. at 635. In a concurrence, Justice Stewart clarified that a professional's ethical obligations "may require abstention from what in other circumstances might be constitutionally protected speech." *Id.* at 646–47. Similarly, in *Sheppard v. Maxwell*, 384 U.S. 333 (1966), the Supreme Court held that a lawyer's verbal communication was subject to "regulation" or "censur[e]" when they "affect[ed] the fairness of a criminal trial" in which the lawyer was professionally involved. 384 U.S. at 350, 363; *see also Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1072–73 (1991) (affirming that a legal professional's communication "could be limited" where the statements at issue had

a "substantial likelihood of materially prejudicing" a proceeding).

The Supreme Court likewise has repeatedly held that verbal communication that is part of or incidental to the practice of licensed health care providers is not covered by the First Amendment. Once again, this framework is based on the key distinction between public speech by a member of a profession and non-public communication in the course of a professional's consultation with a client:

> When a physician speaks to the public, his opinions cannot be censored and suppressed, even if they are at odds with preponderant opinion within the medical establishment. But when a physician speaks to a patient in the course of medical treatment, his opinions are normally regulated on the theory that they are inseparable from the practices of medicine.

Robert C. Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech*, 939 UNIV. ILL. L. REV. 948–49 (2007).

The Supreme Court's endorsement of regulations governing a health care professional's communication in the context of their profession is far from novel. Nearly a century ago, the Supreme Court found that regulation of a dentist's advertisements of his practice was constitutional—even though the advertisements were disseminated to the public, and not restricted to private treatment sessions. *Semler v. Ore. State Bd. of Dental Exam'rs*, 294 U.S. 608, 613 (1935). More recently, the Supreme Court upheld a law requiring physicians to provide information about the risk of abortion as part of the provision of an abortion. *Planned Parenthood of S.E. Pa. v. Casey*, 505 U.S. 883, 884 (1992) (plurality op.),

*overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). The Supreme Court observed its established precedent holding that the First Amendment protects citizens from the government's attempts to compel speech. *Id.* at 851 (holding that compelling schoolchildren to salute the U.S. flag violated the First Amendment). However, citing its earlier decision that a law requiring physicians to disclose prescriptions for certain drugs was within the state's "broad police powers in regulating the administration of drugs by health professionals," the Supreme Court held that the informed consent law at issue was constitutionally permissible because it compelled speech only "as part of the *practice* of medicine." *Id.* at 884; *see also NIFLA*, 138 S. Ct. at 2373 (endorsing this holding in *Casey*). Therefore, there was "no constitutional infirmity in the requirement that the physician provide the information mandated by the State" in the course of treatment. *Casey*, 505 U.S. at 884.

In accordance with this jurisprudence, lower federal courts and state courts routinely hold that "the First Amendment . . . does not insulate the verbal charlatan from responsibility for his conduct; nor does it impede the State in the proper exercise of its regulatory functions." *Shea v. Bd. of Med. Exam'rs*, 81 Cal. App. 3d 564, 146 (Cal. 1978) (revoking medical doctor's license to practice medicine where doctor engaged in monologues with hypnotized patients). This extends to prohibitions of courses of treatment that professional organizations deem harmful to

patients. *See, e.g.*, *Pickup v. Brown*, 740 F.3d 1208, 1228 (9th Cir. 2014) (upholding a state prohibition of "conversion therapy," reasoning that "[a] doctor may not counsel a patient to rely on quack medicine. The First Amendment would not prohibit the doctor's loss of license for doing so.") (cleaned up). This case law relies on the principle that "[m]ost, if not all, medical and mental health treatments require speech, but that fact does not give rise to a First Amendment claim when the state bans a particular treatment." *Id.* at 1229.

Indeed, under tort and malpractice liability schemes, health care providers are routinely—and appropriately—held liable for giving negligent advice to patients in the conduct of their practice. The Supreme Court has long accepted that tort law implicates state action because it is the government, through judges, that enforces the law and shapes the common law, and therefore the First Amendment applies to efforts to limit speech through the application of tort laws. *See, e.g.*, *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964) (holding that the Fourteenth Amendment applied in a defamation "lawsuit between private parties" because state "courts ha[d] applied a state rule of law which petitioners claim[ed] to impose invalid restrictions on their constitutional freedoms of speech"). In the canonical tort case of *Tarasoff v. Regents of University of California*, 551 P.2d 334 (Cal. 1976), for example, the Supreme Court of California held that mental health care professionals have a duty to warn third party individuals who are threatened with bodily harm by a patient. In

the name of protecting the public from harm, this decision went beyond preventing the provision of certain (dangerous, discredited) treatments, as Colorado's law does, and expressly compelled speech.

These cases and others that follow their legal framework teach that state regulations of professional conduct involving verbal communication are not unconstitutional because the communication involved is a component of licensed professional practice that does not implicate the principal First Amendment purpose of the "securing of an informed and educated public opinion with respect to a matter which is of public concern." *Thornhill v. Alabama*, 310 U.S. 88, 104 (1940).

**B.** ***NIFLA* Affirmed The Supreme Court's Jurisprudence That Communication As Part of The Practice of Medicine Is Not Subject to Heightened First Amendment Review.**

The Supreme Court's ruling in *NIFLA* did not abrogate the longstanding permissibility of regulation of communication that is part of or incidental to professional conduct. To the contrary, *NIFLA* repeatedly affirmed the constitutionality of "regulations of professional conduct that incidentally burden speech" on the basis of the core distinction between speech as part of public discourse, which is subject to heightened First Amendment scrutiny, and communication incidental to the licensed practice of medicine, which is not. *See NIFLA*, 138 S. Ct. at 2373.

*NIFLA*'s principal holding—that a California statute requiring certain health

care facilities to post a notice containing specified language in their offices violated the First Amendment—is easily distinguishable from Colorado's statute barring the practice of "conversion therapy" with minor patients.  The law at issue in *NIFLA* "compell[ed] individuals to speak a particular [government-drafted] message" about the availability of state-sponsored treatments including abortion services in a public setting and *outside* the proscribed context of a health care professional's treatment of a patient.  *Id.* at 2371.  The statute's "stated goal" was not to regulate professional conduct but rather to "ensure that California residents make their personal reproductive health care decisions knowing their rights and the health care services available to them."  *Id.* at 2369 (quoting 2015 Cal. Legis. Serv. Ch. 700, § 2 (A.B. 775)).  In stark contrast to Colorado's statute, California's statute attempted to pressgang covered professionals into disseminating the state's message.

*NIFLA* again expressly endorsed the long-established constitutionality of regulating "speech only 'as part of the *practice* of medicine, subject to reasonable licensing and regulation by the State.'"  *NIFLA*, 138 S. Ct. at 2373 (quoting *Casey*, 505 U.S. at 884); *see also Doe v. Rokita*, 54 F.4th 518, 520–21 (7th Cir. 2022) ("[*NIFLA*] does not question the propriety of requirements that medical professionals alert patients to laws that affect medical choices.").  This framework is central to *NIFLA*'s conclusion that, although "States may regulate professional conduct, even though that conduct incidentally involves speech," the California

statute was unconstitutional because, unlike Colorado's law that directly regulates treatment, it was not tied to the practice of medicine at all.  *NIFLA*, 138 S. Ct. at 2372–73.

C. **This Court Should Follow The Ninth Circuit's Analysis In *Tingley* and *Pickup* Upholding Conversion Therapy Bans, Which Was Consistent With *NIFLA* and Supreme Court Jurisprudence.**

The Tenth Circuit is not the first Court of Appeals to consider whether the First Amendment heightened scrutiny is implicated by prohibitions on the provisions of conversion therapy to minors by licensed health care providers.  Twice in the last decade, including as recently as last year, the Ninth Circuit upheld statutory bans on licensed therapists providing conversion therapy to patients on the ground that mental health care treatment is professional conduct rather than First Amendment-covered speech.  *See Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014); *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022).  Together, these decisions carefully analyze controlling First Amendment precedent including, in the case of *Tingley*, the Supreme Court's decision in *NIFLA*.  The Third and Eleventh Circuits have also considered whether the First Amendment invalidates statutory bans on conversion therapy, *see Otto v. City of Boca Raton, Florida*, 981 F.3d 854 (11th Cir. 2022); *King v. Governor of New Jersey*, 767 F.3d 216 (3d Cir. 2014),[4] but the reasoning in those

---

[4]     In *Brokamp v. James*, No. 21-3050-CV, -- F. 4th --, 2023 WL 3102704, at *1 (2d Cir. Apr. 27, 2023) (to be published), the Second Circuit explicitly declined to address whether a licensing regime for mental health practitioners regulated speech

17

cases does not align with Supreme Court jurisprudence regarding professional licensing provisions. The Ninth Circuit's well-reasoned analysis should be followed here because it is consistent with Supreme Court jurisprudence including *NIFLA*.

In *Pickup*, the Ninth Circuit held that a California statute banning "conversion therapy" was outside the scope of First Amendment speech because it "regulate[d] only (1) therapeutic treatment, not expressive speech, by (2) licensed mental health professionals acting within the confines of the counselor-client relationship." 740 F.3d at 1225–32. And in *Tingley*, the Ninth Circuit applied *Pickup* to Washington's nearly identical statute, reasoning that *NIFLA*, although declining to wholesale adopt *Pickup*'s "professional *speech*" framework, did not abrogate *Pickup*'s "central holding that California's conversion therapy law is a regulation on conduct that incidentally burdens speech." 47 F.4th at 1077.

Appellant challenges the Ninth Circuit's approach, arguing that *Pickup* was fully abrogated by *NIFLA* because it relied on a doctrine for evaluating regulations of "professional *speech*" that the Supreme Court declined to adopt in *NIFLA*. Appellant's Opening Br. at 22–23. Not so. *Pickup* introduced a unique legal framework for evaluating regulations of "professional *speech*," according to which

---

or conduct. 2023 WL 3102704, at *10. In concluding that a mental health counselor had failed to state a First Amendment claim arising from New York's licensing regime for mental health counselors, the Second Circuit "assume[d], without deciding, that [the mental health counselor's] counseling services consist[ed] only of speech." *Id.* at *10.

courts would determine to what extent the First Amendment applies to a regulation of mental health professionals on the basis of where it falls on the "continuum" between pure speech and pure conduct. *Pickup*, 740 F.3d at 1227–28. Under this framework, a professional's speech "within the confines of a professional relationship" stood at the continuum's "midpoint," and therefore was subject to "somewhat diminished" First Amendment protection. *Id.* Although *NIFLA* declined to broadly adopt *Pickup*'s "professional speech" framework, 138 S. Ct. at 2371–72, the Ninth Circuit correctly found in *Tingley* that the Supreme Court did not repudiate *Pickup*'s "approach…for regulations of professional conduct," even where that conduct necessarily involves verbal communication, *Tingley*, 47 F.4th at 1075. The Ninth Circuit's reasoning in *Tingley* is consistent with Supreme Court jurisprudence, including *NIFLA*, that recognizes that constitutionality of regulations of professional conduct.

The Eleventh Circuit's approach in *Otto* is not consistent with Supreme Court jurisprudence regarding regulations of professional conduct. In *Otto*, the Eleventh Circuit held that a municipal ban on "conversion therapy" was a limit on First Amendment speech, reasoning that the "ordinances sanction speech directly, not incidentally" and "the only 'conduct' at issue is speech." 981 F.3d at 866. The *Otto* court acknowledged that "conversion therapy" could reasonably be characterized as "a course of conduct" but concluded that "conversion therapy" fell within the First

Amendment's scope as a practice "consist[ing]—entirely—of words." *Id.* at 865. The *Otto* court's analysis ignores *NIFLA*'s distinction between health care providers' speech outside the context of providing medical care—which is entitled to more robust First Amendment scrutiny—and communication "regulated as part of the *practice* of medicine"—which is not subject to heightened First Amendment review. *NIFLA*, 138 S. Ct. at 2373. *Otto* misconstrues *NIFLA*, and its reasoning does not align with Supreme Court jurisprudence.

The Third Circuit's reasoning in *King* is deficient for the same reasons. There, the court likewise held that a "conversion therapy" ban was a restriction on First Amendment speech subject to heightened scrutiny that nonetheless passed constitutional muster, without the benefit of *NIFLA*'s reasoning regarding health care providers' communication as part of their practice of medicine. *King*, 767 F.3d at 239–40. The *King* court also wrongly relied on *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), which concerned an "as-applied" challenge to verbal communications by lawyers, *id.* at 28, by overreading that case as providing that professionals' verbal communications are always protected First Amendment speech. *King*, 767 F.3d at 223 n.7. But *Holder* nowhere reaches this conclusion, which would fly in the face of the Supreme Court jurisprudence outlined throughout this brief. Thus, the *King* court's analysis should not be relied upon.

**D.    The Text and Statutory Context of Colorado's Conversion Therapy Ban Demonstrate That The Statute Is A Regulation of Professional Conduct.**

Colorado's statute regulates professional conduct and does not unconstitutionally limit First Amendment speech.  The statute does not prohibit licensed mental health providers from expressing their viewpoints about conversion therapy or offering to refer a client to a non-licensed professional for those services. Rather, as part of Colorado's statutory licensing scheme for mental health providers, the statute bars the "practice or treatment" of conversion therapy by that licensed provider to a minor patient, which Colorado (and the modern scientific community) has determined to be harmful.  *See* Colo. Rev. Stat. §§ 12-245-202(3.5)(a), 12-245-224(1)(t)(V).  In other words, its target is not speech or the expression of the provider's personal views, but rather purely professional conduct: the provision of specifically defined treatment to minors.

The statute regulates the conduct of mental health practitioners whose credentials as such are sanctioned by the state of Colorado through a license, registration, or certification.[5]  Colorado has an identical statute that regulates the

---

[5] A "[l]icensee" is a professional health care worker licensed pursuant to Colorado law.  Colo. Rev. Stat. § 12-245-202(8).  Relatedly, a "[r]egistrant" is a professional registered pursuant Colorado law or "an unlicensed psychotherapist," *id.* § 12-245-202(16), and a "[c]ertificate holder" is "an addiction counselor certified pursuant to this article 245," *id.* § 12-245-202(2).

conduct of licensed medical professionals.  *See id.* § 12-240-121(1)(ee) (defining

"unprofessional conduct" to include "[e]ngaging in conversion therapy with a patient

who is under eighteen years of age").  As the Supreme Court has held repeatedly, a

state may impose regulations on the conduct of professionals "subject to reasonable

licensing," including where that conduct implicates "speech only 'as part of the

practice[.]'" *NIFLA*, 138 S. Ct. at 2373.  This is just such a regulation.  It does not

bar Appellant from speaking publicly or in any setting outside of the regulated

therapist-patient relationship about her beliefs regarding the purported benefits of

conversion therapy.  Rather, it prohibits her from conducting conversion therapy as

a licensed professional in private sessions with minor patients, and is therefore a

"regulation[] of professional conduct that incidentally burden[s] speech" plainly

outside the scope of First Amendment coverage.  *Id.*; *see also* Post, 939 U. ILL. L.

REV. 948–49.

The goal of Colorado's statutory scheme is "to safeguard the public health,

safety, and welfare of the people of [Colorado] and . . . protect the people of

[Colorado] against the unauthorized, unqualified, and improper application of

psychology, social work, marriage and family therapy, professional counseling,

psychotherapy, and addiction counseling."  Colo. Rev. Stat. § 12-245-101(1).  The

Colorado legislature, in its reasoned judgment, determined that the practice of

"conversion therapy" is an "improper application" of therapy that the state of

Colorado would not sanction. The Colorado legislature's determination aligns with the widespread consensus among medical and psychological professionals that "conversion therapy" harms patients: every major association of medical and psychological professionals in the United States has utterly disavowed the practice as ineffective and harmful.[6]

Research by the American Academy of Pediatrics, the American Psychiatric Association, and other organizations have found that applying "conversion therapy" as "treatment" of minor patients' sexual orientation or gender identity can cause "serious harm," including "anxiety," "depression," "suicidal ideation," "suicidal thoughts," and "self-hatred." *Otto*, 981 F.3d at 875–76 (Martin, J., dissenting). When used on adolescents, the risk of harm from "conversion therapy" is particularly acute and life threatening. *See, e.g.*, Am. Acad. of Child & Adolescent

---

[6] *See, e.g.*, Am. Psychiatric Ass'n, *Position Statement on Conversion Therapy and LGBTQ Patients* (2018) ("Since 1998, the American Psychiatric Association has opposed any psychiatric treatment, such as 'reparative' or conversion therapy…."), *available at* https://www.psychiatry.org/getattachment/3d23f2f4-1497-4537-b4de-fe32fe8761bf/Position-Conversion-Therapy.pdf; Am. Med. Ass'n *Sexual orientation and gender identity change efforts (so-called "conversion therapy")* (2022) ("The American Medical Association and GLMA: Health Professionals Advancing LGBTQ Equality (GLMA) oppose the use of reparative or conversion therapy for sexual orientation or gender identity."), *available at* https://www.ama-assn.org/system/files/conversion-therapy-issue-brief.pdf; Am. Psych. Ass'n *APA Resolution on Gender Identity Change Efforts* (Feb. 2021) ("[T]he APA opposes [gender identity change efforts] because of their association with harm" and "opposes portrayals of transgender and gender nonbinary people as mentally ill because of their gender identities and expressions."), *available at* https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf.

Psychiatry, *Conversion Therapy* (Feb. 2018), *available at* https://www.aacap.org/aacap/Policy_Statements/2018/Conversion_Therapy.aspx. Sixteen states and the District of Columbia have passed laws that ban the practice of "conversion therapy" on minors. Colorado's statute, which narrowly proscribes a demonstrated harmful treatment regime, is consistent with historical examples of constitutional malpractice regulation.

At bottom: Colorado's statute governs the *licensed practice of therapy* with the purpose of protecting the state's minors from suffering harm in the course of psychological treatment. The challenged statute prohibits licensed mental health practitioners from engaging in the *practice* of conversion therapy in their professional capacities. Colorado's definition of "conversion therapy"—"any practice or treatment . . . that attempts or purports to change an individual's sexual orientation or gender identity," Colo. Rev. Stat. § 12-245-202(3.5)—underscores the statute's focus on professional conduct rather than verbal expression unconnected to the targeted procedure (the line drawn by *NIFLA*).

## II. A RULING THAT ALL PROFESSIONAL CONDUCT INVOLVING VERBAL COMMUNICATION IS SUBJECT TO HEIGHTENED FIRST AMENDMENT REVIEW WOULD DESTROY STATES' SANCTIONED POWER TO REGULATE PROFESSIONS THROUGH LICENSING, TORT, AND MALPRACTICE REGIMES.

Colorado's statute is consistent with an historically longstanding and widely accepted legal tradition recognizing the constitutional legitimacy of prohibiting conduct by licensed health care providers employing speech in the practice of their profession in a way that falls outside of accepted medical standards and causes harm to their patients. Appellant argues that heightened First Amendment scrutiny must extend to all professional services enacted through verbal means, such as talk therapy. Appellant's Opening Br. at 15. Were this Court to endorse Appellant's theory, states would be hamstrung in their ability to regulate those services through long-established licensing, tort, and malpractice regimes that enable states to serve and protect their citizens, in violation of the Supreme Court's jurisprudence including *NIFLA*. The outcome would be a distortion of the First Amendment's scope potentially leading to the jettisoning of all regulation of communication-based professional services, even though historically subject to strict licensure requirements (which themselves likely would be imperiled). This would upend otherwise uncontroversial regulatory regimes for health care providers and beyond.

A state has wide latitude to regulate the conduct of professionals through licensing regimes, even when such regulation involves communication. *See supra*,

Part I.A; *NIFLA v. Becerra*, 138 S. Ct. 2361, 2372 (2018) ("States may regulate professional conduct, even though that conduct incidentally involves speech."); *c.f. Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 448, 456 (1978) ("the State bears a special responsibility for maintaining standards among members of the licensed professions" and "does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity").

"First Amendment coverage does not extend to large patches of perfectly ordinary state legislation, like the Uniform Commercial Code or the imposition of tort liability for the negligent failure to warn, even though such legislation precisely seeks to control the successful communication of particularized messages in language." Robert C. Post, Democracy, Expertise, and Academic Freedom: A First Amendment Jurisprudence for the Modern State 3 (2012). Adopting Appellant's viewpoint would subject state licensing requirements to First Amendment challenge any time a licensed professional practices their trade through verbal communications, opening the floodgates to constitutional challenges any time a professional takes issue with such a requirement. This would necessarily challenge the viability of long-established torts and malpractice doctrines, with several courts rejecting First Amendment challenges based on theories similar to Appellants.[7]  But

---

[7] *See, e.g.*, *Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 207 (4th Cir. 2019) (upholding North Carolina ban on the practice of law by corporations despite incidental effects on speech); *Doyle v. Palmer*, 365 F.Supp.3d 295, 304–05

*NIFLA* explicitly recognized that "longstanding torts for professional malpractice fall within the traditional purview of state regulation of professional conduct." 138 S. Ct. at 2373 (cleaned up); *see also* POST, *supra* p. 25, at 45 ("First Amendment coverage does not typically extend to malpractice litigation.").

The Supreme Court has directed that questions of law should be construed to avoid significant constitutional problems wherever possible. *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 500 (1979). Treating the tools used by a licensed mental health provider in the provision of their services—verbal communications—as speech, as opposed to appropriately regulated professional conduct, would call into question the constitutionality of imposing civil liability for malpractice and professional discipline. There would be no limiting principle to what therapists could say in the course of treatment.

---

(E.D.N.Y. 2019) (holding requirement of sponsor affidavit for Bar admission "is nothing more than a standard regulation of the legal profession that... passes rational basis review"); *Gray v. Dep't of Pub. Safety*, 248 A.3d 212, 215 (Me. 2021) (finding no First Amendment violation in application of licensing standards to professional investigator applicant where applicant presented false, uninvestigated information as fact); *Greenberg v. Goodrich*, 593 F. Supp. 3d 174, 225 (E.D. Pa. 2022) (striking professional misconduct rule prohibiting lawyers from expressing harassment or discrimination as unconstitutional infringement of free speech).

## CONCLUSION

"People who actually hurt children can be held accountable." *Otto*, 981 F.3d at 870. Under longstanding Supreme Court doctrine, Colorado's ban on conversion therapy is not an unconstitutional censorship of speech but a constitutionally viable regulation of professional conduct involving communication not subject to heightened First Amendment scrutiny that ensures that mental health providers do not practice harmful "conversion therapy" treatment on minors. To categorize regulations of the practice of conversion therapy on minors as invalid under the First Amendment perverts our Constitutional values. The District Court's decision should be affirmed.

Dated: May 5, 2023            Respectfully submitted,

By: */s/ Thomas S. Kessler*
Luke A. Barefoot
Thomas S. Kessler
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
lbarefoot@cgsh.com
tkessler@cgsh.com

*Counsel for Amici Curiae*

# RULE 32(g)(1) CERTIFICATE OF COMPLIANCE

This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) because this document contains 6,318 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in size 14 Times New Roman font.

Date: May 5, 2023

*/s/ Thomas S. Kessler*
Thomas S. Kessler
Attorney for *Amici Curiae*
CLEARY GOTTLIEB
STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
tkessler@cgsh.com
Telephone: (212) 225-2000