Nos. 22-1445; 23-1002

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

————————————

KALEY CHILES,
*Plaintiff-Appellant*,

v.

PATTY SALAZAR, ET AL.,
*Defendants-Appellees*

————————————

On Appeal from the United States District Court for the
District of Colorado (Dist. Ct. Case No. 1:22-CV-02287)
(Hon. Charlotte N. Sweeney)

————————————

## BRIEF OF AMERICAN PSYCHOLOGICAL ASSOCIATION AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

————————————

Deanne M. Ottaviano
AMERICAN PSYCHOLOGICAL
  ASSOCIATION
750 First Street NE
Washington, DC 20002
(202) 336-6100

Jessica Ring Amunson
  *Counsel of Record*
Jessica Sawadogo
JENNER & BLOCK LLP
1099 New York Avenue NW, Ste. 900
Washington, DC 20001
(202) 639-6023
jamunson@jenner.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

/s/ *Jessica Ring Amunson*

Jessica Ring Amunson
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639 6023
jamunson@jenner.com

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ................................................................................... iii

IDENTITY AND INTERESTS OF AMICUS CURIAE ........................................ 1

SUMMARY OF ARGUMENT ............................................................................... 3

ARGUMENT .......................................................................................................... 6

I.    Background on SOGICE ................................................................................ 8

      A.    History of SOCE and GICE ................................................................. 8

      B.    The APA's Position on SOGICE ....................................................... 10

II.   SOGICE Are Not Legitimate Therapeutic Practices and Can Cause
      Harm, Especially to Minors ........................................................................ 14

      A.    Individuals Report Harm from SOGICE ........................................... 15

      B.    Minors Are Particularly Vulnerable to Harm from SOGICE ............ 19

      C.    Licensed Mental Health Providers Have a Duty to Avoid Harm
            to Members of the Public Whom They are Licensed to Serve .......... 20

III.  There is No Evidence to Support the Efficacy of SOGICE. ........................ 22

IV.   Appellant Misstates and Misrepresents the Science on SOGICE. ............... 24

CONCLUSION ..................................................................................................... 29

# TABLE OF AUTHORITIES

**CASES**

*Doyle v. Hogan*, Case No. 19-cv-0190, 2019 WL 3500924 (D. Md. Aug. 1, 2019), *vacated on other grounds*, 1 F.4th 249 (4th Cir. 2021).......................... 12

*Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014), *abrogated by National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ..... 11

*Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022), *petition for cert. filed*, 91 U.S.L.W. 3251 (U.S. Mar. 28, 2023) (No. 22-942)........................................... 12

**OTHER AUTHORITIES**

American Academy of Child & Adolescent Psychiatry, *Conversion Therapy* (approved Feb. 2018), https://www.aacap.org/aacap/Policy_Statements/2018/Conversion_Therapy.aspx ........................................................................ 11

American Association for Marriage and Family Therapy, *Statement on Nonpathologizing Sexual Orientation* (2004)..................................................... 11

American Medical Ass'n, *Advocating for the LGBTQ Community*, https://www.ama-assn.org/delivering-care/population-care/advocating-lgbtq-community (last visited May 5, 2023) ..................................................... 11

American Psychological Association, *APA Resolution on Gender Identity Change Efforts* (Feb. 2021), https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf ...................... 3, 5, 6, 9, 10, 12, 13, 20, 22, 24

American Psychological Association, *APA Resolution on Sexual Orientation Change Efforts* (Feb. 2021), https://www.apa.org/about/policy/resolution-sexual-orientation-change-efforts.pdf...................................... 3, 5, 12, 19, 20, 22

American Psychological Association, *Ethical Principles of Psychologists and Code of Conduct* (Jan. 1, 2017), https://www.apa.org/ethics/code ................... 21

American Psychological Association, *Task Force on Appropriate Therapeutic Responses to Sexual Orientation* (2009), https://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf ...................... 2, 3, 6, 7, 8, 9, 10, 11, 13, 15, 16, 17, 19, 22, 24, 25, 28

*APA Handbook of Sexuality and Psychology* (Deborah L. Tolman & Lisa M. Diamond eds., 2014) ........................................................................ 14

A. Lee Beckstead & Susan L. Morrow, *Mormon Clients' Experiences of Conversion Therapy: The Need for a New Treatment Approach*, 32 Counseling Psychologist 651 (2004) ................................................ 16

Lee Birk et al., *Avoidance Conditioning for Homosexuality*, 25 Archives Gen. Psychiatry 314 (1971) ........................................................................ 22

John R. Blosnich et al., *Correcting a False Research Narrative: A Commentary on Sullins*, 52 Archives Sex Behav. 885 (2022) ......................... 26

John R. Blosnich et al., *Sexual Orientation Change Efforts, Adverse Childhood Experiences, and Suicide Ideation and Attempt Among Sexual Minority Adults in the United States, 2016-2018*, 110 Am. J. Public Health 1024 (2020) ............................................................................... 16-17

Travis Campbell & Yana van der Meulen Rodgers, *Conversion Therapy, Suicidality, and Running Away: An Analysis of Transgender Youth in the U.S.*, 89 J. Health Econ. 102750 (2022) .......................................... 20

E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1 (2022) ................................................................................... 13-14

Council of the District of Columbia, Comm. on Health, Comm. Rep. on Bill 22-0972, *Conversion Therapy for Consumers Under a Conservatorship or Guardianship Amendment Act of 2018* (Nov. 1, 2018) .............................. 11-12

Gerald C. Davison, *Homosexuality: The Ethical Challenge*, 44 J. Consulting & Clinical Psych. 157 (1976) .......................................................... 25

Annelou L. C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696 (2014) ........................................................................................ 27

Anna Forsythe et al., *Humanistic and Economic Burden of conversion Therapy Among LGBTQ Youths in the United States*, JAMA Pediatrics, 1 (2022) ......................................................................................... 17

iv

Melissa Grey et al., *Review of U.S. Public Policy, Legislative, and Judicial Work on Conversion Efforts*, in The Case Against Conversion "Therapy": Evidence, Ethics, and Alternatives 195 (ed. Douglas C. Haldeman) ............... 14

Amy E. Green et al., *Self-Reported Conversion Efforts and Suicidality Among U.S. LGBTQ Youths and Young Adults*, 110 Am J. Public Health 1221 (2020 ................................................................................................. 20

Gregory M. Herek, *Evaluating Interventions to Alter Sexual Orientation: Methodological and Ethical Considerations*, 32 Archives Sexual Behav. 438 (2003) ...................................................................................... 25

Tracy N. Hipp et al., *From Conversion Toward Affirmation: Psychology, Civil Rights, and Experiences of Gender-Diverse Communities in Memphis*, 74 Am. Psychologist 882 (2019) ............................................................ 1

Institute of Medicine, *Finding What Works in Health Care: Standards for Systematic Reviews* (2011) .................................................................. 6-7

Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey, National Center for Transgender Equality* (Dec. 2016), https://trans equality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf .......... 18

Stanton L. Jones & Mark A. Yarhouse, *A Longitudinal Study of Attempted Religiously Mediated Sexual Orientation Change*, 37 J. Sex & Marital Therapy 404 (2011) ...................................................................... 23

Scott O. Lillenfeld, *Psychological Treatments that Cause Harm*, 2 Persp. on Psych. Sci. 53 (2007) ...................................................................... 25

Neil McConaghy & R.F. Barr, *Classical, Avoidance, and Backward Conditioning Treatment of Homosexuality*, 122 Brit. J. Psychiatry 151 (1973) ...................................................................................... 25-26

Ilan H. Meyer & John R. Blosnich, Commentary: *An Absence of Behavioral Harm Following Non-Efficacious Sexual Orientation Change Efforts: A Retrospective Study of United States Sexual Minority Adults, 2016–2018*, 13 Front Psychol. 997513 (2022) .................................................... 26

*Moving Beyond Change Efforts: Evidence and Action to Support and Affirm LGBTQI+ Youth*, SAMSHA (2023) .................................................. 14

National Association of Social Workers, *Sexual Orientation Change Efforts (SOCE) and Conversion Therapy with Lesbians, Gay Men, Bisexuals, and Transgender Persons* (May 2015), https://www.socialworkers.org/LinkClick.aspx?fileticket=IQYALknHU6s%3D&portalid=0 .......................... 11

NHS England, *Implementing Advice from the Cass Review*, https://www.england.nhs.uk/commissioning/spec-services/npc-crg/gender-dysphoria-clinical-programme/implementing-advice-from-the-cass-review/ ................... 28

Joseph Nicolosi et al., *Retrospective Self-Reports of Changes in Homosexual Orientation: A Consumer Survey of Conversion Therapy Clients*, 86 Psych. Rep. 1071 (2000) .................................................................. 16

Tiffany O'Shaughnessy & Zachary Speir, *The State of LGBQ Affirmative Therapy Clinical Research: A Mixed-Methods Systematic Synthesis*, 5 Psych. Sexual Orientation & Gender Diversity 82 (2018) ............................... 13

Dwight Panozzo, *Advocating for an End to Reparative Therapy: Methodological Grounding and Blueprint for Change*, 25 J. Gay & Lesbian Soc. Servs. 362 (2013) ......................................................... 23

A. Przeworski et al., *A Systematic Review of the Efficacy, Harmful Effects, and Ethical Issues Related to Sexual Orientation Change Efforts*, 28 Clinical Psychol.: Sci. & Prac. 81 (2020) .................................................... 23-24

Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics e20182162 (2018) .......................................................... 13

Caitlin Ryan et al., *Parent-Initiated Sexual Orientation Change Efforts with LGBT Adolescents: Implications for Young Adult Mental Health and Adjustment*, 67 J. on Homosexuality 159 (2018) ............................................... 20

Travis Salway et al., *Prevalence of Exposure to Sexual Orientation Change Efforts and Associated Sociodemographic Characteristics and Psychosocial Health Outcomes among Canadian Sexual Minority Men*, 65 Can. J. Psychiatry 502 (2020) ......................................................... 16

Paul L. Santero et al., *Effects of Therapy on Religious Men Who Have Unwanted Same-Sex Attraction*, Linacre Q., July 2018 .................................... 23

Kim W. Schaeffer et al., *Religiously Motivated Sexual Orientation Change*, 19 J. Psych. & Christianity 61 (2000)................................................................. 16

Michael Schroder & Ariel Shidlo, *Ethical Issues in Sexual Orientation Conversion Therapies: An Empirical Study of Consumers*, 131 J. Gay & Lesbian Psychotherapy 131 (2001) ................................................................. 16

Ariel Shidlo & Michael Schroder, *Changing Sexual Orientation: A Consumer's Report*, 33 Prof. Psych.: Res. & Prac. 249 (2002) ........................ 16

Ariel Shidlo & John C. Gonsiorek, *Psychotherapy with Clients Who Have Been Through Sexual Orientation Change Interventions or Request to Change Their Sexual Orientation*, in Handbook of Sexual Orientation and Gender Diversity in Counseling and Psychotherapy (Kurt A. DeBord et al., eds., 2017) ................................................................................................... 21

Glenn Smith et al., *Treatments of Homosexuality in Britain Since 1950—An Oral History: The Experiences of Patients*, 328 Brit. Med. J. 427 (2004)........ 16

J.C. Sorbara et al., *Mental Health and Timing of Gender-Affirming Care*, 146 Pediatrics e20193600 (2020) .............................................................................. 27

Jenna Marie Strizzi & Ezio Di Nucci, *Ethical and Human Rights Concerns of Sexual Orientation Change Efforts: Commentary on Sullins*, 52 Archives Sex. Behav. 865 (2023)........................................................................................ 26

D.M. Tordoff et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, 5 JAMA Network Open e220978 (2022) ..................................................................................................... 27

Jack L. Turban et al., *Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults*, 77 JAMA Psychiatry 68 (2020)............ 18

## IDENTITY AND INTERESTS OF AMICUS CURIAE[1]

*Amicus curiae* the American Psychological Association ("APA") submits this brief to provide the Court with context regarding the state of scientific knowledge about the safety and effects of sexual orientation change efforts ("SOCE") and gender identity change efforts ("GICE"), together known as sexual orientation and gender identity change efforts, or "SOGICE." [2] As the largest professional association of psychologists, the APA is deeply concerned about the effects of SOGICE especially on minors, and has a particular interest in this case because both parties cite the APA's research to advance their arguments.

The APA is a scientific and educational organization dedicated to increasing and disseminating psychological knowledge. Its over 122,000 members include researchers, educators, clinicians, consultants, and students. The APA's major purposes include increasing and disseminating knowledge regarding human

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person—other than *amicus*, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E). All parties consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

[2] Although gender and sexual orientation are distinct individual characteristics, conversion efforts often regard them as similar or the same. Tracy N. Hipp et al., *From Conversion Toward Affirmation: Psychology, Civil Rights, and Experiences of Gender-Diverse Communities in Memphis*, 74 Am. Psychologist 882 (2019).

1

behavior and fostering the application of psychological learning to important human concerns.

From 2007 to 2009, an APA Task Force on Appropriate Therapeutic Responses to Sexual Orientation (the "2009 Task Force") conducted a systematic review of the peer-reviewed studies on SOCE, which culminated in a comprehensive Report, *see* Am. Psych. Ass'n, Task Force on Appropriate Therapeutic Responses to Sexual Orientation (2009), https://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf. (the "2009 Report") on the state of the scientific literature. *See* Supp.App. at 170-309. [3] The 2009 Report concluded that SOCE are adverse childhood experiences that do not lead to change in sexual orientation, but do cause harm. *Id.* at 176. The APA later voted to adopt a Resolution on Appropriate Affirmative Responses to Sexual Orientation Distress and Change Efforts, stating that "mental health professionals" should "avoid misrepresenting the efficacy of sexual orientation change efforts by promoting or promising change in sexual orientation when providing assistance to individuals distressed by their own or others' sexual orientation." *Id.* at 298.

In 2021, a second APA Task Force updated its findings to reflect the most recent research on SOCE exposures, and to assess studies published on GICE exposures since the 2009 Report. This effort culminated in the APA's passage of the

---

[3] "Supp.App." refers to Appellees' Supplemental Appendix.

APA Resolution on Sexual Orientation Change Efforts (Feb. 2021) ("SOCE Resolution"), https://www.apa.org/about/policy/resolution-sexual-orientation-change-efforts.pdf, and the APA Resolution on Gender Identity Change Efforts (Feb. 2021) ("GICE Resolution"), https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf. Both Resolutions state that SOGICE are ineffective practices associated with psychological and social harm.

The APA's 2009 Report and Resolution, 2021 Resolutions, as well as other APA reports, were discussed in the Appellants' Complaint (Compl. ¶ 74, ECF No.1); Appellants' motion for a preliminary injunction (Motion at 22, ECF No. 29); Appellees' motion to dismiss (Supp.App. at 406); Expert Declarations in support of Appellees' motion to dismiss (*see, e.g.*, Supp.App. at 101-103, 170-309); Appellees' Brief at 2, 51; and Appellant's Brief at 47.

Given the attention the parties have devoted to the Report and Resolutions, and Appellants' mischaracterizations of several of the APA's key findings, the APA has a distinct interest in this case.

## SUMMARY OF ARGUMENT

The APA's findings in the 2009 Report and Resolution, and the 2021 Resolutions—and the state of the scientific evidence regarding the effects and safety of SOGICE more broadly—are at the center of this case. At all stages of this dispute, the parties have expressed divergent views about the effects and risks of SOGICE

3

for minors. *Amicus* respectfully submits this brief to clarify and describe the scientific evidence on these conversion efforts.

To begin, the APA rejects the idea that SOGICE are legitimate therapeutic approaches. SOGICE are dangerous, discredited practices, and do not offer the possibility of conversion. SOGICE developed in the nineteenth century from the perspective of viewing same-sex attraction and gender-nonconforming behaviors as mental illnesses, which is a perspective that no longer aligns with that of mainstream mental health professionals. In the 1980s, however, some individuals began to claim SOGICE were safe and effective for people whose religious beliefs were perceived to conflict with their sexual orientation or gender identity, and incorrectly described these efforts as a form of mental health treatment. This development led several mainstream mental health organizations to adopt resolutions against SOGICE.

Before adopting its 2009 Resolution, the APA Task Force conducted a comprehensive multi-year survey of the scientific literature on SOCE. The 2009 Report reached two key conclusions. *First*, it found SOCE unlikely to change sexual orientation. At the time of the Report—and through the present—there is a scientific consensus that SOCE are unlikely to reduce same-sex attractions. With respect to minors specifically, no scientific evidence shows any form of childhood therapy can alter adult sexual orientation. *Second*, the Report concluded SOCE pose a risk of harm to people who experience them. Multiple scientific studies suggest SOCE may

lead to depression, suicidal ideation, anxiety, substance abuse, impotence and sexual dysfunction, nightmares, gastric distress, dehydration, social isolation, deterioration of relationships with friends and family, and an increase in high-risk sexual behaviors, as well as indirect harms like loss of time and money.

The APA updated the 2009 Report's findings with the publication of its 2021 SOCE and GICE Resolutions. After reviewing research since 2009 on the harms of SOCE, the SOCE Resolution reaffirmed that SOCE lack sufficient bases in scientific principles. The GICE Resolution canvassed the current research, and similarly concluded that GICE pose a significant risk of harm and are not supported by empirical evidence as practices for changing gender identity. Indeed, a confluence of research based on scientific theories supports the conclusions of the APA that SOGICE are not psychotherapy interventions, but are forms of stigma or minority stress. SOGICE are consistent with the definition of adverse childhood experiences, forms of minority stress, an element of family rejection, and an indicator of internalized stigma. *See* SOCE Resolution at 4-5; GICE Resolution at 3-4.

In their challenge to Appellees' bans on SOGICE for minors, Appellant repeatedly misstates or mischaracterize the 2021 Resolutions' key findings and ignore their updated evidence. For example, Appellant attempts to discredit the APA's findings by (1) noting the lack of published research on SOGICE; (2) suggesting that gender-affirming care actually causes harm while relying on faulty

research; and (3) refusing to engage with new research supporting the APA's 2009 Report and Resolutions that show SOGICE cause serious harm.[4] Each of these claims is inconsistent with the APA's findings, and with the available scientific evidence regarding SOGICE.

Contrary to Appellants' suggestion (and consistent with the best available evidence), the APA recommends "provid[ing] multiculturally competent and client-centered therapies to children, adolescents, and their families ***rather than SOCE***." Supp. App at 257 (emphasis added). The APA similarly recommends that "clinicians … use gender-affirming practices when addressing gender identity issues," and states that the APA "***opposes GICE***." GICE Resolution at 2-4 (emphasis added). *Amicus* urges this Court to reject Appellants' mischaracterizations of the scientific evidence and to affirm the decision below.

## ARGUMENT

In this brief, *amicus* reports the conclusions of a systematic review[5] of peer-reviewed empirical research on the effects of SOCE completed and published by the

---

[4] Appellant also cites to a ten-year-old op-ed published by Nicholas Cummings, who served as one-time president of the APA from 1979-80. Contrary to the scientific evidence presented herein, Cummings' comments in USA TODAY are not reflective of peer-reviewed science. Cummings, who passed in 2020, was not involved in the 2009 Report, Task Force, or 2021 Resolutions, and his comments do not state official APA policy established by APA's Council of Representatives in its 2009 and 2021 resolutions.

[5] The Institute of Medicine has defined a systematic review as "a scientific investigation that focuses on a specific question and uses explicit, prespecified

APA in 2009, as well as the conclusions of studies completed on SOGICE effects since the 2009 Report as reflected in the 2021 resolutions.

The APA Task Force conducted the systematic review that became the 2009 Report and presented an accurate summary of the state of scientific knowledge on the efficacy of SOCE up to that time. The review considered only peer-reviewed empirical research on treatment outcomes published from 1960 to the time of the Report. *See* Supp.App. at 179. For this brief, *amicus* has made a good faith effort to review and report the findings of all valid, empirical studies published on SOGICE since the Report.

The 2009 Report also conducted narrative reviews of the larger body of studies on SOCE that did not meet the scientific standards necessary to be valid studies of the effects of SOCE. These studies are useful in understanding the motivations and experiences of those who have participated in SOCE (including whether they look back on those experiences as harmful or helpful), but they are not valid bases for conclusions regarding whether they can change sexual orientation. The 2009 Task Force's conclusions regarding those studies (and the results of similar studies published since the Report was completed) will be reported in this brief when they are pertinent to other important questions.

---

scientific methods to identify, select, assess, and summarize the findings of similar but separate studies."  Institute of Medicine, *Finding What Works in Health Care: Standards for Systematic Reviews* 1 (2011).

Importantly, the lack of recent scientifically-valid efficacy studies on the broad range of SOGICE used in recent decades is due in part to the ethical barriers to such research. Conducting a random controlled trial of an adverse childhood experience is not ethically permissible, and institutional review boards in the United States would not approve such research on vulnerable minors who cannot themselves provide legal consent.

Before citing a study, *amicus* critically evaluated the study's methodology, including the reliability and validity of the measures and tests the study employed and the quality of the study's data-collection procedures and statistical analyses. Scientific research is a cumulative process, and no empirical study is perfect in its design and execution. Accordingly, *amicus* bases its conclusions as much as possible on findings replicated across studies rather than on the findings of any single study. Even well-executed studies may be limited in their implications and generalizability. Many studies discuss their own limitations and provide suggestions for further research. This is consistent with the scientific method and does not impeach these studies' overall conclusions.

## I.   Background on SOGICE

### A. History of SOCE and GICE.

SOCE developed in the mid-nineteenth century to "cure" homosexual desires, which were then viewed as a mental illness. Supp.App. at 199. Because

homosexuality was believed to be caused by "psychological immaturity" or pathologies like genetic defects and hormonal exposure, early SOCE "treatments attempted to correct or repair the damage done by pathogenic factors or to facilitate maturity." *Id.* at 198. These erroneous perspectives on homosexuality persisted throughout much of the twentieth century. *Id.* Techniques to alter sexual orientation included inducing nausea and paralysis; providing electric shock therapy; providing shame-aversion therapy; and attempting "systematic desensitization." *Id.* at 199. Some therapists also used "non[-]aversive" treatments like assertiveness and dating trainings, so-called "satiation therapy," or hypnosis. *Id.*

GICE, which can be forms of SOCE, focus on changing an individual's gender identity, gender expression, or associated components to align with gender role behaviors stereotypically associated with that individual's sex assigned at birth. GICE Resolution at 1. Like SOCE, GICE arose from a belief that nonconformity of a person's gender identity or expression with that person's sex assigned at birth, or a person's nonbinary gender identity, is pathological. *See id.* at 1-2.

Perspectives on same-sex attraction and gender nonconformity have shifted over the decades as overwhelming evidence demonstrated that variance in human sexuality is healthy and normal. By 1973, the American Psychiatric Association removed homosexuality from the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM"), and in 1975, the APA adopted a policy reflecting the same

conclusion. Supp.App. at 188. Over the next several decades, professional health and mental health organizations increasingly adopted the view that homosexuality is "a normal variant of human sexuality." *Id.* Similarly, health organizations today recognize that an "incongruence between sex and gender in and of itself is not a mental disorder." GICE Resolution at 1.

## B. The APA's Position on SOGICE.

After homosexuality was removed from the DSM, experiments and studies on SOGICE decreased dramatically. *See* Supp.App. at 188; *see also id.* at 179 (most studies on SOCE were conducted before 1981). Behavioral therapists "became increasingly concerned that aversive therapies designed as SOCE for homosexuality were inappropriate, unethical, and inhumane." *Id.* at 201. By the 1980s, mainstream mental health professionals had rejected SOGICE because they saw same-sex sexual orientation as a normal part of the continuum of sexual orientation. However, in the 1990s, a counter-movement led primarily by mental health providers practicing within religious communities began to assert SOGICE were safe and effective for people whose religious beliefs were in conflict with their sexual orientation or gender identity.

This led mental health organizations—including the American Counseling Association, the American Psychiatric Association, and the American

Psychoanalytic Association—to adopt resolutions opposed to SOGICE because "such efforts were ineffective and potentially harmful." *Id.* at 189.[6]

To assess the safety and effects of SOGICE, the APA Task Force conducted an extensive review of the literature and published a 124-page Report. The Report concluded SOCE were ineffective and associated with harm. *Id.* at 180.

Several states and localities have relied on the 2009 Report's findings when passing bans on SOGICE for minors.  *See, e.g.*, *Pickup v. Brown*, 740 F.3d 1208, 1224, 1231-32 (9th Cir. 2014) (California legislature relied on APA report in banning mental health providers from using SOCE on minors), *abrogated on other grounds by Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018); Council of the District of Columbia, Comm. on Health, Comm. Rep. on Bill 22-0972, *Conversion Therapy for Consumers Under a Conservatorship or Guardianship Amendment Act of 2018*, at 1 (Nov. 1, 2018) (Council of District of

---

[6] The National Association of Social Workers, the American Medical Association, the American Association for Marriage and Family Therapy, and the American Academy of Child & Adolescent Psychiatry also all oppose SOCE and GICE. *See* Nat'l Ass'n of Soc. Workers, *Sexual Orientation Change Efforts (SOCE) and Conversion Therapy with Lesbians, Gay Men, Bisexuals, and Transgender Persons* (May 2015), https://www.socialworkers.org/LinkClick.aspx?fileticket=IQYAL knHU6s%3D&portalid=0; Am. Medical Ass'n, *Advocating for the LGBTQ Community*, https://www.ama-assn.org/delivering-care/population-care/advocating-lgbtq-community (last visited May 5, 2023); Am. Ass'n for Marriage and Family Therapy, *Statement on Nonpathologizing Sexual Orientation* (2004); Am. Acad. of Child & Adolescent Psychiatry, *Conversion Therapy* (approved Feb. 2018), https://www.aacap.org/aacap/Policy_Statements/2018/Conversion_Therapy.aspx.

Columbia citing APA report in justifying SOCE ban).  Numerous courts have also cited the Report in upholding bans on SOGICE for minors.  *See Doyle v. Hogan*, Case No. 19-cv-019, 2019 WL 3500924, at *2-3 (D. Md. Aug. 1, 2019) (discussing and citing 2009 Report while upholding Maryland's ban on SOCE for minors), *vacated on other grounds*, 1 F.4th 249 (4th Cir. 2021); *Tingley v. Ferguson*, 47 F.4th 1055, 1078 (9th Cir. 2022) (discussing and citing 2009 Report while upholding Washington's ban on SOCE and GICE for minors), *petition for cert. filed*, 91 U.S.L.W. 3251 (U.S. Mar. 28, 2023) (No. 22-942).

In 2021, the APA reviewed the research on SOCE published since the 2009 Report and Resolution, and passed a new resolution reaffirming and strengthening its opposition to SOCE, *especially* when used on minors. The SOCE Resolution found that SOCE pose a significant risk of harm to minors and may be understood as an adverse childhood experience. SOCE Resolution at 1-2. It reiterated that the APA opposes SOCE and opposes training psychologists in SOCE in any stage of their education, or otherwise teaching SOCE as part of an education in psychology. *Id.* at 8. The APA also passed a similar resolution on GICE, based on findings that empirical evidence does not show GICE change one's gender identity, but does show GICE are associated with psychological and social harm. GICE Resolution at 1. As with SOCE, the APA opposes professional training in GICE for psychologists. *Id.*

Accordingly, "mainstream mental health professional associations [currently] support affirmative approaches that focus on helping sexual minorities cope with the impact of minority stress and stigma," rather than SOCE. Supp.App. at 201. Affirmative therapy here refers to "therapy that is culturally relevant and responsive to LGBQ clients and their multiple social identities and communities; addresses the influence of social inequities on the lives of LGBQ clients; fosters autonomy; enhances resilience, coping, and community building; advocates to reduce systemic barriers to mental, physical, relational, and sexual flourishing; and leverages LGBQ client strengths." Tiffany O'Shaughnessy & Zachary Speir, *The State of LGBQ Affirmative Therapy Clinical Research: A Mixed-Methods Systematic Synthesis*, 5 Psych. Sexual Orientation & Gender Diversity 82, 83 (2018).

The same is true of GICE: The APA and other health organizations "have established empirically-supported practice guidelines that encourage clinicians to use gender-affirming practices when addressing gender identity issues," not GICE. *See* GICE Resolution at 2. Gender-affirming care for youth is best understood as "developmentally appropriate care that is oriented towards understanding and appreciating [one's] gender experience." Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics e20182162 (2018). Gender affirming care can include medical interventions, but "there is no 'one-size-fits-all' approach" and

13

transgender and gender diverse people may need to "undergo all, some, or [no] interventions to support their gender affirmation." E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1 (2022).

## II. SOGICE Are Not Legitimate Therapeutic Practices and Can Cause Harm, Especially to Minors.

Although Appellant describes efforts to change one's sexual orientation or gender identity as "counseling" and therapy, this characterization is inaccurate and misguided. Being a person of diverse sexual orientation and/or gender identity is not a mental disorder, *see generally APA Handbook of Sexuality and Psychology* (Deborah L. Tolman & Lisa M. Diamond eds., 2014), and any attempts to "treat" normal variations in human sexuality and gender identity are flawed. *See Moving Beyond Change Efforts: Evidence and Action to Support and Affirm LGBTQI+ Youth*, SAMSHA, 11 (2023); Melissa Grey et al., *Review of U.S. Public Policy, Legislative, and Judicial Work on Conversion Efforts*, *in The Case Against Conversion "Therapy": Evidence, Ethics, and Alternatives* 195 (ed. Douglas C. Haldeman). Thus, any behavioral health or SOGICE seeking to change an individual's gender identity or expression is not indicated and is therefore deeply inappropriate. Moreover, as the below demonstrates, these practices are dangerous, unethical, ineffective, and have been repeatedly discredited.

### A. Individuals Report Harm from SOGICE.

As the 2009 Report explained, there is "evidence to indicate that individuals experienced harm from SOCE."  Supp.App. at 180; *see id.* at 183 (SOCE "has the potential to be harmful"). With respect to aversive SOCE therapies, studies show "negative side effects includ[e] loss of sexual feeling, depression, suicidality, and anxiety." *Id.* at 180. Even for so-called "non-aversive" SOCE, research reports published at the time of the Report "indicate[d] that there are individuals who perceive that they have been harmed." *Id.*

Based on its exhaustive review of the SOCE literature, the 2009 Task Force ultimately concluded that the best available evidence suggested "attempts to change sexual orientation may cause or exacerbate distress and poor mental health in some individuals, including depression and suicidal thoughts." *Id.* at 219. The 2009 Task Force also described in detail "studies that report perceptions of harm," noting those studies "represent[] a serious concern." *Id.*

The 2009 Task Force noted more recent studies "document that there are people who perceive that they have been harmed through SOCE." *Id.* Among those studies, "the reported negative social and emotional consequences include self-reports of anger, anxiety, confusion, depression, grief, guilt, hopelessness, deteriorated relationships with family, loss of social support, loss of faith, poor self-image, social isolation, intimacy difficulties, intrusive imagery, suicidal ideation,

self-hatred, and sexual dysfunction."[7] *Id*. Participants in these studies also described "decreased self-esteem and authenticity to others"; "increased self-hatred and negative perceptions of homosexuality"; "an increase in substance abuse and high-risk sexual behaviors"; and a variety of harms to their relationships, including hostility towards their parents and the loss of lesbian, gay, and bisexual friends and potential romantic partners. *Id.* at 226-28. A 2020 study further documented the harms of SOCE: In a survey of over 8,000 sexual minority men in Canada, researchers found "[e]xposure to SOCE was positively associated with loneliness, regular illicit drug use, suicidal ideation, and suicide attempt." Travis Salway et al., *Prevalence of Exposure to Sexual Orientation Change Efforts and Associated Sociodemographic Characteristics and Psychosocial Health Outcomes Among Canadian Sexual Minority Men*, 65 Can. J. Psychiatry 502, 502 (2020); *see also* John R. Blosnich et al., *Sexual Orientation Change Efforts, Adverse Childhood*

---

[7] *See* A. Lee Beckstead & Susan L. Morrow, *Mormon Clients' Experiences of Conversion Therapy: The Need for a New Treatment Approach*, 32 Counseling Psychologist 651 (2004); Glenn Smith et al., *Treatments of Homosexuality in Britain Since 1950—An Oral History: The Experiences of Patients*, 328 Brit. Med. J. 427 (2004); Ariel Shidlo & Michael Schroder, *Changing Sexual Orientation: A Consumer's Report*, 33 Prof. Psych.: Res. & Prac. 249 (2002); Michael Schroder & Ariel Shidlo, *Ethical Issues in Sexual Orientation Conversion Therapies: An Empirical Study of Consumers*, 131 J. Gay & Lesbian Psychotherapy 131 (2001); Joseph Nicolosi et al., *Retrospective Self-Reports of Changes in Homosexual Orientation: A Consumer Survey of Conversion Therapy Clients*, 86 Psych. Rep. 1071 (2000); Kim W. Schaeffer et al., *Religiously-Motivated Sexual Orientation Change*, 19 J. Psych. & Christianity 61 (2000).

*Experiences, and Suicide Ideation and Attempt Among Sexual Minority Adults in the United States, 2016-2018*, 110 Am. J. Public Health 1024, 1027 (2020) (experiencing SOCE was "independently associated with suicidal ideation, suicide planning, and suicide attempts," even adjusting for adverse child experiences).

In addition to the *direct* harms posed by SOGICE (which may present as mental health issues, physical ailments, sexual dysfunction, or substance abuse), SOGICE also have the potential to cause *indirect* harms like loss of time, energy, and money. *See* Supp.App. at 245; Anna Forsythe et al., *Humanistic and Economic Burden of Conversion Therapy Among LGBTQ Youths in the United States*, JAMA Pediatrics, 1 (2022) (finding the "total annual cost of SOGICE among 4, 554, 300 LGBTQ youths in the US is estimated at $650.16 million, with associated harms, such as substance abuse and suicide attempts, totaling an estimated total economic burden of $9.23 billion"). Moreover, some SOCE recipients may suffer an indirect harm in the form of disappointment or psychological damage from the ineffectiveness of a therapy they thought would be effective. Indeed, the Report found "[i]ndividuals who failed to change sexual orientation, while believing they should have changed with such efforts, described their experiences as a significant cause of emotional and spiritual distress and negative self-image." Supp.App. at 180; *see id*. at 227 (some participants in SOCE studies reported "anger at and a sense of betrayal by SOCE providers" or they "blamed themselves for the failure" of SOCE

to work as expected). Because SOCE are unlikely to change sexual orientation, SOCE risk psychological harms by promising a result unlikely to occur, especially when that change might be a condition of family or community acceptance.

Like SOCE, research shows GICE also lead to adverse outcomes like emotional distress, loss of relationships, and low self-worth. In a recent study of over 27,000 transgender adults in America, the authors found GICE were "significantly associated with increased odds of severe psychological distress during the previous month and lifetime suicide attempts compared with transgender adults who had discussed gender identity with a professional but who were not exposed to [GICE]." Jack L. Turban et al., *Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults*, 77 JAMA Psychiatry 68, 69 (2020). Another study from 2015 reported that individuals who had experienced GICE were "[f]ar more likely to currently be experiencing serious psychological distress" than those who did not, were "[m]ore likely to have attempted suicide," "[n]early three times as likely to have run away from home," "[m]ore likely to have ever experienced homelessness," and "[m]ore likely to have ever done sex work" than those who had not experienced GICE. *See* Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, National Center for Transgender Equality at 110 (Dec. 2016), https://transequality. org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

**B.  Minors Are Particularly Vulnerable to Harm from SOGICE.**

Importantly, there are considerable ethical issues with providing SOGICE to minors. *See* Supp.App. at 248-57. In the absence of scientifically valid studies of efficacy showing safety of SOGICE and in the presence of retrospective reports of harm, the potential for SOGICE to harm minors is of great concern to licensed mental health professionals ("LMHPs"), *amicus*, and the public.

Generally, youth may be particularly vulnerable to the potential harms of SOCE because they have been exposed to negative messages about sexual minorities, but have not yet developed the resources to reject these messages. *See, e.g.*, SOCE Resolution at 5. The 2009 Report therefore advised LMHPs to "take steps to ensure that minor clients have a developmentally appropriate understanding of treatment" and "support adolescents' exploration of identity." Supp.App. at 253. Given "[t]here is no research demonstrating that providing SOCE to children or adolescents has an impact on adult sexual orientation," *id.* at 181; *see id.* at 262, the Report also recommended LMHPs "provide multiculturally competent and client-centered therapies" to children and adolescents, "rather than SOCE," *id.* at 257. Ultimately, the 2009 Task Force concluded it had "concerns that [SOCE-type] interventions may increase self-stigma and minority stress and ultimately increase the distress of children and adolescents." *Id.* at 181.

More recent studies affirm that SOGICE may present unique threats to youth. Studies show minors who have been subjected to SOGICE report more suicide attempts than those who have not. *See, e.g.*, Amy E. Green et al., *Self-Reported Conversion Efforts and Suicidality Among U.S. LGBTQ Youths and Young Adults*, 110 Am J. Public Health 1221, 1221 (2020) (youth who "underwent [SOGICE] were more than twice as likely to report having attempted suicide and having multiple suicide attempts" than youth who did not); *see also* Caitlin Ryan et al., *Parent-Initiated Sexual Orientation Change Efforts with LGBT Adolescents: Implications for Young Adult Mental Health and Adjustment*, 67 J. on Homosexuality 159, 167-68 (2018); GICE Resolution at 2-3; SOCE Resolution at 5-6.

One recent study underscored that minors are especially vulnerable to the negative effects of SOGICE when exposure to SOGICE happens at a young age. The 2022 study found that "conversion therapy increases the risk of attempting suicide and running away" by a significant percentage, and that these "effects are largest when exposure to [SOGICE] occurs at a young age (11-14)." Travis Campbell & Yana van der Meulen Rodgers, *Conversion Therapy, Suicidality, and Running Away: An Analysis of Transgender Youth in the U.S.*, 89 J. Health Econ. 102750 (2022).

**C.    Licensed Mental Health Providers Have a Duty to Avoid Harm to Members of the Public Whom They Are Licensed to Serve.**

"Do no harm" has long been foundational to the practice of healthcare professionals. This means certain aspirational principles (like the patient's self-determination) must be balanced against other principles, including beneficence and non-malfeasance. *See* Am. Psychological Ass'n, *Ethical Principles of Psychologists and Code of Conduct*, at Principles A, E (Jan. 1, 2017), https://www.apa.org/ethics/code. For this reason, an ethical psychologist would be required to resist patient requests that would harm the patient's health, or for which no evidentiary basis exists; for example, a psychologist would decline a request for a weight loss program from a patient with anorexia nervosa. Self-determination, while important, is not the only ethical principle—or even the most important ethical principle—in clinical decision-making. *See* Ariel Shidlo & John C. Gonsiorek, *Psychotherapy with Clients Who Have Been Through Sexual Orientation Change Interventions or Request to Change Their Sexual Orientation*, *in Handbook of Sexual Orientation and Gender Diversity in Counseling and Psychotherapy* 291 (Kurt A. DeBord et al., eds., 2017). Phrased simply, self-determination does not justify dispensing with other ethical obligations regarding patient care.

Accordingly, "the APA urges psychologists to assist patients seeking SOCE to understand the dangers of SOCE, the lack of research showing efficacy, the societal contexts of heterosexism and monosexism,  and the internalized stigma that

21

results from these contexts, and to use acceptance, support, comprehensive assessment, active coping, social support, and identity exploration and development, within a culturally competent framework." SOCE Resolution at 8. Similarly, the GICE Resolution notes, "[P]rofessional consensus recommends affirming therapeutic interventions for transgender and gender nonbinary adults who request that a therapist engage in GICE, and for trans youth whose parents/guardians or other custodians (e.g., state, foster care) request that a therapist engage in GICE." GICE Resolution at 3.

## III.    There Is No Evidence to Support Exposing Individuals to SOGICE.

The APA's systematic review of the literature on the efficacy of SOCE in the 2009 Report concluded there is no scientific evidence that SOCE reduce same-sex attractions. A systematic review of the small number of rigorous peer-reviewed empirical studies found little evidence SOCE decreased same-sex attraction or increased other-sex attraction or behaviors. Moreover, the studies showed little evidence of any enduring changes or changes generalized from the treatment context into the real world.[8] Some studies that claimed to find sexual orientation change

---

[8] The 2009 Task Force Report noted that "enduring change to an individual's sexual orientation is uncommon and that a very small minority of people in the [early SOCE] studies showed any credible evidence of reduced same-sex sexual attraction, though some showed lessened physiological arousal to all sexual stimuli. … Few studies provided strong evidence that any changes produced in laboratory conditions translated to daily life." Supp.App. at 180; *see also* Lee Birk et al., *Avoidance Conditioning for Homosexuality*, 25 Archives Gen. Psychiatry 314 (1971).

were not rigorous enough to permit the 2009 Task Force to draw any conclusions from those studies about the effects of SOCE.

Studies post-dating the Report do not alter its original conclusions. The APA has identified only one post-Report paper purporting to show SOCE can alter sexual orientation, but this paper suffers from serious methodological flaws.[9]  Indeed, since the 2009 Report, social scientists have determined many of the existing studies on SOCE are methodologically and statistically flawed. *See e.g.*, Dwight Panozzo, *Advocating for an End to Reparative Therapy: Methodological Grounding and Blueprint for Change*, 25 J. Gay & Lesbian Soc. Servs. 362 (2013) (reviewing the methodological and ethical problems of SOCE). A 2021 paper by reviewers at Case Western University found that dozens of research studies deeming SOGICE effective suffered from "biased recruitment, retrospective study designs, lack of generalizability, reliance on samples of bisexual individuals rather than those who

---

[9] The study in question resulted in a high attrition rate; lacks a baseline measure representing a state of being untreated; did not maintain constancy regarding assessment intervals; had significant variations among participants in terms of the length of exposure to treatment, the nature of treatment, and the amount of time between a person's initial and subsequent assessments; and fails to explain significant gaps in data regarding participants. *See* Stanton L. Jones & Mark A. Yarhouse, *A Longitudinal Study of Attempted Religiously Mediated Sexual Orientation Change*, 37 J. Sex & Marital Therapy 404 (2011).
    Another paper released after the 2009 Report was published purports to show SOCE led to shifts in sexual orientation for most participants in the study with no harmful side effects. *See* Paul L. Santero et al., *Effects of Therapy on Religious Men Who Have Unwanted Same-Sex Attraction*, Linacre Q., July 2018, at 1. But that study was retracted by the publishing journal due to statistical flaws.

are predominantly homosexual, and the use of sexual or social behavior (e.g., engaging in sex with or marrying an individual of a different gender) as the outcome instead of sexual orientation." *See* A. Przeworski et al., *A Systematic Review of the Efficacy, Harmful Effects, and Ethical Issues Related to Sexual Orientation Change Efforts*, 28 Clinical Psychol.: Sci. & Prac. 81, 83, 92-93 (2020). The APA and social scientists have similarly found no empirical evidence that GICE are effective or safe practices for changing gender identity. *See* GICE Resolution at 2-3.

**IV.    Appellant Misstates and Misrepresents the Science on SOGICE.**

Both here and below, Appellant has mischaracterized key aspects of the APA's Report and Resolutions regarding the scientific research on SOGICE, downplayed the possibility of harm from SOGICE, and ignored more recent evidence underscoring these harms.

*First*, Appellant wrongly claims there is no scientific consensus on the harms of SOGICE, Appellant's Br. at 8-9, 44, in part because the 2009 Report acknowledged methodological problems with the published research on SOCE, *see* Complaint ¶ 74. Appellant ignores the reasons behind the methodological issues, which are directly tied to the harms of SOGICE: numerous researchers and LMHPs have concluded that SOGICE should be neither studied nor provided precisely **because they may cause harm to patients**. *See, e.g.*, Supp.App. at 268 ("Some authors have stated that SOCE should not be investigated or practiced until safety

issues have been resolved.");[10] *id.* at 201 ("Following the removal of homosexuality from the *DSM* [in 1973], the publication of studies of SOCE decreased dramatically").

Moreover, Appellant ignores the font of research conducted in the twelve years since the 2009 Report, confirming SOGICE expose recipients to considerable risk of psychological harm. *See supra* § II. Though the Report acknowledged that scientifically valid efficacy research on SOCE was limited, *see* Supp.App. at 226-27, a body of research exists that is not efficacy studies, but does find some participants in SOCE retrospectively report harms.

Early studies on SOCE also support this conclusion. The Report recognizes "[h]igh dropout rates characterize early [SOCE] studies and may be an indicator that research participants experience these treatments as harmful." *See id.* at 220; *see* Scott O. Lillenfeld, *Psychological Treatments that Cause Harm*, 2 Persp. on Psych. Sci. 53 (2007). As just one example, a 1973 study on SOCE included one respondent who "dropped out" after "lo[sing] all sexual feeling" and six others who reported some form of depression. Supp.App. at 218; *see* Neil McConaghy & R.F. Barr, *Classical, Avoidance, and Backward Conditioning Treatment of Homosexuality*, 122

---

[10] *See, e.g.*, Gregory M. Herek, *Evaluating Interventions to Alter Sexual Orientation: Methodological and Ethical Consideration*s, 32 Archives Sexual Behav. 438 (2003); Gerald C. Davison, *Homosexuality: The Ethical Challenge*, 44 J. Consulting & Clinical Psych. 157 (1976).

Brit. J. Psychiatry 151 (1973). Thus, the relative lack of empirical studies is not evidence of lack of harm from SOGICE, as Appellant appears to suggest. If anything, the lack of studies may indicate the **risk** of harm. Newer research on SOGICE harm only confirms this point. *See supra* § II.A.

*Second,* Appellant relies on flawed research to argue that SOGICE can "increase well-being" and reduce suicidality. Appellant's Br. at 42-43. Appellant cites an article from D. Paul Sullins to make this claim, even though his research and conclusions on SOCE have been repeatedly debunked. *See, e.g.*, Ilan H. Meyer & John R. Blosnich, Commentary: *An Absence of Behavioral Harm Following Non-efficacious Sexual Orientation Change Efforts: A Retrospective Study of United States Sexual Minority Adults, 2016–2018*, 13 Front Psychol. 997513 (2022) (concluding that "Sullins' findings are misleading and his conclusions about the risk posed by SOCE are not valid"); Jenna Marie Strizzi & Ezio Di Nucci, *Ethical and Human Rights Concerns of Sexual Orientation Change Efforts: Commentary on Sullins*, 52 Archives Sex. Behav. 865 (2023) (describing Sullins' research as "advocating for unethical and fraudulent 'treatment' of individuals or patients"). Appellant's reliance on an "invalid" paper, *see* John R. Blosnich et al., *Correcting a False Research Narrative: A Commentary on Sullins*, 52 Archives Sex Behav. 885 (2022), reveals Appellant has no sound basis for advocating that SOGICE are safe practices likely to change one's sexual orientation or gender.

*Third*, Appellant incorrectly asserts that gender-affirming care causes harm and lacks an evidentiary basis for its efficacy. This assertion is false. A myriad of studies demonstrate that gender-affirming care leads to positive outcomes for its participants. *See, e.g.*, Annelou L. C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696 (2014) (linking gender-affirming care to improved psychological well-being for transgender young adults); D.M. Tordoff et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, 5 JAMA Network Open e220978 (2022) (finding that gender-affirming care lowered the risk of moderate to severe depression by 60% and suicidality by 73% for trans and nonbinary youth); J.C. Sorbara et al., *Mental Health and Timing of Gender-Affirming Care*, 146 Pediatrics e20193600 (2020). Furthermore, the APA is aware of no scientifically-valid studies that link gender-affirming care to negative mental health outcomes.

*Finally*, Appellant wrongly claims that because sexual orientation and gender identity may not remain fixed over one's lifetime, that this justifies "consensual" SOGICE. Appellant's Br. at 6, 7. For example, Appellant cites to the Cass Review—a study commissioned by the National Health Services ("NHS") in England to review the state of gender identity services for children and young people—to argue that SOGICE should be implemented to meet the needs of people seeking to change

their sexuality or gender identity. *See id.* at 6, 53. Yet the actions of the NHS arising out of the Cass Review's findings are not to promote SOGICE; they are to *expand and strengthen* gender-affirming care for youth. *See* NHS England, *Implementing Advice from the Cass Review*, https://www.england.nhs.uk/commissioning/spec-services/npc-crg/gender-dysphoria-clinical-programme/implementing-advice-from-the-cass-review/. Indeed, nothing in the Cass Review or the NHS plan proceeding it undermines the practice of gender-affirming care, nor does it suggest psychotherapists should not affirm gender diversity. In any event, gendered systems and healthcare in European countries are vastly different to those in United States, and Appellant cannot rely on the U.K.'s gender identity services as they are not culturally congruent.

In addition, SOGICE cannot be justified by invoking client autonomy or self-determination. *See supra* § II.C. As the 2009 Report recognized, "simply providing SOCE to clients who request it does not necessarily increase self-determination but rather abdicates the responsibility of [LMHPs] to provide competent assessment and interventions that have the potential for benefit with a limited risk of harm." Supp.App. at 246. Moreover, the concept of self-autonomy with respect to minors who "opt into" SOGICE is simply wrong, because minors are typically emotionally and financially dependent on adults. *See id.* at 254.

## CONCLUSION

For the foregoing reasons, the district court's Order should be affirmed.


May 5, 2023                                     Respectfully submitted,

                                              /s/ *Jessica Ring Amunson*


Deanne M. Ottaviano                           Jessica Ring Amunson
AMERICAN PSYCHOLOGICAL                            *Counsel of Record*
  ASSOCIATION                         Jessica Sawadogo
750 First Street NE                           JENNER & BLOCK LLP
Washington, DC 20002                          1099 New York Avenue NW
(202) 336-6100                                Suite 900
                                              Washington, DC 20001
                                              (202) 639-6023
                                              jamunson@jenner.com

29

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) because it contains 6,471 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type style.

<u>*/s/ Jessica Ring Amunson*</u>
Jessica Ring Amunson

*Counsel for Amicus Curiae*

May 5, 2023

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of May, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send notice to all counsel of record in this matter.

/s/ *Jessica Ring Amunson*
Jessica Ring Amunson

*Counsel for Amicus Curiae*

May 5, 2023