FILED
United States Court of Appeals
Tenth Circuit

September 12, 2024

Christopher M. Wolpert
Clerk of Court

<u>PUBLISH</u>

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT
_____

KALEY CHILES,

     Plaintiff – Appellant/Cross - Appellee,

v.

PATTY SALAZAR, in her official capacity as Executive Director of the Department of Regulatory Agencies; REINA SBARBARO-GORDON, in her official capacity as Program Director of the State Board of Licensed Professional Counselor Examiners and the State Board of Addiction Counselor Examiners; JENNIFER LUTTMAN, in her official capacity as a member of the State Board of Licensed Professional Counselor Examiners; AMY SKINNER, in her official capacity as a member of the State Board of Licensed Professional Counselor Examiners; KAREN VAN ZUIDEN, in her official capacity as a member of the State Board of Licensed Professional Counselor Examiners; MARYKAY JIMENEZ, in her official capacity as a member of the State Board of Licensed Professional Counselor Examiners; KALLI LIKNESS, in her official capacity as a member of the State Board of Licensed Professional Counselor

Nos. 22-1445 & 23-1002

Examiners; SUE NOFFSINGER, in her official capacity as a member of the State Board of Licensed Professional Counselor Examiners; RICHARD GLOVER, in his official capacity as a member of the State Board of Licensed Professional Counselor Examiners; ERKIA HOY, in her official capacity as a member of the State Board of Licensed Professional Counselor Examiners; KRISTINA DANIEL, in her official capacity as a member of the State Board of Addiction Counselor Examiners; HALCYON DRISKELL, in her official capacity as a member of the State Board of Addiction Counselor Examiners; CRYSTAL KISSELBURGH, in her official capacity as a member of the State Board of Addiction Counselor Examiners; ANJALI JONES, in her official capacity as a member of the State Board of Addiction Counselor Examiners; THERESA LOPEZ, in her official capacity as a member of the State Board of Addiction Counselor Examiners; JONATHAN CULWELL, in his official capacity as a member of the State Board of Addiction Counselor Examiners,

> Defendants – Appellees/Cross - Appellants.

--------------------------------

INSTITUTE FOR FAITH AND FAMILY; ASSOCIATIONS OF CERTIFIED BIBLICAL COUNSELORS; INSTITUTE FOR

JUSTICE; ETHICS AND PUBLIC
POLICY CENTER, ASSOCIATIONS
OF CERTIFIED BIBLICAL
COUNSELORS; ETHICS AND
PUBLIC POLICY CENTER;
INSTITUTE FOR FAITH AND
FAMILY; INSTITUTE FOR
JUSTICE; AMERICAN
ASSOCIATION OF SUICIDOLOGY;
AMERICAN FOUNDATION FOR
SUICIDE PREVENTION; TREVOR
PROJECT, INC.; DISTRICT OF
COLUMBIA; STATE OF
CALIFORNIA; STATE OF
CONNECTICUT; STATE OF
DELAWARE; STATE OF HAWAII;
STATE OF ILLINOIS; STATE OF
MAINE; STATE OF
MASSACHUSETTS; STATE OF
MICHIGAN; STATE OF
MINNESOTA; STATE OF NEVADA;
STATE OF NEW JERSEY; STATE
OF NEW MEXICO; STATE OF NEW
YORK; STATE OF OREGON; STATE
OF PENNSYLVANIA; STATE OF
RHODE ISLAND; STATE OF
VERMONT; STATE OF
WASHINGTON; ONE COLORADO;
CARLOS A. BALL; ASHUTOSH
BHAGWAT; MICHAEL BOUCAI;
ALAN E. BROWNSTEIN; ERIN
CARROLL; ERWIN
CHEMERINSKY; MICHAEL C.
DORF; THOMAS E. KADRI;
SUZETTE M. MALVEAUX; TONI
MASSARO; NEIL RICHARDS;
JOCELYN SIMONSON; SCOTT
SKINNER-THOMPSON;
CATHERINE SMITH; KYLE
COURTENAY VELTE; ARI E.
WALDMAN,

Amici Curiae.

———————————————

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:22-CV-02287-CNS-STV)**

———————————————

Cody S. Barnett of Alliance Defending Freedom, Lansdowne, Virginia (John J. Bursch of Alliance Defending Freedom, Washington, D.C., Barry K. Arrington of Arrington Law Firm, Wheat Ridge, Colorado, and Shaun Pearman of Pearman Law Firm, Wheat Ridge, Colorado, with him on the briefs), for Plaintiff-Appellant / Cross-Appellee.

Helen Norton, Deputy Solicitor General (Philip J. Weiser, Attorney General, Shannon Wells Stevenson, Solicitor General, Robert Finke, First Assistant Attorney General, Bianca E. Miyata, Assistant Solicitor General, Janna K. Fischer, Assistant Solicitor General, Abby Chestnut, Assistant Attorney General, and Brianna S. Tancher, Assistant Attorney General, Office of the Attorney General for the State of Colorado, with her on the briefs), Denver, Colorado, for Defendants-Appellees / Cross-Appellants.

Peter Breen of Thomas More Society, Chicago, Illinois, and Michael G. McHale of Thomas More Society, Omaha, Nebraska, filed an amicus curiae brief for the Ethics and Public Policy Center, in support of Plaintiff-Appellant.

Edward C. Wilde and Michael S. Overing of the Law Offices of Michael S. Overing, APC, Pasadena, California, filed an amicus curiae brief for the Associations of Certified Biblical Counselors, in support of Plaintiff-Appellant.

Deborah J. Dewart, Hubert, North Carolina, filed an amicus curiae brief for the Institute for Faith and Family, in support of Plaintiff-Appellant.

Paul M. Sherman and Robert J. McNamara of the Institute for Justice, Arlington, Virginia, filed an amicus curiae brief for the Institute for Justice, in support of Neither Party.

Shannon Minter and Christopher Stoll of the National Center for Lesbian Rights, San Francisco, California, and Craig M. Finger and Amalia Sax-Bolder

4

of Brownstein Hyatt Farber Schreck, LLP, Denver, Colorado, filed an amicus curiae brief for One Colorado, in support of Appellees.

Jessica Ring Amunson and Jessica Sawadogo of Jenner & Block LLP, Washington, D.C., and Deanne M. Ottaviano of the American Psychological Association, Washington, D.C., filed an amicus curiae brief for the American Psychological Association, in support of Defendants-Appellees.

Shireen A. Barday and Mark C. Davies of Pallas Partners (US) LLP, New York, New York; Kate Googins and Caelin Moriarity Miltko of Gibson, Dunn & Crutcher LLP, Denver, Colorado; Abbey Hudson and Theo Takougang of Gibson, Dunn & Crutcher LLP, Los Angeles, California; Kelly E. Herbert of Gibson, Dunn & Crutcher LLP, New York, New York; and Brandon Willmore of Gibson, Dunn & Crutcher LLP, Washington, D.C., filed an amicus curiae brief for the Trevor Project, Inc., American Foundation for Suicide Prevention, and American Association of Suicidology, in support of Defendants-Appellees / Cross-Appellants.

Luke A. Barefoot and Thomas S. Kessler of Cleary Gottlieb Steen & Hamilton LLP, New York, New York, filed an amicus curiae brief for Constitutional Law & First Amendment Scholars, in support of Defendant-Appellees.

Robert W. Ferguson, Attorney General, Cristina Sepe, Deputy Solicitor General, Alexia Diorio, Assistant Attorney General, Sarah E. Smith, Assistant Attorney General, and Sierra McWilliams, Assistant Attorney General, Office of the Attorney General for the State of Washington, Olympia, Washington; Rob Bonta, Attorney General, Office of the Attorney General for the State of California, Oakland, California; William Tong, Attorney General, Office of the Attorney General for the State of Connecticut, Hartford, Connecticut; Kathleen Jennings, Attorney General, Office of the Attorney General for the State of Delaware, Wilmington, Delaware; Brian L. Schwalb, Attorney General, Office of the Attorney General for the District of Columbia, Washington, D.C.; Anne E. Lopez, Attorney General, Office of the Attorney General for the State of Hawai'i, Honolulu, Hawaii; Kwame Raoul, Attorney General, Office of the Attorney General for the State of Illinois, Chicago, Illinois; Aaron M. Frey, Attorney General, Office of the Attorney General for the State of Maine, Augusta, Maine; Andrea Joy Campbell, Attorney General, Office of the Attorney General for the State of Massachusetts, Boston, Massachusetts; Dana Nessel, Attorney General, Office of the Attorney General for the State of Michigan, Lansing, Michigan; Keith Ellison, Attorney General, Office of the Attorney General for the State of Minnesota, St. Paul, Minnesota; Aaron D.

Ford, Attorney General, Office of the Attorney General for the State of Nevada, Carson City, Nevada; Raúl Torrez, Attorney General, Office of the Attorney General for the State of New Mexico, Santa Fe, New Mexico; Matthew J. Platkin, Attorney General, Office of the Attorney General for the State of New Jersey, Trenton, New Jersey; Letitia James, Attorney General, Office of the Attorney General for the State of New York, Albany, New York; Ellen F. Rosenblum, Attorney General, Office of the Attorney General for the State of Oregon, Salem, Oregon; Michelle A. Henry, Attorney General, Office of the Attorney General for the State of Pennsylvania, Harrisburg, Pennsylvania; Peter F. Neronha, Attorney General, Office of the Attorney General for the State of Rhode Island, Providence, Rhode Island; Charity R. Clark, Attorney General, Office of the Attorney General for the State of Vermont, Montpelier, Vermont; and Joshua L. Kaul, Attorney General, Office of the Attorney General for the State of Wisconsin, Madison, Wisconsin, filed an amicus curiae brief for Washington, California, Connecticut, Delaware, the District of Columbia, Hawai'i, Illinois, Maine, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Wisconsin, in support of Defendants-Appellees.

_____

Before **HARTZ**, **MORITZ**, and **ROSSMAN**, Circuit Judges.

_____

**ROSSMAN**, Circuit Judge.

_____

Colorado's Minor Conversion Therapy Law (MCTL), Colo. Rev. Stat § 12-245-224(1)(t)(V), prohibits mental health professionals from providing "conversion therapy" to minor clients. "Conversion therapy," as we will explain, is defined by statute, *see* Colo. Rev. Stat. § 12-245-202(3.5), but generally refers to therapeutic attempts by a mental health professional to change a client's sexual orientation or gender identity. Plaintiff-Appellant Kaley Chiles, a licensed professional counselor in Colorado, brought a pre-

6

enforcement challenge under 42 U.S.C. § 1983, contending the MCTL violates the Free Speech and Free Exercise clauses of the First Amendment.[1] She sought a preliminary injunction to enjoin enforcement of the MCTL. The district court denied the motion, and Ms. Chiles now appeals. Defendants-Appellees, the Executive Director of the Colorado Department of Regulatory Agencies, and members of the Colorado Board of Licensed Professional Counselor Examiners and the Board of Addiction Counsel Examiners, cross-appeal the district court's determination that Ms. Chiles has standing. Exercising jurisdiction under 28 U.S.C. § 1292(a)(1), we affirm the district court in full.

## I

Our opinion proceeds as follows. First, we describe the legal, factual, and procedural background underlying these appeals. Next, we address the threshold issue of whether Ms. Chiles has standing to pursue her pre-enforcement First Amendment challenge. We conclude she does. We then consider whether the district court abused its discretion in finding Ms. Chiles failed to show a likelihood of success on the merits of her First Amendment claims. As we explain, we discern no error.

---

[1] Ms. Chiles refers to the MCTL in her Verified Complaint as the "Counseling Censorship Law."

**A**

**1**

This appeal concerns one aspect of Colorado's Mental Health Practice Act, which applies to those who are licensed, registered, or certified in the state to practice psychology, social work, marriage and family therapy, professional counseling, psychotherapy, and addiction counseling. *See* Colo. Rev. Stat. § 12-245-101(1).[2] Through the Mental Health Practice Act, Colorado has established state authorities[3] to license and regulate mental health professionals. Colo. Rev. Stat. § 12-245-101(2). The statutory scheme also prohibits mental health professionals from securing licensure through fraudulent means and performing services outside of the provider's area of training. *See* Colo. Rev. Stat § 12-245-224(h), (s).

In 2019, Colorado added the MCTL to the Mental Health Practice Act. Under the MCTL, a mental health professional may not engage in "[c]onversion therapy with a client who is under eighteen years of age."

---

[2] We refer broadly to the category of professionals regulated under this Title as mental health providers or mental health professionals. *See* Colo. Rev. Stat. Ann. § 12-1-103 ("Profession or occupation" is defined as "an activity subject to regulation by a part or article of this title 12.").

[3] These state authorities include the Board of Licensed Professional Counselor Examiners and the Board of Addiction Counsel Examiners, members of which are Defendants in this appeal. *See* Colo. Rev. Stat. § 12-245-101(2).

Colo. Rev. Stat. § 12-245-224(1)(t)(V). "Conversion therapy"[4] is defined in the MCTL as

> any practice or treatment by licensee, registrant, or certificate holder that attempts or purports to change an individual's sexual orientation or gender identity, including efforts to change behaviors or gender expressions or to eliminate or reduce sexual or romantic attraction or feelings toward individuals of the same sex. . . .

> "Conversion therapy" does not include practices or treatments that provide . . . [a]cceptance, support, and understanding for the facilitation of an individual's coping, social support, and identity exploration and development, including sexual-orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices, as long as the counseling does not seek to change sexual orientation or gender identity; or . . . [a]ssistance to a person undergoing gender transition.

Colo. Rev. Stat. § 12-245-202(3.5). Anyone "engaged in the practice of religious ministry" is exempt from complying with the Mental Health Practice Act—including the MCTL. Colo. Rev. Stat. § 12-245-217(1).

Violating the MCTL has consequences in Colorado. Boards overseeing mental health professionals may "take disciplinary actions or bring injunctive actions, or both." Colo. Rev. Stat. § 12-245-101(2). If a mental health professional violates the MCTL, the statute authorizes the overseeing board to send the provider a letter of admonition or concern;

---

[4] Ms. Chiles has alleged the term "conversion therapy" is "no longer scientifically or politically tenable." App. at 36 ¶ 81.

deny, revoke, or suspend the provider's license; issue a cease-and-desist order; or impose an administrative fine on the provider of up to $5,000 per violation. Colo. Rev. Stat. § 12-245-225. Defendants have never enforced the MCTL against anyone.

### 2[5]

Ms. Chiles is a licensed professional counselor[6] in Colorado. In 2014, she graduated with a Master of Arts in clinical mental health. Since then, Ms. Chiles "has engaged in providing counseling and coaching to clients, court ordered coparenting classes, parent coordinator/decision making, and court ordered substance-abuse evaluations." App. at 42 ¶ 105. She began her career with an interest in providing mental health care to "underserved populations" who she perceived "as having issues that are resistant to typical counseling or that prevented them from benefitting from typical talk therapy." App. at 44 ¶ 113. Ms. Chiles specialized in trauma and treated addictions and personality disorders. "Recently she has taken more interest

---

[5] We derive these facts from Ms. Chiles's complaint and motion for a preliminary injunction.

[6] A "licensed professional counselor means a professional counselor who practices professional counseling and who is licensed pursuant to this part 6." Colo. Rev. Stat. § 12-245-601.

in specializations such as eating disorders, gender dysphoria and sexuality." App. at 44 ¶ 113.

In her complaint, Ms. Chiles alleged she works at Deeper Stories Counseling in Colorado Springs, where her duties "include counseling assigned clients." App. at 42 ¶ 106. At Deeper Stories, clinicians may limit or expand their caseloads depending on interest and specialties. Ms. Chiles is a practicing Christian and works with "adults who are seeking Christian counseling and minors who are internally motivated to seek counseling." App. at 41–42 ¶¶ 104, 106.

Some clients find Ms. Chiles through referrals from churches or word-of-mouth. These clients "uphold a biblical worldview which includes the concepts that attractions do not dictate behavior, nor do feelings and perceptions determine identity." App. at 43–44 ¶ 110. And they "believe their faith and their relationships with God supersede romantic attractions and that God determines their identity according to what He has revealed in the Bible rather than their attractions or perceptions determining their identity." App. at 43–44 ¶ 110. According to Ms. Chiles, clients with "same-sex attractions or gender identity confusion" who "prioritize their faith above their feelings are seeking to live a life consistent with their faith," and not being able to do so leads to "internal conflicts, depression, anxiety, addiction, eating disorders and so forth." App. at 44 ¶ 111.

Ms. Chiles uses only talk therapy in her counseling practice.[7] Ms. Chiles claims that, using talk therapy, she

> does not seek to "cure" clients of same-sex attractions or to "change" clients' sexual orientation; she seeks only to assist clients with their stated desires and objectives in counseling, which sometimes includes clients seeking to reduce or eliminate unwanted sexual attractions, change sexual behaviors, or grow in the experience of harmony with one's physical body.

App. at 38 ¶ 87. And she "does not try to help minors change their attractions, behavior, or identity, when her minor clients tell her they are not seeking such change." App. at 43 ¶ 109.

## B

In September 2022, Ms. Chiles sued in federal court in the District of Colorado alleging the MCTL violates the Free Speech Clause and Free Exercise Clause of the First Amendment on its face and as applied to her. "The purpose of this action," she explained, "is to seek a declaration that

---

[7] Ms. Chiles alleges she does not use "aversive techniques." App. at 36 ¶ 82. She does not specify in her complaint what that term means, but the district court concluded aversive techniques include treatments that "induc[e] nausea, vomiting, or paralysis; providing electric shocks; or having the individual snap an elastic band around the wrist when the individual bec[omes] aroused to same-sex erotic images or thoughts." App. at 60 n.2 (citation omitted). Ms. Chiles has not challenged the district court's stated understanding of "aversive techniques."

the [MCTL] is unconstitutional and to enjoin the Defendants from enforcing this unconstitutional law against Plaintiff."[8] App. at 19 ¶ 36.

Ms. Chiles alleged that, before Colorado enacted the MCTL, she "helped clients freely discuss sexual attractions, behaviors, and identity by talking with them about gender roles, identity, sexual attractions, root causes of desires, behavior and values." App. at 37 ¶ 83. "However, after the mandates of the [MCTL] were imposed on her," Ms. Chiles "has been unable to fully explore certain clients' bodily experiences around sexuality and gender and how their sensations, thoughts, beliefs, interpretations, and behaviors intersect." App. at 44 ¶ 113. While "she has continued to have these discussions freely with some clients," she has "intentionally avoided conversations" with other clients "that may be perceived as violating" the MCTL. App. at 37 ¶ 83. Ms. Chiles maintains, because of the MCTL, she has been "forced to deny voluntary counseling that fully explores sexuality and gender to her clients and potential clients in violation of her and her clients' sincerely held religious beliefs." App. at 46 ¶ 120.

Ms. Chiles moved for a preliminary injunction to enjoin Colorado from enforcing the MCTL. She did not request a hearing and relied wholly on the

---

[8] Ms. Chiles also brought a First Amendment claim on behalf of her minor clients and a Fourteenth Amendment due process claim. Neither is at issue on appeal.

allegations in her verified complaint. Defendants opposed the motion and submitted documentary evidence.[9] The district court denied relief. Both parties timely appealed.[10]

We first consider whether Ms. Chiles has Article III standing to bring her pre-enforcement First Amendment claims. *See Kerr* v. *Polis*, 20 F.4th 686, 692 (10th Cir. 2021) (describing Article III standing as a "threshold question of subject-matter jurisdiction"). We next consider whether the district court abused its discretion by finding Ms. Chiles failed to demonstrate a likelihood of success on the merits of those claims.

## II

"Standing is a prerequisite to a federal court's exercise of Article III jurisdiction, 'serv[ing] to identify those disputes which are appropriately resolved through the judicial process.'" *Peck* v. *McCann*, 43 F.4th 1116, 1129

---

[9] This evidence included: (1) a declaration by Judith Glassgold, Psy.D, a licensed psychologist and lecturer at Rutgers University, who "specialize[s] in psychotherapy with lesbian, gay, bisexual, and transgender (LGBT) issues working with children, adolescents, and adults," Supp. App. at 99; (2) a report by the American Psychological Association (APA) Task Force titled *Appropriate Therapeutic Responses to Sexual Orientation*, Supp. App. at 170; and (3) a report by the Substance Abuse and Mental Health Services Administration (SAMHSA) titled *Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth*, Supp. App. at 310.

[10] We appreciatively note the substantial involvement of amici in this appeal. We have reviewed all these briefs and will discuss some of them in our analysis.

(10th Cir. 2022) (quoting *Lujan* v. *Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). A plaintiff bears the burden of establishing Article III standing by showing (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) the injury is "fairly . . . trace[able] to the challenged action of the defendant," and (3) the injury is likely to be "redressed by a favorable decision" by the court. *Lujan*, 504 U.S. at 560–61 (quoting *Simon* v. *E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)).

In resolving the motion for a preliminary injunction, the district court first considered whether Ms. Chiles has standing to proceed in federal court on her constitutional claims.[11] The district court concluded Ms. Chiles "established the injury in fact requirement," the MCTL's alleged violation of her First Amendment rights "is undisputedly traceable to the statute itself," and the alleged constitutional violations "could be redressed by [a court's] invalidation of the law." App. at 67 & n.5 (quoting *Peck*, 43 F.4th at 1129).

---

[11] In opposing Ms. Chiles's preliminary injunction motion, Defendants contended Ms. Chiles lacked standing "to bring claims on behalf of alleged minor clients, or potential future minor clients." Supp. App. at 95. The district court concluded Ms. Chiles lacked standing to assert claims on behalf of her minor clients. Ms. Chiles's does not challenge that aspect of the district court's ruling.

On appeal, Defendants do not contest Ms. Chiles satisfies the traceability and redressability requirements. *See* App. at 67 n.5 (explaining "the statute's alleged violation of [Ms. Chiles's] First Amendment rights is undisputedly traceable to the statute itself and could be redressed by [a court's] invalidation of the law" (quoting *Peck*, 43 F.4th at 1129)). Guided by the parties' arguments, therefore, we focus our inquiry on the first prong and ask whether Ms. Chiles has alleged an injury in fact. As we explain, she has.

Standing in the First Amendment context is assessed with some leniency, thereby "facilitating pre-enforcement suits" like the one brought by Ms. Chiles. *Peck*, 43 F.4th at 1129. "[A] plaintiff bringing a First Amendment claim can show standing by alleging . . . 'a credible threat of future prosecution' plus an 'ongoing injury resulting from the statute's chilling effect on [her] desire to exercise [her] First Amendment rights.'"[12] *Id.* (quoting *Ward* v. *Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003)). When

---

[12] We have also held a plaintiff bringing a pre-enforcement First Amendment claim may demonstrate standing "by alleging 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute.'" *Peck* v. *McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (quoting *Ward* v. *Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003)). We do not consider this possible path to standing because Ms. Chiles has not relied on it.

pre-enforcement relief is based on an alleged "chilling effect," a plaintiff

must come forward with

> (1) evidence that in the past they have engaged in the type of
> speech affected by the challenged government action;
> (2) affidavits or testimony stating a present desire, though no
> specific plans, to engage in such speech; and (3) a plausible
> claim that they presently have no intention to do so because of
> a credible threat that the statute will be enforced.

*Initiative & Referendum Inst.* v. *Walker*, 450 F.3d 1082, 1089 (10th Cir.

2006) (en banc). These elements of the required injury-in-fact showing are

known as the "*Walker* test."[13] *See Peck*, 43 F.4th at 1130.

Defendants contest the district court's conclusion under the *Walker*

test. We "review the district court's rulings on standing de novo." *See Aptive*

---

[13] In evaluating whether Ms. Chiles established Article III standing, the district court relied solely on the allegations in her verified complaint. *See* App. at 64 n.4 (construing Ms. Chiles's verified complaint, which was submitted under penalties of perjury, as an affidavit for the purpose of analyzing the *Walker* factors). Neither Ms. Chiles nor the Defendants take issue with the district court's approach, which we conclude is permissible in this case. *See Citizen Ctr.* v. *Gessler*, 770 F.3d 900, 909, 913 (10th Cir. 2014) (evaluating allegations in complaint when assessing whether plaintiff satisfied *Walker* test); *Hobby Lobby Stores, Inc.* v. *Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013) ("[T]he government nowhere contested the factual adequacy or accuracy of [plaintiff's] allegations, and given that those allegations were established through a verified complaint, they are deemed admitted for preliminary injunction purposes."), *aff'd sub nom. Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014); *see also Hall* v. *Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) ("The plaintiff's complaint may also be treated as an affidavit if it alleges facts based on the plaintiff's personal knowledge and has been sworn under penalty of perjury.").

*Env't, LLC* v. *Town of Castle Rock, Colo.*, 959 F.3d 961, 973 (10th Cir. 2020) (quoting *Niemi* v. *Lasshofer*, 770 F.3d 1331, 1344 (10th Cir. 2014)). "It is axiomatic that standing is evaluated as of the time a case is filed." *Rio Grande Found.* v. *Oliver*, 57 F.4th 1147, 1161 (10th Cir. 2023). "[T]he proof required to establish standing increases as the suit proceeds," *id.* (quoting *Davis* v. *Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)), and "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," *id.* (quoting *Lujan*, 504 U.S. at 561).[14] Applying these standards here, we discern no error in the district court's conclusion that Ms. Chiles has standing under Article III.

## A

We first ask whether Ms. Chiles alleged she previously "engaged in the type of speech affected by the challenged government action."[15] *Walker*,

---

[14] Ms. Chiles moved for a preliminary injunction before Defendants filed a responsive pleading.

[15] We emphasize the threshold justiciability inquiry and the ultimate First Amendment merits analysis are not coextensive. Any conclusion that Ms. Chiles has previously "engaged in the type of speech affected by the challenged government action," *Walker*, 450 F.3d at 1089, does not bear on whether the MCTL regulates speech in violation of the First Amendment. *See Nat'l Inst. of Fam. & Life Advocs.* v. *Becerra*, 585 U.S. 755, 768 (2018) ("*NIFLA*"); *see also Warth* v. *Seldin*, 422 U.S. 490, 500 (1975) (explaining "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal").

450 F.3d at 1089. The district court found the allegations in Ms. Chiles's complaint "met her burden of showing that she has in the past engaged in the type of speech 'affected' by the [MCTL]." App. at 64 (quoting *Peck*, 43 F.4th at 1129–30).

Defendants do not dispute Ms. Chiles is generally subject to Colorado's regulations on mental health professionals, including the MCTL. But Ms. Chiles cannot satisfy the first *Walker* factor, Defendants insist, because she has not practiced "conversion therapy" under the MCTL. Ms. Chiles has alleged she discusses her clients' bodily experiences or unwanted sexual attractions during therapy, which the MCTL permits. According to Defendants, there is no allegation Ms. Chiles has attempted or purported to change an individual's sexual orientation or gender identity, which the MCTL prohibits.

Ms. Chiles's pleadings are somewhat "vague" on the matter, as Defendants correctly observe. Defs.' Reply Br. at 17. But "the inquiry before the district court was—and our question is—whether Appellant[] ha[s] a personal stake in a case or controversy at the time [she] filed [her] complaint." *Rio Grande Found.*, 57 F.4th at 1162. We consider this question "in light of all the evidence we now have, construed in the light most favorable to Appellant[] and making reasonable inferences in [her] favor."

*Id.* Construing Ms. Chiles's allegations under this standard, we agree with the district court the first *Walker* prong is satisfied.

A review of the verified complaint in the totality supports the conclusion that Ms. Chiles has engaged in conduct she believes the MCTL proscribes. *See Virginia* v. *Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (describing the injury in fact requirement as having been met where "the law is aimed directly at plaintiffs, who, *if their interpretation of the statute is correct*, will have to take . . . compliance measures or risk criminal prosecution" (emphasis added)). For example, Ms. Chiles alleged "[m]any of her clients uphold a biblical worldview," and these clients "believe their faith and their relationships with God supersede romantic attractions and that God determines their identity according to what He has revealed in the Bible rather than their attractions or perceptions determining their identity." App. at 43–44 ¶ 110. She "does not try to help minors change their attractions, behavior, or identity, *when her minor clients tell her they are not seeking such change.*" App. at 43 ¶ 109 (emphasis added). Construed in the light most favorable to Ms. Chiles, this allegation suggests she has previously tried to help her minor clients change their sexual orientation or gender identity when they *have* told her they are seeking such a change. Before the MCTL, she "helped clients freely discuss sexual attractions, behaviors, and identity by talking with them about gender roles, identity,

sexual attractions, root causes of desires, behavior and values." App. at 37 ¶ 83.

But since Colorado enacted the MCTL, Ms. Chiles claims she "has been unable to fully explore certain clients' bodily experiences around sexuality and gender and how their sensations, thoughts, beliefs, interpretations, and behaviors intersect." App. at 44 ¶ 113. Ms. Chiles has thus met her burden of providing "evidence that in the past [she] ha[s] engaged in the type of speech affected by the challenged government action." *Walker*, 450 F.3d at 1089.

## B

We next consider whether Ms. Chiles has adequately stated a "present desire . . . to engage in the restricted speech." *Walker*, 450 F.3d at 1089; *see also Peck*, 43 F.4th at 1130. We have held the second prong of the *Walker* test "is not meant to be difficult to satisfy." *Rio Grande Found.*, 57 F.4th at 1163. "Even in the absence of direct evidence, circumstances from which a court can infer a present desire . . . suffice." *Id.* at 1164.

The district court concluded Ms. Chiles satisfied this prong because she alleged wanting to "assist clients with their stated desires," which include clients "seeking to reduce or eliminate unwanted sexual attractions." App. at 65 (quoting App. at 38 ¶ 87). Defendants argue these allegations are insufficient. "The practices Ms. Chiles describes wanting to

engage in while counseling children are either not prohibited by the [MCTL]," Defendants maintain, "or her allegations are too general to allow any meaningful assessment of whether they would be prohibited." Defs.' Resp. Br. at 21. In response, Ms. Chiles insists she has adequately stated a desire to help clients meet voluntary, self-selected goals, including changing their gender identity or sexual orientation. Engaging in such counseling would violate the MCTL, she claims. We agree with Ms. Chiles.

The verified complaint says Ms. Chiles seeks to "assist clients with their stated desires and objectives in counseling," and those goals sometimes include "seeking to reduce or eliminate unwanted sexual attractions, change sexual behaviors, or grow in the experience of harmony with one's physical body." App. at 38 ¶ 87. Ms. Chiles also alleged her "[c]lients who have same-sex attractions or gender identity confusion and who also prioritize their faith above their feelings are seeking to live a life consistent with their faith," App. at 44 ¶ 111, and she "wants to provide counseling, including certain types of voluntary counseling related to sexuality and gender, to minor clients and potential clients" but is prohibited from doing so by the MCTL, App. at 45 ¶¶ 116–17.

Construing the verified complaint in the light most favorable to Ms. Chiles and drawing reasonable inferences in her favor, Ms. Chiles has satisfied the second prong of the *Walker* test. A contrary conclusion on the

record before us would contravene "the leniency we generally apply to First Amendment standing inquiries." *Peck*, 43 F.4th at 1131–32; *see also id.* at 1131 ("We thus decline to require categorically that . . . First Amendment plaintiffs know exactly what they would say and when they want to say it in order to challenge a speech-restrictive law.").

### C

Finally, we examine whether Ms. Chiles has satisfied the third prong of the *Walker* test, which asks whether a plaintiff has alleged "a credible threat that the statute will be enforced." *Peck*, 43 F.4th at 1132 (internal quotation marks omitted); *see also Walker*, 450 F.3d at 1089. Ms. Chiles admits Colorado has never actually enforced the MCTL. Even so, the district court properly found Ms. Chiles has shown a credible threat of enforcement.

"The mere presence on the statute books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct prohibited by the statute." *Winsness* v. *Yocom*, 433 F.3d 727, 732 (10th Cir. 2006). Instead, "to satisfy Article III, the plaintiff's expressive activities must be inhibited by 'an objectively justified fear of real consequences.'" *Id.* (quoting *D.L.S.* v. *Utah*, 374 F.3d 971, 975 (10th Cir. 2004)). "This Court has identified 'at least three factors

to be used in determining a credible fear of prosecution: (1) whether the plaintiff showed past enforcement against the same conduct; (2) whether authority to initiate charges was not limited to a prosecutor or an agency and, instead, any person could file a complaint against the plaintiffs; and (3) whether the state disavowed future enforcement.'" *Peck*, 43 F.4th at 1132 (quoting *303 Creative LLC* v. *Elenis*, 6 F.4th 1160, 1174 (10th Cir. 2021), *overruled by* 600 U.S. 570 (2023)).

The district court found the first two factors favored Defendants. But the third factor, the court concluded, weighed heavily in support of Ms. Chiles because Colorado has never disavowed punishing those who violate the MCTL. On appeal, Defendants essentially challenge the weight assigned by the district court to the disavowal factor. They argue "[i]n the absence of the other two factors—past enforcement and broad enforcement authority like a private right of action—whether the state has disavowed future enforcement should be of little weight to a reviewing court." Defs.' Resp. Br. at 24. Otherwise, in their view, any plaintiff could establish a credible fear of enforcement "simply by showing there is a law on the books that the plaintiff may violate." Defs.' Resp. Br. at 24. We are not persuaded.

The third prong of the *Walker* test "is not supposed to be a difficult bar for plaintiffs to clear in the First Amendment pre-enforcement context." *Peck*, 43 F.4th at 1133 (collecting cases). In *Peck*, we reasoned "the state's

staunch refusal to disavow prosecution has heavy weight" where "[t]here is nothing, not even their word," to prevent prosecutors from bringing criminal charges against someone who violates a state non-disclosure statute. *Id.* The focus on whether the relevant authority has disavowed enforcement is applicable here. "[A] refusal to provide . . . an assurance" that a statute will not be enforced "undercuts Defendants' argument that [a plaintiff's] perception of a threat of prosecution is not objectively justifiable." *Id.* Reviewing *de novo*, we agree with the district court this factor supports Ms. Chiles. *See id.* at 1132–33 (finding plaintiff satisfied the third prong of the *Walker* test where the past enforcement factor "slightly" favored plaintiff, the private right of action factor did not favor plaintiff, and the credible threat factor favored plaintiff).

We conclude Ms. Chiles has shown an injury in fact for the purpose of demonstrating Article III standing to assert her pre-enforcement First Amendment challenge. We now proceed to the merits of Ms. Chiles's appeal.

### III

Ms. Chiles asks us to reverse the district court's order denying her motion for a preliminary injunction. "A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *U.S. ex rel. Citizen Band Potawatomi Indian Tribe of Okla.* v. *Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888 (10th Cir. 1989). To prevail on a

preliminary injunction motion, the moving party must prove: "(1) that she's 'substantially likely to succeed on the merits,' (2) that she'll 'suffer irreparable injury' if the court denies the injunction, (3) that her 'threatened injury' (without the injunction) outweighs the opposing party's under the injunction, and (4) that the injunction isn't 'adverse to the public interest.'" *Free the Nipple-Fort Collins* v. *City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019) (quoting *Beltronics USA, Inc.* v. *Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009)). "[T]he final two factors 'merge when the Government is the opposing party.'" *Denver Homeless Out Loud* v. *Denver, Colo.*, 32 F.4th 1259, 1278 (10th Cir. 2022) (quoting *Nken* v. *Holder*, 556 U.S. 418, 435 (2009)). Here, where a requested injunction would "change[] the status quo," the preliminary injunction motion is considered "disfavored," and "the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors."[16]

---

[16] Ms. Chiles argues her preliminary injunction request should not be considered disfavored. She insists a heavier burden only applies if, unlike here, the injunction "alters the status quo *and* affords the movants all the relief they could recover at the conclusion of a full trial on the merits." Pl.'s Reply Br. at 34. Ms. Chiles makes this argument for the first time in her reply brief, so we decline to consider it. *See Wheeler* v. *Comm'r*, 521 F.3d 1289, 1291 (10th Cir. 2008) ("[I]ssues raised by an appellant for the first time on appeal in a reply brief are generally deemed waived."); *see also Silverton Snowmobile Club* v. *U.S. Forest Serv.*, 433 F.3d 772, 783 (10th Cir. 2006) (describing the "general rule that appellate courts will not entertain issues raised for the first time on appeal in an appellant's reply [brief]"

*Free the Nipple-Fort Collins*, 916 F.3d at 797. To prevail, the movant thus "must make a 'strong showing' that these [factors] tilt in her favor." *Id.* (quoting *Fish* v. *Kobach*, 840 F.3d 710, 724 (10th Cir. 2016)).

"District courts have discretion over whether to grant preliminary injunctions, and we will disturb their decisions only if they abuse that discretion." *Courthouse News Serv.* v. *N.M. Admin. Off. of Cts.*, 53 F.4th 1245, 1254 (10th Cir. 2022) (quoting *Free the Nipple-Fort Collins*, 916 F.3d at 796). "A district court's decision crosses the abuse-of-discretion line if it rests on an erroneous legal conclusion or lacks a rational basis in the record." *Id.* (quoting *Free the Nipple-Fort Collins*, 916 F.3d at 796). "In reviewing 'a district court's decision to grant or deny a preliminary

---

(quoting *Anderson* v. *U.S. Dep't of Labor*, 422 F.3d 1155, 1174 (10th Cir. 2005)) (internal quotation marks omitted)).

Even if we reached this belated contention, we would find it unavailing. "[A] disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win." *Free the Nipple-Fort Collins*, 916 F.3d at 797. Enjoining the MCTL would disturb the status quo by rendering unenforceable a state law that was "in effect for nearly 4 years before Ms. Chiles filed her Complaint in the District Court." Def's. Resp. Br. at 26; *see also Schrier* v. *Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005) ("In determining the status quo for preliminary injunctions, this court looks to the reality of the existing status and relationship between the parties . . . ." (quoting 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948 (2d ed. 1995)). In any event, our disposition does not depend on assigning a heavier burden to Ms. Chiles.

injunction, we thus examine the court's factual findings for clear error and its legal conclusions de novo.'" *Id.* at 1254–55 (quoting *Free the Nipple-Fort Collins*, 916 F.3d at 796–97). Ms. Chiles does not contend the district court's factual findings are clearly erroneous, so we evaluate the legal issues before us based on the findings made by the district court on the record before it.[17]

---

[17] The courts of appeal "do not sit as self-directed boards of legal inquiry and research." *Colorado* v. *U.S. Env't Prot. Agency*, 989 F.3d 874, 885 (10th Cir. 2021) (quoting *Nat'l Aeronautics & Space Admin.* v. *Nelson*, 562 U.S. 134, 147 n.10 (2011)). This accords with the "principle of party presentation," which is "a fundamental premise of our adversarial system." *Id.* at 885. But the dissent discusses at length what appears to be independent research into various studies of sexuality, gender identity, and treatments for gender dysphoria in minors. The dissent details perceived pitfalls of peer-reviewed publications in these areas and concludes courts should "be skeptical" of such studies. Dissent at 24. We cannot agree.

Our singular task as an appellate court is to review the judgment of the district court according to the applicable standard of review. "[W]e do not find facts on appeal . . . ." *Green* v. *Post*, 574 F.3d 1294, 1304 n.9 (10th Cir. 2009). That is the work of the trial court. Here, as we discuss, the district court found conversion therapy is harmful to minors. We review that determination for clear error, meaning "we may not reverse '[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety . . . even [if] . . . had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently.'" *Johnson* v. *City of Cheyenne*, 99 F.4th 1206, 1229 (10th Cir. 2024) (alterations in original) (quoting *Anderson* v. *City of Bessemer City*, 470 U.S. 564, 573–74 (1985)). Ms. Chiles does not make a clear error argument; nor does the dissent suggest the district court clearly erred. Bound by the standard of review, mindful of our limited appellate role, and guided by party presentation, we see no basis for skepticism.

Even if the dissent offers its research only "to indicate the sort of analysis that needs to be conducted by the judiciary, particularly the trial

The district court found Ms. Chiles had not met her burden of showing a likelihood of success on the merits of her First Amendment free speech and free exercise claims. Reviewing each claim in turn, we agree.

## A

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed* v. *Town of Gilbert*, 576 U.S. 155, 163 (2015)

---

courts," that is, at best, unnecessary and at worst, risky. Dissent at 37. This risk is borne out in the dissent's independent research and analysis. For example, the dissent discusses an extra-record source—a recent article from the *New York Times*—that apparently says "medical authorities in Finland, Sweden, Denmark, and Norway, have, purportedly based on experience in those countries, restricted medical treatment (as opposed to psychotherapy) of minors to enhance gender transition." Dissent at 27–28 (citing Azeen Ghorayshi, *Youth Gender Medications Limited in England, Part of Big Shift in Europe*, N.Y. Times (April 9, 2024), https://www.nytimes.com/ 2024/04/09/health/europe-transgender-youth-hormone-treatments.html [https://perma.cc/D68U-EWRK]). The article differentiates between different forms of gender-affirming care for minors, which include puberty blockers, hormone therapy, and psychotherapy. Ghorayshi, *supra*. Finland, for example, actually "recommend[s] psychotherapy as the primary treatment for adolescents with gender dysphoria." *Id.* The questions raised in the article about the efficacy of hormone treatments administered to minors, then, do not apply to the efficacy of psychotherapy.

Why bother to clarify the record? Because the details matter. Overlooking the nuances between different types of gender-affirming care confuses the issues presented and risks undermining the integrity of judicial decision-making in these already challenging cases. We will leave it to the parties to develop the evidence and to the district court to assess its relevance and reliability.

(quoting U.S. Const. amend. I). "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States* v. *Stevens*, 559 U.S. 460, 468 (2010) (quoting *Ashcroft* v. *ACLU*, 535 U.S. 564, 573 (2002)). It is well settled "if a law targets protected speech in a content-based manner," it is subject to strict scrutiny. *Animal Legal Def. Fund* v. *Kelly*, 9 F.4th 1219, 1227 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 2647 (2022). However, "the First Amendment does not prevent restrictions directed at . . . conduct from imposing incidental burdens on speech." *Id.* (quoting *Sorrell* v. *IMS Health Inc.*, 564 U.S. 552, 567 (2011)). Under these circumstances, the law must withstand a "lower level of scrutiny." *Nat'l Inst. of Fam. & Life Advocs.* v. *Becerra*, 585 U.S. 755, 765 (2018) (*NIFLA*).

The key precedent for our purposes is *NIFLA*. There, the Supreme Court considered a challenge to a California law regulating crisis pregnancy centers, which are "pro-life (largely Christian belief-based) organizations that offer a limited range of free pregnancy options, counseling, and other services to individuals that visit a center." 585 U.S. at 761 (citation omitted). The law required crisis pregnancy centers to "disseminate a

government-drafted notice on site."[18] *Id.* at 763. This notice read, in part, "California has public programs that provide immediate free or low-cost access to comprehensive family planning services (including all FDA-approved methods of contraception), prenatal care, and abortion for eligible women." *Id.*

Petitioners—crisis pregnancy centers and an organization composed of crisis pregnancy centers—sued, alleging the notice requirement violated the Free Speech Clause of the First Amendment. *Id.* at 765. The district

---

[18] The law at issue in *NIFLA* imposed notice requirements on two types of pregnancy centers: licensed pregnancy centers and unlicensed pregnancy centers. 585 U.S. at 761–62. The licensed or unlicensed distinction, without more, is immaterial for our purposes. But only *NIFLA*'s analysis of the notice requirement for licensed crisis pregnancy centers bears on this case.

In analyzing the notice requirement for unlicensed pregnancy centers, the Supreme Court observed "[t]he services that trigger the unlicensed notice . . . do not require a medical license." 585 U.S. at 777. The Court analyzed that notice requirement assuming, without deciding, it was a disclosure requirement regulating commercial speech. *See id.* at 776, 778. In the instant case, all agree the MCTL is not a disclosure law requiring "professionals to disclose factual, noncontroversial information in their 'commercial speech'" contemplated by this portion of *NIFLA*. *Id.* at 768. The Supreme Court's analysis of the notice requirement for unlicensed pregnancy centers therefore does not aid our analysis.

By contrast, *NIFLA* considered whether the notice requirement for licensed facilities was a regulation of "professional conduct . . . incidentally involv[ing] speech." *Id.* at 768. This question is at the heart of Ms. Chiles's appeal. We thus focus our analysis on the portions of *NIFLA* analyzing the notice requirement for licensed crisis pregnancy centers.

court denied petitioners' motion for preliminary injunction, and the Ninth Circuit affirmed, holding "petitioners could not show a likelihood of success on the merits." *Id.* The Ninth Circuit concluded the notice requirement "survives the 'lower level of scrutiny' that applies to regulations of 'professional speech.'" *Id.* (quoting *Nat'l Inst. of Fam.& Life Advocs.* v. *Harris,* 839 F.3d 823, 845 (9th Cir. 2016)).

The Supreme Court reversed. The Court first observed that its "precedents have long protected the First Amendment rights of professionals." *Id.* at 771. And the Court declined to treat "professional speech as a unique category that is exempt from ordinary First Amendment principles." *Id.* at 773; *see also id.* at 768 ("This Court's precedents do not recognize such a tradition for a category called 'professional speech.'").[19]

*NIFLA* reaffirmed the Constitution "does not prevent restrictions directed at . . . conduct from imposing incidental burdens on speech." *Id.* at 769 (quoting *Sorrell*, 564 U.S. at 567). The Court acknowledged it has

---

[19] The Supreme Court clarified this point because the Third, Fourth, and Ninth Circuits had "recognized 'professional speech' as a separate category of speech that is subject to different rules." *NIFLA*, 585 U.S. at 767 (citing cases). In deciding *NIFLA*, the Ninth Circuit relied on *Pickup* v. *Brown*, 740 F.3d 1208, 1228 (9th Cir. 2014), which had held "First Amendment protection of a professional's speech is somewhat diminished." *See Nat'l Inst. of Fam. & Life Advocs.* v. *Harris,* 839 F.3d 823, 834 (9th Cir. 2016) (citing *Pickup*, 740 F.3d at 1208). The Supreme Court's decision in *NIFLA* abrogated *Pickup*. *NIFLA*, 585 U.S. at 767–68.

"afforded less protection for professional speech in two circumstances—neither of which turned on the fact that professionals were speaking." *Id.* at 768. "First, our precedents have applied more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech'" (the first *NIFLA* context).[20] *Id.* Second, "States may regulate professional conduct, even though that conduct incidentally involves speech" (the second *NIFLA* context).[21] *Id.*

---

[20] *NIFLA* cited several cases to illustrate this first context. *See NIFLA*, 585 U.S. at 768 (citing *Zauderer* v. *Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985) (holding "an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers"); *Milavetz, Gallop & Milavetz, P.A.* v. *United States*, 559 U.S. 229, 250 (2010) (considering whether rule requiring debt relief agencies to make certain disclosures in advertisements is unjustified or unduly burdensome); *Ohralik* v. *Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) (explaining "the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity")).

[21] The dissent insists our position contravenes *NIFLA* because, in our colleague's view, we are "saying that professional speech should be treated differently from other speech." Dissent at 16. That is not what we are saying. Nor could we.

*NIFLA* makes clear that speech uttered by professionals has been afforded "less protection" under the First Amendment in only two circumstances. *NIFLA*, 585 U.S. at 768. "Outside of the two contexts," however, the Court has acknowledged strict scrutiny will usually apply. *See id.* at 771 (citing cases in which restrictions on speech by professionals fell "[o]utside of the[se] two contexts" and accordingly were subject to strict scrutiny). We heed the Court's instruction that the two contexts identified in *NIFLA* do not turn on the fact that "professionals were speaking." *NIFLA*,

In support of the second *NIFLA* context, relevant here, the Supreme Court cited *Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U.S. 833 (1992) (joint opinion of O'Connor, Kennedy, and Souter, JJ.), *overruled on other grounds by Dobbs* v. *Jackson Women's Health Org.*, 597 U.S. 215 (2022). *NIFLA*, 585 U.S. at 769–70.[22] In *Casey*, petitioners brought a First Amendment free speech challenge to a Pennsylvania law requiring physicians to obtain informed consent from patients before they could perform an abortion. 505 U.S. at 844, 884. The Supreme Court upheld the

---

585 U.S. at 768. Rather, when speech is uttered by professionals, we may not treat it differently from speech uttered by laypersons—unless it falls within one of the two *NIFLA* contexts. In applying *NIFLA*, we must first ask whether the challenged regulation falls inside or outside the two contexts identified by the Court. Only by doing so may we determine the requisite level of scrutiny to apply to the MCTL.

[22] The Supreme Court marshalled *Casey* as the primary example of an incidental speech restriction falling within the second *NIFLA* context. *See NIFLA*, 585 U.S. at 768–70. However, the Court also cited *Ohralik*, 436 U.S. at 456, in support of the proposition that "under our precedents, States may regulate professional conduct, even though that conduct incidentally involves speech." *NIFLA*, 585 U.S. at 768; *see also Ohralik*, 436 U.S. at 457 (finding "[i]n-person solicitation by a lawyer of remunerative employment is a business transaction in which speech is an essential but subordinate component"). When later elaborating on this line of precedent, the Court likewise noted "[l]ongstanding torts for professional malpractice, for example, 'fall within the traditional purview of state regulation of professional conduct.'" *NIFLA*, 585 U.S. at 769 (quoting *NAACP* v. *Button*, 371 U.S. 415, 438 (1963)); *see also Button*, 371 U.S. at 419, 444 (finding state ban against "the improper solicitation of any legal or professional business" was not supported by a state "regulatory interest . . . which can justify the broad prohibitions which it has imposed").

34

informed consent requirement, reasoning in a joint opinion[23] that the law regulated speech "only as part of the practice of medicine, subject to reasonable licensing and regulation by the State." *Id.* at 884. "We see no constitutional infirmity," the Court held, "in the requirement that the physician provide the information mandated by the State here." *Id.*

The Court concluded the notice requirement in *NIFLA* was unlike the informed consent requirement in *Casey*. *NIFLA*, 585 U.S. at 770. The notice requirement was "not tied to a [medical] procedure at all." *Id.* It applied "to all interactions between a covered facility and its clients, regardless of whether a medical procedure is ever sought, offered, or performed." *Id.* And it provided "no information about the risks or benefits" of any procedures a facility may provide. *Id.* The notice requirement did not qualify as a

---

[23] The joint opinion in *Casey* was authored by Justices O'Connor, Kennedy, and Souter. *See Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U.S. 833, 843 (1992), *overruled on other grounds by Dobbs* v. *Jackson Women's Health Org.*, 597 U.S. 215 (2022). "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks* v. *United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg* v. *Georgia*, 428 U.S. 153, 169 n.15 (1976)). "Although parts of *Casey*'s joint opinion were a plurality not joined by a majority of the Court, the joint opinion is nonetheless considered the holding of the Court . . ., as the narrowest position supporting the judgment." *June Med. Servs. L. L. C.* v. *Russo*, 140 S. Ct. 2103, 2135 n.1 (2020) (citing *Marks*, 430 U.S. at 193), *abrogated on other grounds by Dobbs*, 597 U.S. at 215.

"regulation of professional conduct," the Court determined, and necessarily could not fall within the context of professional conduct regulations only "incidentally involv[ing] speech." *Id.* at 768, 770.

**B**

The district court held the MCTL falls within the second *NIFLA* context. In reaching that conclusion, the district court reasoned the MCTL regulates the professional conduct of mental health professionals, narrowly applies to their "therapeutic 'practice[s] or treatment[s],'" and "[a]ny speech affected by the [MCTL] is incidental to the professional conduct it regulates." *See* App. at 72, 75–76.

On appeal, Ms. Chiles acknowledges the MCTL regulates mental health professionals in Colorado. But the MCTL "regulates speech at its core," she insists, and "suppresses [her] speech directly, not incidentally." Opening Br. at 27. Defendants urge affirmance, insisting the law "regulates the practice of licensed mental health professionals, implicating speech only as part of the practice of mental health care." Defs.' Resp. Br. at 30.

To resolve Ms. Chiles's appellate challenge, we apply "ordinary First Amendment principles," and proceed from the controlling premise that there is no tradition categorically insulating "professional speech" from

First Amendment protection.[24] *NIFLA*, 585 U.S. at 768, 774. Colorado's power to regulate the counseling profession does not authorize the state to regulate all speech uttered by a counseling professional. We reject any contrary notion.

Mindful of these first principles, we proceed to examine whether the MCTL falls within the second *NIFLA* context.[25] It does. The statute is part of Colorado's regulation of the healthcare profession and, as the district court correctly found, applies to mental health professionals providing a type of prohibited treatment to minor patients. On the record before us, we agree the MCTL regulates professional conduct that "incidentally involves speech." *NIFLA*, 585 U.S. at 768. Ms. Chiles has advanced no contrary availing argument, as we will explain.

---

[24] We note the Supreme Court in *NIFLA* recognized "neither California nor the Ninth Circuit has identified a persuasive reason for treating professional speech as a unique category that is exempt from ordinary First Amendment principles." 585 U.S. at 773. But the Court "d[id] not foreclose the possibility that some such reason exists." *Id.* The parties do not advance any such reasons in this case, and we decline to answer this question *sua sponte*. Contrary to the dissent's assertion, no part of our holding or reasoning depends on treating professional speech as a separate category under the First Amendment.

[25] This case does not involve the first *NIFLA* context because, as we noted, the MCTL does not require professionals to disclose factual, noncontroversial information in commercial speech. *See NIFLA*, 585 U.S. at 768. No one suggests otherwise.

**1**

We first ask whether the MCTL regulates professional conduct. The district court concluded (1) the MCTL regulates mental health professionals acting in their professional capacity, and (2) the aspect of their professional conduct being regulated is a "therapeutic 'practice[] or treatment[].'" *See* App. at 72.

**a**

We first consider the district court's conclusion that the MCTL "regulates the[] professional conduct" of "specifically credentialed professionals." App. at 72. The MCTL applies to:

> licensed psychologists and psychologist candidates, licensed social workers and clinical social worker candidates, licensed marriage and family therapists and marriage and family therapist candidates, licensed professional counselors and licensed professional counselor candidates, unlicensed psychotherapists, and licensed and certified addiction counselors and addiction counselor candidates, . . . and mental health professionals who have been issued a provisional license.

Colo. Rev. Stat § 12-245-101(2). The MCTL prohibits these mental health professionals from "engag[ing] in . . . [c]onversion therapy with a client who is under eighteen years of age." Colo. Rev. Stat. § 12-245-224(1)(t)(V). From

the text of the statute, it is apparent the MCTL regulates mental health professionals practicing their profession.[26]

The MCTL falls within the more comprehensive Mental Health Practice Act, which regulates an array of conduct engaged in by mental health professionals when treating clients. *See* Colo. Rev. Stat. §§ 12-245-101–12-245-806.[27] The stated purpose of the Mental Health Practice Act is "to safeguard the public health, safety, and welfare of the people of this state" and "to protect the people of this state against the unauthorized, unqualified, and improper application" of mental healthcare. Colo. Rev. Stat. § 12-245-101(1). To that end, the Mental Health Practice Act prohibits a range of conduct by mental health professionals deemed an

---

[26] The dissent refers to "counseling" provided by myriad sources, including "family, friends, clergy, [and] social media." Dissent at 2. The case before us only concerns counseling provided by licensed mental health professionals.

[27] The Mental Health Practice Act, in turn, is part of Title 12 of the Colorado Revised Statutes, which regulates a broad spectrum of "Professions and Occupations." For example, Articles 100 through 170 of Title 12 regulate "Business Professions and Occupations," including accountants (Article 100), electricians (Article 115), engineers (Article 120), mortuaries (Article 135), and plumbers (Article 155). *See* Colo. Rev. Stat. §§ 12-100-101–12-170-117. Articles 200 through 315 of Title 12 regulate "Health-Care Professions and Occupations," such as dentists (Article 220), physicians assistants (Article 240), nurses (Article 255), pharmacists (Article 280), and physical therapists (Article 285). The Mental Health Practice Act, contained in Article 245 of Title 12, is among the "Health-Care Professions and Occupations" regulations.

"improper application" of mental healthcare, such as: acting "in a manner that does not meet the generally accepted standards of the profession[]"; "perform[ing] services outside of the person's area of . . . experience"; and using "rebirthing as a therapeutic treatment," which involves "restraint[s] that create[] a situation in which a patient may suffer physical injury or death." Colo. Rev. Stat. § 12-245-224(1)(g)(I), (h), (t)(IV). The subject of these regulations is the professional care that mental health providers give their patients. That is, undoubtedly, professional conduct.

Our conclusion also finds support in the MCTL's legislative history, which the district court found instructive. In opposing Ms. Chiles's preliminary injunction motion, Defendants pointed to a statement by one of the MCTL's sponsors, Colorado Senator Stephen Fenberg, who explained Colorado enacted the MCTL "because all of the prevailing science and modern medicine tells us that not only does this practice [of conversion therapy] not work, but it . . . actually harms young people." Supp. App. at 86. The district court made a factual finding that "Colorado considered the body of medical evidence" demonstrating the harms of conversion therapy before passing the MCTL. *See* App. at 78. Ms. Chiles does not challenge this factual finding, the legislative history upon which it is based, or offer any contrary evidence. The record confirms the Colorado legislature determined the practice of conversion therapy constituted an "improper

40

application" of professional counseling. Constitutional Law & First Amendment Scholars Amicus Br. at 22–23. And the MCTL's prohibition on the practice of conversion therapy by therapists treating minor clients "fall[s] under the . . . umbrella of professional conduct [regulations] for mental health professionals," as Defendants explain. Def's. Resp. Br. at 31.

There is a long-established history of states regulating the healthcare professions. "[F]rom time immemorial," states have enacted regulations to "secure . . . against the consequences of ignorance and incapacity" by medical professionals. *Dent* v. *West Virginia*, 129 U.S. 114, 122 (1889); *see also Watson* v. *Maryland*, 218 U.S. 173, 176 (1910) ("It is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health. There is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine."). "American laws to control the quality of medical service [date back to] the mid-1600s." Washington, California, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Maine, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Wisconsin (Twenty States) Amicus Br. at 21; *see also* One Colorado Amicus Br. at 10. This historical tradition of regulation is unsurprising because medical

treatment provided to the public must fall within the accepted standard of care for the profession. *See L.W. ex rel. Williams* v. *Skrmetti*, 83 F.4th 460, 473 (6th Cir. 2023) ("State and federal governments have long played a critical role in regulating health and welfare, . . . [and] have an abiding interest 'in protecting the integrity and ethics of the medical profession . . . .'" (quoting *Washington* v. *Glucksberg*, 521 U.S. 702, 731 (1997))); *see, e.g.*, *Crane* v. *Johnson*, 242 U.S. 339, 340, 343 (1917) (upholding medical licensing requirement challenged by "drugless practitioner" who "does not employ either medicine, drugs, or surgery in his practice" but instead "employ[s] faith, hope, and the processes of mental suggestion"); *Del Castillo* v. *Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1225–26 (11th Cir. 2022) (upholding state licensing requirements for nutritionists and noting the legislature found "the *practice* of . . . nutrition counseling by unskilled and incompetent practitioners presents a danger to the public health and safety"), *cert. denied sub nom. Del Castillo* v. *Ladapo*, 143 S. Ct. 486 (2022). As the dissent appropriately puts it, "when the evidence of [a counseling method's] ineffectiveness or harm is strong enough," mental health providers "may properly be subject to sanction, from lawsuit to loss of license and perhaps more." Dissent at 3.

We affirm the district court's conclusion that the MCTL regulates the professional conduct of mental health providers in Colorado.

**b**

The district court next found talk therapy provided by mental health professionals is a medical treatment. According to the district court, "[w]hat licensed mental health providers do during their appointments with patients for compensation under the authority of a state license is treatment." App. at 75 (quoting *Tingley* v. *Ferguson*, 47 F.4th 1055, 1082 (9th Cir. 2022), *cert. denied*, 601 U.S. ----, 144 S. Ct. 33 (2023)); *see also* App. at 75 n.8; Supp. App. at 188 (APA Task Force Report describing "psychoanalysis and behavior therapy" as "types of therapeutic orientation"). The district court further concluded the MCTL's prohibition on administering conversion therapy to minors is a regulation of a "healthcare treatment." *See* App. at 75 (quoting *Otto* v. *City of Boca Raton, Fla.*, 41 F.4th 1271, 1292 (11th Cir. 2022) (Rosenbaum, J., dissenting)). We agree.

Conversion therapy is defined by the MCTL as "any practice or treatment" by a mental health professional "that attempts or purports to change an individual's sexual orientation or gender identity, including efforts to change behaviors or gender expressions or to eliminate or reduce sexual or romantic attraction or feelings toward individuals of the same sex." Colo. Rev. Stat. § 12-245-202(3.5)(a).

43

Ms. Chiles insists this statutory definition, which plainly says therapy is treatment, is merely a "labeling game." Opening Br. at 21 (citation omitted). Even if the government refers to talk therapy as a treatment, Ms. Chiles maintains the MCTL "regulates speech at its core." Opening Br. at 27. She explains she only uses words when counseling clients, but "Colorado cannot end-run the First Amendment" simply by relabeling her speech as conduct. Opening Br. at 16; *see also* Institute for Faith and Family Amicus Br. at 15 (contending "[t]he government plays word games, attempting to regulate speech by improperly relabeling it as conduct" (internal quotation marks and citation omitted)). She likewise "contests the conflation of her speech with 'medical treatment.'" Opening Br. at 23 n.4. In her view, "[t]he conversations she has with clients are 'not medical at all' but are 'a client-directed conversation consisting entirely of speech.'" Opening Br. at 23 n.4 (quoting *Otto* v. *City of Boca Raton, Fla.*, 981 F.3d 854, 866 n.3 (11th Cir. 2020)). Ms. Chiles compares the professional counseling services she provides to conversations a "sophomore psychology major" could have with a fellow student, which "[n]o one" would label as medical treatment or professional conduct." Opening Br. at 23 n.4. These arguments are wholly unpersuasive.

Ms. Chiles is a licensed professional counselor, a position earned after years of advanced education and licensure. In her complaint, she

distinguishes herself as a professional who treats "co-occurring clinical issues such as addictions, attachment, and . . . personality disorders." App. at 36 ¶ 83. Ms. Chiles's clients present to her with "depression, anxiety, addiction, eating disorders, and so forth" and "seek[] resolution of such turmoil" through her counseling. App. at 44 ¶ 111. Ms. Chiles is obviously treating patients, as her own allegations make clear.

Ms. Chiles does not dispute her counseling services fall under the ambit of Colorado's Mental Health Practice Act, which regulates "the *treatment* [provided] to assist individuals or groups to alleviate behavioral and mental health disorders." *See* Colo. Rev. Stat. § 12-245-202(14)(a) (emphasis added); *see also id.* § 12-245-101(1). Nor does she dispute that mental health professionals provide "therapeutic interventions" meant to safeguard patients' health. *See* American Psychological Association (APA) Amicus Br. at 21–22. Ms. Chiles describes her talk-based counseling services as providing "vital mental health care" to her clients. App. at 14 ¶ 1. "The relationship between a mental health professional and her client," Ms. Chiles says in her complaint, "has always been based on a *deeply held trust* from which a *critical therapeutic alliance* forms." App. at 14 ¶ 1 (emphasis added). Similarly, as Defendants persuasively point out, the counseling relationship between provider and patient involves special privileges, a power differential, and a financial arrangement. Such a

relationship bears no resemblance to an exchange between a "sophomore psychology major" and her peers. *See* Opening Br. at 23 n.4. Talk therapy is a treatment, not an informal conversation among friends. *See Lowe* v. *S.E.C.*, 472 U.S. 181, 232 (1985) (White, J., concurring) ("One who takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances is properly viewed as engaging in the practice of a profession.").

Ms. Chiles treats her patients in counseling sessions where she provides talk therapy. And the MCTL applies to mental health professionals while practicing their profession—which is treating patients.

### 2

That the MCTL is a law regulating the conduct of mental health professionals is only part of the inquiry. We still must consider whether the MCTL "incidentally involves speech," as the district court determined, or if the law regulates "speech as speech," as Ms. Chiles claims. *NIFLA*, 585 U.S. at 768, 770. "The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours." *Cohen* v. *California*, 403 U.S. 15, 24 (1971). We admit it may not always be easy to "locate the point where regulation of a profession leaves off and prohibitions on speech begin." *Lowe*, 472 U.S. at 232; *see also NIFLA*, 585 U.S. at 769 ("While drawing the

line between speech and conduct can be difficult, this Court's precedents have long drawn it."). But here, the boundaries are precisely drawn and readily navigable.

As the statutory text makes plain, the MCTL regulates the provision of a therapeutic modality—carried out through use of verbal language—by a licensed practitioner authorized by Colorado to care for patients. In this way, the MCTL is unlike the notice requirement in *NIFLA*, which the Supreme Court found regulated "speech as speech." *NIFLA*, 585 U.S. at 770. Recall, the notice requirement in *NIFLA* applied in a blanket fashion to covered facilities providing pregnancy-related services. *Id*. at 763. The required notice was "not tied to a [medical] procedure at all" and "applie[d] to all interactions between a covered facility and its clients, regardless of whether a medical procedure [wa]s ever sought, offered, or performed." *Id*. at 770. Here, by contrast, the MCTL prohibits a particular mental health treatment provided by a healthcare professional to her minor patients.

The MCTL does not regulate expression. It is the practice of conversion therapy—not the discussion of the subject by the mental health provider—that is a "[p]rohibited activit[y]" under the MCTL.[28] *See* Colo.

---

[28] According to the dissent, our holding today means "any speech within th[e] field [of professional counseling] can be regulated, without the usual protection of speech under the First Amendment, as incidental to that

Rev. Stat. § 12-245-224. The MCTL rests on the very principle rightfully urged by the dissent: the government cannot restrict any speech uttered by professionals simply by relabeling it conduct.

Ms. Chiles may, in full compliance with the MCTL, share with her minor clients her own views on conversion therapy, sexual orientation, and gender identity. She may exercise her First Amendment right to criticize Colorado for restricting her ability to administer conversion therapy. She may refer her minor clients to service providers outside of the regulatory ambit who can legally engage in efforts to change a client's sexual orientation or gender identity. *See* Colo. Rev. Stat. § 12-245-217(1) (exempting "[a] person engaged in the practice of religious ministry" from complying with the Mental Health Practice Act). And once a minor client reaches the age of majority, Ms. Chiles may provide conversion therapy to that client. The only conduct prohibited is providing what the dissent agrees is a treatment to minor clients. *See* Dissent at 15.

---

conduct." Dissent at 5. And the dissent insists deleterious consequences are sure to follow. *See, e.g.*, Dissent at 6 (asserting the "government could simply enact legislation prohibiting obstruction of the work of the agency and then penalize criticism of the agency by a member of the public as incidental to preventing obstruction"), 12 ("[A]ll the government needs to do to regulate speech without worrying about the First Amendment is put it within a category . . . that includes conduct and declare that any regulation of speech within the category is merely incidental to regulating the conduct."). Neither is true, as our analysis confirms.

*Conant* v. *Walters*, a case cited by Ms. Chiles, is instructive by contrast. *See* Opening Br. at 20–21 (citing 309 F.3d 629 (9th Cir. 2002), *cert. denied*, 540 U.S. 946 (2003)). There, a federal policy prohibited doctors from "*recommending* or prescribing" medical marijuana to patients. *Conant*, 309 F.3d at 632 (emphasis added). The Ninth Circuit held the policy did not survive First Amendment scrutiny. *Id.* at 639. Crucial to the Ninth Circuit's reasoning was that even the "recommendation" of marijuana to a patient was prohibited by the policy, chilling the exercise of a doctor's "right to explain the medical benefits of marijuana to patients." *Id.* at 638. Here, as Defendants explain, "a mental health professional like Ms. Chiles is free to tell any minor client that conversion therapy may serve their goals and refer the client to a religious minister who can provide that service." Def's. Resp. Br. at 46. The MCTL permits mental health professionals "to have that conversation with their minor clients" but prohibits them from providing the conversion therapy treatment itself to minors. Def's. Resp. Br. at 46. As the district court put it, "[a]ny speech affected by the [MCTL] is incidental to the professional conduct it regulates." App. at 75–76. That is correct.

Our conclusion is fully consistent with *Casey*, the sole decision the Supreme Court used as an example of a regulation within *NIFLA*'s second context. *See NIFLA*, 585 U.S. at 769–70. The informed consent requirement in *Casey* required a physician to inform a patient seeking an abortion "of

the nature of the procedure, the health risks of the abortion and of childbirth, and the probable gestational age of the unborn child." *Casey*, 505 U.S. at 881 (internal quotation marks omitted). "To be sure," the joint opinion acknowledged, "the physician's First Amendment rights not to speak [were] implicated" by the informed consent law. *Id.* at 884. However, the medical professional's speech was implicated "only as part of the practice of medicine," which is, of course, "subject to reasonable licensing and regulation by the State." *Id.* Like the law in *Casey*, the MCTL implicates mental health professionals' speech only as part of their practice of mental health treatment. Under *NIFLA*, this is precisely the type of regulation that "regulate[s] professional conduct . . . incidentally involv[ing] speech." 585 U.S. at 768; *see also Del Castillo*, 26 F.4th at 1226 (acknowledging nutritional counseling "involves some speech," but finding the state's regulation on nutritional counseling by dieticians involves speech only as "an incidental part of regulating the profession's conduct").

"The power of government to regulate the professions is not lost whenever the practice of a profession entails speech."[29] *Lowe*, 472 U.S.

---

[29] Of course, the tradition of state regulation of the professions is not limited to the medical profession. As Amici Constitutional & First Amendment Scholars point out, for instance, the Supreme Court has upheld several regulations of the legal profession, even though those regulations involve lawyers' speech. Constitutional & First Amendment Scholars

at 228 (White, J., concurring). Rather, "it has never been deemed an abridgement of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney* v. *Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). The MCTL incidentally involves speech because an aspect of the counseling conduct, by its nature, necessarily involves speech. By regulating which treatments Ms. Chiles may perform in her role as a licensed professional counselor, Colorado is not restricting Ms. Chiles's freedom of expression. In other words, Ms. Chiles's First Amendment right to freedom of speech is implicated under the MCTL, but it is not abridged.

**3**

Ms. Chiles makes several contrary arguments, but none is availing.

---

Amicus Br. at 11–12; *see, e.g.*, *Sheppard* v. *Maxwell*, 384 U.S. 333, 363 (1966) (holding lawyers' communications to the press that "affect[] the fairness of a criminal trial [are] not only subject to regulation, but [are] highly censurable and worthy of disciplinary measures"); *Gentile* v. *State Bar of Nev.*, 501 U.S. 1030, 1072, 1075 (1991) (holding a lawyer's communications "could be limited" where the lawyer's speech presents a "substantial likelihood of material prejudice" to a pending case); *Ohralik*, 436 U.S. at 457 (holding "[i]n-person solicitation by a lawyer of remunerative employment is a business transaction in which speech is an essential but subordinate component" and is subject to a "lower[]" level of judicial scrutiny).

*First*, Ms. Chiles seeks distance from *Casey*. The informed consent law in *Casey* was tied to an abortion procedure, Ms. Chiles points out. And, she reasons, abortion "is a concrete and invasive medical procedure," while counseling "involves only words and no 'scalpel,'" so "Colorado's invocation of *Casey* is inapposite." Pl.'s Reply Br. at 22 (quoting *Otto*, 981 F.3d at 865)). We cannot agree.

For one thing, nothing in *Casey* suggests the nature of the medical treatment was dispositive of the First Amendment question. *See Casey*, 505 U.S. at 884 ("[A] requirement that a doctor give a woman certain information as part of obtaining her consent to an abortion is, for constitutional purposes, no different from a requirement that a doctor give certain specific information about *any* medical procedure." (emphasis added)). Nor does *NIFLA*. *See* 585 U.S. at 770 (emphasizing *Casey* "explained that the law regulated speech only 'as part of the *practice* of medicine, subject to reasonable licensing and regulation by the State'" (quoting *Casey*, 505 U.S. at 884)). We decline Ms. Chiles's invitation to read a "concrete and invasive medical procedure" standard into the *NIFLA* analysis where none exists. *See* Pl.'s Reply Br. at 22.

Moreover, endorsing Ms. Chiles's effort to distinguish *Casey* would require us to conclude—erroneously—that mental health care is not really health care and that talk therapy is not really medical treatment. We will

52

not engage in such misguided thinking, which minimizes the mental health profession, distorts reality, and ignores the record in this case. Mental health treatment can carry long-lasting, life-altering consequences for patients.[30] Talk therapy is no less a medical treatment than the procedures described in *Casey* simply because it is "implemented through speech rather than through scalpel." *Tingley*, 47 F.4th at 1064. And, "[t]he difference between skilled and inept talk therapy—no less than that between deft and botched surgery—can, in some cases, mean the difference between life and death." *Otto*, 41 F.4th at 1292 (Rosenbaum, J., dissenting). The allegations in Ms. Chiles's verified complaint—and indeed, Ms. Chiles's career as a licensed, professional counselor—plainly proceed from that very premise.

Finally, a contrary conclusion would undermine the state's ability to require its mental health professionals who engage in talk therapy to conform to the "generally accepted standards of the profession[]." Colo. Rev.

---

[30] *See, e.g.*, APA Amicus Br. at 15–16 (explaining "the reported negative social and emotional consequences" of conversion therapy include "anger, anxiety, confusion, depression, grief, guilt, hopelessness, deteriorated relationships with family, loss of social support, loss of faith, poor self-image, social isolation, intimacy difficulties, intrusive imagery, suicidal ideation, self-hatred, sexual dysfunction[,] . . . . an increase in substance abuse, . . . . [and] suicide attempt[s]"); The Trevor Project Amicus Br. at 9–10 ("[E]xposure to conversion therapy is a significant risk factor for suicidality."); Twenty States Amicus Br. at 5 ("[N]on-aversive, non-physical conversion therapy . . . can cause serious harms including emotional trauma, depression, anxiety, suicidality, and self-hatred.").

Stat § 12-245-224(1)(g)(I). It would effectively "immuniz[e] talk therapy from regulation," including talk therapy that falls below the professional standard of care. Twenty States Amicus Br. at 11, 27; *see also* One Colorado Amicus Br. at 15–16. Adopting Ms. Chiles's position could insulate swaths of professional conduct by therapists from regulation, such as Colorado's prohibitions on administering "demonstrably unnecessary" treatments without clinical justification and "perform[ing] services outside of the [provider's] area of training, expertise, or competence." Colo. Stat. Ann. § 12-245-224(1)(h), (t)(II). Such an outcome is irreconcilable with the well-settled principle that the medical profession "is obviously one of those vocations where the power of the state may be exerted to see that only properly qualified persons shall undertake its responsible and difficult duties." *Watson*, 218 U.S. at 176; *see also Lambert* v. *Yellowley*, 272 U.S. 581, 596 (1926) ("[T]here is no right to practice medicine which is not subordinate to the police power of the States.").[31]

---

[31] For these same reasons, we likewise reject Ms. Chiles's identical argument about *EMW Women's Surgical Center, P.S.C.* v. *Beshear*, 920 F.3d 421 (6th Cir. 2019). That case, like *Casey*, involved a challenge to an informed consent law applicable to doctors prior to performing an abortion. *Id.* at 424. The law directed a doctor to "display the ultrasound images for the patient; and explain, in the doctor's own words, what is being depicted by the images." *Id.* "Failure to comply with these requirements [could] result in the doctor being fined and referred to Kentucky's medical-licensing board." *Id.* The Sixth Circuit concluded the law was a "regulation of

*Second,* Ms. Chiles relies on a number of cases to support reversal, but none advances her cause or meaningfully aids our analysis. Ms. Chiles cites *Holder* v. *Humanitarian Law Project*, 561 U.S. 1 (2010) for the proposition that laws appearing to regulate conduct may actually constitute speech regulations subject to strict scrutiny. *See* Opening Br. at 17 (citing *Holder*, 561 U.S. at 28). In *Holder*, the Supreme Court considered a free speech challenge to a law prohibiting materially supporting organizations identified as engaging in terrorist activity. *Holder*, 561 U.S. at 7–8. "The law here may be described as directed at conduct," the Supreme Court explained. *Id.* at 28. But "as applied to plaintiffs," the law "regulates speech." *Id.* at 27–28. Consequently, the law must be subject to a "more demanding standard" of scrutiny. *Id.*

Ms. Chiles contends *Holder* is the decisional law that resolves this appeal. So does the dissent. They insist here, as in *Holder*, what "trigger[s] coverage under the statute consists of communicating a message." *See*

---

'professional conduct . . . that incidentally involves speech" within the second *NIFLA* context and was therefore "not subject to heightened scrutiny." *Id.* at 426, 443 (quoting *NIFLA*, 585 U.S. at 768). Once again, Ms. Chiles contends the MCTL is distinguishable from the informed consent requirement in *EMW* because the latter regulated "performing an abortion," which is "separately identifiable conduct . . . involving a concrete and invasive medical procedure." Opening Br. at 27 (citations omitted). Because we reject Ms. Chiles's wholly unsupported distinction between talk-based mental health treatment and so-called "invasive" medical procedures, her attempt to distinguish *EMW* from the instant case is unavailing.

Dissent at 14 (quoting *Holder*, 561 U.S. at 28); Reply Br. at 12 (same). But the conduct triggering coverage under the MCTL—administering conversion therapy to minors—is not communicating a message but practicing a "treatment . . . that attempts or purports to change an individual's sexual orientation or gender identity." Colo. Rev. Stat. § 12-245-202(3.5)(a); *see also* Colo. Rev. Stat. § 12-245-224(1)(t)(V). As we have explained, Ms. Chiles may communicate whatever message she likes about any subject without triggering coverage under the statute. This difference alone is enough to distinguish the MCTL from the statute in *Holder*.

Also, as Defendants persuasively point out, *Holder*—and the other similar cases Ms. Chiles cites—are not instructive because they do not even deal with regulations of professional conduct that incidentally involve speech.[32] *See* Opening Br. at 17–18, 21; Pl.'s 28(j) Letter at 1 (citing cases);

---

[32] We have already determined the MCTL falls within one of the two contexts identified in *NIFLA*. *See NIFLA*, 585 U.S. at 768. Cases that fall outside of the two contexts do not resolve this appeal. The statute in *Holder* regulated professional conduct, but it did not regulate professional conduct that "*incidentally involve[d] speech.*" *See NIFLA*, 585 U.S. at 768, 771 (emphasis added) (acknowledging *Holder* involved "the First Amendment rights of professionals" but was "[o]utside of the two contexts" in which speech uttered by professionals has been afforded "less protection"). This distinction—misunderstood by the dissent—makes all the difference. The dissent's reliance on *Cohen* v. *California*, 403 U.S. 15 (1971) is unavailing for the same reason. *See Cohen*, 403 U.S. at 26 (holding "absent a . . .

*see, e.g.*, *303 Creative LLC*, 600 U.S. at 587 (finding non-discrimination law that would require business owner to provide wedding websites to same-sex couples regulates "pure speech"); *Animal Legal Def. Fund*, 9 F.4th at 1232 (concluding law prohibiting use of deception to gain access to animal facility regulates speech and was subject to strict scrutiny); *Telescope Media Grp.* v. *Lucero*, 936 F.3d 740, 750 (8th Cir. 2019) (finding law that would require videographers to make same-sex wedding videos regulates speech and is subject to strict scrutiny). These cases do not disturb our conclusion that the speech regulated by the MCTL falls within the second *NIFLA* context.[33]

Ms. Chiles also cites *Brokamp* v. *James*, 66 F.4th 374, 392 (2d Cir. 2023) in support of her contention that "laws that generally apply to counseling regulate not conduct but speech." Reply Br. at 20. *Brokamp* is at least more factually analogous. There, the Second Circuit considered a free speech challenge to state licensing requirements for mental health

---

particularized and compelling reason for its actions, the State may not, consistently with the First and Fourteenth Amendments, make the simple public display . . . of [a] single four-letter expletive [on a shirt] a criminal offense").

[33] Nor does Ms. Chiles advance any compelling arguments that the MCTL is more akin to the regulations in these cases than the regulations in cases such as *Casey* or *EMW*.

professionals who provide talk therapy.[34] *Brokamp*, 66 F.4th at 380–83. The Second Circuit "assume[d], without deciding," the plaintiff's counseling services "consist only of speech without any non-verbal conduct." *Id.* at 392. On this basis, it then appeared to assume, also without analysis, the regulation as applied to plaintiff could not fall within NIFLA's second context. *Id.* at 391–92. But *Brokamp* is not persuasive, particularly because our sister circuit never considered whether regulations on talk therapy can fall within the second *NIFLA* context.

We therefore reject Ms. Chiles's argument that the MCTL "suppresses [her] speech directly, not incidentally."[35] Opening Br. at 27. The MCTL

---

[34] The law at issue in *Brokamp*, unlike the MCTL, was a licensing requirement. *Brokamp* v. *James*, 66 F.4th 374, 382 (2d Cir. 2023). But that is not the feature of *Brokamp* that makes it unhelpful, as we explain. As an analytical matter, we see no reason to distinguish between cases involving licensing requirements (such as *Brokamp*) and cases involving regulations of already-licensed professionals (such as this case). The parties do not argue otherwise.

[35] Ms. Chiles continues to insist strict scrutiny applies because the MCTL is "content-based." *See* Opening Br. at 29 (citing *Animal Legal Def. Fund* v. *Kelly*, 9 F.4th 1219, 1228 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 2647 (2022)). The dissent echoes this point. *See* Dissent at 20 ("When the Court said [in *NIFLA*] that 'professional' speech is not excepted from 'the rule that content-based regulations of speech are subject to strict scrutiny,' the Justices undoubtedly had regulation of conversion therapy at the forefront of their minds as an application of that statement." (citing *NIFLA*, 585 U.S. at 767)). We disagree with Ms. Chiles and the dissent that the MCTL is a content-based regulation.

———————————

"Content-based regulations target speech based on its communicative content." *Animal Legal Def. Fund*, 9 F.4th at 1228 (quoting *NIFLA*, 585 U.S. at 766) (internal quotation marks omitted). "A law is content-based where it 'require[s] enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred.'" *Id.* (quoting *McCullen* v. *Coakley*, 573 U.S. 464, 479 (2014)) (internal quotation marks omitted); *see also Holder*, 561 U.S. at 27 (explaining the statute at issue "regulates speech on the basis of its content" because "Plaintiffs want to speak . . . and whether they may do so under [the statute] depends on what they say"). "As a general matter, [content-based] laws 'are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.'" *NIFLA*, 585 U.S. at 766 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

As we have explained, the MCTL does not target speech based on its communicative content. And contrary to the dissent's assertion, whether Ms. Chiles's conduct is prohibited by the MCTL does not turn on what she says but on the therapy she practices. The MCTL thus does not "require[] enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *Animal Legal Def. Fund*, 9 F.4th at 1228 (quoting *McCullen*, 573 U.S. at 479) (internal quotation marks omitted). Instead, whether Ms. Chiles's conduct complies with the statute depends on the intended effect of the therapeutic treatment being administered: the conduct is prohibited only if the therapy is intended to "change an individual's sexual orientation or gender identity." Colo. Rev. Stat. § 12-245-202(3.5)(a).

In any event, whether the MCTL is a content-based regulation is antecedent to the issue before us; it does not resolve it. In *NIFLA*, the Supreme Court began by observing the notice requirement was a content-based regulation of speech. *NIFLA*, 585 U.S. at 766 (finding the notice requirement "is a content-based regulation of speech" because it "compel[s] individuals to speak a particular message"). The Court nevertheless proceeded to consider whether the notice requirement fell within either of the two *NIFLA* contexts, which would subject it to a "lower level of scrutiny." *Id.* at 768. In other words, as the Supreme Court tells us, even a content-based regulation is subject to a lower level of scrutiny if it falls within one of the *NIFLA* contexts.

59

prohibits licensed professionals from engaging in a certain therapeutic treatment with their minor clients. The MCTL does not prohibit a mental health professional from discussing what conversion therapy is, what her views on conversion therapy are, or who can legally provide this treatment to her minor clients. It only bars a mental health professional from engaging in the practice herself. We thus conclude, as the district court did, the MCTL is a regulation of professional conduct incidentally involving speech. *NIFLA*, 585 U.S. at 770.

***

In reaching our holding, we join the Ninth Circuit in concluding a "law[] prohibiting licensed therapists from practicing conversion therapies on minors . . . . is a regulation on conduct that incidentally [involves] speech." *Tingley*, 47 F.4th at 1077, 1082–83 ("What licensed mental health providers do during their appointments with patients for compensation under the authority of a state license is treatment. . . . That some of the health providers falling under the sweep of [the law] use speech to treat [patients] is 'incidental.'"), *cert. denied*, 601 U.S. ----, 144 S. Ct. 33 (2023). We recognize the Eleventh Circuit, over dissent,[36] reached a different result

---

[36] In dissenting from the panel majority, Judge Martin reasoned the challenged ordinance was a content-based restriction subject to strict scrutiny. *Otto* v. *City of Boca Raton, Fla.*, 981 F.3d 854, 874 (11th Cir. 2020)

about a similar law, concluding such restrictions are "content-based regulations of speech and must satisfy strict scrutiny" because "[w]hat the government calls a 'medical procedure' consists—entirely—of words." *Otto*, 981 F.3d at 865, 867–68, *en banc reh'g denied*, 41 F.4th at 1271.[37] We are unpersuaded by this reasoning, as our discussion confirms.

---

(Martin, J., dissenting). In her view, the challenged ordinance withstood this heightened level of scrutiny, so plaintiffs were not entitled to a preliminary injunction. *Id.*

[37] Judge Jordan (joined by Judges Wilson, Rosenbaum, and Jill Pryor) and Judge Rosenbaum (joined by Judge Jill Pryor) authored dissents from the denial of rehearing en banc in *Otto*. We find Judge Rosenbaum's dissent particularly persuasive.

As Judge Rosenbaum explains, "no one goes to a doctor or therapist to engage in a political, social, or religious debate; they go to obtain treatment of their health condition." *Otto* v. *City of Boca Raton, Fla.*, 41 F.4th 1271, 1285 (11th Cir. 2022) (Rosenbaum, J., dissenting) (internal quotation marks and alterations omitted). "And it is antithetical to that purpose for licensed professionals to engage in a practice on their young clients that has repeatedly been shown to be associated with more than doubling the risk of death and has not been shown to be efficacious." *Id.* at 1319. "If a state could not revoke the license of (or otherwise discipline) a professional whose inept talk therapy contributed in a significant way to, for example, clients' decisions to kill themselves, the state's police power to protect public health and safety would be effectively worthless." *Id.* at 1294. We agree with Judge Rosenbaum, and it bears repeating:

> A single young person who tries to kill themselves is one too many; it cannot be the case that thousands of kids must be sacrificed in the name of the First Amendment when laws that prohibit such practices by licensed professionals still allow anyone—including licensed professionals—to say whatever they please about such techniques both within and outside the

## C

We now consider the MCTL under rational basis review.[38] Under this standard, "this court will uphold a government [action] if it is 'rationally related to a legitimate government purpose or end.'" *Teigen* v. *Renfrow*, 511 F.3d 1072, 1083 (10th Cir. 2007) (quoting *Christian Heritage Acad.* v. *Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1031–32 (10th Cir.

───────────────

professional-client relationship, as long as they do not practice the technique on their minor clients.

*Id.* at 1319.

[38] In *NIFLA*, the Supreme Court did not specify what "less protection" means, leaving open the question of what level of scrutiny—intermediate or rational basis—applies to laws falling within the two identified circumstances. *See* 585 U.S. at 768. Circuit courts are split on this issue. *Compare Cap. Assoc. Indus., Inc.* v. *Stein*, 922 F.3d 198, 208 (4th Cir. 2019) (explaining "[a]lthough the [Supreme] Court's cases have not been crystal clear about the appropriate standard of review," "[w]e think the correct reading of Supreme Court precedent . . . is that intermediate scrutiny should apply to regulations of conduct that incidentally impact speech"), *with Tingley* v. *Ferguson*, 47 F.4th 1055, 1077–78 (9th Cir. 2022) (applying rational basis review to law regulating conduct that incidentally involves speech); *see also Otto*, 981 F.3d at 861 (noting if challenged ordinances are not content-based restrictions of speech, "they receive the lighter touch of intermediate scrutiny or perhaps even rational basis review").

Here, the district court applied rational basis review. On appeal, Ms. Chiles argues only that the MCTL is subject to strict scrutiny. She does not argue, even in the alternative, that intermediate scrutiny applies if we conclude, as the district court did, the MCTL falls within the second *NIFLA* context. Therefore, given the procedural history of this case and the arguments before us on appeal, we do not disturb the district court's conclusion that rational basis review applies in the event the MCTL is subject to "less protection" under *NIFLA*. *See* 585 U.S. 768.

2007)). "[H]ealth and welfare laws [are] entitled to a 'strong presumption of validity'" and "must be sustained if there is a rational basis on which the legislature could have thought that [the law] would serve legitimate state interests." *Dobbs*, 597 U.S. at 301 (quoting *Heller* v. *Doe*, 509 U.S. 312, 219 (1993)).

The district court concluded the MCTL survives rational basis review. "Defendants have a legitimate and important state interest," the district court found, "in the prevention of 'harmful therapy known to increase suicidality in minors'" and in "regulating the efficacy and safety of . . . the practices of mental health professionals who counsel minor clients." App. at 77 (quoting Supp. App. at 76). Because the MCTL "protect[s] minors from ineffective and harmful therapeutic modalities," it "rationally serves these legitimate and important interests." App. at 78.

In her opening brief, Ms. Chiles does not challenge the district court's ruling that the law withstands rational basis review[39] and maintains only

---

[39] Ms. Chiles devotes one paragraph of her reply brief to the assertion the MCTL "cannot satisfy even rational basis review," though she does not provide the legal standard for this review or invoke plain error review. Reply Br. at 31–32. This cursory—and belated—assertion is insufficient under our precedent. *See Reedy* v. *Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011) ("[T]he general rule in this circuit is that a party waives issues and arguments raised for the first time in a reply brief." (quoting *M.D. Mark, Inc.* v. *Kerr–McGee Corp.,* 565 F.3d 753, 768 n.7 (10th Cir. 2009))); *United States* v. *Cooper*, 654 F.3d 1104, 1128 (10th Cir. 2011) ("It is well-settled

that the law cannot survive strict scrutiny.[40] But in advancing this argument, she provides several reasons the MCTL serves no legitimate governmental interest.[41] In enacting the MCTL, she contends, "Colorado's primary interest was suppressing a viewpoint with which the State disagrees"; Colorado does not "have a legitimate interest in suppressing ideas it considers harmful"; and Colorado does not have an interest in "stop[ping] clients from voluntarily seeking emotional changes that the clients believe will increase well-being solely because, in the government's eyes, such change is a bad decision." Opening Br. at 40–42 (alterations omitted). She also contends the MCTL rests on the "questionable

_____

that '[a]rguments inadequately briefed in the opening brief are waived.'" (quoting *Adler* v. *Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998)); *Bronson* v. *Swensen*, 500 F.3d 1099, 1105 ("[C]ursory statements, without supporting analysis and case law, fail to constitute the kind of briefing that is necessary to avoid application of the forfeiture doctrine."). We note, however, even if we did consider her one-paragraph argument, it would not alter our conclusion that the MCTL survives rational basis review.

[40] Because we apply rational basis review to the MCTL, we need not consider the parties' arguments regarding whether the MCTL survives strict scrutiny.

[41] Whether the MCTL serves a legitimate government interest is at the heart of the rational basis inquiry. *See Teigen* v. *Renfrow*, 511 F.3d 1072, 1083 (10th Cir. 2007). For that reason, we exercise our discretion to review Ms. Chiles's arguments that the MCTL "serves no legitimate interest" as part of our scrutiny analysis, notwithstanding her failure to advance any argument in her opening brief that the MCTL fails rational basis review.

assumption[]" that encouraging clients to change their sexual orientation or gender identity will harm them. Opening Br. at 43.

Defendants maintain Colorado has legitimate interests in maintaining the integrity of the mental health profession and protecting minors from harmful therapeutic practices. The MCTL is rationally related to these legitimate public interests, Defendants insist, because "[e]mpirical studies show that conversion therapy is both harmful and ineffective, especially for children," and "lacks clinical utility." Defs.' Resp. Br. at 50–51. By "restrict[ing] a specific therapeutic treatment that mental health professionals employ when working with children, who are most vulnerable to the harms that conversion therapy presents," the MCTL "reasonably relate[s] to the state's interest in preventing harmful therapy for minors." Defs.' Resp. Br. at 50, 52.

Colorado's interest in "safeguarding the physical and psychological well-being of a minor" is undoubtedly legitimate. *New York* v. *Ferber*, 458 U.S. 747, 756–57 (1982). As is the State's "legitimate interest . . . in regulating and maintaining the integrity of the mental-health profession." *Ferguson* v. *People*, 824 P.2d 803, 810 (Colo. 1992). The only remaining question is whether the MCTL is rationally related to one of these legitimate governmental interests.

The district court made several factual findings relevant to our inquiry. First, the district court found "conversion therapy is ineffective and harms minors who identify as gay, lesbian, bisexual, transgender, or gender non-conforming." App. at 78. Second, the court found the record "amply shows that the [MCTL] comports with the prevailing medical consensus regarding conversion therapy and sexual orientation change efforts." App. at 78 n.10. Third, "Colorado considered the body of medical evidence regarding conversion therapy and sexual orientation change efforts—and their harms," the district court found, "when passing the [MCTL] and made the . . . decision to protect minors from ineffective and harmful therapeutic modalities." App. at 78. Ms. Chiles has not contended on appeal these findings are clearly erroneous. *See Courthouse News Serv.*, 53 F.4th at 1254 (explaining a district court's factual findings in resolving a motion for a preliminary injunction are reviewed for clear error). As we explain, each factual finding is based on—and extensively supported by—the preliminary injunction record. *See* App. at 78 (citing the documentary evidence Defendants submitted with their opposition to Ms. Chiles's motion for a preliminary injunction).

First, the preliminary injunction record shows conversion therapy is harmful to minors. Dr. Judith Glassgold, a licensed psychologist and lecturer at Rutgers University, who "specialize[s] in psychotherapy with

lesbian, gay, bisexual, and transgender (LGBT) issues working with children, adolescents, and adults," described in her declaration several studies documenting the harms caused by conversion therapy, including harms to minors.[42] Supp. App. at 99. "Taken as a whole," she explained, "the scientific research and professional consensus is that conversion therapy is ineffective and poses the risk[] of harm." Supp. App. at 111–12. For example,

> Those who reported undergoing [conversion therapy] efforts were more than twice as likely to report having attempted suicide and having multiple suicide attempts. Those who reported exposure to [conversion therapy] had almost 2 times greater odds of seriously considering suicide, more than 2 times greater odds of having attempted suicide, and 2½ times greater odds of multiple suicide attempts in the previous year. Green and colleagues found that youth aged 13-25 who indicated that they had been exposed to [conversion therapy] also reported that in the past 12 months they had seriously considered suicide. The

---

[42] Dr. Glassgold has also "taught graduate and supervised graduate students at Rutgers in psychology and psychotherapy, especially in the area of sexual orientation and gender, as well as in the treatment of depression, anxiety, suicidality, and trauma." Supp. App. at 99. She has "authored a number of papers, presentations, and trainings related to the harmful effects of conversion therapy as well as appropriate approaches for those distressed by their sexual orientation or who face conflicts between their religious beliefs and sexual orientation." Supp. App. at 100. In addition, she served as the Chair of the APA Task Force on Appropriate Therapeutic Responses to Sexual Orientation and wrote and edited sections of the Task Force's *Appropriate Therapeutic Responses to Sexual Orientation* report. Dr. Glassgold also served as an APA staff coordinator for the expert consensus panel that provided the basis of SAMHSA's *Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth* report. Both reports are part of the preliminary injunction record.

researchers reported that even after controlling for other events, [conversion therapy] was the strongest predictor of multiple suicide attempts.

Supp. App. at 139.

The APA Task Force report summarizes "a systematic review of the peer-reviewed journal literature on sexual orientation change efforts (SOCE)," including verbal, non-aversive SOCE. Supp. App. at 176; *see also* Supp. App. at 133, 180, 219–20. The report concludes conversion therapy for minors "is a practice that is not supported by credible evidence[] and has been disavowed by behavioral health experts and associations." Supp. App. at 324. That is because "efforts to change sexual orientation are unlikely to be successful and involve some risk of harm, contrary to the claims of SOCE practitioners and advocates."[43] Supp. App. at 176.

The district court's conclusion that the MCTL "comports with the prevailing medical consensus regarding conversion therapy" is likewise grounded in the preliminary injunction record. App. at 78 n.10. Dr. Glassgold described conversion therapy as "based on outdated,

---

[43] The APA Task Force reported, as the dissent acknowledges, "studies . . . indicate that attempts to change sexual orientation may cause or exacerbate distress and poor mental health in some individuals, including depression and suicidal thoughts." Dissent at 32 (quoting Supp. App. at 219). In our view, the APA Task Force's conclusion supports the district court's finding that conversion therapy is harmful to minors.

unscientific beliefs and false stereotypes" that "have no basis in science and have been thoroughly discredited through decades of scientific research." Supp. App. at 121. Similarly, SAMHSA reported "none of the existing research supports the premise that mental or behavioral health interventions can alter gender identity or sexual orientation" in minors and any such attempts "should not be part of behavioral health treatment." Supp. App. at 318. And these conclusions, as SAMHSA explained, were based on "consensus statements developed by experts in the field." Supp. App. at 318.

As we already discussed, the district court was aware of the MCTL's legislative history, included in the preliminary injunction record, and found Colorado considered the body of medical evidence on conversion therapy when passing the MCTL. This legislative history contains a statement from one of the sponsors of the bill, explaining,

> This is simply about making sure that licensed practitioners in the state of Colorado are not offering a practice known as conversion therapy to young people under the age of 18. The reason is because all of the prevailing science and modern medicine tells us that not only does this practice not work, but it is not considered therapy in . . . the mainstream sense of what therapy is. In fact there are many reasons to believe that it does the opposite and it actually harms young people.

Supp. App. at 86 (citation omitted). Ms. Chiles has not disputed this legislative history or its relevance to our analysis. *See U.S. Dep't of Agric.*

69

v. *Moreno*, 413 U.S. 528, 534 (1973) (considering legislative history in determining whether a challenged government action rationally furthers a legitimate governmental interest).

Under these circumstances, we cannot say it was clear error for the district court to conclude conversion therapy is ineffective and harmful to minors who identify as gay, lesbian, bisexual, transgender, or gender non-conforming, the MCTL comports with prevailing medical consensus regarding conversion therapy, and the Colorado legislature considered this evidence when enacting the MCTL.[44]

---

[44] Amicus APA also explains conversion therapy is a "dangerous, discredited practice[] . . . . that no longer aligns with [the perspective] of mainstream mental health professionals." APA Amicus Br. at 4. According to the APA, "[m]inors who have been subjected to [conversion therapy] report more suicide attempts than those who have not," and "minors are especially vulnerable to the negative effects" of conversion therapy when they are exposed to it at a young age. APA Amicus Br. at 20. Similarly, a 2019 report from Amicus the Trevor Project revealed "[f]orty-two percent of LGBTQ youth who underwent conversion therapy reported a suicide attempt in the past year," which is "more than twice the rate of their LGBTQ peers who did not report undergoing conversion therapy." The Trevor Project Amicus Br. at 12. And these youth are "more than three times as likely to report multiple suicide attempts in the past year" than those who did not undergo conversion therapy. The Trevor Project Amicus Br. at 13. According to the Trevor Project, "conversion therapy is a source of deep anxiety" for many LGBTQ youth, and "[n]o available research supports the claim that conversion therapy efforts are beneficial to children, adolescents, or families." The Trevor Project Amicus Br. at 15, 19 (internal quotations and citations omitted).

Unsurprisingly, then, "[e]very mainstream medical and mental health organization"—including the U.S. Surgeon General, the American Academy

Ms. Chiles contends there is "[an]other side of the debate" on conversion therapy. Opening Br. at 41. At oral argument, Ms. Chiles conceded she did not present evidence with her preliminary injunction motion or put on expert testimony to contradict the studies proffered by Defendants. *See* Oral Arg. at 10:57–11:23. Rather, she relies on her verified complaint, which Ms. Chiles claims documents the "benefits" of the counseling services she wishes to provide. In her verified complaint, Ms. Chiles cited studies and online articles stating "[s]ame-sex attractions are more fluid than fixed, especially for adolescents" and "studies on SOCE do not provide scientific proof that they are more harmful than other forms

---

of Child and Adolescent Psychiatry, the American Academy of Pediatrics, and the World Health Organization—"has uniformly rejected conversion therapy as unsafe for minors and devoid of any scientific merit." The Trevor Project Amicus Br. at 26; *see also* Twenty States Amicus Br. at 6–7. And as Amici One Colorado and Twenty States contend, the MCTL "is based on the medical consensus that treatments that seek to change a minor's sexual orientation or gender identity are unnecessary, provide no therapeutic benefit, and are dangerous to the health and well-being of children and adolescents." One Colorado Amicus Br. at 2; Twenty States Amicus Br. at 2–3.

We acknowledge not all of these arguments and cited sources were before the district court, so we do not rely on them as dispositive to our legal analysis. *See United States* v. *Suggs*, 998 F.3d 1125, 1141 (10th Cir. 2021) ("[W]e are 'a court of review, not of first view.'" (quoting *Cutter* v. *Wilkinson*, 544 U.S. 709, 718 n.7 (2005)). We note only these arguments are consistent with the evidence before the district court and further support our conclusion here.

of therapy." App. at 34–35. Later, Defendants supplied additional documentary evidence in their opposition to Ms. Chiles's preliminary injunction motion. This evidence included "peer-reviewed journal literature on sexual orientation change efforts," Supp. App. at 176, and synthesized "the current state of scientific understanding of the development of sexual orientation and gender identity in children and adolescents as well as the professional consensus on clinical best practices with these populations," Supp. App. at 324. We perceive no clear error in the district court's decision to rely on Defendants' evidence about the efficacy and impact of conversion therapy, and Ms. Chiles has not attempted to argue otherwise.[45] *See United States* v. *Rico*, 3 F.4th 1236, 1239–40 (10th Cir. 2021) ("[W]e do not find clear error when ample evidence in the record supports the district court's factual finding.").[46]

---

[45] We respectfully disagree with the dissent that the existence of debate or changing professional attitudes over time regarding the efficacy and harmfulness of conversion therapy suggests there is a lack of scientific consensus on the matter. *See Tingley*, 47 F.4th at 1081 ("That expert medical organizations have changed their view over time, with additional research, is a good thing. Science, and the medical practices used to treat human conditions, evolve over time. But we still trust doctors, and the professional organizations representing them, to treat our ailments and update their recommendations on the governing standard of care.").

[46] Even assuming, without deciding, the studies cited by Ms. Chiles are correct, this would create two permissible views of the evidence. And we cannot say the district court clearly erred by crediting the evidence

Ms. Chiles insists the district court should have rejected the empirical studies Defendants offered, which, she claims, "focused on nonconsenting minors treated with physical, aversive techniques. . . . [that] have nothing in common with the counseling conversations that [Ms.] Chiles offers." Pl.'s Reply Br. at 30. We disagree. Defendants' evidence indicates the APA Task Force report was based on "studies of religiously-oriented SOCE (e.g., *verbal forms*, support groups, religious efforts)," and "[i]n . . . non-experimental studies, participants perceived that they had been harmed by SOCE." Supp. App. at 133 (emphasis added); *see also* Supp. App. at 219–20 (describing

_____

proffered by Defendants. *See Att'y Gen. of Okla.* v. *Tyson Foods, Inc.*, 565 F.3d 769, 777 n.2 (10th Cir. 2009) ("[T]he district court made a choice between two permissible views of the evidence, and it is not our role to label this choice clearly erroneous."); *see also Lambert* v. *Yellowley*, 272 U.S. 581, 589–91 (1926) (upholding the constitutionality of the National Prohibition Act's limit on the prescription of spirit liquor for medical treatment and explaining Congress considered evidence that "practicing physicians differ about the value of . . . liquors for medicinal purposes, but that the preponderating opinion is against their use for such purposes").

For this reason, we also find unhelpful the dissent's discussion of the record evidence. The dissent explains "[a] vote by a professional organization" is inadequate to justify Colorado banning the use of conversion therapy on minors. Dissent at 22. Of course, the record evidence about the harms of conversion therapy consisted of much more than a mere "vote" by a single professional organization. In any event, weighing the relative strengths and weaknesses of the evidence does not comport with our circumscribed appellate role when reviewing the district court's factual findings for clear error. *See Free the Nipple-Fort Collins*, 916 F.3d at 796–97.

reports of harm in recent studies of "nonaversive and recent approaches to SOCE"). Similarly, the SAMHSA report notes "[r]ecent research reports on religious and nonaversive efforts indicate that there are individuals who perceive they have been harmed [by these techniques]." Supp. App. at 220. Contrary to Ms. Chiles's assertions, the preliminary injunction record included studies involving non-aversive conversion therapy.[47]

We thus have no trouble concluding the MCTL is rationally related to Colorado's interest in protecting minor patients seeking mental health care from obtaining ineffective and harmful therapeutic modalities. *See Ferber*, 458 U.S. at 756–57. Likewise, we do not disturb the district court's finding

---

[47] The record amply describes the harms of conversion therapy based on studies involving non-aversive techniques and studies involving minors. *See* Supp. App. at 180 (describing perceived harms from "nonaversive efforts"), 249 (explaining the APA Task Force "reviewed the literature on SOCE in children and adolescents" in preparing the report), 256 ("SOCE that focus on negative representations of homosexuality and lack a theoretical or evidence base provide no documented benefits and can pose harm [to minors] through increasing sexual stigma and providing inaccurate information."). We acknowledge the dissent's point that the reports in the record do not describe studies confined *only* to talk-based conversion therapy administered only to minors. See Dissent at 34. But as counsel for Defendants explained at oral argument, "it would be unethical to engage in those sorts of studies because it would require patients to undergo a treatment that has been determined to be unsafe and ineffective." Oral Arg. at 14:58–15:58. The "dearth of available evidence" highlighted by the dissent "is precisely because it would be unethical for an institutional review board to approve a study that required patients to undergo this treatment." Oral Arg. at 16:00–16:15.

74

that the MCTL comports with prevailing medical consensus, so we conclude the MCTL is rationally related to Colorado's interest in ensuring its licensed mental health professionals comply with the prevailing standard of care in their field. *See Ferguson*, 824 P.2d at 810. The MCTL withstands rational basis review.[48]

Accordingly, the district court committed no abuse of discretion in concluding Ms. Chiles failed to show a likelihood of success on the merits of her First Amendment free speech claim.

## IV

We turn next to Ms. Chiles's free exercise claim. Ms. Chiles also challenges the district court's ruling that she failed to demonstrate a likelihood of success on the merits of this claim. Again, we discern no error.

## A

"The Free Exercise Clause of the First Amendment, applicable to the States under the Fourteenth Amendment, provides that 'Congress shall make no law . . . prohibiting the free exercise' of religion." *Fulton* v. *City of*

---

[48] "Under the majority's position," the dissent maintains, "a state law *prohibiting* therapy that affirm[s] a youth's homosexual orientation . . . very likely would [be] upheld as constitutional" under rational basis review. Dissent at 3. Not so. The record in this case documents the harms to minors caused by conversion therapy and the prevailing professional opinion that conversion therapy is unsafe and ineffective. The record envisioned by the dissent is not before us.

*Phila, Pa.*, 593 U.S. 522, 532 (2021) (quoting U.S. Const. amend. I). "[A] plaintiff may carry the burden of proving a free exercise violation . . . by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy* v. *Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022). If a plaintiff makes this showing, the challenged action violates the First Amendment free exercise clause "unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* "Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny." *Id.* at 526.

"[L]aws incidentally burdening religion," the Supreme Court has explained, "are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral *and* generally applicable." *Fulton*, 593 U.S. at 533 (emphasis added); *see also Church of Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520, 531 (1993) ("[O]ur cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."); *Fulton*, 593 U.S. at 543 (Barrett, J., concurring) ("[T]his Court [has] held that a neutral and generally applicable law typically does not

76

violate the Free Exercise Clause—no matter how severely that law burdens religious exercise."). Instead, "a law that is both neutral and generally applicable need only be rationally related to a legitimate governmental interest to survive a constitutional challenge." *Grace United Methodist Church* v. *City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006); *see also Taylor* v. *Roswell Indep. Sch. Dist.*, 713 F.3d 25, 52 (10th Cir. 2013) ("Government actions that stem from 'neutral' rules of 'general applicability' are subject to rational basis review, even if the application of the neutral rule 'has the incidental effect of burdening a particular religious practice.'" (citation omitted)).

As the party seeking a preliminary injunction, Ms. Chiles must show the MCTL is not neutral or generally applicable. *See Free the Nipple-Fort Collins*, 916 F.3d at 797 (describing moving party's burden to show a likelihood of success on the merits of a preliminary injunction motion); *see also Kennedy*, 597 U.S. at 525 (explaining "a plaintiff may carry the burden of proving a free exercise violation . . . by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable'"); *Tingley*, 47 F.4th at 1084–87 (concluding movant did not carry his preliminary injunction burden of showing the challenged law was not neutral and generally applicable). The district court concluded Ms. Chiles failed to meet this burden. Because

Ms. Chiles failed to carry this burden, the district court held the MCTL was subject to rational basis review. *See Fulton*, 593 U.S. at 533 (explaining "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable"). The district court—in considering Ms. Chiles's free speech challenge to the MCTL—had already concluded the law survives rational basis review. And the district court likewise held Ms. Chiles failed to show a likelihood of success on the merits of her free exercise claim.

On appeal, Ms. Chiles argues the MCTL is neither neutral nor generally applicable and must satisfy strict scrutiny. We disagree.

## 1

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices *because of their religious nature*." *Fulton*, 593 U.S. at 533 (emphasis added). "[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral . . . ." *Church of Lukumi Babalu Aye*, 508 U.S. at 533.

"To determine the object of a law, we must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face." *Id*. "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context." *Id*. Here, the plain text of the MCTL shows it is neutral on its face. Ms. Chiles

78

insists otherwise, contending the MCTL "is not neutral because it facially suppresses speech well known to be religious." Opening Br. at 34. But Ms. Chiles misunderstands the law. She argues conversion therapy is "primarily a religious practice." Opening Br. at 35 (internal quotation marks and alterations omitted). She does not contend the MCTL "*refer[s]* to a religious practice without a secular meaning discernible." *See Church of Lukumi Babalu Aye*, 508 U.S. at 533 (emphasis added). We therefore reject her argument that the MCTL lacks facial neutrality.

Of course, "[f]acial neutrality is not determinative." *Id.* at 534. Other factors "relevant to the assessment of governmental neutrality include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.'" *Masterpiece Cakeshop, Ltd.* v. *Colo. C.R. Comm'n*, 584 U.S. 617, 639 (2018) (quoting *Church of Lukumi Babalu Aye*, 508 U.S. at 540). None of these other considerations compels a different conclusion about the MCTL's neutrality.

Ms. Chiles contends the MCTL is not neutral because it is "well[] known that counseling from the viewpoint and with the goals prohibited by the [MCTL] is primarily a religious . . . practice." Opening Br. at 35 (internal quotation marks and citation omitted). The MCTL's restrictions thus fall

almost exclusively on religious counselors, she argues, and the law prevents clients with strong religious beliefs from seeking counsel that aligns with and respect their beliefs. According to Ms. Chiles, "[i]t is reasonable to infer [religious] animus from these facts." Opening Br. at 36.

We are not persuaded. Ms. Chiles has failed to show the MCTL "restricts [religious] practices *because of their religious nature*." *Fulton*, 593 U.S. at 533 (emphasis added); *see also Church of Lukumi Babalu Aye*, 508 U.S. at 532 ("[T]he protections of the Free Exercise Clause [apply] if the law at issue . . . regulates or prohibits conduct *because it is undertaken for religious reasons*." (emphasis added)). Nothing in the record suggests the MCTL's aim is to infringe or restrict practices because of their religious motivation. *See Masterpiece Cakeshop*, 584 U.S. at 639 (describing "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body" as "[f]actors relevant to the assessment of governmental neutrality" (citation omitted)). And recall, the district court made a factual finding that the MCTL targets therapeutic practices because of their *harmful effect on minors*, rather than their *religious* nature. App. at 82–83 (describing the preliminary injunction record as showing the MCTL "targets these therapeutic modalities because

conversion therapy is ineffective and has the potential to 'increase [minors']
isolation, self-hatred, internalized stigma, depression, anxiety, and
suicidality'" (quoting Supp. App. at 132–34)). Notably, Ms. Chiles does not
challenge this finding as clearly erroneous. *See e.g.*, Opening Br. at 42
(acknowledging "Colorado might believe that volitional change in sexuality
or gender identity is impossible or undesirable[,] [a]nd it might believe that
those who pursue volitional change are making a mistake that may harm
them"); Reply Br. at 31 (stating the Colorado legislature, in enacting the
MCTL, "inferred that . . . harms might result from [conversion therapy
administered through] mere words"). Nor does Ms. Chiles meaningfully
address the legislative history of the MCTL which focused, not on
restricting religious practice, but on preventing the harmful impact of
conversion therapy on minors.

Even assuming Ms. Chiles is correct that people with certain religious
beliefs are more likely to practice and seek conversion therapy, that does
not, without more, suggest the law was enacted with religion as its target.[49]

---

[49] Ms. Chiles also contends the MCTL cannot be neutral because it
contains an "illusory" exemption for religious ministers who administer
conversion therapy to minors. Opening Br. at 36. According to Ms. Chiles,
the MTCL's exemption for religious ministers does not exempt
conversations that would otherwise be prohibited by the MCTL, since the
MCTL regulates only individuals who are licensed, registered, or certified
by the state and thus does not apply to religious ministries at all. This

*See Church of Lukumi Babalu Aye*, 508 U.S. at 535 ("[A]dverse impact will not always lead to a finding of impermissible targeting. . . . [A] social harm may have been a legitimate concern of government for reasons quite apart from discrimination."). Ms. Chiles has made no contrary showing. *See Taylor*, 713 F.3d at 52 ("A rule is neutral 'so long as its object is something other than the infringement or restriction of religious practices.'" (quoting *Corder* v. *Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1233 (10th Cir. 2009))); *cf. Church of Lukumi Babalu Aye*, 508 U.S. at 541–42 (finding city ordinances banning animal sacrifice were enacted "to target animal sacrifice by Santeria worshippers because of its religious motivation" where evidence demonstrated "significant hostility exhibited by residents, members of the city council, and other city officials toward the Santeria religion and its practice of animal sacrifice"). On the record before us, we agree with the district court that the MCTL is a neutral law.

--------

argument is unavailing. For one thing, the religious ministry exemption applies to the entire Mental Health Practice Act. *See* Colo. Rev. Stat. § 12-245-217(1). And we agree with Defendants that the exemption is not illusory because it allows anyone, whether licensed with the state or not, to provide services akin to conversion therapy, so long as that is done through a religious ministry. Def's. Resp. Br. at 56–57. But again, even assuming Ms. Chiles is correct that the religious ministry exemption "has no operation," Opening Br. at 37, it does not follow that the MCTL has "as its object . . . the infringement or restriction of religious practices," *Grace United Methodist Church* v. *City of Cheyenne*, 451 F.3d 643, 649–50 (10th Cir. 2006).

**2**

We next consider whether Ms. Chiles has shown the MCTL lacks general applicability.

"[T]he rule that laws burdening religious practice must be of general applicability . . . is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Church of Lukumi Babalu Aye*, 508 U.S. at 542–43. It stems from "[t]he principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Id*. In *Fulton*, the Supreme Court identified two ways to determine whether a law lacks general applicability. First, a law lacks general applicability "if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions'" from the law's requirements. *Fulton*, 593 U.S. at 533 (quoting *Emp. Div., Dep't of Hum. Res. of Ore.* v. *Smith*, 494 U.S. 872, 884 (1990)). Second, a law is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id*. at 534.

Ms. Chiles insists the MCTL is not generally applicable because it "invite[s] enforcement authorities to pass judgment and make individualized exemptions for secular counselors of whose attitudes they approve." Opening Br. at 39. She explains the MCTL explicitly allows

therapy that facilitates an individual's "identity exploration and development." Colo. Rev. Stat. § 12-245-202(3.5). By allowing this therapy, she maintains, the MCTL effectively permits secular counselors to "change" their minor clients' identities from straight or cisgender to LGBT but prohibits religious counselors from "changing" their minor clients' identities from LGBT to straight or cisgender. *See* Opening Br. at 39. We are unpersuaded.

The framework advanced by Ms. Chiles does not describe "a mechanism for individualized exemptions" to the MCTL's prohibition on conversion therapy by mental health professionals. *Fulton*, 593 U.S. at 533 (quoting *Smith*, 494 U.S. at 884). As Defendants persuasively contend, the MCTL's provisions "apply equally to all licensed mental health professionals, regardless of their religious beliefs or affiliations," and "[t]here is no mechanism for the [regulatory] Boards 'to consider the particular reasons for a person's conduct' and determine that providing conversion therapy to children in a professional setting might be permissible." Def's. Resp. Br. at 60 (quoting *Fulton*, 593 U.S. at 533); *cf.* *Fulton*, 593 U.S. at 535–36 (provision creating a "formal system of entirely discretionary exceptions" to a contractual non-discrimination requirement "made available . . . at the 'sole discretion' of the [enforcing body] . . . . renders the contractual non-discrimination requirement not generally

applicable"). That the MCTL allows mental health professionals to administer treatments that provide "acceptance, support, and understanding for the facilitation of an individual's coping, social support, and identity exploration and development" does not mean the MCTL lacks general applicability. Colo. Rev. Stat. § 12-245-202(3.5).

Nor does Ms. Chiles advance any argument that the MCTL "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. Ms. Chiles has identified no secular activity permitted by Colorado that undermines the state's interest in protecting minors and maintaining the integrity of the mental health profession.

Therefore, the district court did not abuse its discretion in holding "Ms. Chiles has failed to meet her burden of showing the [MCTL] is not . . . generally applicable." App. at 86.

## B

Because, on the record before us, we find Ms. Chiles has failed to show the MCTL lacks neutrality and general applicability, the district court did not abuse its discretion in finding the MCTL is subject to rational basis review. *See Grace United Methodist Church*, 451 F.3d at 649. And for the reasons already explained in Part III.C, the MCTL survives rational basis review. Therefore, the district court did not abuse its discretion in holding

Ms. Chiles has failed to demonstrate a likelihood of success on the merits of her free speech and free exercise claims and by extension, in denying her motion for a preliminary injunction regarding these claims. *See Denver Homeless Out Loud*, 32 F.4th at 1277 ("An injunction can issue only if each [preliminary injunction] factor is established.").

## V

We **AFFIRM** the district court's denial of Ms. Chiles's motion for a preliminary injunction.

22-1445/23-1002, *Chiles v. Salazar*
**HARTZ,** J., dissenting.

## I.    PREVIEW

### A.

This case presents two distinct, but intertwined, fundamental and important questions. The first, which is the one addressed in the majority opinion, is when, if ever, speech is not speech under the First Amendment. The majority opinion holds, in essence, that speech by licensed professionals in the course of their professional practices is not speech, but conduct. Because, says the majority opinion, engaging in the practice of a profession is conduct (even if the practice consists exclusively of talking), any restriction on professional speech is just incidental to the regulation of conduct. In my view, and, more importantly, in the view of the United States Supreme Court, such wordplay poses a serious threat to free speech.

The second question, which the majority opinion did not need to address because of the way it resolved the first issue, is whether a court should treat as "science" the pronouncements of prestigious persons or organizations that are not supported by sound evidence. Science has enjoyed tremendous respect because of the great advances it has made since the beginning of the scientific revolution. But it has not made those advances by respecting "authority." To give just one illustration, although Albert Einstein is widely recognized as the greatest of physicists, virtually all theoretical physicists, then and now, have rejected his views of the nature of quantum mechanics. Only in a very weak moment would a true scientist say, "I am science." The progress of science has resulted

from the creative genius of scientists whose imaginations are then tested through the scientific method. Absent such rigorous testing, their views are no more than plausible theory. To be sure, some sciences are "softer" than others. For example, I doubt that any proposition in psychology can be tested with the rigor typical in physics. But for each field, there are appropriate standards for collecting and analyzing data and experience that are objective—that is, independent of the prestige of the persons expressing a view. Applying those objective standards, whether this application be called strict review, exacting review, rigorous review, or some other term, is an essential task of the judiciary when "science" is invoked to justify restrictions on free speech.

## B.

We are called on to answer these questions in the context of a most troubling issue. Many young people have suffered severe emotional distress as they struggle with resolving their sexual orientation or gender identity. In the course of that struggle they may receive a great deal of counseling, wanted or unwanted, from family, friends, clergy, social media, and otherwise. Counseling may support a transition from traditional norms or conforming to those norms.

In Colorado, and a number of other States, however, the law restricts the counseling that can be given to minors by one specific group of persons—ironically, those persons specially trained to provide psychological counseling. One would think that anyone concerned with relieving the emotional distress suffered by these young people would want to be open to a wide variety of counseling provided by trained professionals. Of course, when experience shows that a method of counseling fails to accomplish its

purpose, or even harms the patient or client, conscientious therapists should abandon the practice. And when the evidence of ineffectiveness or harm is strong enough, those who continue with the practice may properly be subject to sanction, from lawsuit to loss of license and perhaps more (just as any speech can be subject to a regulation that survives strict scrutiny). Ideology, however, cannot substitute for data and experience.

What if the shoe were on the other foot? It was not terribly long ago that the mental-health establishment declared homosexuality to be a mental disorder. A therapist who told a homosexual that he was psychologically sound and should take pride in his being different could presumably have been accused of professional malpractice. Under the majority's position, a state law *prohibiting* therapy that affirmed a youth's homosexual orientation would have faced only rational-basis review and very likely would have been upheld as constitutional. I suspect that many people are grateful that those who disagreed with the common wisdom were able to make their case and change minds. And, most relevant to the case before us, that those dissidents were able to support their views with evidence from their experience in providing therapy contrary to (condemned by?) the prevailing view. It may be comforting to think that such errors are behind us, that the march forward toward enlightenment is relentless, or at least that the elites—the decisionmakers and influential thinkers—inevitably move in that direction. But that has not been the course of history, even recent history.

We are fortunate to belong to a society in which the freedom of speech protected by the First Amendment allows us to speak our minds free of government interference, to do so in every context, absent powerful reasons supported by historical practice and

trustworthy study and experience. The issue in this case is whether to recognize an exception to freedom of speech when the leaders of national professional organizations declare certain speech to be dangerous and demand deference to their views by all members of their professions, regardless of the relevance or strength of their purported supporting evidence. As I understand controlling Supreme Court precedent, the answer is clearly *no*. And this case itself suggests the wisdom of that precedent. If that precedent is based on fear that the mandates of professional organizations are too likely to be dominated by ideology rather than evidence, this case can provide little comfort that the fear is unjustified. To be sure, the jury is out on whether the views of those organizations turn out to be correct. But there are serious questions about whether those views were based on persuasive, much less compelling, evidence that would support the restrictions on Chiles.

## C.

I have no doubt of the sincerity of the views expressed by the majority opinion. And the result reached by the majority—upholding the Colorado prohibition on Chiles—may ultimately be correct. But the path taken is quite troubling. And that path contradicts directly relevant Supreme Court authority.

The majority opinion makes several fundamental errors. First, it pays lip service to the proposition that the Supreme Court has never recognized a lesser First Amendment protection for "professional" speech. But it ignores the meaning of that statement, which is that speech cannot be treated differently just because it is uttered by a professional.

Second, in a related error, the majority opinion reads Supreme Court authority as stating that it has recognized two areas in which professional speech *is* treated differently from speech by others. But what the Court actually said is that while it has subjected regulation of speech by professionals to lesser scrutiny in two contexts, the fact that the speech was by professionals was irrelevant to the decision to apply lesser scrutiny.

Third, and most remarkable—because Supreme Court doctrine is so clearly to the contrary—the majority opinion treats speech as conduct. It does so by invoking the doctrine that in some circumstances regulation of conduct that incidentally burdens speech is subjected to lesser scrutiny. Under that doctrine, for example, a law may require real-estate brokers to pass a test showing knowledge of real-estate law, even though the law may incidentally restrict speech in that a person without a license cannot freely talk to people trying to sell or buy a home. But the majority opinion takes the incidental-burden doctrine way beyond its proper bounds.

In particular, a restriction on speech is not *incidental* to regulation of conduct when the restriction is imposed because of the expressive content of what is said. And that is the type of restriction imposed on Chiles. The majority opinion takes a field, licensed mental-health treatment, describes it as conduct, and then says that any speech within that field can be regulated, without the usual protection of speech under the First Amendment, as incidental to that conduct. But the "conduct" being regulated here is speech itself, and it is being regulated because of disapproval of its expressive content.

A court cannot say that just because a broadly applicable law that restricts speech also restricts conduct, the restriction on speech is merely incidental to the regulation of

conduct. The approach of the majority opinion would "give[] the States unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement. States cannot choose the protection that speech receives under the First Amendment, as that would give them a powerful tool to impose invidious discrimination of disfavored subjects." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*), 585 U.S. 755, 773 (2018) (internal quotation marks omitted). I daresay any speech that a government finds offensive could be placed within a field of conduct and, under the analysis of the majority opinion, regulated as "incidental" to regulation of that field of conduct. Take criticism of a government agency as an example. Viewed from the perspective of those running an agency, criticism will often be characterized as obstructing the work of the agency. If so, the government could simply enact legislation prohibiting obstruction of the work of the agency and then penalize criticism of the agency by a member of the public as incidental to preventing obstruction. What an opportunity for suppression of dissent this would offer. The majority opinion cannot escape the consequences of its reasoning by offering the baffling *ipse dixit* that the Colorado statute's ban on engaging in conversion talk therapy does not "restrict[] Ms. Chiles's freedom of expression." Maj. Op. at 51.

Fortunately, as will be discussed more fully later, Supreme Court doctrine already bars such efforts. Decades ago, the Court considered a prosecution for disturbing the peace. *See Cohen v. California*, 403 U.S. 15 (1971). Disturbing the peace is a legitimate crime. What the defendant did satisfied all the elements of the crime. But what he did was speech (strictly speaking, expressive conduct); he wore a shirt bearing an expletive. The Court voided the conviction under the First Amendment. More recently, some

organizations and lawyers who wished to provide expert legal advice to certain terrorist groups sought to enjoin enforcement of a criminal statute prohibiting the provision of material support, including expert advice or assistance, to terrorists. *See Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010). Again, what they wished to do satisfied the requirements of the criminal statute. Under the reasoning of the majority opinion in this case, the lawyers would not be entitled to protection under the First Amendment because they sought to engage in speech incidental to the conduct of aiding terrorists. But the Supreme Court held that giving legal advice to the terrorist organizations was speech protected by the First Amendment. The Court rejected their argument for an injunction against applying the statute to them only because the restriction on speech survived the requisite scrutiny.

The majority opinion would avoid the Supreme Court doctrine by pointing out that the Colorado statute regulates a profession. But how is that relevant when the Supreme Court has declared that the First Amendment protection of speech does not care whether the speech was made by a professional? Yes, a regulation of (professional) conduct need not be subject to rigorous scrutiny under the First Amendment even though the regulation may *incidentally* regulate speech (*e.g.*, a law may deny a person a license to practice a profession if the person does not satisfy certain character, training, and education requirements even though the denial of a license may limit the person's opportunity to speak). But there is no applicable Supreme Court authority permitting regulation to escape rigorous scrutiny when, as here, it is directed at speech because of its point of view.

I proceed to explain more fully how the Supreme Court has treated professional speech and then suggest how courts should assess the quality of evidence supporting the Colorado regulations.

## II.    TALK THERAPY IS SPEECH

The thrust of the Supreme Court's opinion in *NIFLA* was largely devoted to addressing the fact that "[s]ome Courts of Appeals have recognized 'professional speech' as a separate category of speech that is subject to different rules." 585 U.S. at 767. The Court may have thought that it disposed of the matter when it responded: "But this Court has not recognized 'professional speech' as a separate category of speech. Speech is not unprotected merely because it is uttered by 'professionals.'" *Id.*

The majority opinion suggests, however, that there is more to the story. It states that "[t]he Court acknowledged [in *NIFLA*] it has 'afforded less protection for professional speech in two circumstances—neither of which turned on the fact that professionals were speaking.' [585 U.S.] at 768." Maj. Op. at 32. But it ignores the Court's language after the dash. The Court's point was that the First Amendment *never* cares whether "professionals were speaking." 585 U.S. at 768. It acknowledged that there are two circumstances in which it has upheld a regulation of professional speech without subjecting that speech to strict scrutiny—the usual standard for determining whether a restriction on speech is compatible with the First Amendment. But in those two circumstances in which the speech (by professionals) has been "afforded less protection" than speech in general, the Court has followed the same rules as it would if the speech were by someone other than a professional. *Id.* In both circumstances, the reduced

Page 8

protection for professional speech had not "turned on the fact that professionals were speaking." *Id.* That is, in the two circumstances in which it has reduced the protection for speech made by professionals, it was applying general principles that recognized no distinction for professionals.

The Court made this point clear in discussing those two circumstances. The first type of regulation that was subjected to lesser scrutiny was "laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech.'" *Id.* But the same less-demanding standard of review applies to disclosure requirements for commercial speech by nonprofessionals. *See Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) ("[T]he State may at times prescribe what shall be orthodox in commercial advertising by requiring the dissemination of purely factual and uncontroversial information . . . ." (internal quotation marks omitted)); *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 15 n.12 (1986) ("The State, of course, has substantial leeway in determining appropriate information disclosure requirements for business corporations.").[1]

The second circumstance mentioned in *NIFLA* arises when governments "regulate professional conduct, even though that conduct incidentally involves speech." 585 U.S. at 768. The Court explained that "[t]he First Amendment does not prevent restrictions

---

[1] In any event, this circumstance is irrelevant to the case before us because the concern with the Colorado statute is that it suppresses speech, not that it compels speech. This distinction was the basis of the dissent in *NIFLA*, which argued that the disclosure requirement at issue did not impair the marketplace of ideas. *See* 585 U.S. at 794–95 (Breyer, J., dissenting).

directed at commerce or conduct from imposing incidental burdens on speech, and professionals are no exception to this rule." *Id.* at 769. To illustrate this point, the Court discussed the holding in *Planned Parenthood of Southeast Pennsylvania v. Casey*, 505 U.S. at 884 (joint opinion of O'Connor, Kennedy, and Souter, JJ.), which upheld a requirement that doctors "give a woman certain information as part of obtaining her consent to an abortion." *Id.* But this requirement does not treat physicians any differently from other persons. One who touches another is liable for battery, absent consent. *NIFLA* quotes the explanation by then-Judge Cardozo that "a surgeon who performs an operation without his patient's consent commits an assault." 585 U.S. at 770 (internal quotation marks omitted). The inference is inescapable (although it escapes the majority opinion) that the Supreme Court meant what it said when it declared that in those circumstances where professional speech has been provided diminished protection, the rationale for the reduced protection had nothing to do with the fact that the speaker was a professional.[2]

Accordingly, if talk therapy is to be afforded lesser First Amendment protection than speech in general, that must be because of free-speech doctrine that also applies to nonprofessional speech. The majority opinion identifies no such doctrine. The Supreme Court in *NIFLA* said that "neither California nor the Ninth Circuit has identified a

---

[2] The majority is simply mistaken when it claims that "nothing in *Casey* suggests the nature of the medical treatment was dispositive of the First Amendment question," Maj. Op. at 51, and then proceeds to extend the application of the *Casey* exception to treatment consisting solely of speech. Certainly as interpreted in *NIFLA*, *Casey* upheld the informed-consent requirement only for a physical intrusion on the body. Because informed consent is necessary only for physical acts, this example in *Casey* has no relevance to talk therapy.

persuasive reason for treating professional speech as a unique category that is exempt from ordinary First Amendment principles." 585 U.S. at 773. I recognize that the Court did "not foreclose the possibility that some such reason exists." *Id.* But one can say with confidence that categorizing some professional speech as "a form of treatment" is not such a reason. The Ninth Circuit had suggested precisely that reason, stating that when professional speech is "a form of treatment," regulation of such speech need only satisfy rational-basis review. *Nat'l Inst. of Fam. & Life Advocs. v. Harris*, 839 F.3d 823, 839 (9th Cir. 2016). Yet *NIFLA* declared that the Ninth Circuit's opinion had not "identified a persuasive reason for treating professional speech" differently. 585 U.S. at 773.

The majority attempts to sidestep this problem by using the device of defining the speech used by Chiles during therapy as "conduct." I understand the majority's argument that speech is conduct to be as follows: First, it says the treatment of mental-health disorders is conduct. After all, it reasons, the Colorado statute is part of a whole chapter regulating mental-health treatment. Then it contends that any regulation of speech used in such treatment is simply regulation "incidental" to the conduct of mental-health treatment. Although all that Chiles does in the alleged conversion therapy[3] is talk to her patient, that talk can be regulated without the usual First Amendment constraints, because

---

[3] I use the term *conversion therapy* throughout this dissent because that is the term used in the Colorado statute. A better term in the homosexuality context is probably *sexual orientation change efforts* (SOCE) because it avoids any implication that homosexuality is a disorder. *See* American Psychological Association, *APA Resolution on Sexual Orientation Change Efforts* (2021). In the transgender context the comparable term is *gender identity change efforts* (GICE). *See* American Psychological Association, *APA Resolution on Gender Identity Change Efforts* (2021).

it is really conduct. In the words of the majority opinion, Colorado's conversion therapy

ban does not regulate Chiles's speech but instead merely "regulates the provision of a

therapeutic modality—carried out through the use of verbal language—by a licensed

practitioner authorized by Colorado to care for patients." Maj. Op. at 46. The Colorado

statute, says the opinion, "does not regulate expression." *Id.* at 47.

In other words, according to the majority all the government needs to do to

regulate speech without worrying about the First Amendment is put it within a category

("a therapeutic modality") that includes conduct and declare that any regulation of speech

within the category is merely incidental to regulating the conduct. But to "classify some

communications as 'speech' and others as 'conduct' is to engage in nothing more than a

'labeling game.' . . . Simply put, speech is speech, and it must be analyzed as such for

purposes of the First Amendment." *King v. Governor of the State of N.J.*, 767 F.3d 216,

228–29 (3d Cir. 2014) (further internal quotation marks omitted), rejected on other

grounds by *NIFLA*, 585 U.S. at 767; *see Otto v. City of Boca Raton*, 981 F.3d 854, 865

(11th Cir. 2020) ("[The treatment provided by talk-based conversion therapists] is not just

carried out *in part* through speech: the treatment provided by [such therapists] *is entirely*

speech. If [talk-based conversion therapy] is conduct, the same could be said of teaching

or protesting—both are activities, after all. Debating? Also an activity. Book clubs? Same

answer." (internal quotation marks omitted).)

Fortunately, the Supreme Court has long rejected such a maneuver. More than 50

years ago a city prosecuted a young man for disturbing the peace by wearing a shirt with

an offensive expletive. The Court, in *Cohen v. California*, 403 U.S. 15 (1971), assumed

that wearing the shirt satisfied all the elements of disturbing the peace. But it reversed the conviction. As the Court put it, "The only 'conduct' which the State sought to punish is the fact of communication. Thus, we deal here with a conviction resting solely upon 'speech' . . . ." *Id.* at 18. The protection of the First Amendment was not diminished just because the speech satisfied all the elements of a criminal statute generally regulating conduct. It was not enough that the speech could be classified as coming within a "modality" (namely, disturbing the peace) that included conduct. As with *Cohen*, the regulation of the "conduct" in this case "rest[s] solely upon speech," that is, "the fact of communication." *Id.* (internal quotation marks omitted).

More recently, the Supreme Court considered legislation that makes it a crime to "knowingly provide material support or resources to a foreign terrorist organization." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 8 (2010) (brackets and internal quotation marks omitted). The plaintiffs challenged the law on free-speech grounds insofar as it prohibited providing training (such as training "on how to use humanitarian and international law to peacefully resolve disputes") and expert advice (such as teaching "how to petition for humanitarian relief before the United Nations") to terrorist organizations. *Id.* at 21–22. The government responded that "the only thing truly at issue in this litigation is conduct, not speech. [The statute] is directed at the fact of plaintiffs' interaction with the [terrorist groups], . . . and only incidentally burdens their expression." *Id.* at 26. The Court rejected this argument, declaring that the statute "regulates speech on the basis of its content. Plaintiffs want to speak to the [terrorist organizations], and whether they may do so under [the statute] depends on what they

say." *Id.* at 27. The government further argued that the statute "should nevertheless receive intermediate scrutiny because it generally functions as a regulation of conduct." *Id.* (emphasis removed). The Court was not persuaded, saying that the argument ran "headlong into a number of our precedents, most prominently *Cohen*, [which] also involved a generally applicable regulation of conduct, barring breaches of the peace." *Id.* at 27–28. Summarizing that decision, the Court said that "when Cohen was convicted for wearing a jacket bearing an epithet, . . . we recognized that the generally applicable law was directed at Cohen because of what his speech communicated—he violated the breach of the peace statute because of the offensive content of his particular message. We accordingly applied more rigorous scrutiny and reversed his conviction." *Id.* at 28. The Court then treated the material-support statute, as applied to the plaintiffs' wished-for conduct, as a regulation of speech subject to rigorous First Amendment review, saying that the case before it fell "into the same category" as *Cohen*: "The law here may be described as directed at conduct, as the law in *Cohen* was directed at breaches of the peace, but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message." *Id.*[4]

That same description applies here. Even if the regulation of mental-health providers can be described generally as directed at conduct, the conduct of Chiles "triggering coverage under the statute consists of communicating a message." *Id.* Chiles

---

[4] I should note, though, that the prohibition in *Holder* ultimately survived rigorous scrutiny, and that could also be the result of applying rigorous scrutiny in this case. *See Holder*, 561 U.S. at 28, 40.

wants to speak to her patients, and "whether [she] may do so . . . depends on what she says." *Id.* at 27. If her speech to a minor "provide[s] [a]cceptance, support, and understanding for the facilitation of an individual's coping, social support, and identity exploration and development," it is permitted. C.R.S. § 12-245-202(3.5)(b)(I). If, on the other hand, her speech "attempts or purports to change a [minor] individual's sexual orientation or gender identity," it is prohibited. *Id.* § 12-245-202(3.5)(a); C.R.S. § 12-245-224(t)(V) . In *Holder* the Supreme Court described the protected speech as follows: "Plaintiffs want to speak to the [terrorist organizations], and whether they may do so under [the material-support statute] depends on what they say." 561 U.S. at 27. What is the difference here?

The prohibition of Chiles's speech cannot escape rigorous First Amendment scrutiny simply because the prohibition may also apply to much conduct. The majority opinion's observation that "[t]alk therapy is a treatment," Maj. Op. at 45, is therefore true, but irrelevant to whether talk therapy is speech, and, indeed, speech entitled to the full protection of the First Amendment. The label "medical treatment" has no purchase in First Amendment doctrine. As the Supreme Court said in providing First Amendment protection to allegedly libelous speech:

> In deciding the question now, we are compelled by neither precedent nor policy to give any more weight to the epithet 'libel' than we have to other 'mere labels' of state law. Like insurrection, contempt, advocacy of unlawful acts, breach of the peace, obscenity, solicitation of legal business, and the various other formulae for the repression of expression that have been challenged in this Court, libel can claim no talismanic immunity from constitutional limitations. It must be measured by standards that satisfy the First Amendment.

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) (citations omitted). The term *medical treatment* should likewise be afforded no talismanic power.

What *Cohen* and *Holder* teach is that a regulation that bars speech because of what it communicates is a direct regulation of speech, not a regulation of conduct that incidentally affects speech. Failure to recognize this is the fundamental error in the majority opinion.

The majority opinion attempts to distinguish *Holder* on the ground that it does "not even deal with regulations of professional conduct that could incidentally involve speech." Maj. Op. at 56. Insofar as the majority opinion is saying that the regulations in *Holder* did not address professional conduct, it is factually incorrect. The statute in *Holder* clearly regulated professional conduct—conduct by the attorneys who wished to assist terrorists. *NIFLA* described the statute as, in part, regulating "organizations that provided specialized advice about international law." 585 U.S. at 771. Is the majority opinion distinguishing a statute that comprehensively regulates a profession from a statute that regulates only one aspect of professional conduct? Why should that affect the First Amendment analysis?

In any event, it is irrelevant whether *Holder* dealt with professional conduct. In full conflict with *NIFLA*, the majority opinion again appears to be saying that professional speech should be treated differently from other speech. Otherwise, why would we care whether *Holder* dealt with regulations of professional conduct? But as discussed above, *NIFLA* made clear that in the only two circumstances in which the Court has subjected regulation of professional speech to less scrutiny, its decisions did

not "turn[] on the fact that professionals were speaking." 585 U.S. at 768. That is, "professional speech" is subject to the same First Amendment protections as other speech. Therefore, even if the majority were correct that *Holder* did not involve professional conduct, its holding would still be relevant and applicable to the situation before us. And that holding tells us that the government may not, under the guise of regulating mere "conduct," regulate pure speech under some kind of lesser First Amendment standard.

As for the possibility that *Holder* could be distinguished on the ground that it did not address a regulation of "conduct that [could] incidentally involve speech," Maj. Op. at 56, the majority opinion is correct that *NIFLA* states that *Holder* was "'[o]utside of the two contexts' in which" professional speech has been less protected. *Id.* n.32 (quoting 585 U.S. at 771). But it draws exactly the wrong inference from that observation. Why did the Court say that the speech in *Holder* was outside of the second context? (The first context—commercial speech—clearly did not apply.) It was not because the regulation did not generally govern conduct; the regulation prohibited providing assistance to terrorist organizations. The reason *Holder* was outside of the second context is because it did not concern merely an effect on speech that was incidental to regulation of conduct (such as a licensing requirement that a licensee be of good character, which could incidentally prevent an applicant from becoming a licensed attorney and speaking with clients). There was nothing *incidental* about the regulation of speech in *Holder*. Just as was the case in *Cohen*, and is the case here, the regulation in *Holder* was *directed at speech because of what it communicated*, and such a regulation must be tested under

ordinary First Amendment scrutiny. *See Holder*, 561 U.S. at 28 ("The law here may be described as directed at conduct, as the law in *Cohen* was directed at breaches of the peace, but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message."). Indeed, *Holder* considered and rejected the very argument that the majority now embraces—namely, that the material-support statute should be subjected to lesser scrutiny because it regulated conduct, not speech. *See Holder*, 561 U.S. at 27 ("The Government is wrong that the only thing actually at issue in this litigation is conduct . . . Plaintiffs want to speak to the [terrorist organizations], and whether they may do so under [the material-support statute] depends on what they say."). The second circumstance is not at issue here for exactly the same reason it was not at issue in *Holder*. When *NIFLA* states that the regulation at issue in *Holder* was outside of the second context, it is declaring that a law that penalizes speech because of what it communicates is not a law that *incidentally* affects speech.

In a related argument that talk therapy is not speech, the majority opinion argues that Chiles's provision of talk therapy is not the same as speech a psychology major could have with a fellow student, because Chiles "is a licensed professional counselor, a position earned after years of advanced education and licensure." Maj. Op. at 44. My response repeats what I have already said. Is the majority stating that professional speech should be treated differently under the First Amendment from identical speech by a nonprofessional? That would fly in the face of what the Supreme Court has recently told us. "Speech is not unprotected merely because it is uttered by 'professionals.'" *NIFLA*, 585 U.S. at 767. And if mere licensing requirements for those providing "personalized

Page 18

services" were enough to transform protected speech into unprotected conduct, the government would have "unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement. States cannot choose the protection that speech receives under the First Amendment, as that would give them a powerful tool to impose invidious discrimination of disfavored subjects." *Id.* at 773 (internal quotation marks omitted). "State labels cannot be dispositive of the degree of First Amendment protection." *Id.* (brackets and internal quotation marks omitted).

The majority opinion can also find no succor in the nonprecedential concurring opinion of three Justices in *Lowe v. SEC*, 472 U.S. 181, 232 (1985). As I read that concurring opinion, the language cited by the majority opinion is saying only that the government can deny a person a license based on character or other qualifications, even though there is an incidental impact on the person's freedom to speak (since only licensed persons are permitted to counsel clients or patients in certain ways). Also, I should note that a century-old decision cited by the majority opinion, *Crane v. Johnson*, 242 U.S. 339 (1917), did not address the First Amendment and therefore has no bearing here.

That brings us back to *NIFLA*. Its declaration that professional speech should be treated the same as any other speech compels reversal here. I have already explained the various ways in which the majority opinion misreads language in *NIFLA*. What I now turn to are parts of that opinion that address the particular issue before us and indicate substantial skepticism with respect to the type of regulation imposed here.

To begin with, it is worth noting what lower-court opinions the Supreme Court was referencing when it said that "these courts except professional speech from the rule

that content-based regulations of speech are subject to strict scrutiny," 585 U.S. at 767, and then proceeded with its discussion explaining that "professional" speech must be treated the same as other speech. Two of the three opinions referenced were *King v. Governor of the State of N.J.*, 767 F.3d 216 (3d Cir. 2014) and *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014). In each the circuit court was addressing the propriety of a ban on conversion therapy through speech by licensed mental-health professionals. *See King*, 767 F.3d at 221; *Pickup*, 740 F.3d at 1221, 1229 n.5. The context was essentially identical to what we have here. When the Court said that "professional" speech is not excepted from "the rule that content-based regulations of speech are subject to strict scrutiny," 585 U.S. at 767, the Justices undoubtedly had regulation of conversion therapy at the forefront of their minds as an application of that statement. It would be passing strange for the Court to cite critically those particular cases if it thought the decisions were ultimately correct.

Further, the extended passage in *NIFLA* warning of the dangers of allowing the government to tell medical professionals what and what not to say to patients is completely inconsistent with the majority opinion's unqualified endorsement of precisely such government control. The passage goes as follows:

> The dangers associated with content-based regulations of speech are also present in the context of professional speech. As with other kinds of speech, regulating the content of professionals' speech poses the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information. Take medicine, for example. Doctors help patients make deeply personal decisions, and their candor is crucial. Throughout history, governments have manipulated the content of doctor-patient discourse to increase state power and suppress minorities:

> For example, during the Cultural Revolution, Chinese physicians were dispatched to the countryside to convince peasants to use contraception. In the 1930s, the Soviet government expedited completion of a construction project on the Siberian railroad by ordering doctors to both reject requests for medical leave from work and conceal this government order from their patients. In Nazi Germany, the Third Reich systematically violated the separation between state ideology and medical discourse. German physicians were taught that they owed a higher duty to the 'health of the Volk' than to the health of individual patients. Recently, Nicolae Ceausescu's strategy to increase the Romanian birth rate included prohibitions against giving advice to patients about the use of birth control devices and disseminating information about the use of condoms as a means of preventing the transmission of AIDS.

*Id.* at 771–72 (brackets, citations, and internal quotation marks omitted). Is it possible to read that paragraph and think that the Court would exempt from strict scrutiny a governmental order to mental-health professionals that they not provide conversion therapy that consists solely of talking with the patient? If, as the majority opinion argues, talk therapy is "medical treatment" the regulation of which constitutes merely regulation of professional conduct, Maj. Op. at 52, then so too is a doctor's visit involving the doctor's "giving advice to patients about the use of birth control devices" or providing "information about the use of condoms as a means of preventing the transmission of AIDS." *NIFLA*, 585 U.S. at 772.  And if, as the majority opinion says, talk therapy "can, in some cases, mean the difference between life and death," Maj. Op. at 53 (internal quotation marks omitted), so can good or bad advice as to birth control or the use of condoms to prevent AIDS. But *NIFLA* nonetheless considered the speech involved in providing such "medical treatment" to be protected by the First Amendment.

I therefore conclude that insofar as the Colorado statute prohibits conversion therapy that is limited to conversations with a patient or client, the prohibition must be subjected to close scrutiny. That should be the task of the district court in the first instance, but a few observations are in order.

### III.   HOW TO REVIEW THE EVIDENCE REGARDING TALK-ONLY CONVERSION THERAPY

One likely reason for the resistance to subjecting restrictions on speech by professionals to rigorous scrutiny is the view that such scrutiny is the kiss of death. After all, how often does discrimination on the basis of race survive strict scrutiny? But I would be more sanguine about the survivability of typical professional regulations. *See, e.g.*, *Holder*, 561 U.S. at 25–39 (upholding under rigorous scrutiny the challenged restrictions on providing legal advice to terrorists); *Williams-Yulee v. Florida Bar* 575 U.S. 433, 455 (2015) (restriction on personal solicitation of campaign contributions by judicial candidate survives strict scrutiny).  For example, surely there are compelling reasons to forbid attorneys from disclosing client confidences. And surely a lawyer should be subject to a malpractice claim for negligently misinforming a client about the statute-of-limitations deadline.

In the present context, I do not think it out of the question that the government can justify a ban on conversion therapy even if it is limited solely to speech. But there needs to be evidence, good evidence, to support that. A vote by a professional organization might be indicative that there is such evidence, but it is not a substitute. I say that partly because the briefs of appellees and several amici emphasize the official positions taken

by national professional organizations. But I have no idea of the process by which those positions were arrived at or who actually made the decisions, and it really does not matter unless they are based on persuasive evidence. Consensus is irrelevant to science. A book by one great physicist reports a comment by an even greater one that makes the point: "When a book was published entitled *100 Authors Against Einstein*, [Einstein] retorted, 'If I were wrong, then one would have been enough!'" Stephen Hawking, *A Brief History of Time* 193 (1996).

The reversal of the views of the American Psychiatric Association regarding whether homosexuality is a mental disorder is illustrative. The majority opinion suggests that the reversal is not an illustration of how professional associations can go wrong but, rather, an example of how we can trust professional expertise to develop along with research discoveries. *See* Maj. Op. at 72 n.45. In my view, however, the original error is simply an illustration of what happens when ideology prevails over the scientific approach. For example, one criticism of the declaration that homosexuality is a mental disorder was that the psychiatrists advocating that position had studied a nonrepresentative sample: they based their views on observations of their patients who were homosexual, not the general population of homosexuals. One would think that those who seek psychiatric help are more likely to have a mental disorder than others. In contrast, supporting the revised position of the APA were studies based on standardized, fairly objective tests for mental health (such as the MMPI) that indicated that "homosexual men and women were essentially similar to heterosexual men and women in adaptation and functioning." American Psychological Association, *Report of the*

Page 23

*American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation* (*Task Force Report*) 23 (2009).

The courts must exercise the utmost caution before endorsing government suppression of speech. The *NIFLA* Court warned that "when the government polices the content of professional speech, it can fail to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail. Professionals might have a host of good-faith disagreements, both with each other and with the government, on many topics in their respective fields." *NIFLA*, 585 U.S. at 772 (citation and internal quotation marks omitted). "The best test of truth is the power of the thought to get itself accepted in the competition of the market, and the people lose when the government is the one deciding which ideas should prevail." *Id.* (citation, brackets, and internal quotation marks omitted). Courts must be particularly wary that in a contentious and evolving field, the government and its supporters would like to bypass the marketplace of ideas and declare victory for their preferred ideas by fiat. The courts can play a vital role in preventing this country from having a Lysenko moment.

What, then, are the courts to do in fulfilling their responsibility to police the use of expert opinion in judicial proceedings?[5] One, is to be skeptical. Not every study

---

[5] The majority opinion would have the courts do very little. The district courts would engage in perfunctory review of studies endorsed by professional organizations, and the appellate courts would defer to the district courts. *See*, *e.g.*, Maj. Op. at 68 n.43 (adopting statement in Task Force Report not supported by any sound studies relevant to this case). Such an approach has bred dismay by true scientists at the conclusions reached in the courts in a variety of contexts. The Supreme Court attempted to provide more vigorous judicial oversight of expert testimony in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); and Federal Rule of Evidence 702 was modified in response. But

Page 24

published in a peer-reviewed journal can be relied on. Several investigators have

attempted to replicate experimental studies in the social behavioral sciences (which

include psychology) with varying success, suggesting an average reproducibility rate of

between 35% and 75%.[6] There may be a number of explanations, including random

variations and sloppy work. But shortcomings serious enough to warrant losing a

prestigious position are not outside the realm of possibility.[7] And improper research

techniques are apparently not uncommon. A 2011 study received survey responses from

more than 2,000 academic psychologists at major U.S. universities about whether they

had engaged in practices that the authors described as questionable research practices

(which did not include research misconduct—that is, fabrication, falsification, and

---

too many courts have maintained a laissez faire attitude, so Rule 702 was strengthened in the recent 2023 amendments. The approach of the majority opinion is an unfortunate step backwards.

[6] *See* Colin F. Camerer et al., *Evaluating the replicability of social science experiments in* Nature *and* Science *between 2010 and 2015*, 2 Nature Human Behavior 637, 642 (2018); *see also* Kelsey Piper, *Science has been in a "replication crisis" for a decade. Have we learned anything?*, Vox (Oct. 14, 2020), https://www.vox.com/future-perfect/21504366/science-replication-crisis-peer-review-statistics [https://perma.cc/3FYF-J968]; Alexander A. Aarts et al., *Estimating the reproducibility of psychological science*, 349 Science 943 (2015); Richard A. Klein et al., *Many Labs 2: Investigating Variation in Replicability Across Samples and Settings*, 1 Advances in Methods and Practices in Psychological Science 443 (2018).

[7] *See, e.g.*, Nicholas Wade, *Scientist Under Inquiry Resigns From Harvard*, N.Y. Times (July 20, 2011) (behavioral psychologist), https://www.nytimes.com/2011/07/21/science/21hauser.html [https://perma.cc/BN3C-W9LA]; Oliver Whang and Benjamin Mueller, *What to Know About the Stanford President's Resignation*, N.Y. Times (July 19, 2023), https://www.nytimes.com/2023/07/19/science/tessier-lavigne-resignation-research.html [https://perma.cc/6E8S-4F8S].

plagiarism); a majority reported that they had.[8] A more recent meta-analysis of such studies estimated that 12% of researchers had witnessed other researchers fabricate data, 10% had witnessed others falsify data, and 40% had witnessed other researchers engage in questionable research practices.[9] Moreover, one may question whether research that may go against the grain of prevailing opinion can get funding, much less be published. The questionable retraction of the publication of an against-the-grain study is reported in one recent article.[10] The plausibility of that report has been increased by the response of professional psychological associations in this country to a report by Dr. Hilary Cass commissioned by England's National Health Service based on a four-year review of research on gender treatment for youth. *See* Pamela Paul, *Why Is the U.S. Still Pretending We Know Gender-Affirming Care Works?*, N.Y. Times (July 12, 2024), https://www.nytimes.com/2024/07/12/opinion/gender-affirming-care-cass-review.html [https://perma.cc/YT8L-LYY4] (reporting that "in the United States, federal agencies and professional associations that have staunchly supported the gender-affirming care model [have] greeted the Cass Review with silence or utter disregard," and concluding that "the United States continues to put ideology ahead of science").

---

[8] S*ee* Leslie K. John et al., *Measuring the Prevalence of Questionable Research Practices With Incentives for Truth Telling*, 23 Psych. Sci. 524 (2012).
[9] *See* Yu Xie et al., *Prevalence of Research Misconduct and Questionable Research Practices: A Systematic Review and Meta-Analysis*, 27 Sci. and Eng'g Ethics (Jun. 2021).
[10] Colin Wright, *Anatomy of a Scientific Scandal*, City Journal (June 12, 2023), https://www.city-journal.org/article/anatomy-of-a-scientific-scandal [https://perma.cc/E9MD-324F].

I now turn to the Colorado statute. I begin with the ban on all treatment of minors with gender issues by licensed mental-health professionals except what is commonly known as gender-affirming care—that is, care supportive of changing gender. It is unclear whether Chiles engages in treatment of gender issues; but in any event a discussion of the debate on such treatment of minors may be helpful in assessing the prohibition on conversion therapy for those with sexual-orientation issues.

The Colorado statute prohibits any treatment of minors that attempts to change their gender identity. *See* C.R.S. § 12-245-202(3.5)(a); C.R.S. § 12-245-224(t)(V). The consensus view of organizations of mental-health professionals in this country is that only gender-affirming care (including the administration of drugs) should be provided to minors,[11] and that attempts to change a minor's intent to change gender identity are dangerous—significantly increasing suicidal tendencies and causing other psychological injuries.[12] The organizations insist that this view reflects the results of peer-reviewed studies.[13]

But outside this country there is substantial doubt about those studies. In the past few years there has been significant movement in Europe away from American orthodoxy. For example, medical authorities in Finland, Sweden, Denmark, and Norway

---

[11] *See* Paul, *supra* ("[A]ll the major professional medical organizations in the United States have officially embraced [the gender-affirming-care model] in their guidelines[.]").

[12] *See, e.g.*, American Psychological Association, *Resolution on Gender Identity Change Efforts* 3 (2021) (asserting that gender-identity change efforts "are associated with harmful social and emotional effects for many individuals, including but not limited to, the onset or increase of . . . suicidality.").

[13] *See, e.g.*, *id.* (citing studies).

have, purportedly based on experience in those countries, restricted medical treatment (as opposed to psychotherapy) of minors to enhance gender transition.[14] Most notably, the English National Health Service has now greatly restricted medical treatment of minors to assist in gender transition except as part of scientific studies to test the efficacy of such treatment.[15] This decision was based on the "largest review ever undertaken in the field of transgender health care."[16] Commissioned by England's National Health Service and led by Dr. Hilary Cass, former President of the Royal College of Paediatrics,[17] its findings cast serious doubt on the current state of youth transgender medicine. The report says that youth transgender medicine is "an area of remarkably weak evidence," and that "we have no good evidence on the long-term outcomes of interventions to manage gender-related distress." *Independent Review of Gender Identity Services for Children and Young People* (the Cass Review) 13 (April 2024). It noted that "[c]linicians who have spent many years working in gender clinics have drawn very different conclusions from their clinical experience about the best way to support young people with gender-related distress." *Id.* Among other things, the report said that "the evidence does not adequately support the claim that gender-affirming treatment reduces suicide risk." *Id.* at 187.

---

[14] *See* Azeen Ghorayshi, *Youth Gender Medications Limited in England, Part of Big Shift in Europe*, N.Y. Times (April 9, 2024), https://www.nytimes.com/2024/04/09/health/europe-transgender-youth-hormone-treatments.html[https://perma.cc/D68U-EWRK].

[15] *See id.*

[16] The Economist, *The Cass Review damns England's youth-gender services* (Apr. 10, 2024), https://www.economist.com/britain/2024/04/10/the-cass-review-damns-englands-youth-gender-services [https://perma.cc/WQK8-797R].

[17] *See id.*

Perhaps even more interesting for purposes of this case than the report itself has been the response of the mental-health professional associations in this country. As reported by a columnist for the New York Times, those organizations have expressed hostility to the Cass Review but without confronting any specific findings.[18] And one state association apparently even banned discussion of the Cass Review on its listserv.[19] These responses do not provide comfort that the organizations are motivated by science rather than ideology.

In that light, it is important to examine whether the evidence relating to conversion therapy directed at sexual preference is more settled than for that directed at gender identity. To begin with, the 2009 report of the American Psychological Association Task Force (the Task Force Report) examining conversion therapy is rather persuasive that much of the evidence that conversion therapy actually works to change sexual orientation is unreliable. The report recognizes that there had been studies reporting successes but, for the most part, they suffered from "serious methodological problems." *Task Force Report* at 2. As summarized in the Executive Summary of the Task Force Report: "Few

---

[18] *See* Paul, *supra* ("[I]n the United States, federal agencies and professional associations that have staunchly supported the gender-affirming care model [have] greeted the Cass Review with silence or utter disregard.").

[19] *See* Leor Sapir, *A Consensus No Longer*, City Journal (Aug. 12, 2024), https://www.city-journal.org/article/a-consensus-no-longer [https://perma.cc/D962-7GBH] (reporting that "the Pennsylvania Psychological Association, a branch of the American Psychological Association, forbade any mention of the Cass Review on its professional listserv"); Benjamin Ryan, *The Pennsylvania Psychological Association Forbids Its Members to Mention the Cass Review*, Reality's Last Stand (Jul. 19, 2024), https://www.realityslaststand.com/p/the-pennsylvania-psychological-association [https://perma.cc/SSP4-HWNT] (copying the email sent to members, which justifies the listserv ban because the discussion causes harm to some members).

studies . . . could be considered true experiments or quasi-experiments that would isolate and control the factors that might effect a change" *Id.* "Only one of these studies actually compared people who received a treatment with people who did not and could therefore rule out the possibility that other things, such as being motivated to change, were the true cause of any change the researchers observed in the study participants." *Id.* (citation omitted). In particular, the Task Force Report pointed out the flaws in studies in which people who had been exposed to conversion therapy "are asked to recall and report on their feelings, beliefs, and behaviors at an earlier age or time and are then asked to report on these same issues at present." *Id*. at 29. The report noted that "[a]n extensive body of research demonstrates the unreliability of retrospective" studies of this type. *Id.* It mentioned some examples of potential problems, including that retrospective study designs "are extremely vulnerable to response-shift biases resulting from recall distortion and degradation," since "[p]eople find it difficult to recall and report accurately on feelings, behaviors, and occurrences from long ago and, with the passage of time, will often distort the frequency, intensity, and salience of things they are asked to recall." *Id.* Also, "[i]ndividuals tend to want to present themselves in a favorable light. As a result, people have a natural tendency to report on their current selves as improved over their prior selves" and will "report change under circumstances in which they have been led to expect that change will occur, even if no change actually does occur." *Id.*

One chapter of the Task Force Report discusses the studies that it thought were worth examining regarding the efficacy of conversion therapy on homosexual persons

(usually men).[20] As for decreasing same-sex sexual behavior, the review studies reported

success rates ranging from 11% to 42% for conversion therapy. *See id.* at 38. The report

summarized that no effect had been shown in the only randomized control-group trial;

"[q]uasi-experimental results found that a minority of men reported reductions; and the

nonexperimental studies "found that study participants often reported reduced behavior

but also found that reductions . . . were not always sustained." *Id.* at 39. Regarding

decreasing same-sex sexual attraction, the report summarized that experimental studies

showed decreases for 34% of subjects or more, but none of the studies "compared

treatment outcomes to an untreated control group"; one quasi-experimental study

reported that 50% of participants reported reduced arousal after a year and others had

comparable results; and nonexperimental studies found "reductions in participants' self-

reported sexual attraction and physiological response under laboratory conditions"

ranging from 7% to 100%, with an average of 58%. *Id.* at 36–37. The studies reviewed by

the Task Force Report showed lesser success in increasing other-sex sexual attraction.

---

[20] One study discussed in the report was authored by Prof. Robert L. Spitzer of Columbia University, who played an important role in the decision of the American Psychiatric Association to end the categorization of homosexuality as a mental disorder. *See* John Bancroft et al., *Peer Commentaries on Spitzer*, 32 Archives of Sexual Behav. 419, 419 (2003). He interviewed 200 adult subjects who insisted that conversion therapy had worked for them. *See* Robert L. Spitzer, *Can Some Gay Men and Lesbians Change Their Sexual Orientation? 200 Participants Reporting a Change from Homosexual to Heterosexual Orientation*, 32 Archives of Sexual Behav. 403 (2003). The study was published in 2003. In 2012, however, Prof. Spitzer apologized for the study and retracted it, explaining that he had no way of knowing whether the reports by the subjects he spoke with were credible. *See* Robert L. Spitzer, *Spitzer Reassess His 2003 Study of Reparative Therapy of Homosexuality*, 41 Archives of Sexual Behav. 757 (2012). It is unclear why this explanation would not require retraction of all studies based on interviews or surveys.

The task force concluded: "The limited number of rigorous early studies and complete lack of rigorous recent prospective research on [conversion therapy] limits claims for the efficacy and safety of [conversion therapy] . . . . [A] small number of rigorous studies . . . [that] focus on the use of aversive treatments . . . show that enduring change to an individual's sexual orientation is uncommon and that a very small minority of people in these studies showed any credible evidence of reduced same-sex sexual attraction . . . Given the limited amount of methodologically sound research, we cannot draw a conclusion regarding whether recent forms of [conversion therapy] are or are not effective." *Id.* at 42–43.

> Regarding harm from conversion therapy, the Task Force Report summarized:

> We conclude that there is a dearth of scientifically sound research on the safety of [conversion therapy]. Early and recent research studies provide no clear indication of the prevalence of harmful outcomes among people who have undergone efforts to change their sexual orientation or the frequency of occurrence of harm because no study to date of adequate scientific rigor has been explicitly designed to do so. . . . However, studies from both periods indicate that attempts to change sexual orientation may cause or exacerbate distress and poor mental health in some individuals, including depression and suicidal thoughts. The lack of rigorous research on the safety of [conversion therapy] represents a serious concern. . . .

*Id.* at 42.

The above discussion of the Task Force Report demonstrates two things that are of considerable importance to this case and cases like it. First, the mental-health community recognizes objective standards for determining the efficacy and safety of psychological therapy. The task force carefully evaluated the reliability of nearly all the studies regarding conversion therapy up to that time, and found almost all of them wanting in

essential respects. I do not think that it would be an improper intrusion on that community for courts to require evidence satisfying those objective standards before deciding that the government can impose restrictions on the free speech of therapists in performing therapy.  Second, the record establishes that, at least at the time of the Task Force Report, there was insufficient objective evidence to determine the efficacy and danger of conversion therapy.

It is also worth noting two important omissions from the Task Force Report. First, there is no discussion of the proper way to evaluate whether a type of therapy should be described as malpractice. Because there were no good measures of effectiveness or harm, the task force had no occasion to weigh them against one another and determine whether conversion therapy should be prohibited. For instance, should a type of therapy be considered malpractice if the odds of success are only 15%, even if the only harm to the patient will be expenditure of time and money? *Cf., e.g.*, Nadine Koslowski et al., *Effectiveness of interventions for adults with mild to moderate intellectual disabilities and mental health problems: systematic review and meta-analysis*, 209 British J. Psychiatry 469, 469 (2016) (finding that therapeutic interventions for treating mental-health problems in intellectually disabled adults had "[n]o significant effect . . .  for the predefined outcome domains behavioural problems, depression, anxiety, quality of life and functioning" and that "[t]here is no compelling evidence supporting interventions aiming at improving mental health problems in people with mild to moderate intellectual disability"). Should therapy be banned for those with intellectual disabilities? How does

the mental-health community evaluate psychological therapy in assessing whether a

therapist has committed malpractice?

The second omission is the absence of any study (good or bad) that focuses on the

type of therapy at issue in this case: talk therapy for a minor provided by a licensed

mental-health professional. In fact, no study was limited to minors and no study was

limited to talk therapy. Thus, even if there is some good research on the efficacy and

harm of conversion therapy in some contexts, that research may be largely irrelevant to

this case. Perhaps there are good reasons to think that results for adults would apply to

minors, and that the results from talk therapy would be the same as for aversion therapy.

But the record does not contain any such reasons.

The Task Force Report is not the last word from the American Psychological

Association. In early 2021 it adopted a resolution on Sexual Orientation Change Efforts

(SOCE). *See* American Psychological Association, *APA Resolution on Sexual Orientation

Change Efforts* (*SOCE Resolution*) (2021). The resolution firmly opposed conversion

therapy. It referenced the Task Force Report regarding the effectiveness and harm of

conversion therapy and "scientific evidence on SOCE published since 2009." *SOCE

Resolution* at 8. The Resolution spoke with a broad brush. I doubt that the APA was

thinking about the possible First Amendment implications of banning speech therapy or

thought that there was any reason to address it specifically. In any event, the research it

references—and that referenced by the government and its amici in their briefs to this

court—has the same omission I mentioned with respect to the Task Force Report. None

of the cited papers specifically studied the results of conversion therapy (1) by licensed

mental-health professionals (2) limited to talk therapies (as opposed to aversive therapies) (3) provided to minors. The great bulk of the studies do not describe the therapy provided, so there is no way to know whether any of the therapy was limited to speech. Of the four studies that described the therapy as including both talk and aversion therapy, three did not distinguish between the types of therapy in stating the results.[21] The one that did distinguish between the types of therapy found that the negative effects of aversion therapy were far greater.[22] With respect to whether the therapy was provided by a licensed professional,[23] a little less than half the cited papers did not indicate who gave the therapy, and a little more than half said that the therapy was provided by both licensed and unlicensed practitioners. Only one said the therapy was provided only by licensed psychotherapists,[24] and only one of the others gave separate results for licensed and

---

[21] *See* John P. Dehlin et al., *Sexual Orientation Change Efforts Among Current or Former LDS Church Members*, 62 J. Counseling Psych. 95 (2015); Annesa Flentje et al., *Sexual reorientation therapy interventions: Perspectives of ex-ex-gay individuals*, 17 J. Gay & Lesbian Mental Health (2013); Jeanna Jacobsen & Rachel Wright, *Mental Health Implications in Mormon Women's Experiences With Same-Sex Attraction: A Qualitative Study*, 42 The Counseling Psychs. 664 (2014).

[22] *See* Kate Bradshaw et al., *Sexual Orientation Change Efforts Through Psychotherapy for LGBQ Individuals Affiliated With the Church of Jesus Christ of Latter-Day Saints*, J. Sex & Marital Therapy (May 2014).

[23] This could be a significant factor. One cited study was based on a survey which reported that 80.8% of those who had received conversion therapy received it from a religious leader. *See* John R. Blosnich et al., *Sexual Orientation Change Efforts, Adverse Childhood Experiences, and Suicide Ideation and Attempt Among Sexual Minority Adults, United States, 2016–2018*, 110 Am. J. Public Health 1024, 1026 **(**2020). Perhaps ironically, the Colorado statute does not apply to conversion therapy from clergy. *See* C.R.S. § 12-245-217(1) (exempting those "engaged in the practice of religious ministry" from complying with the conversion-therapy ban).

[24] *See* Bradshaw et al., *supra*.

unlicensed practitioners.[25] As for the ages of the subjects, half did not say whether any of those receiving therapy were minors and only one provided results specifically for those receiving conversion therapy as minors. None of the studies stated results for therapy of minors provided by licensed mental-health professionals that was limited to speech.[26]

---

[25]  *See* Dehlin et al., *supra*.

[26] The majority opinion is not disturbed by this absence of relevant studies. After all, it says, quoting Defendants' counsel at oral argument, "[I]t would be unethical to engage in those sorts of studies because it would require patients to undergo a treatment that has been determined to be unsafe and ineffective." Maj. Op. at 74 n.47. This ignores the fact that the studies in this area have generally been retrospective, examining the results after someone provided treatment. Indeed, some of these studies probably included minors who received only talk therapy from a licensed professional, but the analysis did not focus on that group. In any event, the logic of this argument is something Lewis Carroll would love: "We assert, without adequate supporting evidence, that this therapy is ineffective and harmful. Therefore, you cannot conduct a study to see if there is support for our assertion, because it would be unethical to provide this therapy."

The majority's footnote does cite the Task Force Report in support of the statutory ban. Nice try, but the support evaporates on inspection. First, the footnote cites the sentence: "Recent research reports on religious and nonaversive efforts indicate that there are individuals who perceive they have been harmed." Task Force Report at 3. There is no mention of whether the studies included minors or therapy by licensed professionals or reported the extent of harm. And, as the Task Force Report makes clear in its discussion of reports where patients felt they had benefitted from conversion therapy, such reports are entitled to little weight unless the study is properly conducted.

Next, the footnote quotes the sentence reporting that the Task Force "reviewed the literature on SOCE in children and adolescents." Task Force Report at 72. I am not sure what the majority opinion wants us to infer from that fact. Are we to defer to anything the Task Force concluded because it read the literature? Would that not be an abandonment of the judicial role in determining whether there is science supporting the statute?

Finally, the footnote quotes the following statement from the chapter in the report that addresses children and adolescents: "SOCE that focus on negative representations of homosexuality and lack a theoretical or evidence base provide no documented benefits and can pose harm through increasing sexual stigma and providing inaccurate information." Task Force Report at 79. I am not sure of the relevance of that statement, because nothing in the record supports an assertion that the therapy Chiles provides includes "negative treatments of homosexuality." But in any event, the statement is not supported by any referenced studies (nor am I aware of any) on talk therapy to minors by licensed professionals. It is true that no proper studies show benefits, but neither do any

The purpose of the above discussion of the relevant research is not to reach any definitive conclusions about the prohibition challenged by Chiles. Rather, my purpose has been to indicate the sort of analysis that needs to be conducted by the judiciary, particularly the trial courts, which have the advantage of obtaining expert guidance in assessing the reliability and strength of expert opinion.[27] The burden on the district court is a heavy one, but the First Amendment protection of free speech demands no less.

---

show that such therapy "can pose harm." The Task Force's views may well be worth consideration by mental-health therapists; but they need further support if they are to justify a restriction on First Amendment freedom.

[27] A good example of how *not* to conduct the necessary analysis is provided by footnote 17 of the majority opinion. The footnote purports to "clarify" (that is, correct) distortions in my dissent and concludes that what is happening in England and elsewhere in Europe does "not apply to the efficacy of psychotherapy." Maj. Op. at 29 n.17. That statement is mistaken in two respects. First, the studies and experience from abroad have undermined the credibility in this area of the American Psychological Association, the American Psychiatric Association, and the other national mental-health associations that have insisted that their gospel of aggressive treatment for gender dysphoria in minors, including the use of drugs and even surgery, is not just supported, but demanded, by science. To repeat what I said earlier in text, the Cass Review states that youth transgender medicine is "an area of remarkably weak evidence," and that "we have no good evidence on the long-term outcomes of interventions to manage gender-related distress." Cass Review at 13. I am not the only one to recognize what a radical attack has been raised against the "common wisdom" regarding the treatment of gender dysphoria in young people. The Economist headline was *The Cass Review damns England's youth-gender services*; and the one in the New York Times was *Why Is the U.S. Still Pretending We Know Gender-Affirming Care Works?* And supporting the Cass Review is the significant restriction on various treatments (still strongly advocated in this country) by the very countries where those treatments were "pioneered." I guess I do not know what "call into question" means. But I would think that anyone who has had faith in the pronouncements of the American Psychological Association, the American Psychiatric Association, and its partners on the subject should begin to view those pronouncements with skepticism. Second, the Cass Review in particular appears to question the scientific support for *all* transgender treatment of minors. To repeat a third time, the Cass Review concluded that youth transgender medicine is "an area of remarkably weak evidence" and there is "no good evidence on the long-term outcomes of interventions to manage gender-related distress." Cass Review at 13. Some countries have not restricted psychotherapy,

Because I think reversal is required under the free-speech doctrine of the Supreme

Court, I need not address the free-exercise-of-religion claim.

---

but that is not because of studies showing its effectiveness or lack of harm. What may well be the case—and certainly when the First Amendment right to free speech is at stake, the courts must use their resources to examine this—is that there are no good studies on the effectiveness and potential harm from either gender-affirming psychotherapy or conversion talk therapy with youth. What to do when such studies are conducted is a matter for the future.